UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EMPRESAS CABLEVISIÓN, S.A.B. DE C.V.,

Plaintiff,

- against -

JPMORGAN CHASE BANK, N.A. AND J.P. MORGAN SECURITIES, INC.,

Defendants.

---

09 Civ. 9972 (JSR)

NOTICE OF MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that upon the accompanying (i) Declaration of Jaquelina Truzzell, dated December 16, 2009 and the exhibits thereto, (ii) Declaration of Sheldon L. Pollock, dated December 17, 2009 and the exhibits thereto, (iii) Memorandum of Law, dated December 17, 2009, (v) Local Civil Rule 56.1 Statement, dated December 17, 2009, and (vi) all prior proceedings in this action, Defendants JPMorgan Chase Bank, N.A. and J.P. Morgan Securities, Inc. (collectively "Defendants") will move this Court, before the Honorable Jed. S. Rakoff, U.S.D.J., at the United States Courthouse, 500 Pearl Street, Room 14B, New York, New York, at a date and time to be determined by the Court, for an Order:

(a) pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting Defendants summary judgment on all claims alleged against them in the Complaint; and

(b) granting such other further relief as the Court deems just and proper.

Pursuant to the Court's direction, Plaintiff's Opposition Papers shall be served and filed on or before December 21, 2009. and Defendants' Reply Papers shall be served and filed on or before December 21, 2009.

Dated: New York, New York
December 17, 2009

DAVIS POLK & WARDWELL LLP

By: ______________________

D. Scott Wise
Amelia T.R. Starr
Sheldon L. Pollock

450 Lexington Avenue
New York, New York 10017
(212) 450-4000
d.wise@davispolk.com
amelia.starr@davispolk.com
sheldon.pollock@davispolk.com
*Attorneys for Defendants JPMorgan Chase Bank, N.A. and J.P. Morgan Securities, Inc.*

To: Stephen R. Neuwirth
Daniel P. Cunningham
Judd R. Spray

Quinn Emanuel Urquhart Oliver & Hedges LLP
51 Madison Avenue,
22nd Floor
New York, New York
10010
(212) 849-7000
*Attorneys for Plaintiff Empresas Cablevision, S.A.B. de C.V.*

# TRUZZELL DECLARATION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EMPRESAS CABLEVISIÓN, S.A.B DE C.V.,

Plaintiff,

- against -

JPMORGAN CHASE BANK, N.A. AND J.P. MORGAN SECURITIES INC.,

Defendants.

09 Civ. 9972 (JSR)

**DECLARATION OF JAQUELINA TRUZZELL**

I, Jaquelina Truzzell declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I submit this Declaration in support of the Memorandum of Law in Opposition to Plaintiff's Application for a Preliminary Injunction and in Support of Defendants' Motion for Summary Judgment of Defendants JPMorgan Chase Bank N.A. and J.P. Morgan Securities Inc. (collectively "JPMorgan"). Unless stated otherwise, I have personal knowledge of the facts set forth herein.

2. I began my career at JPMorgan in 1995 working in the Credit Department in Buenos Aires. In 1996 I moved to the New York office where I supported both Latin America Credit and Mergers & Acquisitions. In 2000, I moved to Argentina to work on client management and in 2001, I returned to the New York office to work in the Latin America Credit Department. In 2007, I moved to Latin America Debt Capital Markets focusing on syndicated loans.

3. I am currently an Executive Director for the Buenos Aires branch of JPMorgan Chase Bank, N.A.

4. In 2007, Plaintiff Empresas Cablevisión, S.A.B. de C.V. ("Cablevisión") approached JPMorgan and other financial institutions to submit proposals in connection with a facility to finance an acquisition of companies owning the majority of the assets of Bestel by Cablestar. Thereafter, Cablevisión borrowed $225 million (the "Loan") pursuant to a credit agreement dated December 19, 2007 (the "Credit Agreement") and a promissory note dated December 21, 2007. Attached as Exhibit A, is a true and correct copy of the Credit Agreement. I actively participated in the negotiation of the Credit Agreement. Both parties to the Credit Agreement were represented by sophisticated counsel and the business teams involved had significant experience with these types of agreements.

5. The Credit Agreement expressly permits JPMorgan to assign (with the borrower's consent) its rights and obligations under the Credit Agreement to a third party or sell participations in the Loan (without the borrower's consent). An assignment makes the assignee a party to the Credit Agreement, giving the assignee the rights and obligations of the Lender. On the other hand, a participation does not affect the contractual relationship between Cablevisión and JPMorgan and simply permits a participant to receive an economic interest in the Loan.

6. Borrowers can and do negotiate to restrict the Bank's rights to sell participations and/or assignments to any third parties. This can be effected by creating a list of companies or types of companies that cannot purchase participations and/or assignments. In this case, Cablevisión did not request such a "Black List" during the extensive negotiations leading up to the execution of the Credit Agreement.

7.      Prior to executing the Credit Agreement, both parties understood that JPMorgan intended to syndicate 90 percent of the Loan in the secondary market. JPMorgan prefunded the entire amount of the Loan with the understanding that it would attempt to syndicate the Loan in 2008.

8.      Given the deepening crisis of the financial markets and the closing of the credit markets, JPMorgan did not attempt to syndicate the Loan in 2008 in an effort to avoid a perceived market failure of the syndication of the Facility.

9.      In early 2009, JPMorgan worked with Cablevisión's parent company, Grupo Televisa, S.A.B. ("Televisa"), to market the Loan to banks with which Televisa had business relationships.  Those efforts proved largely unsuccessful.

10.     As a result, as JPMorgan expanded its search for potential buyers, JPMorgan considered approaching Banco Inbursa, S.A. ("Inbursa").  Inbursa is a Mexican bank without foreign ownership, that was not only familiar with the Mexican cable and telecommunications industry, but also was familiar with Cablevisión, as it directly or indirectly holds a significant ownership interest in Cablevisión.

11.     As a result of these considerations, JPMorgan decided to seek Televisa's approval to show the Loan asset to Inbursa.  In April 2009, I was told by Mr. Gilberto Sotelo ("Sotelo"), Executive Director at J.P. Morgan Servicios, S.A. de C.V., J.P. Morgan Grupo Financiero, that he had a telephone call with Guadalupe Phillips Margain, Televisa's Director of Risk and Financing.  During this phone call, Mr. Sotelo asked Ms. Phillips Margain if Televisa had any objection to JPMorgan showing the Loan asset to Inbursa.  Ms. Phillips Margain told Mr. Sotelo that Televisa had no objection.

12. Thereafter, JPMorgan commenced discussions about the Loan with Inbursa. They responded with interest, and wanted to pursue further due diligence. On May 8, 2009, Julian Lautersztain of J.P. Morgan Securites Inc., requested, among other things, that Televisa provide a letter authorizing Inbursa to access Cablevisión's credit report. On May 15, 2009, America Castillo Campos at Televisa provided a signed letter authorizing Inbursa to access Cablevisión's credit report.

13. Negotiations with Inbursa continued. On May 20, 2009, JPMorgan sent a draft assignment agreement relating to the Loan to Inbursa. Inbursa viewed the economics of the transaction favorably, since they were going to be able to buy a portion of the Loan at a significant discount off the Loan's face value.

14. On May 21, Julian Lautersztain sent a request to Televisa and Cablevisión for their written consent to the Inbursa Assignment Agreement. On May 22, 2009, Ms. Phillips Margain of Televisa emailed Mr. Sotelo of JPMorgan, explaining that "she was very surprised" to learn that JPMorgan was negotiating an assignment with Inbursa. This was the first time that Televisa expressed any potential issue with an assignment to Inbursa. Mr. Sotelo called Ms. Phillips Margain that day, and Ms. Phillips Margain informed him that she would get back to Mr. Sotelo after discussing the issue with other Televisa officials.

15. On May 29, 2009, Mr. Sotelo informed me and others at JP Morgan that Cablevisión had still not decided whether it would consent to the assignment. As a result of the delay, JP Morgan and Inbursa agreed to discuss the option of a participation agreement instead, which would not require the Borrower's consent under the Credit Agreement.

16. In June 2009, I negotiated the participation agreement, based on JPMorgan's form of a participation agreement for this line of business, with Mr. Jesus Granillo of Inbursa. During the course of those negotiations, Mr. Granillo asked for a "side letter" that would have given Inbursa some of JPMorgan's rights and obligations as Lender under the Credit Agreement. JPMorgan refused to accept this proposal, explaining to Mr. Granillo that JPMorgan could only provide a participant the rights permitted under the Credit Agreement. Attached as Exhibit B is a true and correct copy of my email to Mr. Granillo rejecting Inbursa's proposal for a "side letter."

17. Over the next few weeks, JPMorgan and Televisa had discussions regarding whether Televisa would consent to an assignment of the Loan to Inbursa or the possibility of Televisa purchasing the Loan itself. No final agreement was reached.

18. During the first two weeks of July 2009, JPMorgan and Inbursa continued to negotiate the terms and conditions of a participation agreement.

19. On July 15, 2009, JPMorgan and Inbursa executed the participation agreement (the "Participation Agreement"). The Participation Agreement is the only agreement, written or otherwise, that establishes the terms and conditions of Inbursa's participation in the Loan. Attached as Exhibit C is a true and correct copy of the executed Participation Agreement between JPMorgan and Inbursa. There are no other agreements between JPMorgan and Inbursa with respect to the Loan.

20. Under the terms and conditions of the Participation Agreement and the Credit Agreement, JPMorgan is obligated to share with Inbursa: (i) copies of the Credit Agreement; (ii) executed amendments, consents, waivers or notices regarding the Credit Agreement and any other material relating to any of the foregoing that is received by the

Bank in its capacity as Lender; (iii) the occurrence of any "Event of Default" under the Credit Agreement; and (iv) as otherwise permitted under Article 9 of the Credit Agreement. If the Borrower provides other, confidential information to JPMorgan outside of these categories, including but not limited to any requests for modifications, consents, amendments, waivers or notices related to the Credit Agreement, JPMorgan would share such information with the participant only if permitted to do so by the Borrower.

21. To date, JPMorgan has not shared any information about Cablevisión with Inbursa, other than the Loan documents.

Dated: New York, New York
December 16, 2009

Jaquelina Truzzell

Sworn to before me this
16th day of December 2009

Andrea Whittleton
Notary Public

ANDREA WHITTLETON
Notary Public State of New York
No 01WH6098950
Qualified in Kings County
Certified in New York County
Commission Expires Sept. 22, 2011

# EXHIBIT A

**Execution Copy**

CREDIT AGREEMENT

dated as of

December 19, 2007

among

EMPRESAS CABLEVISIÓN, S.A.B. DE C.V.,

THE LENDERS PARTY HERETO

and

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent

---

J.P. MORGAN SECURITIES INC.,
as Sole Bookrunner and Lead Arranger

## TABLE OF CONTENTS

PAGE

### ARTICLE 1
DEFINITIONS

Section 1.01. *Defined Terms* ....1
Section 1.02. *Terms Generally* ....15
Section 1.03. *Accounting Terms; Changes in GAAP* ....15

### ARTICLE 2
THE CREDITS

Section 2.01. *Commitments* ....16
Section 2.02. *Method of Borrowing* ....16
Section 2.03. *Funding of Loans* ....16
Section 2.04. *Method of Electing Interest Periods* ....17
Section 2.05. *Payment at Maturity; Evidence of Debt* ....18
Section 2.06. *Optional and Mandatory Prepayments* ....18
Section 2.07. *Fees* ....19
Section 2.08. *Interest* ....19
Section 2.09. *Substitute Rate of Interest* ....20
Section 2.10. *Increased Costs* ....22
Section 2.11. *Illegality* ....22
Section 2.12. *Break Funding Payments* ....23
Section 2.13. *Taxes* ....24
Section 2.14. *Payments Generally; Pro Rata Treatment; Sharing of Set-offs* ....26
Section 2.15. *Substitute Rate Loans Substituted for Affected Loans* ....28
Section 2.16. *Lender's Obligation to Mitigate; Replacement of Lenders* ....28

### ARTICLE 3
REPRESENTATIONS AND WARRANTIES

Section 3.01. *Organization; Powers* ....29
Section 3.02. *Authorization; Enforceability* ....29
Section 3.03. *Governmental Approvals; No Conflicts* ....30
Section 3.04. *Financial Statements; No Material Adverse Change* ....30
Section 3.05. *Properties* ....31
Section 3.06. *Litigation and Environmental Matters* ....31
Section 3.07. *Compliance with Laws and Agreements* ....31
Section 3.08. *Investment Company Status; Regulatory Restrictions on Borrowing* ....32
Section 3.09. *Federal Reserve Regulations* ....32
Section 3.10. *Taxes* ....32
Section 3.11. *Disclosure* ....32
Section 3.12. *Subsidiaries* ....33
Section 3.13. *Solvency* ....33
Section 3.14. *Rank of Debt* ....33
Section 3.15. *No Immunity* ....33

**ARTICLE 4**
CONDITIONS

Section 4.01. *Conditions* ....33

**ARTICLE 5**
AFFIRMATIVE COVENANTS

Section 5.01. *Financial Statements and Other Information* ....36
Section 5.02. *Notice of Material Events* ....37
Section 5.03. *Existence; Conduct of Business* ....37
Section 5.04. *Payment of Tax Obligations* ....37
Section 5.05. *Maintenance of Properties* ....38
Section 5.06. *Insurance* ....38
Section 5.07. *Proper Records; Rights to Inspect and Appraise* ....38
Section 5.08. *Compliance with Laws* ....38
Section 5.09. *Use of Proceeds* ....38
Section 5.10. *Currency Hedging* ....38

**ARTICLE 6**
NEGATIVE COVENANTS

Section 6.01. *Debt* ....39
Section 6.02. *Liens* ....40
Section 6.03. *Fundamental Changes* ....41
Section 6.04. *Investments, Loans, Advances, Guarantees and Acquisitions* ....41
Section 6.05. *Asset Sales* ....42
Section 6.06. *Sale and Leaseback Transactions* ....42
Section 6.07. *Hedging Agreements* ....42
Section 6.08. *Restricted Payments* ....42
Section 6.09. *Transactions with Affiliates* ....43
Section 6.10. *Restrictive Agreements* ....43
Section 6.11. *Amendment of Material Documents* ....44
Section 6.12. *Capital Expenditures* ....44
Section 6.13. *Interest Expense Coverage Ratio* ....44
Section 6.14. *Leverage Ratio* ....44
Section 6.15. *Fiscal Year* ....44

**ARTICLE 7**
EVENTS OF DEFAULT

Section 7.01. *Events Of Default* ....44

**ARTICLE 8**
THE ADMINISTRATIVE AGENT

Section 8.01. *Appointment and Authorization* ....47
Section 8.02. *Rights and Powers as a Lender* ....47
Section 8.03. *Limited Duties and Responsibilities* ....47
Section 8.04. *Authority to Rely on Certain Writings, Statements and Advice* ....48
Section 8.05. *Sub-Agents and Related Parties* ....48

Section 8.06. *Resignation; Successor Administrative Agent* ....48
Section 8.07. *Credit Decisions by Lenders* ....49

**ARTICLE 9**
MISCELLANEOUS

Section 9.01. *Notices* ....49
Section 9.02. *Waivers; Amendments* ....50
Section 9.03. *Expenses; Indemnity; Damage Waiver* ....51
Section 9.04. *Successors and Assigns* ....52
Section 9.05. *Survival* ....55
Section 9.06. *Counterparts; Integration; Effectiveness* ....55
Section 9.07. *Severability* ....55
Section 9.08. *Right of Set-off* ....55
Section 9.09. *Governing Law; Jurisdiction; Consent to Service of Process* ....56
Section 9.10. *Appointment of Agent For Service of Process* ....56
Section 9.11. *Waiver of Immunity* ....57
Section 9.12. *Judgment Currency* ....57
Section 9.13. *WAIVER OF JURY TRIAL* ....57
Section 9.14. *Use of English Language* ....58
Section 9.15. *Headings* ....58
Section 9.16. *Confidentiality* ....58
Section 9.17. *USA Patriot Act* ....59

<u>SCHEDULES</u>:

Schedule 2.01 -- Commitments
Schedule 3.05 -- Existing Real Properties
Schedule 3.06 -- Disclosed Matters
Schedule 3.12 -- List of Subsidiaries
Schedule 6.01 -- Existing Debt
Schedule 6.02 -- Existing Liens
Schedule 6.10 -- Existing Restrictions

<u>EXHIBITS</u>:

Exhibit A -- Form of Assignment
Exhibit B-1 -- Form of Opinion of special New York counsel to the Borrower
Exhibit B-2 -- Form of Opinion of Mexican counsel to the Borrower
Exhibit B-3 -- Form of Opinion of special New York counsel to the Administrative Agent
Exhibit B-4 -- Form of Opinion of special Mexican counsel to the Administrative Agent
Exhibit C -- Form of Note
Exhibit D -- Form of Borrowing Request
Exhibit E -- Form of Notice of Interest Period Election
Exhibit F -- Terms of Subordination

CREDIT AGREEMENT dated as of December 19, 2007 among Empresas Cablevisión, S.A.B. de C.V., a Mexican *sociedad anónima bursátil de capital variable* (the "**Borrower**"), the Lenders party hereto and JPMorgan Chase Bank, N.A., as Administrative Agent.

The parties hereto agree as follows:

## ARTICLE 1
### DEFINITIONS

Section 1.01. *Defined Terms.* As used in this Agreement, the following terms have the meanings specified below:

"**Adjusted LIBO Rate**" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Adjustment.

"**Administrative Agent**" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent for the Lenders hereunder, and its successors in such capacity.

"**Administrative Agent's Account**" means account number 90081133381H1659 maintained with JPMorgan Chase Bank, N.A.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with such specified Person.

"**Agreement**" means this Credit Agreement.

"**Applicable Margin**" means, in the case of any Loan for any day, the applicable percentage per annum set forth below under the caption "LIBO Rate Margin" opposite the applicable Leverage Ratio as set forth in the most recent Compliance Certificate received by the Administrative Agent pursuant to Section 5.01(c) prior to such day:

| Pricing Level | Leverage Ratio | LIBO Rate Margin |
|---|---|---|
| 1 | < 1.75:1 | 0.375% |
| 2 | ≥ 1.75:1 but < 2.25:1 | 0.400% |
| 3 | ≥ 2.25:1 but < 2.75:1 | 0.425% |
| 4 | ≥ 2.75:1 but < 3.25:1 | 0.500% |
| 5 | ≥ 3.25:1 | 0.625% |

Any increase or decrease in the Applicable Margin resulting from a change in the Leverage Ratio shall become effective as of the first Business Day following the date on which a Compliance Certificate is delivered pursuant to Section 5.01(c); *provided* that if a Compliance Certificate is not delivered when due in accordance with Section 5.01(c),

then Pricing Level 5 shall apply as of the fifth Business Day after the date on which such Compliance Certificate was required to have been delivered until the date (if any) on which such Compliance Certificate is delivered.

"**Asset Disposition**" means a Prepayment Event described in clause (a) of the definition of "Prepayment Event".

"**Assignment**" means an assignment and assumption agreement entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent and the Borrower, in the form of Exhibit A or any other form approved by the Administrative Agent.

"**Base Rate**" means, for any day, a rate per annum equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1%. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"**Bestel**" means Bestel, S.A. de C.V.

"**Bestel Acquisition**" means the acquisition by the Borrower, directly or through one or more newly formed or existing entities, of certain assets of Bestel; *provided* that immediately after giving effect to such acquisition, such newly formed or existing entity will be a direct or indirect subsidiary of the Borrower.

"**Board of Directors**" means the board of directors or comparable governing body of any Person, or any committee thereof duly authorized to act on its behalf.

"**Borrower**" has the meaning specified in the introductory paragraph of this Agreement.

"**Borrower's Account**" mean account number 400216167 maintained with JPMorgan Chase Bank.

"**Borrowing**" means a borrowing of Loans under Section 2.01.

"**Borrowing Request**" means a request by the Borrower for a Borrowing in accordance with Section 2.02.

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City, United States or Mexico City, Mexico are authorized or required by law to remain closed; *provided* that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which commercial banks are not open for international business in London, England, including dealings in Dollar deposits in the London interbank market.

"**Cablevisión Group Companies**" means the Borrower and its Material Subsidiaries.

"**Capital Expenditures**" means, for any period, the additions to property, plant and equipment and other capital expenditures of the Borrower and its Subsidiaries that are (or would be) set forth in a consolidated statement of cash flows of the Borrower and its Subsidiaries for such period prepared in accordance with GAAP.

"**Capital Lease Obligations**" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required under GAAP to be classified and accounted for as capital leases on a balance sheet of such Person. The amount of such obligations will be the capitalized amount thereof determined in accordance with GAAP.

"**Casualty Event**" means a Prepayment Event described in clause (b) of the definition of "Prepayment Event".

"**Central Bank**" means the *Banco de México*, the Central Bank of Mexico.

"**Change in Law**" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.10(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"**Change of Control**" means Televisa shall cease to Control the Borrower.

"**Change of Control Prepayment Notice**" has the meaning set forth in Section 2.06(c).

"**Commitment**" means, for each Lender, the amount set forth under the heading "Commitment" opposite such Lender's name on Schedule 2.01, as such amount may be reduced or adjusted from time to time in accordance with the terms of this Agreement.

"**Commitment Letter**" means the commitment letter between the Borrower, Televisa, the Administrative Agent and the Lead Arranger, dated as of November 29, 2007.

"**Compliance Certificate**" has the meaning assigned to such term in Section 5.01(c).

"**Consolidated EBITDA**" means, for any period, Consolidated Net Income for such period plus (a) without duplication and to the extent deducted in determining such Consolidated Net Income, the sum of (i) Consolidated Interest Expense for such period, (ii) consolidated income tax expense for such period, (iii) all amounts attributable to depreciation and amortization for such period, (iv) any extraordinary charges for such period and (v) non-operating expenses for such period, and minus (b) without duplication and to the extent included in determining such Consolidated Net Income, (i) any extraordinary gains for such period, (ii) any interest income for such period and (iii) any non-operating income for such period, all determined on a consolidated basis in accordance with GAAP.

**"Consolidated Interest Expense"** means, for any period, the sum of the interest expense (including imputed interest expense in respect of Capital Lease Obligations) of the Borrower and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP.

**"Consolidated Net Income"** means, for any period, the net income or loss of the Borrower and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; *provided* that there shall be excluded (a) the income (or loss) of any Person (except the Borrower or any Subsidiary) in which any other Person (except the Borrower, a Subsidiary or a director holding qualifying shares in compliance with applicable law) owns an Equity Interest, except to the extent that dividends or other distributions were actually paid by such Person to the Borrower or any Subsidiary during such period, and (b) the income or loss of any Person accrued before (i) the date it becomes a Subsidiary, (ii) the date it is merged into or consolidated with the Borrower or any Subsidiary or (iii) the date its assets are acquired by the Borrower or any Subsidiary.

**"Control"** means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. **"Controlling"** and **"Controlled"** have meanings correlative thereto.

**"Credit Exposure"** means, with respect to any Lender at any time, such Lender's Commitment at such time or, if the Commitments shall have been terminated, the aggregate outstanding principal amount of the Loans of such Lender at such time.

**"Debt"** of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all payment obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (e) all Debt of others secured by any Lien on property owned or acquired by such Person, whether or not the Debt secured thereby has been assumed; provided, that the amount of such Debt shall be the lesser of (i) the fair market value of such property as of the date of determination and (ii) the amount of such Debt, (f) all Guarantees by such Person of Debt of others, including avales, (g) all Capital Lease Obligations of such Person, (h) all payment obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (i) all payment obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (j) all payment obligations of such Person under Hedging Agreements (other than Qualifying Hedges) and (k) all payment obligations of such Person in respect of Synthetic Purchase Agreements; *provided* that Debt shall not include any liability constituting (A) Trade Accounts Payable, (B) indebtedness of the Borrower to any Subsidiary, or of any Subsidiary to the Borrower or any other Subsidiary, to the extent that any such indebtedness is eliminated in the consolidation of the financial statements of the Borrower and its consolidated Subsidiaries in accordance with GAAP, or (C) Televisa Subordinated Debt. For purposes of clause (j) of this definition, the "principal" amount of Debt of a Person in respect of any Hedging Agreement at any time will be the maximum aggregate amount (after giving effect to any netting agreements) that such Person would be required to pay if such Hedging Agreement were terminated at such time.

"**Default**" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"**Disclosed Matters**" means the actions, suits, proceedings and environmental matters disclosed in Schedule 3.06.

"**Dollars**" or "**$**" refers to lawful money of the United States.

"**Drawdown Date**" means the date on which the Lenders makes the Loans to the Borrower, which in no event shall be later than five (5) Business Days after the Effective Date.

"**Effective Date**" means the date of this Agreement.

"**Environmental Laws**" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, the preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or health and safety matters associated with exposure to Hazardous Material including the Mexican General Law of Ecological Balance and Environmental Protection (*Ley General del Equilibrio Ecológico y la Protección al Ambiente*), the Mexican General Law for the Prevention and Integral Management of Wastes (*Ley General para la Prevención y Gestión Integral de los Residuos*), the National Waters Law (*Ley de Aguas Nacionales*).

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of remediation, fines, penalties or indemnities), of the Borrower or any Material Subsidiary thereof directly or indirectly resulting from or based on (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Material, (c) exposure to any Hazardous Material, (d) the release or threatened release of any Hazardous Material into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Equity Interests**" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, outstanding on any date of determination.

"**Equity Related Person**" means (i) any Person (other than any Cablevisión Group Company) holding, directly or indirectly, 10% or more of the capital stock of the Borrower or any of its Material Subsidiaries on the Effective Date and (ii) any Subsidiary of a Person referred to in clause (i), other than any Cablevisión Group Company.

"**Eurodollar**", when used with respect to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"**Events of Default**" has the meaning specified in Article 7.

"**Federal Funds Effective Rate**" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"**Federal Reserve Board**" means the Board of Governors of the Federal Reserve System of the United States.

"**Financial Officer**" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"**Financing Transactions**" means the execution, delivery and performance by the Borrower of the Loan Documents, the borrowing of Loans and any use of the proceeds thereof on the Drawdown Date.

"**Fiscal Quarter**" means a fiscal quarter of the Borrower.

"**Fiscal Year**" means a fiscal year of the Borrower.

"**Foreign Lender**" means any Lender that is organized under the laws of a jurisdiction other than Mexico.

"**GAAP**" means the Mexican *normas de información financiera*, applicable in Mexico as in effect from time to time, applied on a basis consistent (except for changes concurred in by the Borrower's independent public accountants) with the most recent audited consolidated financial statements of the Borrower and its consolidated Subsidiaries delivered to the Lenders.

"**Governmental Authority**" means any branch of power, whether legislative, judicial or administrative, of any state, the government of the United States, Mexico, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Guarantee**" by any Person (the "**guarantor**") means any payment obligation, contingent or otherwise (including an *aval*), of the guarantor guaranteeing or having the economic effect of guaranteeing any Debt or other payment obligation of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation or

to purchase (or advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Debt or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Debt or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Debt or other obligation; *provided* that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"**Hazardous Materials**" means all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law, including all explosive or radioactive substances or wastes.

"**Hedging Agreement**" means any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest rate, currency exchange rate or commodity price hedging arrangement.

"**Interest Election**" means an election by the Borrower to change or continue the Interest Period applicable to any Borrowing in accordance with Section 2.04.

"**Interest Payment Date**" means, with respect to any Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part.

"**Interest Period**" means, with respect to each Loan, (i) the period commencing on the date of borrowing specified in the applicable Borrowing Request and ending on the numerically corresponding day in the calendar month that is one, three or six months thereafter, as the Borrower may elect in such Borrowing Request, and (ii) for each subsequent Interest Period, the period commencing on the last date of the Interest Period then ending with respect to such Loan and ending on the numerically corresponding day in the calendar month that is one, three or six months thereafter, as the Borrower may elect in a Notice of Interest Period Election; *provided* that (i) if any Interest Period would end on a day which is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period and (iii) any Interest Period that would otherwise end after the Maturity Date shall instead end on the Maturity Date.

"**Investment**" has the meaning specified in Section 6.04.

"**JPMorgan Chase**" means JPMorgan Chase Bank, N.A.

"**Lead Arranger**" means J.P. Morgan Securities Inc., in its capacity as lead arranger and sole bookrunner for this Agreement.

"**Lender Affiliate**" means, with respect to any Lender, an Affiliate of such Lender (excluding any special purpose fund or other vehicle organized to invest in whole or in part in bank loans and similar extensions of credit and issue obligations to finance such investments).

"**Lender Parties**" means the Lenders, the Administrative Agent and the Lead Arranger.

"**Lenders**" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment, other than any such Person that ceases to be a party hereto pursuant to an Assignment.

"**Lending Office**" means, as to each Lender, its office located at its address set forth in its Administrative Questionnaire (or identified in its Administrative Questionnaire as its Lending Office) or such other office as such Lender may hereafter designate as its Lending Office (or if it so designates, its Lending Office solely with respect to Loans bearing interest at the Eurodollar Rate or Substitute Rate) by notice to the Borrower and the Administrative Agent.

"**Letseb Note**" means the US$80,000,000 note issued on December 13, 2007 by Letseb, S.A. de C.V. and guaranteed by Televisa.

"**Leverage Ratio**" means, on any day, the ratio for the Borrower and its consolidated Subsidiaries of (a) Total Debt as of such date to (b) Consolidated EBITDA for the period of four consecutive Fiscal Quarters ended on such day (or, if such day is not the last day of a Fiscal Quarter, ended on the last day of the Fiscal Quarter most recently ended before such day for which the Borrower has delivered consolidated financial statements to the Administrative Agent pursuant to Section 3.04 or Section 5.01).

"**LIBO Rate**" means, with respect to any Eurodollar Borrowing for any Interest Period, the rate per annum equal to the British Bankers Association LIBOR Rate ("**BBA LIBOR**") from Telerate Successor Page 3750, as published by Reuters (or, if such source is unavailable, such other commercially available source providing quotations of BBA LIBOR as designated by the Administrative Agent from time to time to the Borrower) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate (rounded upwards, if necessary, to the next 1/16 of 1%) for Dollar deposits with a maturity comparable to such Interest Period. If such rate is not available at such time for any reason, then the "LIBO Rate" with respect to such Eurodollar Borrowing for such Interest Period shall be the rate at which Dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days before the beginning of such Interest Period.

"**Lien**" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loan Documents**" means this Agreement and any Note.

"**Loans**" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"**Margin Stock**" has the meaning assigned to such term in Regulation U of the Federal Reserve Board.

"**Material Adverse Effect**" means a material adverse effect on (a) the business operations, property, condition (financial or otherwise) or prospects of the Borrower and its Material Subsidiaries, taken as a whole, (b) the ability of the Borrower to perform any of its material obligations under any Loan Document or (c) the rights and remedies available to any Lender Party under any Loan Document.

"**Material Debt**" means Debt (other than obligations in respect of the Loans) of any one or more Cablevisión Group Companies in an aggregate principal amount exceeding $20,000,000.

"**Material Subsidiary**" means, at any date of determination, (A) any subsidiary of the Borrower (the "tested subsidiary") for which either of the following is true (in each case, determined for such tested subsidiary with its subsidiaries, on a consolidated basis in accordance with GAAP): (i) for the most recent Fiscal Year of the Borrower, the consolidated net revenues of such tested subsidiary was more than 10% of the consolidated net revenues of the Borrower and its consolidated Subsidiaries or (ii) as of the end of such Fiscal Year, the consolidated total assets of such tested subsidiary was more than 10% of the consolidated total assets of the Borrower and its consolidated Subsidiaries, all as set forth on the most recently available consolidated financial statements of the Borrower referred to in Section 3.04 or delivered pursuant to Section 5.01 and (B) each of Cablestar, S.A. de C.V., Letseb, S.A. de C.V. and Operbes, S.A. de C.V. unless (x) on such date, such Person is no longer a Subsidiary or (y) after December 31, 2007, such date on which such Person does not comply with (i) or (ii) above.

"**Mexican Stock Exchange**" means the Stock Exchange of Mexico (*Bolsa Mexicana de Valores, S.A. de C.V.*).

"**Mexican Tax Authority**" means any governmental, regulatory or administrative body, agency or authority, any court of judicial authority, any arbitrator or any public, private or industry regulatory authority of the government of Mexico, or any political subdivision thereof in charge of affairs related to Taxes or Other Taxes.

"**Mexico**" means the United Mexican States.

"**Maturity Date**" means the fifth anniversary of the Drawdown Date.

"**Moody's**" means Moody's Investors Service, Inc. (or any successor providing ratings).

"**Net Proceeds**" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds, but only as and when received, (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards

and similar payments, in each case net of (b) the sum of (i) all fees and out-of-pocket expenses paid by the Borrower or any of its Subsidiaries to third parties (other than Affiliates) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction, a casualty or a condemnation or similar proceeding), the amount of all payments required to be made by the Borrower or any of its Subsidiaries as a result of such event to repay Debt (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, and (iii) the amount of all taxes paid (or reasonably estimated to be payable) by the Borrower or any of its Subsidiaries, and the amount of any reserves established by the Borrower or any of its Subsidiaries to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer).

"**New York Court**" has the meaning specified in Section 9.09(b).

"**Notice of Interest Period Election**" has the meaning specified in Section 2.04.

"**Operbes Loan**" means a loan dated December 13, 2007 by Televisa or one of its Affiliates to Operbes, S.A. de C.V., in an amount of up to $38,082,685.

"**Other Taxes**" has the meaning specified in Section 2.13(a).

"**Outstanding Amount**" means, with respect to any Lender at any time, the aggregate outstanding principal amount of its Loans, determined at such time after giving effect to all payments and prepayments, and any prior assignments by or to such Lender pursuant to Section 9.04.

"**Participants**" has the meaning specified in Section 9.04(e).

"**Permitted Investments**" means investments in:

(a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States), in each case maturing within two years from the date of acquisition thereof and denominated in Dollars;

(b) commercial paper, maturing not more than 365 days after the date of acquisition thereof, issued by a corporation (other than an Affiliate of the Company) incorporated or organized and in existence under the laws of Mexico or any jurisdiction thereof or the United States of America, any state thereof or the District of Columbia or any foreign country recognized by the United States of America in which the Company or any of its Subsidiaries are engaged in business activities with a rating at the time as of which any investment therein is made of "P-2" (or higher) according to Moody's or "A-2" (or higher) according to S&P (or equivalent ratings by their Mexican affiliates);

(c) certificates of deposit, banker's acceptances and time deposits maturing within two years from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any

commercial bank organized under the laws of the United States or any State thereof which has a combined capital and surplus of at least $500,000,000;

(d) fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e) *Certificados de la Tesorería de la Federación* (Cetes), *Bonos de Desarrollo del Gobierno Federal* (Bondes), whether denominated in Pesos or UDIs, *Bonos de Regulación Monetaria* (BREMs) and *Bonos de Protección al Ahorro* (BPAs), in each case, issued by the government of Mexico, denominated in Pesos and maturing not later than two years after the acquisition thereof.

"**Permitted Liens**" means:

(a) Liens imposed by law for taxes, assessments, governmental charges or claims, that are either (i) delinquent for less than 90 days; *provided* that the fair market value of the aggregate amount of the property subject to such Liens does not exceed $10,000,000 or (ii) that are not yet due or are being contested in compliance with Section 5.04(a);

(b) carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 60 days or are being contested in compliance with Section 5.04(a);

(c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d) Liens incurred or deposits made to secure (i) letters of credit, the performance of tenders, bids, trade contracts, leases, licenses, statutory or regulatory obligations, bankers' acceptances, surety and appeal bonds, government contracts, performance and return-of-money bonds and other obligations of a similar nature incurred in the ordinary course of business (exclusive of obligations for the payment of borrowed money) and any bank's unexercised right of set off with respect to deposits made in the ordinary course and (ii) indemnity obligations in respect of the sale, transfer, lease or other disposition of any property of the Borrower or any Material Subsidiary; provided that the property subject to such Lien does not have a fair market value in excess of the cash or cash equivalent proceeds received by the Borrower and its Material Subsidiaries in connection with such sale, transfer, lease or other disposition;

(e) judgment liens in respect of judgments that do not constitute an Event of Default under clause (k) of Section 7.01 hereof; and

(f) easements, municipal and zoning restrictions, rights-of-way and similar encumbrances on real property that do not materially interfere with the ordinary conduct of business of the Borrower and its Material Subsidiaries, taken as a whole;

(g) leases or subleases granted to others that do not materially interfere with the ordinary course of business of the Borrower and its Material Subsidiaries, taken as a whole;

(h) Liens arising from filing Uniform Commercial Code or similar financing statements regarding leases;

(i) Liens in favor of the Borrower or any Material Subsidiary;

(j) Liens arising from the rendering of a final judgment or order against the Borrower or any Material Subsidiary of the Borrower that does not give rise to an Event of Default;

(k) Liens securing reimbursement obligations with respect to trade letters of credit that encumber documents and other property relating to such trade letters of credit and the products and proceeds thereof;

(l) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(m) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Borrower or any of its Material Subsidiaries in the ordinary course of business of the Borrower and its Material Subsidiaries, taken as a whole;

(n) Liens on the rights of the Borrower or a Material Subsidiary to payments in respect of programming or films and all proceeds therefrom; and

(o) Liens not permitted under the foregoing clauses (a) through (n) of this definition; *provided* that the aggregate amount of the property subject to such Liens at any time does not exceed $5,000,000.

"**Permitted Refinancing**" means, with respect to any Debt (the "**refinanced Debt**"), any extensions, renewals and replacements of such Debt (the "**refinancing Debt**") that (A) is incurred by the same Person or Persons as were obligors under the refinanced Debt, (B) if the refinanced Debt is subordinated in right of payment to obligations under the Loan Documents, then such refinancing Debt is subordinated to at least the same obligations on terms at least as favorable to the Lenders as those governing the refinanced Debt, (C) does not increase the outstanding principal amount thereof and (D) has a maturity date no earlier than, and a weighted average life no shorter than, the refinanced Debt.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Pesos**" or "**Ps**" means the lawful money of Mexico.

"**Prepayment Event**" means:

(a) any sale, transfer or other disposition (including pursuant to a sale and leaseback transaction) of any property of the Borrower or any

Subsidiary, except dispositions described in Sections 6.05(a) or Section 6.05(b); or

(b) any casualty or other insured damage to any property of the Borrower or any Subsidiary, or any taking of any such property under power of eminent domain or by condemnation or similar proceeding, or any transfer of any such property in lieu of a condemnation or similar taking thereof.

"**Prime Rate**" means the rate of interest per annum publicly announced from time to time by JPMorgan Chase as its prime rate in effect at its principal office in the City of New York. Each change in the Prime Rate will be effective for purposes hereof from and including the date such change is publicly announced as being effective.

"**Process Agent**" has the meaning set forth in Section 9.10(a).

"**Qualifying Hedges**" has the meaning assigned to such term in Section 5.10.

"**Register**" has the meaning specified in Section 9.04(c).

"**Regulation T**" means Regulation T of the Federal Reserve Board, as in effect from time to time.

"**Regulation U**" means Regulation U of the Federal Reserve Board, as in effect from time to time.

"**Regulation X**" means Regulation X of the Federal Reserve Board, as in effect from time to time.

"**Related Parties**" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and its Affiliates.

"**Required Lenders**" means, at any time, Lenders having at least 51% in aggregate amount of the Credit Exposures at such time (disregarding for this purpose any Credit Exposures held by the Borrower or its Related Parties).

"**Restricted Payment**" means (a) any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest in any Cablevisión Group Company, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interest in any Cablevisión Group Company other than in accordance with the terms thereof (including, for this purpose, any payment in respect of any such Equity Interest under a Synthetic Purchase Agreement), (b) any payment with respect to Televisa Subordinated Debt and (c) any loan or advance to an Equity Related Person (other than advances for services in the ordinary course of business that are at prices and on terms and conditions not less favorable to the Cablevisión Group Companies making such advances than could be obtained on an arm's length basis from unrelated third parties).

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. (or any successor providing ratings).

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Statutory Reserve Adjustment**" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Federal Reserve Board to which the Administrative Agent is subject with respect to eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Federal Reserve Board). Such reserve percentages will include those imposed pursuant to such Regulation D. The Statutory Reserve Adjustment will be adjusted automatically on and as of the effective date of any change in any applicable reserve percentage.

"**subsidiary**" means, with respect to any Person at any date, any corporation, limited liability company, partnership or other entity of which Voting Stock representing more than 50% of the total voting power of the outstanding Voting Stock is owned, directly or indirectly, by such Person and/or one or more other subsidiaries of such Person.

"**Subsidiary**" means any subsidiary of the Borrower.

"**Substitute Rate**" means, for any day and for any Lender, a rate per annum determined pursuant to Section 2.09(B) or (C), as applicable.

"**Substitute Rate Loan**" means a Loan which bears interest at the Substitute Rate pursuant to the provisions of Sections 2.09, 2.11 or 2.15.

"**Synthetic Purchase Agreement**" means any margin loan, total return swap, equity derivative or prepaid forward or combination of such agreements pursuant to which the Borrower or a Subsidiary is or may become obligated to make (i) any payment in connection with the purchase by any third party, from a Person other than the Borrower or a Subsidiary, of any Equity Interest or (ii) any payment (other than on account of a permitted purchase by it of any Equity Interest) the amount of which is determined by reference to the price or value at any time of any Equity Interest. For the avoidance of doubt, the term Synthetic Purchase Agreement shall not include the making or repayment of any contribution of capital or any agreement relating thereto.

"**Taxes**" has the meaning specified in Section 2.13(a).

"**Televisa**" means Grupo Televisa, S.A.B. and its successors.

"**Televisa Subordinated Debt**" means any unsecured Debt of the Borrower or any Subsidiary owing to Televisa and/or its Affiliates that (a) is expressly subordinated to the prior payment in full in cash of the principal of and interest on the Loans and other obligations under the Loan Documents on terms at least as favorable to the Lenders as the terms set forth on Exhibit F hereto and (b) has no required repayments (whether upon scheduled maturity, pursuant to scheduled amortization or upon the occurrence of a contingency, other than a customary acceleration upon a bankruptcy or insolvency of the Borrower or the relevant Subsidiary, and subject to the subordination provisions referred to above) and no payments of interest prior to the date that is 91 days after the Maturity Date.

"**Total Debt**" means, as of any date, the aggregate amount of Debt referred to in (a), (b), (e), (f), (g), (j) or (k) under the definition thereof (but, in the case of clauses (e) and (f), only to the extent of Guarantees of Debt of the type referred to in clauses (a), (b), (g), (j) and (k)) of the Borrower and its Subsidiaries, determined on a consolidated basis as of such date), *provided* that all Debt arising from the Operbes Loan shall not be considered Total Debt pursuant to this paragraph until March 30, 2008.

"**Trade Accounts Payable**" means, with respect to any Person, any accounts payable, notes or any other monetary obligation to trade creditors created, assumed or Guaranteed by such Person or any of its subsidiaries arising in the ordinary course of business in connection with the acquisition of goods or services from such trade creditors.

"**United States**" means the United States of America.

"**Voting Stock**" means any class of Equity Interests of a Person pursuant to which the holders thereof, as a class, have the general voting power under ordinary circumstances to elect at least a majority of the board of directors or equivalent governing body of such Person.

"**Wholly Owned Subsidiary**" of any Person means a subsidiary of such Person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such Person or another Wholly Owned Subsidiary of such Person or by such Person together with one or more of its other Wholly Owned Subsidiaries.

Section 1.02. *Terms Generally.* The definitions of terms herein (including those incorporated by reference to another document) shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "**include**", "**includes**" and "**including**" shall be deemed to be followed by the phrase "**without limitation**". The word "**will**" shall be construed to have the same meaning and effect as the word "**shall**". Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (c) the words "**herein**", "**hereof**" and "**hereunder**", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the word "**property**" shall be construed to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. In determining any payment or other amount that is required to be made at any time "pro rata" to or from any group of Lenders, Loans or Commitments, such amount shall be determined, unless otherwise specified, at the respective amounts of such Loans or Commitments, as applicable, or in the case of Lenders, to the Loans and/or Commitments held by them, in each case at such time.

Section 1.03. *Accounting Terms; Changes in GAAP.* Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be

construed in accordance with GAAP as in effect from time to time; *provided* that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment of any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment of any provision hereof for such purpose), regardless of whether such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be applied on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

## ARTICLE 2
## THE CREDITS

Section 2.01. *Commitments*. (a) On the Drawdown Date, in each case subject to the terms and conditions set forth herein, each Lender agrees to make a Loan to the Borrower in a principal amount equal to its Commitment. Loans and Commitments hereunder are not revolving and amounts repaid or prepaid may not be reborrowed.

(b) The Commitments of the Lenders are several, *i.e.*, the failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder, and no Lender shall be responsible for any other Lender's failure to make Loans as and when required hereunder. Any undrawn portion of the Commitments shall automatically terminate immediately after the borrowing on the Drawdown Date.

Section 2.02. *Method of Borrowing*. (a) The Borrower shall request that Lenders make the Loans by delivering to the Administrative Agent a notice in writing in substantially the form of Exhibit D (a "**Borrowing Request**") no later than 12:00 noon, New York City time, at least two (2) Business Days before the Drawdown Date. Such Borrowing Request shall be irrevocable and shall specify the following information:

(i) the aggregate amount of the Loans to be made on the Drawdown Date (which aggregate amount shall not exceed $225,000,000);

(ii) the Drawdown Date, which shall be a Business Day; and

(iii) the initial Interest Period to be applicable to such Loans, which shall be a period contemplated by the definition of "Interest Period".

(b) Promptly and in any event at least one day before the Drawdown Date, after it receives a Borrowing Request in accordance with this Section, the Administrative Agent shall notify each Lender as to the details of such Borrowing Request and the amount of such Lender's Loan to be made pursuant thereto, and such notice shall be irrevocable.

Section 2.03. *Funding of Loans*. (a) Not later than 12:00 noon, New York City time, on the Drawdown Date, each Lender shall make available the full amount of its Loan in Dollars in Federal or other funds immediately available in New York City, to the Administrative Agent at the Administrative Agent's Account. Unless the Administrative

Agent determines that any applicable condition specified in Section 4.01 has not been satisfied, the Administrative Agent will make the funds so received from the Lenders available to the Borrower by crediting the Borrower's Account.

(b) Unless the Administrative Agent receives notice from a Lender before the proposed date of any Borrowing that such Lender will not make its share of such Borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.03(a) and may, in reliance on such assumption, make a corresponding amount available to the Borrower. In such event, if a Lender has not in fact made its share of such Borrowing available to the Administrative Agent, such Lender and the Borrower severally agree to pay to the Administrative Agent, forthwith on demand such corresponding amount with interest thereon, for each day from and including the day such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the then applicable interest rate determined as provided in Section 2.08. If such Lender pays such amount to the Administrative Agent, such amount shall constitute such Lender's Loan included in such Borrowing and the Borrower shall have no further obligations under this subsection (b) in respect thereof.

Section 2.04. *Method of Electing Interest Periods.* (a) The initial Interest Period for each Borrowing shall be as specified in the relevant Borrowing Request. Thereafter, the Borrower may from time to time, subject to Sections 2.09, 2.10, 2.11 and 2.12, elect the duration of the Interest Period or Interest Periods applicable to the Loans (subject in each case to the definition of Interest Period and Sections 2.09, 2.10, 2.11 and 2.12). Each such election of an Interest Period shall be made by delivering a written notice substantially in the form of Exhibit E hereto (a "**Notice of Interest Period Election**") to the Administrative Agent not later than 12:00 noon, New York City time, on the third Business Day before such election is to be effective. If no such notice is timely received prior to the end of an Interest Period, the Borrower shall be deemed to have elected that all Loans having such Interest Period be continued as Loans with an Interest Period of three months (in each case subject to the definition of Interest Period).

(b) Each Notice of Interest Period Election shall specify:

(i) the date on which the election specified in such notice is to become effective, which shall comply with subsection (a) above; and

(ii) the duration of the new Interest Period.

Each Interest Period specified in a Notice of Interest Period Election shall comply with the provisions of the definition of Interest Period.

(c) Promptly after receiving a Notice of Interest Period Election from the Borrower pursuant to Section 2.04(a) above, the Administrative Agent shall notify each Lender of the contents thereof and such notice shall not thereafter be revocable by the Borrower.

Section 2.05. *Payment at Maturity; Evidence of Debt.* (a) The Borrower unconditionally promises to pay to the Administrative Agent on the Maturity Date, for the account of each Lender, the then unpaid principal amount of such Lender's Loans.

(b) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time.

(c) The Administrative Agent shall maintain accounts with respect to the Loans in which it shall record (i) the amount of each Loan made hereunder and whether the interest is based on the Substitute Rate or Eurodollar Rate and each Interest Period (if any) applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d) The entries made in the accounts maintained pursuant to subsections (b) and (c) of this Section shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein; *provided* that any failure by any Lender or the Administrative Agent to maintain such accounts or any error therein shall not affect the Borrower's obligation to repay the Loans in accordance with the terms of this Agreement.

(e) Each Lender's Loans shall be represented by a promissory note executed by the Borrower and payable in Dollars to such Lender in substantially the form of Exhibit C hereto (each, a "Note", and collectively, the "Notes"). Each Note shall be executed by the Borrower, qualify as a *pagaré* under Mexican law and specify the Applicable Margin applicable to the Loans pursuant to the terms hereof as of the Drawdown Date. The Administrative Agent shall deliver to each Lender, promptly upon receipt, any Note received for the account of such Lender. Upon (1) any assignment made pursuant to Section 9.04, the Borrower shall prepare, execute and deliver, against simultaneous delivery of the existing Note or Notes, (A) a new Note payable to the assignee Lender and (B) if necessary, a new Note payable to the assignor Lender, each dated the date of such Note being exchanged, in a principal amount equal to the principal amount of the Loan so assigned (or, in the case of the assignor Lender, retained after such assignment) and otherwise duly completed or (2) a change in the Applicable Margin reflected in the existing Note or Notes pursuant to the terms hereof, the Borrower shall execute and deliver, against simultaneous delivery of the existing Note or Notes, a new Note or Notes payable to any relevant Lender identical in all respects to the Note or Notes being replaced other than the Applicable Margin, upon its own request or the request of a relevant Lender, provided, that in no event shall the failure of the Borrower or a Lender to request or receive any such replacement Note affect the Applicable Margin applicable to the Loans from time to time pursuant to the terms hereof.

Section 2.06. *Optional and Mandatory Prepayments.* (a) *Optional Prepayments.* The Borrower will have the right at any time to prepay the Loans in whole or in part in amounts not less than $5,000,000 or increments of $1,000,000 in excess thereof and otherwise in accordance with the provisions of this Section.

(b) *Asset Dispositions and Casualty Events.* With respect to each Fiscal Year, within ten Business Days after the date on which any Net Proceeds are received by or on

behalf of the Borrower or any Subsidiary in respect of any Asset Disposition or Casualty Event (*provided* that the amount thereof, determined in the aggregate for all Asset Dispositions and Casualty Events after the date hereof and not previously subject to the prepayment requirements of this Section 2.06, exceeds $25,000,000 in such Fiscal Year), the Borrower shall prepay the Loans in an aggregate amount equal to such excess; *provided* that (i) if the Borrower shall deliver to the Administrative Agent a certificate of a Financial Officer to the effect that (A) the Borrower and its Subsidiaries intend to apply the Net Proceeds from such event (or a portion thereof specified in such certificate), within 180 days after receipt of such Net Proceeds, to invest in assets (other than cash equivalents or short-term assets) of the business of the Borrower and its Subsidiaries, and (B) no Default has occurred and is continuing; then no prepayment will be required pursuant to this subsection in respect of such Net Proceeds (or the portion of such Net Proceeds specified in such certificate, if applicable) except that, if any such Net Proceeds have not been so applied by the end of such 180-day period, a prepayment will be required at that time in an amount equal to the amount of such Net Proceeds that have not been so applied, subject to the limitations otherwise set forth in this clause (b).

(c) *Change of Control.* If a Change of Control shall occur, the Borrower will, within five Business Days after the occurrence thereof, deliver to the Administrative Agent notice describing in reasonable detail the facts and circumstances giving rise thereto. If any Lender so directs by written notice delivered to the Administrative Agent and the Borrower not later than five Business Days after delivery of notice of such Change of Control (the "**Change of Control Prepayment Notice**"), the Loans of such Lender shall become due and payable (together with accrued interest thereon to the date of payment) on the twentieth Business Day after the notice initially delivered by the Borrower, all without further demand, protest or other notice of any kind, all of which are hereby waived by the Borrower, unless prior to such date such Lender has delivered to the Administrative Agent and the Borrower a subsequent written notice expressly rescinding such Change of Control Prepayment Notice.

(d) *Accrued Interest.* Each prepayment under this Section 2.06 shall be accompanied by accrued interest to the extent required by Section 2.08.

(e) *Notice of Prepayments.* The Borrower shall notify the Administrative Agent by telephone (confirmed by telecopy) of any prepayment of any Borrowing hereunder, not later than 12:00 noon, New York City time, three Business Days before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment. Promptly after it receives any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.

Section 2.07. *Fees.* The Borrower shall pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon by the Borrower with the Administrative Agent.

Section 2.08. *Interest.* (a) Each Loan shall bear interest on the outstanding principal amount thereof, for each day during each Interest Period applicable thereto, at a rate per annum equal to the sum of the Applicable Margin for such day plus the Adjusted LIBO Rate applicable to such Interest Period (subject in any event to Sections 2.09, 2.10, 2.11 and 2.12).

(b) Notwithstanding the foregoing, during the continuance of any Event of Default, principal of each Loan shall bear interest at 2% per annum in excess of the rate otherwise applicable thereto pursuant to clause (a) above; provided that any overdue principal of or interest on any Loan shall bear interest for each day until paid at a rate per annum equal to the higher of (i) the sum of 2% plus the Applicable Margin for such day plus the Adjusted LIBO Rate applicable to such Loan on the day before such payment was due and (ii) the sum of 2% plus the Applicable Margin for such day plus the Adjusted LIBO Rate, for this purpose determined pursuant to the definition thereof but for periods selected from time to time by the Administrative Agent (not shorter than one day or longer than three months). Any other overdue amounts under this Agreement shall bear interest at a rate per annum equal to the sum of (i) the Base Rate *plus* (ii) 2%.

(c) Interest accrued on each Loan shall be payable in arrears on each Interest Payment Date for such Loan; *provided* that (i) interest accrued pursuant to Section 2.08(b) shall be payable on demand, (ii) upon any repayment of any Loan, interest accrued on the principal amount repaid shall be payable on the date of such repayment and (iii) upon any permitted conversion of a Eurodollar Loan to a Substitute Rate Loan before the end of the current Interest Period therefor, interest accrued on such Loan shall be payable on the effective date of such conversion.

(d) All interest hereunder will be computed on the basis of a year of 360 days, except that (i) interest computed at the Substitute Rate will be computed on the basis of a year of the number of days agreed by the parties in determining the Substitute Rate and (ii) any determination based on the Prime Rate will be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case will be payable for the actual number of days elapsed in the relevant period (including the first day but excluding the last day).

(e) The Administrative Agent shall determine, in accordance with the terms of this Agreement, each interest rate applicable to the Loans hereunder. The Administrative Agent shall promptly notify the Borrower and the Lenders of each rate of interest so determined, and its determination thereof shall be *prima facie* evidence thereof.

Section 2.09. *Substitute Rate of Interest.* If before the beginning of any Interest Period for a Eurodollar Borrowing:

(i) the Administrative Agent determines (which determination will be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(ii) Lenders whose Loans to be included in such Borrowing aggregate at least 51% thereof advise the Administrative Agent that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining such Loans for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the affected Lenders by telephone or telecopy as promptly as practicable thereafter and:

(A) during the 15-day period next succeeding the date of any such notice (the "**Negotiation Period**"), the Administrative Agent (in consultation with the affected Lenders) and the Borrower will

negotiate in good faith for the purpose of agreeing upon an alternative, mutually acceptable basis (the "**Substitute Basis**") for determining the rate of interest to be applicable to the Loans for such Interest Period;

(B)   if at the expiry of the Negotiation Period, the affected Lenders and the Borrower have agreed upon a Substitute Basis and the Administrative Agent has received confirmation from its Mexican counsel that such Substitute Basis has received all necessary governmental approvals and consents, the rate of interest based on such Substitute Basis shall (1) be deemed to be the "**Substitute Rate**" for such Interest Period and (2) be retroactive to, and take effect from, the beginning of such Interest Period, and the Borrower shall forthwith deliver to the Administrative Agent (for delivery to the affected Lenders), in exchange for the then existing Notes, new Notes substantially in the form of Exhibit C hereto with such changes as the Administrative Agent deems necessary to reflect the rate of interest based on such Substitute Basis;

(C)   if at the expiry of the Negotiation Period, a Substitute Basis shall not have been agreed upon as aforesaid or the Administrative Agent shall not have received the above-mentioned confirmation as to requisite governmental approvals or consents, the Administrative Agent shall forthwith notify each affected Lender of such failure to agree or to receive such confirmation and, within five Business Days after receipt of such notice (or as soon thereafter as practicable), each such Lender shall notify the Borrower through the Administrative Agent of the cost to such Lender (as determined by it in good faith) of funding and maintaining its Loan for such Interest Period; and the interest payable to such Lender on its Loan for such Interest Period shall be a rate per annum equal to the Applicable Margin above the cost to such Lender of funding and maintaining its Loan for such Interest Period as so notified by such Lender (in such event, such rate shall be deemed to be the "**Substitute Rate**" for such Interest Period) (or, as to any principal of such Loan or, to the extent permitted by applicable law, other amount payable to such Lender on or in respect of its Loan that is then past due, 2% per annum plus the Applicable Margin above such cost); and

(D)   the procedures specified in clauses (A), (B) and (C) above shall apply to each Interest Period succeeding the first Interest Period to which they were applied unless and until the Administrative Agent shall determine in consultation with the affected Lenders that the conditions referred to in clause (i) or (ii) above no longer exist and so notifies the Borrower and the affected Lenders, whereupon interest on the Loans shall again be determined in accordance with the provisions of Section 2.08 hereof commencing on the first day of the Interest Period next succeeding the date of such notice.

Section 2.10. *Increased Costs*. (a) If any Change in Law (other than a Change in Law affecting Taxes, as to which Section 2.13 shall govern) shall:

(i) impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate); or

(ii) impose on any Lender or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make Eurodollar Loans) or to reduce any amount received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower shall pay to such Lender such additional amount or amounts as will compensate it for such additional cost incurred or reduction suffered as provided in Section 2.10(c).

(b) If any Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower shall pay to such Lender such additional amount or amounts as will compensate it or its holding company for any such reduction suffered as provided in Section 2.10(c).

(c) A certificate of a Lender setting forth the amount or amounts necessary to compensate it or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section shall be delivered to the Borrower and shall constitute *prima facie* evidence of such amount(s). The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof.

(d) Failure or delay by any Lender to demand compensation pursuant to this Section will not constitute a waiver of its right to demand such compensation; *provided* that the Borrower will not be required to compensate a Lender pursuant to this Section for any increased cost or reduction incurred more than 135 days before it notifies the Borrower of the Change in Law giving rise to such increased cost or reduction and of its intention to claim compensation therefor. However, if the Change in Law giving rise to such increased cost or reduction is retroactive, then the 135-day period referred to above will be extended to include the period of retroactive effect thereof.

Section 2.11. *Illegality*. (a) If, on or after the date hereof, the adoption of any applicable law, rule or regulation, or any change in any applicable law, rule or regulation, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender (or its Lending Office) with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency, shall make it unlawful or impossible for any Lender (or its Lending Office) to make, maintain or fund its Eurodollar Loans and such Lender shall so

notify the Administrative Agent, the Administrative Agent shall forthwith give notice thereof to the other Lenders and the Borrower, whereupon until such Lender notifies the Borrower and the Administrative Agent that the circumstances giving rise to such suspension no longer exist, the obligation of such Lender to make Eurodollar Loans, or continue outstanding Loans as Eurodollar Loans, shall be suspended. Before giving any notice to the Administrative Agent pursuant to this Section, such Lender shall designate a different Lending Office if such designation will avoid the need for giving such notice and will not, in the judgment of such Lender, be otherwise disadvantageous to such Lender.

(b) If such notice is given, the affected Lender shall follow the procedures set forth in clauses (A) and (B) of Section 2.09 for determining the "Substitute Rate"; *provided* that the negotiation described therein shall be between such affected Lender and the Borrower. If at the end of the Negotiation Period referred to therein, (i) such Lender and the Borrower have agreed to a Substitute Rate for the affected Loans, such Loans shall thereafter bear interest at such Substitute Rate and (ii) such Lender and the Borrower have not agreed to a Substitute Rate for the affected Loans, the Borrower shall repay the Loans of such Lender in full, together with interest accrued thereon to the date of payment at the rate applicable to such Loans (based on the Adjusted LIBO Rate and Section 2.08(a)) (a) on the last day of the then current Interest Period applicable to such Eurodollar Loan if such Lender may lawfully continue to maintain and fund such Loan as a Eurodollar Loan to such day or (b) immediately if such Lender shall determine that it may not lawfully continue to maintain and fund such Loan as a Eurodollar Loan to such day. If such Lender's Loans continue to remain outstanding as Substitute Rate Loans, interest and principal thereon shall be payable on the same dates as, and on a pro rata basis with, the interest and principal payable on the related Eurodollar Loans of the other Lenders.

Section 2.12. *Break Funding Payments.* If (a) any principal of any Eurodollar Loan is repaid on a day other than the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) any Eurodollar Loan is converted on a day other than the last day of an Interest Period applicable thereto, (c) the Borrower fails to borrow, convert, continue or prepay any Loan on the date specified in any notice delivered pursuant hereto, (d) any Eurodollar Loan is assigned on a day other than the last day of an Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.16, or (e) any Loan is required to become an Substitute Rate Loan (whether such conversion is pursuant to Sections 2.09, 2.11 or 2.15 or otherwise) on any day other than the last day of an Interest Period applicable thereto, then the Borrower shall compensate each Lender for its loss, cost and expense attributable to such event. In the case of a Eurodollar Loan, such loss, cost and expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the end of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have begun on the date of such failure), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the beginning of such period, for Dollar deposits of a comparable amount and period from other leading international banks in the Eurodollar market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the

Borrower and shall be *prima facie* evidence of such amount(s). The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof.

Section 2.13. *Taxes*. (a) For purposes of this Section 2.13, the following terms have the following meanings:

(i) "Taxes" means any and all taxes, duties, levies, imposts, contributions, deductions, charges or withholdings of any nature imposed by Mexico (or any political subdivision thereof, or taxing authority therein), and any penalties, fines or interest thereon (except as specified in Section 2.13(b) below), excluding, in the case of each Lender and the Administrative Agent, taxes, duties, levies, imposts, deductions, charges and withholdings imposed on (or measured by) its net income, and branch profits, franchise or taxes imposed on it (other than "Other Taxes" due to a connection between such Lender or the Administrative Agent and Mexico other than the participation in this Agreement.

(ii) "Other Taxes" means any and all documentary taxes and any other excise or property taxes, or similar charges or levies, including any penalties, fines or interest arising therefrom or with respect thereto (except as specified in Section 2.13(b) below) imposed by Mexico, and which arise from any payment made pursuant to any Loan Document or from the execution, delivery, registration or enforcement of, or otherwise with respect to, any Loan Document (including any of the foregoing that are imposed or that arise in the future).

(iii) "Qualified Jurisdiction" means any jurisdiction with which Mexico has entered into a treaty for the avoidance of double taxation.

(b) Any and all payments by the Borrower to or for the account of any Lender Party hereunder or under any Note shall be made without deduction or withholding for any Taxes or Other Taxes; *provided* that, if the Borrower shall be required by law, rule or regulation to deduct or withhold any Taxes or Other Taxes from any such payments,

(i) the sum payable shall be increased as necessary so that after making all required deductions and withholdings (including deductions and withholding applicable to additional sums payable under this Section 2.13) such Lender Party receives an amount equal to the sum it would have received had no deductions or withholdings been made, *provided*, *however*, that if such Lender Party fails to (1) use its reasonable commercial efforts to (A) maintain registration with the Mexican Ministry of Finance and Public Credit as a foreign financial institution for purposes of Article 195 of the Mexican Income Tax Law (*Ley del Impuesto sobre la Renta*) or (B) maintain its residence for tax purposes or applicable Lending Office in a jurisdiction that is a Qualified Jurisdiction (or, in the case of any Lender Party that becomes a party to this Agreement after the date hereof, as of the date such Lender Party becomes a party hereto) and to satisfy the requirements to be considered a resident of such jurisdiction under, and to be entitled to the benefits of, the treaty for the avoidance of double taxation entered into between Mexico and such jurisdiction or (2) comply with any certification, identification, information, documentation or other reporting requirement concerning nationality, residence or identity of such Lender Party if

(x) such compliance is required or imposed by a statute, treaty, regulation or administrative practice of general application in order to make any claim for reduction in the rate of withholding or deduction of any such Taxes or Other Taxes, and (y) the Borrower shall have notified each Lender Party, in writing, that it will be required to provide such information or documentation at least thirty (30) days in advance of the date when such information is to be provided, then the Borrower shall not be required to pay any additional amounts or sums in respect of any Taxes or Other Taxes or portion thereof that are deducted or withheld at a rate in excess of the greater of (x) 4.9% or (y) the rate then applicable to a Lender that is a United States resident for tax purposes and is fully eligible for benefits under the treaty for the avoidance of double taxation entered into between Mexico and the United States, that would not have been deducted or withheld but for such Lender Party's failure to so perform the actions described in clause (1) or clause (2) of this Section 2.13(b)(i).

(ii) the Borrower shall make such deductions withholdings;

(iii) the Borrower shall pay the full amount deducted or withheld to the relevant taxation authority or other authority in accordance with applicable law;

(iv) the Borrower shall indemnify any Lender or the Administrative Agent for any related penalties, fines or interest thereof, provided the penalties, fines or interest are in respect of an amount of Tax or Other Taxes for which the Borrower is required to pay additional amounts in accordance with this Section 2.13(b)(i); and

(v) the Borrower shall furnish to the Administrative Agent, at its address referred to in Section 9.01, the original or a certified copy of a receipt or return evidencing payment thereof (or other evidence of payment satisfactory to the Administrative Agent), within thirty (30) Business Days after the date such payment is made, and the Administrative Agent shall promptly forward a copy of such receipt to the relevant Lender.

(c) If a Lender pays any Taxes or Other Taxes that the Borrower is required to pay pursuant to this Section 2.13, the Borrower agrees to indemnify each Lender Party for the full amount of Taxes or Other Taxes paid by such Lender Party (as the case may be) and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto. This indemnification shall be paid within 15 Business Days after such Lender Party makes demand therefor, with interest thereon for each day from (and including) the 15th Business Day following delivery of such demand to (but excluding) the date of such indemnification at a rate per annum equal to the Substitute Rate for such day.

(d) If no Taxes or Other Taxes shall be payable in respect of any payment under this Agreement or any Note, the Borrower will, upon the request of the Administrative Agent, furnish to the Administrative Agent a certificate in form issued by the Mexican Tax Authorities, or a legal opinion to that effect, to the Administrative Agent's counsel, confirming that such payment is exempt from or not subject to Taxes or Other Taxes.

(e) Each Lender Party (i) represents and warrants to the Borrower that, as of the date hereof (or, in the case of a Lender Party that becomes a party to this Agreement after the date hereof, on the date such Lender Party becomes a party hereto), (A) such Lender Party is registered with the Mexican Ministry of Finance and Public Credit as a foreign financial institution for purposes of Article 195 of the Mexican Income Tax Law (*Ley del Impuesto sobre la Renta*) and (B) the principal corporate office of such Lender Party is located in a Qualified Jurisdiction and such Lender Party satisfies the requirements to be considered a resident of such jurisdiction under, and to be entitled to the benefits of, the treaty for the avoidance of double taxation entered into between Mexico and such Qualified Jurisdiction, and (ii) will use its reasonable commercial efforts to (A) maintain registration therewith for purposes of Article 195 of the Mexican Income Tax Law (*Ley del Impuesto sobre la Renta*) and (B) maintain its principal corporate office in a jurisdiction which is a Qualified Jurisdiction and to satisfy the requirements to be considered a resident of such jurisdiction under, and to be entitled to the benefits of, the treaty for the avoidance of double taxation entered into between Mexico and such Qualified Jurisdiction. If in the case of any such Lender Party such registration is cancelled or not renewed upon expiration during the term of this Agreement for reasons unambiguously attributable to any such Lender Party, or if any such Lender Party or beneficial owner of any Note fails to provide, within thirty (30) days after the receipt of a written request from the Borrower made pursuant to Section 2.13(b)(i)(2) above, information, documentation or other evidence of such registration or renewal, or if such Lender Party fails to use commercial reasonable efforts to maintain its tax residence in a jurisdiction with which Mexico has entered into a treaty for the avoidance of double taxation or fails to satisfy the requirements to be considered a resident of such jurisdiction for tax purposes under, or to be entitled to the benefits of such treaty, the Borrower may prepay the then outstanding Loans of such Lender Party or direct such Lender Party to assign, at a price that is no less than all then accrued and unpaid interest and principal, the relevant Loans to an institution acceptable to the Administrative Agent that is able to make the representations set forth in clause (i) of the first sentence of this paragraph (e).

(f) If as a result of a Change of Law after the date hereof, the rate at which Taxes or Other Taxes are imposed on payments made by the Borrower hereunder to any Lender Party increases above the rate in effect on the date hereof (or, in the case of any Lender Party that becomes a party to this Agreement after the date hereof, on the date such Lender Party becomes a party hereto), then such Lender Party will take measures within its control to designate a different Lending Office (if its Loan is affected by such Change of Law) if such designation will avoid the need for, or minimize or reduce the amount of, payment of additional amounts otherwise payable by the Borrower under paragraph (b) of this Section 2.13, and will not, in the sole opinion of such Lender Party, be disadvantageous to such Lender Party. In the event that any such Lender Party does not so designate a different Lending Office, the Borrower may prepay the Loan of such Lender Party or direct such Lender Party to assign, at a price that is no less than all then accrued and unpaid interest and principal, such Loan to an institution (which must be satisfactory to the Administrative Agent) that is able to designate a Lending Office that will avoid the need for, or minimize or reduce the amount of, additional amounts payable by the Borrower under paragraph (b) of this Section 2.13.

Section 2.14. *Payments Generally; Pro Rata Treatment; Sharing of Set-offs*. (a) The Borrower shall make each payment required to be made by it under the Loan Documents (whether of principal, interest or fees, or amounts payable under Section 2.10,

2.11 or 2.13 or otherwise) by the time expressly required under the relevant Loan Document for such payment (or, if no such time is expressly required, before 12:00 noon, New York City time), on the date when due, in immediately available funds, without set-off or counterclaim. Any amount received after such time on any day may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at the Administrative Agent's Account, except that payments pursuant to Sections 2.10, 2.11, 2.13 and Section 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payment received by it for the account of any other Person to the appropriate recipient promptly after receipt thereof. If any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment will be extended to the next succeeding Business Day and, if such payment accrues interest, interest thereon will be payable for the period of such extension. All payments hereunder with respect to Loans shall be made in Dollars.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees relating to the Loans then due hereunder, such funds shall be applied (i) first, to pay interest and fees then due hereunder with respect to such Loans, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, to pay principal of Loans then due hereunder with respect to such Loans, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)     If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender with respect to such other Lender's Loans, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans held by other Lenders to the extent necessary so that the benefit of all such payments shall be shared by such Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this subsection shall not apply to any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant (other than to the Borrower or any Subsidiary or Affiliate thereof). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)     Unless, before the date on which any payment is due to the Administrative Agent for the account of one or more Lender Parties hereunder, the Administrative Agent receives from the Borrower notice that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance on such assumption, distribute to each

relevant Lender Party the amount due to it. In such event, if the Borrower has not in fact made such payment, each Lender Party severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender Party with interest thereon, for each day from and including the day such amount is distributed to it to but excluding the day it repays the Administrative Agent at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e) If any Lender fails to make any payment required to be made by it pursuant to Sections 2.03(b), Section 2.14(d) or Section 9.03(c), the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.15. *Substitute Rate Loans Substituted for Affected Loans.* If (a) the obligation of any Lender to make or continue Loans at the Eurodollar Rate has been suspended pursuant to Section 2.11 or (b) any Lender has demanded compensation under Section 2.10 with respect to its Loans and the Borrower shall, by at least three Business Days' prior notice to such Lender through the Administrative Agent, have elected that the provisions of this Section shall apply to such Lender, then, unless and until such Lender notifies the Borrower that the circumstances giving rise to such suspension or demand for compensation no longer exist (which notice such Lender shall give promptly upon making any such determination):

(i) all Loans which would otherwise be made or continued by such Lender at the Eurodollar Rate shall instead be Substitute Rate Loans (on which interest and principal shall be payable contemporaneously with the related Loans of the other Lenders); and

(ii) after each of its Loans bearing interest at the Eurodollar Rate has been repaid (or converted to an Substitute Rate Loan), all payments of principal which would otherwise be applied to repay such Loans shall be applied to repay its Substitute Rate Loans instead.

If such Lender notifies the Borrower that the circumstances giving rise to such notice no longer apply, the principal amount of each such Substitute Rate Loan shall again accrue interest at the Eurodollar Rate on the first day of the next succeeding Interest Period applicable to the related Loans of the other Lenders.

Section 2.16. *Lender's Obligation to Mitigate; Replacement of Lenders.* (a) If any Lender requests compensation under Section 2.10, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.13, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.10 or Section 2.13, as the case may be, in the future, (ii) would not subject such Lender to any unreimbursed cost or expense and (iii) would not otherwise be disadvantageous to such Lender. The Borrower shall pay all costs and expenses incurred by any Lender in connection with any such designation or

assignment within ten Business Days of written notice thereof, specifying the same in reasonable detail.

(b) If (x) any Lender (A) requests compensation under Section 2.10, or (B) defaults in its obligation to fund Loans hereunder, or (y) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.13, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.10 or payments required to be made pursuant to Section 2.13, such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment cease to apply.

## ARTICLE 3
### REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lender Parties that:

Section 3.01. *Organization; Powers*. Each Cablevisión Group Company is duly organized and validly existing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where failures to do so, in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

Section 3.02. *Authorization; Enforceability*. (a) The Financing Transactions to be entered into by the Borrower are within its corporate powers and have been duly authorized by all necessary corporate and, if required, stockholder action. This Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Loan Document to which the Borrower is to be a party, when executed and delivered by the Borrower, will constitute, a legal, valid and binding obligation of the Borrower, in each case enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, *concurso mercantil*, reorganization, moratorium and other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(b) The Borrower and its Material Subsidiaries collectively possess all licenses, concessions, permits, consents, approvals and other authorizations issued by, and have made all declarations and filings with, the appropriate Governmental Authority,

that are necessary for the ownership or lease of their respective properties or the conduct of their respective businesses (except where the failure to do so would not have a Material Adverse Effect); and neither the Borrower nor any of its Material Subsidiaries has received notice of any revocation, rescission, withdrawal, *rescate* proceedings, or modification of any such license, concession, permit or authorization or has any reason to believe that any such license, concession, permit or authorization will not be renewed in the ordinary course.

(c) This Agreement and the other Loan Documents are in proper legal form under the laws of Mexico for the enforcement thereof against the Borrower under such law. All formalities required in the Borrower's jurisdiction of incorporation for the validity and enforceability of each of the Loan Documents have been satisfied, and no Other Taxes are required to be paid and no notarization is required for the validity and enforceability thereof; *provided*, that in the event any legal proceedings are brought in the courts of Mexico, a Spanish translation of the documents required in such proceedings, prepared by a court-approved translator, would have to be approved by such court after the defendant had been given an opportunity to be heard with respect to the accuracy of the translation, and proceedings would thereafter be based upon the translated documents.

Section 3.03. *Governmental Approvals; No Conflicts*. The Financing Transactions (i) do not require the Borrower to obtain or make, as of the Effective Date, any consent or approval of, registration or filing with, or other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect, (ii) will not violate any law or regulation applicable to the Borrower or the charter, by-laws or other organizational documents of any Cablevisión Group Company or any order of any Governmental Authority, (iii) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Cablevisión Group Company or any of its properties, or give rise to a right thereunder to require any Cablevisión Group Company to make any payment (except for any of the foregoing in this clause (iii) that would not reasonably be expected to have a Material Adverse Effect) and (iv) will not result in the creation or imposition of any Lien on any property of any Cablevisión Group Company not permitted to exist by this Agreement.

Section 3.04. *Financial Statements; No Material Adverse Change*. (a) The Borrower has heretofore furnished to the Lenders (i) its consolidated balance sheet as of December 31, 2006 and the related consolidated statements of income, stockholders' equity and changes in financial position for the Fiscal Year then ended, reported on by PricewaterhouseCoopers, independent public accountants, and (ii) its consolidated balance sheet as of September 30, 2007 and the related consolidated statements of income showing year-to-date results, all certified by its chief financial officer. Such financial statements present fairly, in all material respects, the financial position of the Borrower and its consolidated Subsidiaries as of such dates and their results of operations and cash flows for such periods in accordance with GAAP, subject to normal year end adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b) The consolidated forecasted balance sheet, statements of income and cash flows of the Borrower and its consolidated Subsidiaries delivered to the Lenders were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, the Borrower's reasonable estimate of its future financial condition and performance.

(c) None of the Cablevisión Group Companies has, as of the Effective Date, any material contingent liabilities or material, unusual long-term commitments, except as disclosed in the financial statements referred to in Section 3.04(a) or the notes thereto and except for the Disclosed Matters.

(d) Since December 31, 2006, there has been no material adverse change in the business operations, property, condition (financial or otherwise) or prospects of the Borrower and its Material Subsidiaries, taken as a whole.

Section 3.05. *Properties.* (a) Each Cablevisión Group Company has good title to, or valid leasehold interests in, all real and personal property material to its business, except for defects in title that do not interfere in any material respect with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes, and free of all Liens other than those permitted by Section 6.02.

(b) Each Cablevisión Group Company owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and the use thereof by the Cablevisión Group Companies does not infringe upon the rights of any other Person, except for infringements that, in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.06. *Litigation and Environmental Matters.* (a) Except for the Disclosed Matters, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting any Cablevisión Group Company (i) as to which there is a reasonable possibility of adverse determinations that, in the aggregate, could reasonably be expected to result in a Material Adverse Effect or (ii) that involve any of the Loan Documents or the Financing Transactions.

(b) Except for the Disclosed Matters and except for other matters that, in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, no Cablevisión Group Company (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) is subject to any Environmental Liability or (iii) has received notice of any claim with respect to any Environmental Liability.

Section 3.07. *Compliance with Laws and Agreements.* (a) Each Cablevisión Group Company is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding on it or its property, except where failures to do so, in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. No Default has occurred and is continuing.

(b) Each of the Borrower and its Material Subsidiaries complies with Mexican labor laws in all material respects. Except to the extent the following could not (either separately or in the aggregate) reasonably be expected to result in a Material Adverse Effect, there is (a) no illegal labor practice complaint pending or, to the knowledge of the Borrower, threatened against the Borrower or any of its Material Subsidiaries, and no grievance or arbitration proceeding arising out of or under collective bargaining agreements is pending or, to the Borrower's knowledge, threatened against the Borrower or any of its Material Subsidiaries, and (b) no strike, material labor dispute, slowdown,

stoppage or other material labor disturbance pending or, to the knowledge of the Borrower, threatened against the Borrower or any of its Material Subsidiaries; there is no complaint pending or, to the Borrower's knowledge, threatened against the Borrower or any of its Material Subsidiaries alleging violation of any Mexican national, departmental, state, local or foreign law applicable to the Borrower and its Material Subsidiaries relating to discrimination in the hiring, promotion or pay of employees; and to the Borrower's knowledge, there are no other conflicts between the Borrower or any of its Material Subsidiaries and any of their respective employees.

Section 3.08. *Investment Company Status; Regulatory Restrictions on Borrowing*. The Borrower is not required to register as an "investment company" under the U.S. Investment Company Act of 1940. The Borrower is not subject to regulation under any law, treaty, rule or regulation or determination of an arbitrator or court or other Governmental Authority (other than Regulations T, U and X of the Federal Reserve Board) which limits its ability to incur any Debt under this Agreement or any Note.

Section 3.09. *Federal Reserve Regulations*. (a) Neither the Borrower nor any of its Material Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

(b) No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of Regulations T, U and X of the Federal Reserve Board.

Section 3.10. *Taxes*. (a) There is no income, stamp or other similar tax, levy, assessment, impost, deduction, charge or withholding imposed by Mexico (or any municipality or other political subdivision or taxing authority thereof or therein that exercises power to impose such tax, levy, assessment, impost, deduction, charge or withholding) either (i) on or by virtue of the execution or delivery by the Borrower of the Loan Documents or (ii) on any payment to be made by the Borrower pursuant to the Loan Documents, other than any such tax, levy, assessment, impost, deduction, charge or withholding imposed on any Person as a result of such Person being a resident of Mexico for tax purposes or by virtue of its having a permanent establishment for tax purposes in Mexico to which income under the Loan Documents is attributable, except for withholding tax on payments of interest and fees deemed to be interest to Lenders that are not residents of Mexico for tax purposes and to the Administrative Agent.

(b) The Borrower and each Material Subsidiary thereof has filed all foreign federal, state and local tax returns required to be filed or has requested extensions thereof and paid all taxes and tax like obligations (including social security, workers' housing fund and retirement fund obligations) required to be paid by it and any other assessment, fine, or penalty levied against it and any other assessment, fine or penalty levied against it, to the extent any of the foregoing is due and payable, except for (i) such taxes as are being contested in good faith by appropriate proceedings and for which the Borrower or Material Subsidiary, as applicable, has set aside on its books adequate reserves or (ii) such failure to file or to pay as would not have a Material Adverse Effect.

Section 3.11. *Disclosure*. None of the reports, financial statements, certificates or other information furnished by or on behalf of the Borrower to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other

Loan Document or delivered hereunder or thereunder (as modified or supplemented by other information so furnished) contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; *provided* that, with respect to projected financial information, (i) the Borrower represents only that such information was prepared in good faith based on assumptions believed to be reasonable at the time and (ii) it is understood that such projected financial information shall not be viewed as facts and that actual results may differ significantly from the projected results and such differences may be material.

Section 3.12. *Subsidiaries*. Schedule 3.12 sets forth the name of, and the ownership interest of the Borrower in, each of its Material Subsidiaries, in each case as of the Effective Date. All the Borrower's Subsidiaries are fully consolidated in its consolidated financial statements.

Section 3.13. *Solvency*. Immediately after the Financing Transactions to occur on the Effective Date are consummated and after giving effect to the application of the proceeds of each Loan made on the Drawdown Date, (a) the fair value of the assets of the Borrower, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property of the Borrower will exceed the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) the Borrower will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; (d) the Borrower will not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and proposed to be conducted after the Effective Date; and (e) the Borrower will not satisfy any of the requirements to be placed in *consurso mercantil* under the *Ley de Concursos Mercantiles*.

Section 3.14. *Rank of Debt*. The obligations of the Borrower under the Loan Documents to pay any and all amounts due thereunder constitute direct, senior, unsecured, unsubordinated obligations of the Borrower and rank at least *pari passu* in right of payment with all other present or future direct, senior, unsecured, unsubordinated indebtedness for borrowed money of the Borrower.

Section 3.15. *No Immunity*. Neither the Borrower nor any of its property has any immunity from the jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) under the laws of Mexico in respect of its obligations under the Loan Documents.

## ARTICLE 4
### CONDITIONS

Section 4.01. *Conditions*. The obligations of the Lenders to make Loans hereunder on the Drawdown Date is subject to each of the following conditions:

(a) The Administrative Agent (or its counsel) shall have received from each party hereto, either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include telecopy or PDF transmission of a signed signature page) that such party has signed a counterpart of this Agreement.

(b) The Administrative Agent shall have received a favorable written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of each of (i) Cleary Gottlieb Steen & Hamilton LLP, special New York counsel for the Borrower, substantially in the form of Exhibit B-1 and (ii) Mijares, Angoitia, Cortés y Fuentes, S.C., Mexican counsel for the Borrower, substantially in the form of Exhibit B-2 The Borrower requests such counsel to deliver such opinions.

(c) The Administrative Agent shall have received a favorable opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of each of (i) Davis Polk & Wardwell, special New York counsel for the Administrative Agent and (ii) Ritch Mueller, S.C., special Mexican counsel for the Administrative Agent, substantially in the form of Exhibits B-3 and B-4, respectively.

(d) The Administrative Agent shall have received such documents and certificates as the Administrative Agent or its counsel may reasonably request relating to (i) the organization and existence of the Borrower, (ii) the authorization of the Financing Transactions and (iii) any other legal matters relating to the Borrower, the Loan Documents or the Financing Transactions, all in form and substance satisfactory to the Administrative Agent and its counsel, including (x) the *estatutos sociales* in effect for the Borrower, certified by a notary public as to authenticity and by a Borrower's officer as to effectiveness, and (y) powers-of-attorney for officers of the Borrower, certified by a notary public as to authenticity and by a Borrower's officer as to effectiveness, with authority for acts of administration and issuance of negotiable instruments.

(e) The Administrative Agent shall have received (i) a copy of a letter from CT Corporation Systems accepting its appointment as the Process Agent pursuant to Section 9.10 hereof, on behalf of the Borrower, and (ii) a special irrevocable power of attorney granted by the Borrower to CT Corporation Systems appointing it as the Process Agent, duly notarized by a Mexican notary public, as required under Mexican law.

(f) The representations and warranties of the Borrower set forth in the Loan Documents shall be true on and as of the date of such Borrowing, both before and immediately after giving effect thereto.

(g) Immediately after giving effect to such Borrowing no Default shall have occurred and be continuing.

(h) The Lenders shall have received:

(i) (A) audited consolidated financial statements of the Borrower for the fiscal years ended on December 31, 2004, 2005 and 2006 and (B) unaudited consolidated financial statements of the Borrower for the Fiscal Quarter ended on September 30, 2007 and unaudited consolidated financial statements for the same periods of the prior fiscal year; and

     (ii) projections for the Cablevisión Group Companies beginning in 2007 through 2012, in form and with detail and supporting information reasonably satisfactory to the Arranger.

(i) There shall not have occurred or become known to the Administrative Agent or the Lead Arranger any event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect, since the Effective Date.

(j) There shall not have occurred, in each case after the date hereof, (i) any material adverse change in Mexican political or economic conditions, including without limitation any imposition of exchange or currency controls or declaration of moratorium or (ii) any material disruption of or material adverse change in conditions in the United States, Mexican or international financial, banking or capital markets that in the case of (i) or (ii), in the Arranger's judgment, could materially impair the syndication of the Loans under this Agreement.

(k) Neither the Administrative Agent nor the Lead Arranger shall have become aware of any information or other matter (including any matter relating to financial models and underlying assumptions relating to the projections) affecting any of the Cablevisión Group Companies that in the Administrative Agent's or the Lead Arranger's judgment is inconsistent in a material and adverse manner with any such information or other matter disclosed to the Administrative Agent or the Lead Arranger prior to the date hereof or could reasonably be expected to materially impair the syndication of the Loans under this Agreement.

(l) All consents and approvals required to be obtained from any Governmental Authority or other Person in connection with the execution, delivery and performance by the Borrower of its obligations under the Loan Documents shall have been obtained.

(m) The Borrower shall have paid all fees and other amounts due and payable to the Lender Parties on or before the Effective Date, including, to the extent invoiced, all out-of-pocket expenses (including fees, charges and disbursements of counsel) required to be reimbursed or paid by the Borrower under the Loan Documents.

(n) The Administrative Agent shall have received for the account of each Lender an executed Note dated the Drawdown Date complying with the provisions of Section 2.05(e).

(o) The Administrative Agent shall have received a certificate of a Financial Officer of the Borrower attesting to the solvency of the Borrower, in form and substance reasonably satisfactory to the Administrative Agent, but in any event prepared after giving effect to the Financing Transactions to occur on the Drawdown Date, and setting forth the aggregate outstanding Debt of the Borrower.

(p) The Administrative Agent shall have received a certificate, dated the Effective Date and signed by a Financial Officer of the Borrower as to the compliance with items (g), (h) and (m).

Notwithstanding the foregoing, the obligations of the Lenders to make Loans hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived

pursuant to Section 9.02) at or prior to 5:00 p.m., New York City time, on December 26, 2007 (and in the event such conditions are not so satisfied or waived, the Commitments to make Loans shall terminate at such time).

## ARTICLE 5
### AFFIRMATIVE COVENANTS

Until all the Commitments have expired or terminated and the principal of and interest on each Loan have been paid in full, the Borrower covenants and agrees with the Lenders that:

Section 5.01. *Financial Statements and Other Information.* The Borrower will furnish to the Administrative Agent (which will promptly forward to each Lender):

(a) within 120 days after the end of each Fiscal Year, its audited consolidated balance sheet as of the end of such Fiscal Year and the related statements of income, stockholders' equity and changes in financial position (or cash flows) for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all reported on by independent public accountants of recognized national standing in Mexico (without any qualification or exception as to the scope of such audit) as presenting fairly in all material respects the financial position, results of operations and changes in financial position (or cash flows) of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP;

(b) within 60 days after the end of each of the first three Fiscal Quarters of each Fiscal Year, its unaudited consolidated balance sheet as of the end of such Fiscal Quarter and the related statement of income for such Fiscal Quarter and for the then elapsed portion of such Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous Fiscal Year, all certified by a Financial Officer as presenting fairly in all material respects the financial position and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP, subject to normal year-end adjustments and the absence of footnotes;

(c) concurrently with each delivery of financial statements under clauses (a) or (b) above, a certificate of a Financial Officer (a "**Compliance Certificate**") (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations demonstrating compliance with Sections 6.13 and 6.14 and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the Borrower's most recent audited financial statements referred to in Section 3.04 or delivered pursuant to this Section and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(d) concurrently with each delivery of financial statements under clause (a) above, a certificate of the accounting firm that reported on such financial statements stating whether during the course of their examination of such financial statements they

obtained knowledge of any Default (which certificate may be limited to the extent required by accounting rules or guidelines); and

(e) promptly following any request therefor, such other information regarding the operations, business affairs and financial condition (including a projected consolidated balance sheet and related statements of projected operations and cash flows and setting forth the assumptions used in the preparation thereof; provided, that in no event shall the Borrower be obligated to provide such projections more frequently than once per Fiscal Year) of the Cablevisión Group Companies on a consolidated basis, as the Administrative Agent may reasonably request.

Section 5.02. *Notice of Material Events*. The Borrower will furnish to the Administrative Agent prompt written notice of the following (and, in any event, within five Business Days after any Financial Officer obtains knowledge thereof):

(a) the occurrence of any Default;

(b) the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting any Cablevisión Group Company that if adversely determined, could reasonably be expected to result in a Material Adverse Effect; and

(c) any other event that results in, or that any Financial Officer determines in good faith could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03. *Existence; Conduct of Business*. The Borrower, together with its Material Subsidiaries, considered as a whole, will continue to engage primarily in the business of providing cable, internet and/or telecommunication services in Mexico and in activities reasonably related, ancillary or complementary thereto. Each Cablevisión Group Company will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, concessions, permits, consents, approvals, other authorizations, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business; *provided* that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution expressly permitted under Section 6.03.

Section 5.04. *Payment of Tax Obligations*. Each Cablevisión Group Company will pay its material tax liabilities and material tax-like obligations (including obligations under the *Ley del Seguro Social*, the *Ley del Instituto del Fondo Nacional de la Vivienda para los Trabajadores* and the *Ley de los Sistemas de Ahorro para el Retiro* and all laws and regulations related to the foregoing) before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and (b) the relevant Cablevisión Group Company has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

Section 5.05. *Maintenance of Properties*. Each Cablevisión Group Company will maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

Section 5.06. *Insurance*. The Borrower will maintain and will cause each of its Material Subsidiaries to maintain with financially sound and reputable insurance companies, insurance in at least such amounts, against at least such risks and with such risk retention as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

Section 5.07. *Proper Records; Rights to Inspect and Appraise*. Each Cablevisión Group Company will keep proper books of record and account in which complete and correct entries are made of all transactions relating to its business and activities. Each Cablevisión Group Company will permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice during normal business hours, (i) to visit and inspect its properties, to examine and make extracts from its books and records and (ii) to discuss its affairs, finances and condition with its officers and independent accountants, all as may be reasonably necessary, as determined by the Administrative Agent or any Lender, to ensure compliance by the Borrower of its obligations hereunder; *provided* that unless an Event of Default shall be continuing, no Lender shall conduct the activities referred to in clause (i) above more than once in any calendar year.

Section 5.08. *Compliance with Laws*. Each Cablevisión Group Company will comply with all laws, rules, regulations and orders of any Governmental Authority (including Environmental Laws) applicable to it or its property, except where failures to do so, in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 5.09. *Use of Proceeds*. The Borrower shall use the proceeds of the Loans for general corporate purposes, which may include (i) to fund or refinance the Bestel Acquisition and (ii) to pay fees and expenses incurred in connection with the Financing Transactions. No part of the proceeds of any Loan will be used, directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Federal Reserve Board, including Regulations T, U and X.

Section 5.10. *Currency Hedging*. The Borrower will, within the earlier of (a) one year after the Effective Date and (b) forty-five days after the Leverage Ratio exceeds 2.50:1 at any time after the Effective Date, enter into, and maintain at all times thereafter, currency Hedging Agreements with respect to Debt of the Borrower denominated in a currency other than Pesos (excluding the Letseb Note), and limiting the exchange rate exposure of the Borrower between Pesos and such other currency for at least five years ("**Qualifying Hedges**"), such that after giving effect thereto and at all times thereafter, an amount of Debt of the Borrower and its Material Subsidiaries equal to (a) 100% of the aggregate outstanding principal amount of the Loans *plus* (b) 50% of the aggregate outstanding principal amount of all other Debt for borrowed money of the Borrower and its Material Subsidiaries (determined on a consolidated basis), is either (a) denominated in Pesos or (b) subject to Qualifying Hedges.

## ARTICLE 6
### NEGATIVE COVENANTS

Until all the Commitments have expired or terminated and the principal of and interest on each Loan have been paid in full, the Borrower covenants and agrees with the Lenders that:

Section 6.01. *Debt.* The Borrower will not, and will not permit any of its Material Subsidiaries to, create, incur, assume any Debt, except:

(i) Debt created under the Loan Documents;

(ii) Qualifying Hedges and Hedging Agreements of the Borrower otherwise permitted under Section 6.07;

(iii) Debt existing on the date hereof and listed in Schedule 6.01 and any Permitted Refinancings thereof;

(iv) Debt of the Borrower to any Subsidiary and Debt of any Material Subsidiary to the Borrower or any other Subsidiary; provided, that loans, advances or other Investments made by the Borrower or any Material Subsidiary to or in any other Subsidiary shall be subject to Section 6.04;

(v) Debt of the Borrower incurred to finance the acquisition, construction or improvement of any assets, including Capital Lease Obligations and any Debt assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets before the acquisition thereof, and any Permitted Refinancing thereof; *provided* that (A) such Debt is incurred before or within 90 days after such acquisition or the completion of such construction or improvement and (B) the aggregate principal amount of Debt permitted by this clause (including Permitted Refinancings thereof) shall not exceed $20,000,000 at any time outstanding;

(vi) Debt of any Person that becomes a Material Subsidiary after the date hereof and Permitted Refinancings thereof; *provided* that (A) such Debt exists at the time such Person becomes a Material Subsidiary and is not created in contemplation of or in connection with such Person becoming a Material Subsidiary and (B) the aggregate principal amount of Debt permitted by this clause (including Permitted Refinancings thereof) shall not exceed $20,000,000 at any time outstanding;

(vii) Debt incurred by the Borrower or any of its Material Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business or consistent with past practice, including in respect of workers compensation claims, health, disability or other employee benefits;

(viii) obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of the Material Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto,

in each case in the ordinary course of business or consistent with past practice; and

(ix) any Guarantee by the Borrower of Debt of a Material Subsidiary permitted under any of the preceding clauses of this Section 6.01;

(x) Debt of the Borrower of the type referred to in the definition of Total Debt; *provided* that immediately after giving effect to such incurrence the Leverage Ratio (with Total Debt determined for this purpose on the date of and immediately after giving effect to the incurrence of such Debt) shall not exceed 4.0:1; and

(xi) Debt of the Borrower not permitted under any of the preceding clauses of this Section 6.01; *provided* that the aggregate principal amount of Debt permitted by this clause shall not exceed $20,000,000 at any time outstanding.

*provided* that immediately after giving effect to any incurrence of Debt under clauses (x) or (xi) above, no Event of Default shall have occurred and then be continuing.

Section 6.02. *Liens*. Neither the Borrower nor any Material Subsidiary will create or permit to exist any Lien on any property now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(i) Permitted Liens;

(ii) any Lien on any property of the Borrower or any Material Subsidiary existing on the date hereof and listed in Schedule 6.02; *provided* that (A) such Lien shall not apply to any other property of the Borrower or any Material Subsidiary and (B) such Lien shall secure only those obligations which it secures on the date hereof and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(iii) any Lien existing on any property before the acquisition thereof by the Borrower or any Material Subsidiary or existing on any property of any Person that becomes a Material Subsidiary after the date hereof before the time such Person becomes a Material Subsidiary; *provided* that (A) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Material Subsidiary, as the case may be, (B) such Lien will not apply to any other property of the Borrower or any Material Subsidiary and (C) such Lien will secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Material Subsidiary, as the case may be, and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof; and

(iv) Liens on assets acquired, constructed or improved by the Borrower or any Material Subsidiary; *provided* that (A) the Debt secured by such liens is permitted by Section 6.01(v), (B) such Liens are incurred before or within 90 days after such acquisition or the completion of such construction or improvement, (C) such Liens will not apply to any other property of the Borrower or any Material Subsidiary and (D) the aggregate principal amount of

all obligations outstanding at any date secured by Liens permitted by this clause (iv) does not at any time exceed $20,000,000.

Section 6.03. *Fundamental Changes*. No Cablevisión Group Company will merge into or consolidate with any other Person, or liquidate or dissolve, or permit any other Person to merge into or consolidate with it, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, (i) any Subsidiary may merge into the Borrower in a transaction in which the Borrower is the surviving corporation, (ii) any Subsidiary may merge into any Subsidiary in a transaction in which the surviving entity is a Subsidiary and (iii) any Subsidiary may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders.

Section 6.04. *Investments, Loans, Advances, Guarantees and Acquisitions*. Neither the Borrower nor any Material Subsidiary will purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary before such merger) any Equity Interest in or evidence of indebtedness or other security (including any option, warrant or other right to acquire any of the foregoing) of, make any loan or advance to, Guarantee any obligation of, or make any investment or other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (but excluding any plant, property or equipment acquired directly by such Person and not through the acquisition of Equity Interests of another Person holding such assets or a assets constituting a business unit of such other Person) (each of the foregoing, an "**Investment**"), except:

(a) the Bestel Acquisition;

(b) Permitted Investments;

(c) Investments existing on the date hereof and listed on Schedule 6.04; and

(d) Investments by (i) the Borrower in its Material Subsidiaries and (ii) one Material Subsidiary in another Material Subsidiary or the Borrower;

(e) Investments by the Borrower or its Material Subsidiaries in Subsidiaries other than Material Subsidiaries; provided that the aggregate amount of all Investments by the Borrower or its Material Subsidiaries in or to such Subsidiaries under this clause (e) (including without limitation, loans and advances by the Borrower or its Material Subsidiaries to, and Guarantees by the Borrower or its Material Subsidiaries of Debt of, such Subsidiaries), including any such Investments existing on the Effective Date, shall not exceed $20,000,000 in the aggregate;

(f) Guarantees constituting Debt permitted by Section 6.01; and

(g) Investments by the Borrower and/or its Material Subsidiaries, directly or indirectly, in any Person (excluding (i) any Subsidiary that is not a Material Subsidiary and (ii) any Equity Related Person) engaged primarily in the business of providing cable, internet and/or telecommunication services, so long as (x) immediately prior to any such Investment, no Default shall have occurred and be continuing, and (y) the Borrower is in

compliance with both Section 6.13 (determined for this purpose immediately after giving effect to such Investment and the incurrence of any Debt in connection therewith) and Section 6.14, *provided* that nothing contained in this clause (g) shall be construed to limit Investments by the Borrower and/or its Material Subsidiaries in (1) Subsidiaries that thereby become Material Subsidiaries to the extent provided under clause (d) of this Section 6.04 or (2) Subsidiaries other than Material Subsidiaries to the extent permitted under clause (e) of this Section 6.04.

Section 6.05. *Asset Sales.* Neither the Borrower nor any Material Subsidiary will sell, transfer, lease or otherwise dispose of any property, including any Equity Interest owned by it, except:

(a) sales transfers, leases or other dispositions of inventory (for the avoidance of doubt, including set-top boxes), obsolete, worn-out or surplus equipment and Permitted Investments in the ordinary course of business;

(b) sales, leases, transfers and other dispositions to the Borrower or a Material Subsidiary; *provided* that any such sales, transfers or dispositions shall comply with Section 6.09; and

(c) sales, leases, transfers and other dispositions of assets (except Equity Interests in a Subsidiary) that are not permitted by any other clause of this Section; *provided* that the aggregate fair market value of all assets sold, transferred or otherwise disposed of in reliance on this clause shall not exceed $50,000,000 during any Fiscal Year;

*provided* that all sales, transfers, leases and other dispositions permitted by clauses (b) or (c) of this Section shall be made for fair value and, in the case of clause (c) above, for at least 90% cash consideration.

Section 6.06. *Sale and Leaseback Transactions.* Neither the Borrower nor any Material Subsidiary will enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, unless (i) any such sale of any asset is made for cash consideration in an amount not less than the cost of such asset and is consummated within 90 days after such Cablevisión Group Company acquires or completes the construction of such asset and (ii) the aggregate consideration of all such transactions shall not exceed $15,000,000.

Section 6.07. *Hedging Agreements.* Neither the Borrower nor any Material Subsidiary will enter into any Hedging Agreement, except (a) Hedging Agreements required by Section 5.10 and (b) Hedging Agreements entered into in the ordinary course of business to hedge or mitigate risks to which a Cablevisión Group Company is exposed in the conduct of its business or the management of its liabilities.

Section 6.08. *Restricted Payments.* (a) No Cablevisión Group Company will declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so other than (i) Restricted Payments made by any Wholly Owned Subsidiary with respect to its capital stock and (ii)

other Restricted Payments, *provided* that at the time of and after giving effect to any Restricted Payment made pursuant to this clause (ii):

(A) no Default has occurred and is continuing, and

(B) the aggregate amount expended for all Restricted Payments pursuant to this clause (ii) after the Effective Date would not exceed the aggregate amount of Consolidated Net Income, determined on a cumulative basis for the period beginning with the Fiscal Quarter of the Borrower ended September 30, 2007 and ending on the last day of the Borrower's most recently completed Fiscal Quarter for which financial statements have been provided (or if not timely provided, required to be provided) pursuant to Section 5.01.

(b) Not later than the date of making any Restricted Payment (other than those Restricted Payments referred to in paragraph (a)(i) above), the Borrower will deliver to the Administrative Agent an officers' certificate stating that the Restricted Payment is permitted and setting forth the basis upon which the calculations required by the covenant were calculated.

Section 6.09. *Transactions with Affiliates*. From and after the Effective Date, no Cablevisión Group Company will sell, lease or otherwise transfer any property to, or purchase, lease or otherwise acquire any property from, or otherwise engage in any other transaction with, any of its Affiliates, other than another Cablevisión Group Company in the ordinary course of business, the Televisa Subordinated Debt, the Operbes Loan and receipt of capital contributions, except (a) transactions in the ordinary course of business that are at prices and on terms and conditions not less favorable to such Cablevisión Group Company than could be obtained on an arm's-length basis from unrelated third parties and (b) any Restricted Payment permitted by Section 6.08. It is understood that, without limitation of the definition of "Affiliate", direct or indirect holders of 10% or more of the capital stock of the Borrower on the date hereof shall be deemed to be Affiliates of the Borrower and its Material Subsidiaries for purposes of this Section 6.09.

Section 6.10. *Restrictive Agreements*. No Cablevisión Group Company will, directly or indirectly, enter into or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition on the ability of any Subsidiary to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Debt of the Borrower or any other Subsidiary; *provided* that the foregoing shall not apply to (i) restrictions and conditions imposed by law or by any Loan Document, (ii) restrictions and conditions existing on the date hereof and identified on Schedule 6.10 (but shall apply to any amendment or modification expanding the scope of any such restriction or condition), (iii) customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, *provided* that such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) any restrictions and conditions contained in agreements of any Person that becomes a Subsidiary after the date hereof, *provided* that such agreements were not entered into in contemplation of such Person's becoming a Subsidiary at the time such Person entered into by any Subsidiary of the Borrower acquired by the Borrower after the Effective Date, (v) restrictions and conditions imposed by any agreement relating to secured Debt permitted by this Agreement if such restrictions or conditions apply only to the property

securing such Debt and (vi) customary provisions in leases restricting the assignment or subletting thereof.

Section 6.11. *Amendment of Material Documents.* No Cablevisión Group Company will amend, modify or waive any of its rights under its constitutional or organizational documents (including its *estatutos sociales*, by-laws or other organizational documents) in a manner that could reasonably be expected to have a Material Adverse Effect.

Section 6.12. *Capital Expenditures.* (a) The Borrower will not permit the aggregate amount of Capital Expenditures made by the Borrower and its Subsidiaries in any Fiscal Year referred to below to exceed the amount set forth below opposite such Fiscal Year:

| Fiscal Year | Amount |
|---|---|
| 2008 | $100,000,000 |
| 2009 | $100,000,000 |
| 2010 | $100,000,000 |
| 2011 | $100,000,000 |
| 2012 | $100,000,000 |

(b) Any amount permitted to be expended in any Fiscal Year pursuant to clause (a) of this Section 6.12, if not so expended in the Fiscal Year for which it is permitted, (i) may be carried over for expenditure in the next succeeding Fiscal Year only and (ii) Capital Expenditures shall be deemed made, first, in respect of amounts carried over from the prior Fiscal Year pursuant to the foregoing clause (i) and, second, in respect of amounts permitted for such Fiscal Year as provided above.

Section 6.13. *Interest Expense Coverage Ratio.* The Borrower will not permit the ratio, determined as of the last day of any Fiscal Quarter, of (a) Consolidated EBITDA to (b) Consolidated Interest Expense, in each case for any period of four consecutive Fiscal Quarters, to be less than 2.25 to 1.00.

Section 6.14. *Leverage Ratio.* The Borrower will not permit the Leverage Ratio determined as of the last day of any Fiscal Quarter to exceed 4.00 to 1.00.

Section 6.15. *Fiscal Year.* The Borrower shall not change its fiscal year end to a date other than December 31.

## ARTICLE 7
## EVENTS OF DEFAULT

Section 7.01. *Events Of Default.* If any of the following events (**"Events of Default"**) shall occur:

(a) the Borrower shall fail to pay any principal of any Loan when the same shall become due, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b) the Borrower shall fail to pay when due any interest on any Loan or any other amount (except an amount referred to in clause (a) above) payable under any Loan Document, and such failure shall continue unremedied for a period of three Business Days;

(c) any representation, warranty or certification made by or on behalf of any Cablevisión Group Company in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made (or deemed made);

(d) the Borrower shall fail to observe or perform any covenant or agreement contained in Section 5.02, 5.03 (with respect to the existence of the Borrower) or 5.09 or in Article 6;

(e) the Borrower shall fail to observe or perform any covenant or agreement contained in any Loan Document (other than those specified in clause (a), (b) or (d) above), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender);

(f) any Cablevisión Group Company shall fail to make a payment or payments (whether of principal or interest and regardless of amount) in respect of Material Debt when the same shall become due, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise, or within any applicable grace period;

(g) any event or condition that has not been waived or cured and results in Material Debt becoming due before its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of Material Debt or any trustee or agent on its or their behalf to cause Material Debt to become due, or to be prepaid in full (whether by redemption, purchase, offer to purchase or otherwise), prior to its stated maturity;

(h) an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization, *concurso mercantil, quiebra,* or other similar relief in respect of any Cablevisión Group Company, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect (including the *Ley de Concursos Mercantiles*) or (ii) the appointment of a receiver, trustee, custodian, *conciliador,* sequestrator, conservator or similar official for any Cablevisión Group Company or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i) any Cablevisión Group Company shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization, *concurso mercantil, quiebra,* or other similar relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect (including the *Ley de Concursos Mercantiles*), (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Section,

(iii) apply for or consent to the appointment of a receiver, trustee, custodian, *conciliador*, sequestrator, conservator or similar official for any Cablevisión Group Company or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any corporate action for the purpose of effecting any of the foregoing;

(j) any Cablevisión Group Company shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(k) one or more final judgments for the payment of money in an aggregate amount exceeding $20,000,000 shall be rendered against one or more Cablevisión Group Companies and shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed;

(l) any restriction or requirement shall be imposed, promulgated or amended by any Governmental Authority on or after the date hereof that restricts, limits or prohibits the acquisition or the transfer of foreign exchange by the Borrower and that impairs or could reasonably be expected to impair the Borrower's ability to perform its financial obligations under the Loan Documents in accordance with the terms thereof (including payment in Dollars); or any Governmental Authority shall take any action, including a moratorium, having an effect on the schedule of payments of the Borrower under any Loan Document; or the Borrower shall, voluntarily or involuntarily, participate or take any action to participate in any facility or exercise involving the rescheduling of the Borrower's debts or the restructuring of the currency in which the Borrower may pay its obligations;

(m) any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder, ceases to be in full force and effect; or the Borrower or any other Person acting on its behalf contests in any manner the validity or enforceability of any Loan Document;

(n) any property or asset of the Borrower and its Material Subsidiaries shall be nationalized, expropriated, lost, subject to *rescate* proceedings or impaired (collectively, "impaired"; and "impairment" has a correlative meaning) by action of any Governmental Authority (including without limitation through the termination, withdrawal, seizure, revocation or amendment of any license (or licenses) or concession of the Borrower or any of its Subsidiaries to operate their business but excluding an impairment resulting from a required divestiture in connection with an acquisition), *provided* that (i) the property or asset so impaired produces a loss of more than 10% of the gross revenues of the Borrower and its Subsidiaries, determined on a consolidated basis for the four Fiscal Quarters then most recently ended and (ii) unless such impairment is not reasonably susceptible of cure, such impairment shall continue for a period of 60 days thereafter;

then, and in every such event (other than an event with respect to the Borrower described in clause (h) or (i) above), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable

may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all other payment obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are waived by the Borrower; and in the case of any event with respect to the Borrower described in clause (h) or (i) above and subject to the next succeeding sentence, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all other payment obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are waived by the Borrower. The Administrative Agent shall promptly notify the Lenders of any Event of Default pursuant to this Section 7.01.

## ARTICLE 8
## THE ADMINISTRATIVE AGENT

Section 8.01. *Appointment and Authorization.* Each of the Lenders hereby irrevocably appoints the Administrative Agent its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto.

Section 8.02. *Rights and Powers as a Lender.* Any bank serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with any Cablevisión Group Company or Affiliate thereof as if it were not the Administrative Agent hereunder.

Section 8.03. *Limited Duties and Responsibilities.* The Administrative Agent shall not have any duties or obligations except those expressly set forth in herein. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose or any liability for any failure to disclose, any information relating to any Cablevisión Group Company that is communicated to or obtained by the bank serving as the Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any

statement, warranty or representation made in or in connection with this Agreement, (ii) the contents of any certificate, report or other document delivered thereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article 4 or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 8.04. *Authority to Rely on Certain Writings, Statements and Advice*. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (who may be counsel for any Cablevisión Group Company), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 8.05. *Sub-Agents and Related Parties*. The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through one or more sub-agents appointed by it and shall not be responsible for the negligence or misconduct of any such sub-agent selected by it in good faith and with due care. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding Sections of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent to the same extent that they apply to the Administrative Agent, and shall apply to activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Section 8.06. *Resignation; Successor Administrative Agent*. Subject to the appointment and acceptance of a successor Administrative Agent as provided in this paragraph, the Administrative Agent may resign at any time by notifying the Lenders and the Borrower. Upon any such resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent from among the Lenders which shall be a bank with an office in New York, New York. Upon acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder. Immediately thereupon, the successor Administrative Agent shall give notice of its acceptance of its appointment as Administrative Agent to the Borrower and the Lenders. The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed by the Borrower and such successor. After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring

Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

Section 8.07. *Credit Decisions by Lenders*. Each Lender acknowledges that it has, independently and without reliance on the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance on the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based on this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.

## ARTICLE 9
### MISCELLANEOUS

Section 9.01. *Notices*. (a) Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i) if to the Borrower, to it at Rio de la Loza 182, Colonia Doctores 06720, Mexico, D.F. México, Attention of Ignacio Gallardo Islas (Telecopy No. (52-55) 5761 2475), with a copy to Televisa, Vasco de Quiroga 2000, Edificio A, Piso 3, Col. Santa Fe, México, D.F., C.P. 06720, Mexico, Attention Vice President and General Counsel (Telecopy No. (52-55) 5261-2546);

(ii) if to the Administrative Agent, to JPMorgan Chase Bank, N.A., Americas Investment Bank Loan Operations, 1111 Fannin, 10th Floor, Houston, Texas 77002, Attention of Tokunbo Tayo (Telecopy No. (713) 750-2666), with a copy to JPMorgan Chase Bank, 270 Park Avenue, New York 10017, Attention of Paul Doud (Telecopy No. (52-55) 2454-5885); and

(iii) if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

(b) Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices pursuant to Article 2 unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c) Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the Administrative Agent and the Borrower. All notices and other communications given to any party hereto in accordance

with the provisions of this Agreement will be deemed to have been given on the date of receipt.

(d) Unless the Administrative Agent otherwise prescribes, (i) notices and other communications (other than notices or communications in respect of payment of the Loans, the terms of the Loans (including interest rates) or a Default hereunder) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

Section 9.02. *Waivers; Amendments*. (a) No failure or delay by any Lender Party in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Lender Parties under the Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by subsection (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall be construed as a waiver of any Default, regardless of whether any Lender Party had notice or knowledge of such Default at the time.

(b) No Loan Document or provision thereof may be waived, amended or modified except, in the case of this Agreement, by an agreement or agreements in writing entered into by the Borrower and the Required Lenders or, in the case of any other Loan Document, by an agreement or agreements in writing entered into by the parties thereto with the consent of the Required Lenders; *provided* that no such agreement shall:

(i) increase the Commitment of any Lender without its written consent;

(ii) reduce the principal amount of any Loan or reduce the rate of interest thereon without the written consent of each Lender Party affected thereby;

(iii) postpone the maturity of any Loan or any date for the payment of any interest payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender Party affected thereby;

(iv) change Section 2.14(b) or Section 2.14(c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender;

(v) change any provision of this Section or the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to take any action thereunder, without the written consent of each Lender;

*provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent without its prior written consent.

(c) Notwithstanding the foregoing, if Lenders having at least 75% of the Credit Exposures at such time (disregarding for this purpose any Credit Exposures held by the Borrower and any Related Parties) enter into or consent to any waiver, amendment or modification pursuant to subsection (b) of this Section, no consent of any other Lender will be required if, when such waiver, amendment or modification becomes effective, (i) the Commitment of each Lender not consenting thereto terminates and (ii) all amounts owing to it or accrued for its account hereunder are paid in full.

Section 9.03. *Expenses; Indemnity; Damage Waiver.* (a) The Borrower shall pay (i) all agreed reasonable out-of-pocket expenses incurred by the Administrative Agent and the Lead Arranger, including reasonable fees, charges and disbursements of Davis Polk & Wardwell, special New York counsel and Ritch Mueller, S.C., special Mexican Counsel in connection with the syndication of the credit facilities provided for herein and the preparation, execution and delivery of the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), *provided* that the reasonable out-of-pocket expenses incurred by the Administrative Agent and the Lead Arranger to be paid by the Borrower pursuant to this clause (i) shall be expressly limited to the terms agreed to in the Commitment Letter, (ii) all reasonable out-of-pocket expenses incurred by the Lender Parties and their Affiliates, including reasonable fees, charges and disbursements of counsel for the Administrative Agent, in connection with any amendments, modifications or waivers of the provisions of any Loan Documents (whether or not consummated), (iii) if an Event of Default occurs, any stamp or documentary taxes that may be required to be paid upon the introduction into Mexico of any Note or other Loan Documents in connection with any collection, bankruptcy, insolvency or other enforcement proceedings resulting therefrom, and (iv) all reasonable out-of-pocket expenses incurred by any Lender Party, including any fees, charges and disbursements of any counsel for any Lender Party, in connection with the enforcement or protection of its rights in connection with the Loan Documents (including its rights under this Section), the Loans, including all such reasonable out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Loans.

(b) The Borrower shall indemnify each of the Lender Parties and their respective Related Parties (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages and liabilities and reasonable related expenses, including the reasonable fees, charges and disbursements of counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of or in connection with (i) the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the

consummation of the Financing Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by the Borrower or any Subsidiary, or any Environmental Liability related in any way to the Borrower or any Subsidiary or (iv) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not be available to any Indemnitee (x) to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from such Indemnitee's gross negligence, bad faith, breach of the Loan Documents by the Indemnitee or willful misconduct or (y) with respect to any settlement entered into by any Indemnitee without the Borrower's written consent (such consent not to be unreasonably withheld or delayed).

(c) To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent under subsection (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent, in its capacity as such. For purposes hereof, a Lender's "**pro rata share**" shall be determined based on its share of the sum of the total outstanding Loans and unused Commitments at the time.

(d) To the extent permitted by applicable law, none of the parties hereto shall assert, and each hereby waives, any claim against any Indemnitee or other party hereto, on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Financing Transactions, any Loan or the use of the proceeds thereof.

(e) All amounts due under this Section shall be payable not later than 10 Business Days after written demand therefor.

Section 9.04. *Successors and Assigns*. (a) The provisions of this Agreement shall be binding on and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (except the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly provided herein, the Related Parties of the Lender Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) Any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of any Commitment it has at the time and any Loans at the time owing to it); *provided* that:

(i) the Administrative Agent and the Borrower must give prior written consent to any such assignment (which consent shall not be unreasonably withheld) except that a Lender may assign or otherwise transfer its rights and obligations hereunder without the prior written consent of (a) the Borrower if (1) such assignment or transfer is an assignment or transfer of all or any portion of a Loan to a Person that is a Lender or a Lender Affiliate or (2) an Event of Default has occurred and is continuing or (b) the Administrative Agent if such assignment or transfer is an assignment or transfer of all or any portion of a Loan to a Person that is a Lender or a Lender Affiliate (and if the consent of the Borrower or the Administrative Agent is not required, such assigning Lender shall promptly notify the Borrower and/or the Administrative Agent, as applicable, of the amount of such assignment and the identity of the assignee);

(ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(iii) unless the Administrative Agent and the Borrower otherwise consent, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date on which the relevant Assignment is delivered to the Administrative Agent) shall not be less than $3,000,000; *provided* that this (iii) shall not apply to an assignment to a Lender or a Lender Affiliate or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans;

(iv) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment, together with a processing and recordation fee of $3,500; and

(v) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent a completed Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower and its related parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

Subject to acceptance and recording thereof pursuant to subsection (d) of this Section, from and after the effective date specified in each Assignment the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment, be released from its obligations under this Agreement (and, in the case of an Assignment covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.10, 2.11, 2.13 and 9.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection (b) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (e) of this Section.

(c) The Administrative Agent, acting for this purpose as agent of the Borrower, shall maintain at one of its offices in New York City a copy of each Assignment delivered to it and a register for the recordation of the names and addresses of the Lenders, their respective Commitments and the principal amounts of the Loans owing to each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive, and the parties hereto may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by any party hereto at any reasonable time and from time to time upon reasonable prior notice.

(d) Upon its receipt of a duly completed Assignment executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in subsection (b) of this Section and any written consent to such assignment required by subsection (b) of this Section, the Administrative Agent shall accept such Assignment and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this subsection.

(e) Any Lender may, without the consent of the Borrower or any other Lender Party, sell participations to one or more banks or other entities ("**Participants**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the other Lender Parties shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant. Subject to subsection (f) of this Section, each Participant shall be entitled to the benefits of Sections 2.10, 2.11, and 2.13 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, *provided* that such Participant agrees to be subject to Section 2.14(c) as though it were a Lender.

(f) A Participant shall not be entitled to receive any greater payment under Sections 2.10 or 2.13 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.13 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.13 as though it were a Lender.

    (g)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; *provided* that (i) no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto and (ii) no foreclosure of any such pledge or security interest shall be permitted without the consents required by this Section 9.04.

    Section 9.05. *Survival.* All covenants, agreements, representations and warranties made by the Borrower in the Loan Documents and in certificates or other instruments delivered in connection with or pursuant to the Loan Documents shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Lender Party may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder. The provisions of Sections 2.10, 2.11, 2.13, 9.03 and Section 9.16 and Article 8 shall survive and remain in full force and effect regardless of the consummation of the Financing Transactions, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

    Section 9.06. *Counterparts; Integration; Effectiveness.* This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent or the Lead Arranger constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement (i) will become effective when the Administrative Agent shall have signed this Agreement and received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto and (ii) thereafter will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or PDF will be effective as delivery of a manually executed counterpart of this Agreement.

    Section 9.07. *Severability.* To the fullest extent permitted by law, if any provision of any Loan Document is invalid, illegal or unenforceable in any jurisdiction then such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or thereof and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

    Section 9.08. *Right of Set-off.* If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law and upon notice to the Borrower, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or

Affiliate to or for the credit or the account of the Borrower against any obligations of the Borrower now or hereafter existing hereunder and held by such Lender, irrespective of whether or not such Lender shall have made any demand hereunder and although such obligations may be unmatured. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender may have.

Section 9.09. *Governing Law; Jurisdiction; Consent to Service of Process*. (a) This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b) Each of the parties hereto irrevocably and unconditionally submits, for itself and its property, to the jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof (each a "**New York Court**") and to the courts of its own corporate domicile in any action brought against such party as a defendant, in any action or proceeding arising out of or relating hereto, or for recognition or enforcement of any judgment, and each party hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court, to the extent permitted by law, in such Federal court or other court. Each party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c) Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating hereto in any New York Court. Each of the parties hereto hereby irrevocably waive, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

Section 9.10. *Appointment of Agent For Service of Process*. (a) The Borrower hereby irrevocably designates, appoints, authorizes and empowers as its agent for service of process, CT Corporation System, at its offices currently located at 111 Eighth Avenue, New York, New York 10011 (the "**Process Agent**"), to accept and acknowledge for and on its behalf service of any and all process, notices or other documents that may be served in any suit, action or proceeding relating hereto in any New York Court. Such designation and appointment shall be irrevocable until all principal of and interest on the Loans and other sums payable under the Loan Documents shall have been paid in full in accordance with the provisions thereof. The Borrower covenants and agrees that it shall take any and all reasonable action, including the execution and filing of any and all documents, that may be necessary to continue the foregoing designation and appointment in full force and effect and to cause the Process Agent to continue to act in such capacity.

(b) The Borrower consents to process being served in any suit, action or proceeding of the nature referred to in Section 9.09 by serving a copy thereof upon the Process Agent. Without prejudice to the foregoing, the Lenders and the Administrative Agent agree that, to the extent lawful and possible, written notice of said service upon the Process Agent shall also be mailed by internationally recognized overnight courier, postage prepaid, return receipt requested, to the Borrower at the address specified in or pursuant to Section 9.01 or to any other address of which the Borrower shall have given

written notice to the Administrative Agent. If said service upon the Process Agent shall not be possible or shall otherwise be impractical after reasonable efforts to effect the same, the Borrower consents to process being served in any suit, action or proceeding of the nature referred to in Section 9.09 by the mailing of a copy thereof by registered or certified airmail, postage prepaid, return receipt requested, to the address of the Borrower specified in or pursuant to Section 9.01 or to any other address of which the Borrower shall have given written notice to the Administrative Agent, which service shall be effective 14 days after deposit in the mail. The Borrower agrees that such service (i) shall be deemed in every respect effective service of process upon the Borrower in any such suit, action or proceeding and (ii) shall to the fullest extent permitted by law, be taken and held to be valid personal service upon and personal delivery to the Borrower.

(c) Nothing in this Section shall affect the right of any party hereto to serve process in any manner permitted by law, or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.

Section 9.11. *Waiver of Immunity*. To the extent that the Borrower has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid or execution, or otherwise) with respect to itself or its property, the Borrower hereby irrevocably waives such immunity in respect of its obligations under the Loan Documents to the extent permitted by applicable law and, without limiting the generality of the foregoing, agrees that the waivers set forth in this Section shall have effect to the fullest extent permitted under the Foreign Sovereign Immunities Act of 1976 of the United States of America and are intended to be irrevocable for purposes of such Act.

Section 9.12. *Judgment Currency*. (a) If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum due hereunder in Dollars into another currency (the "**Judgment Currency**"), the parties hereto agree, to the fullest extent that they may legally and effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase Dollars with such Judgment Currency in New York, New York, on the Business Day immediately preceding the day on which final judgment is given.

(b) The obligation of the Borrower in respect of any sum due to any Lender hereunder in Dollars shall, to the extent permitted by applicable law, notwithstanding any judgment in a currency other than Dollars, be discharged only to the extent that on the Business Day following receipt of any sum adjudged to be so due in the Judgment Currency such Lender may in accordance with normal banking procedures purchase the Dollars in the amount originally due to such Lender with the Judgment Currency. If the amount of Dollars so purchased is less than the sum originally due to such Lender, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify such Lender against the resulting loss; and if the amount of Dollars so purchased is greater than the sum originally due to such Lender, such Lender agrees to repay such excess to the Borrower.

Section 9.13. *WAIVER OF JURY TRIAL*. EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH

PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.14. *Use of English Language.* Except as provided in Section 3.02(c), any translation of this Agreement into another language shall have no interpretive effect. All documents or notices to be delivered pursuant to or in connection with this Agreement shall be in the English language or, if any such document or notice is not in the English language, accompanied by an English translation thereof, and the English language version of any such document or notice shall control for purposes hereof.

Section 9.15. *Headings.* Article and Section headings and the Table of Contents herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.16. *Confidentiality.* Each Lender Party agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority having jurisdiction over such Lender Party, *provided* that such Lender Party shall, to the extent legally permissible, notify the Borrower of the request for disclosure prior to such disclosure if such Lender Party has reason to believe that such regulatory authority is not subject to its customary duty of confidentiality, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedy hereunder or any suit, action or proceeding relating to any Loan Document or the enforcement of any right thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any actual or prospective assignee of or Participant in any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information either (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to such Lender Party on a nonconfidential basis from a source other than the Borrower. For the purposes of this Section, "**Information**" means all information received from the Borrower or any Related Parties relating to the Borrower, any of its Related Parties or their respective businesses, other than any such information that is available to any Lender Party on a nonconfidential basis before disclosure by the Borrower or any of its Related Parties; *provided* that such information shall be deemed to have been provided on a confidential basis unless such information is clearly identified at the time of delivery as "nonconfidential." Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

EACH LENDER ACKNOWLEDGES TO THE BORROWER THAT INFORMATION AS DEFINED IN THE PRECEDING PARAGRAPH FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS TO THE BORROWER THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING UNITED STATES FEDERAL AND STATE SECURITIES LAWS.

ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

Section 9.17. *USA Patriot Act.* Each Lender that is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**"), hereby notifies the Borrower that, pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act.

[Signature Page(s) to Follow]

12/19/07 19:47

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

EMPRESAS CABLEVISIÓN, S.A.B. DE C.V., as Borrower

By: ______________________

Name: Salvi Rafael Folch Viadero / Jorge Lutteroth Echegoyen

Title: Attorneys-in-fact

LENDER PARTIES:

JPMORGAN CHASE BANK, N.A., as
Administrative Agent

By: ______________________
Name: Anthony O. Preware
Title: Vice - President

JPMORGAN CHASE BANK, N.A.,
as Lender

By: ______________________
Name: Anthony O. Preware
Title: Vice - President

Schedule 2.01

**Commitment Schedule**

| Name of Lender | Total |
|---|---|
| JPMorgan Chase Bank, N.A. | $225,000,000 |
| **Total** | $225,000,000 |

Schedule 3.05

**Existing Real Properties**

**Schedule 3.05**

Land owner: Tecnicable, S.A. de C.V.

| | Location | Public Deed Description |
|---|---|---|
| 1. | Dr. Río de la Loza 182, Col. Doctores, Delegación Cuauhtemoc, México, D.F., C.P. 06720 | Public deed number 33,486, dated December 6, 1994, granted before Lic. Luis Antonio Montes de Oca Mayagoltia, Notary Public number 29 in México, Distrito Federal. |
| 2. | Dr. Río de la Loza 190, Col. Doctores, Delegación Cuauhtemoc, México, D.F., C.P. 06720 | Public deed number 30,470, dated December 6,1994, granted before Lic. Luis Antonio Montes de Oca Mayagoitia, Notary Public number 29 in México, Distrito Federal. |
| 3. | Lago Chiem 77, Col. San Juanico Pénsil, Delegación Miguel Hidalgo, México, D.F., C.P. 11440 | Public deed number 57,077 dated August 21, 2003, granted before Lic. Rafael Manuel Oliveros Lara, Notary Public number. 45 in México Distrito Federal. |
| 4. | Hacienda Zotoluca 455, Col. Hacienda Echegaray, Naucalpan, Estado de México | Public deed number 34,035 dated October 2, 2003, granted before Lic. Pedro Porcayo Vergara, Notary Public number. 93 in México, Distrito Federal. |
| 5. | Capulhuac 58, Col. Cumbria, Cuautitlán Izcalli, Estado de México. | Public deed number 32,907 dated March 12, 2004, granted before Lic. Juan Castañeda Salinas, Notary Public number 93 in the State of México. |
| 6. | Federico T. de la Chica, Edificio 6, Ciudad Satélite, Naucalpan, Estado de México. | Public deed number 58,002 dated May 20, 2004, granted before Lic. Rafael Manuel Oliveros Lara, Notary Public number 45 in México Distrito Federal. |
| 7. | Poniente 150 No. 991, Fraccionamiento A, Lote 12, Manzana 1-A, Col. Industrial Vallejo, Delegación Azcapotzalco, México, D.F., C.P. 02300. | Public deed number 15,716 dated May 12, 2006, granted before Lic. Manuel Enrique Oliveros Lara, Notary Public number 100 in Ciudad de México, Distrito Federal. |
| 8. | Concepción Beistegui No. 312, Col. Del Valle, Delegación Benito Juárez, México, D.F., C.P. 03100 | Public deed number 105,010 dated November 29, 2006, granted before Lic. Gerardo Correa Etchegaray, Notary Public number 89 in México, Distrito Federal. |
| 9. | Emiliano Zapata #22, Col. Santa Anita, Iztacalco, Estado de México, C.P. 08300 | Public deed number 16,327 dated March 21, 2007, granted before Lic. Manuel Enrique Oliveros Lara, Notary Public number 100 in México, Distrito Federal. |

Schedule 3.06

**Disclosed Matters**

Schedule 3.06

The following issues are still pending to be resolved. It is important to mention that the following pending resolutions, even if their outcome is negative, will not result in a Material Adverse Effect against any Cablevisión Group Company pursuant to the Loan Documents.

**1. Center of Arbitration Mexico.**

Empresas Cablevisión, S.A. de C.V.,
Vs.
Grupo Integral de Televisión por Cable, S.A. de C.V., Tele Cabe Centro Occidente, S.A. de C.V.,
Telecable del Oriente, S.A. de C.V., Bestcable, S.A. de C.V., y Metrovisión del Centro, S.A. de C.V.

Arbitral Trial.
Negative Resolution.

**2. Fourth District Court on Civil Matters.**

Empresas Cablevisión, S.A. de C.V.,
vs.
Grupo Integral de Televisión por Cable, S.A. de C.V., Tele Cabe Centro Occidente, S.A. de C.V.,
Telecable del Oriente, S.A. de C.V., Bestcable, S.A. de C.V., y Metrovisión del Centro, S.A. de
C.V.

Nullity Incident to the Arbitration Declaration
Expediente No. 128/2007.

Schedule 3.12

List of Subsidiaries

# EMPRESAS CABLEVISIÓN, S.A.B. DE C.V.
## Subsidiaries and Associate
## as of September 30, 2007

| Name of Company | Country of Incorporation |
|---|---|
| Milar, S.A. de C.V. | Mexico |
| Argos Comunicación, S.A. de C.V. (*) | Mexico |
| Cablestar, S.A. de C.V. | Mexico |
| Cablevisión, S.A. de C.V. | Mexico |
| Tercera Mirada, S.A. de C.V. | Mexico |
| Grupo Mexicano de Cable, S.A. de C.V. | Mexico |
| Integravisión de Occidente, S.A. de C.V. | Mexico |
| La Casa de la Risa, S.A. de C.V. (1) | Mexico |
| Servicios Cablevisión, S.A. de C.V. | Mexico |
| Tecnicable, S.A. de C.V. | Mexico |
| Telestar del Pacífico, S.A. de C.V. | Mexico |
| Letseb, S.A. de C.V. | Mexico |
| Operbes, S.A. de C.V. | Mexico |

( * ) Associate.
( 1 ) Entity with no current operations.

Schedule 6.01

**Existing Debt**

**Cablestar Bridge Loan**

| | | |
|---|---|---|
| **Borrower** | Cablestar | |
| **Lender** | Videoserpel | |
| **3M Libor on 10-12-7** | 5.1325 | % |
| **Applicable Margin (bps)** | 50.4 | over Libor 3M |
| **Total Interest Rate** | 5.6363 | % |
| **Tenor** | 3.0 | months |
| **Effective Date** | Martes-11/12/2007 | |
| **Maturity** | Martes-11/03/2008 | |
| **Amount** | 325.0 | millions of dollars |
| **Guarantors** | Empresas Cablevisión, Cablemás y TVI according to the following table | |

| | **Amount** | **Spread** | **Percentage of Guaranty** |
|---|---|---|---|
| Cablevisión | 225 | 50 | 69% |
| Cablemás | 50 | 50 | 15% |
| TVI | 50 | 52.5 | 15% |

| | | |
|---|---|---|
| **Borrower** | Cablevisión | |
| **Lender** | Grupo Televisa | |
| **3M Libor on 10-12-7** | 4.4175 | % |
| **Applicable Margin (bps)** | 50.4 | over Libor 12M |
| **Total Interest Rate** | 4.9213 | % |
| **Tenor** | 12.0 | months |
| **Effective Date** | Jueves-20/12/2007 | |
| **Maturity** | Viernes-19/12/2008 | |
| **Amount** | 8,000,000 | dollars |
| **Moratory Interest** | LIBOR + 250 | |

| | | |
|---|---|---|
| **Borrower** | Operbes | |
| **Lender** | Cablevisión | |
| **3M Libor on 10-12-7** | 4.4175 | % |
| **Applicable Margin (bps)** | 50.4 | over Libor 12M |
| **Total Interest Rate** | 4.9213 | % |
| **Tenor** | 12.0 | months |
| **Effective Date** | Jueves-20/12/2007 | |
| **Maturity** | Viernes-19/12/2008 | |
| **Amount** | 8,000,000 | dollars |
| **Moratory Interest** | LIBOR + 250 | |

|  |  |  |
|---|---|---|
| Borrower | Operbes | |
| Lender | Grupo Televisa | |
| 3M Libor on 10-12-7 | 5.1325 | % |
| Applicable Margin (bps) | 50.4 | over Libor 3M |
| Total Interest Rate | 5.6363 | % |
| Tenor | 3.0 | months |
| Effective Date | Jueves-13/12/2007 | |
| Maturity | Jueves-13/03/2008 | |
| Amount | 38,082,685.0 | dollars |

Schedule 6.02

**Existing Liens**

Schedule 6.02

There are no liens or limitations upon any property or right of the Borrower or any of its Material Subsidiaries, that could affect the compliance of its obligations under the Loan Agreement.

Schedule 6.10

**Existing Restrictions**

Schedule 6.10

There are no restrictions for any Cablevisión Group Company to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay loans, that could affect the compliance of its obligations pursuant to the Loan Agreement.

EXHIBIT A

ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "Assignor") and [*Insert name of Assignee*] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as may be further amended from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1. Assignor: ______________________________

2. Assignee: ______________________________
[is an Eligible Assignee][and is an Affiliate of [*identify Lender*]][1]

3. Borrower: Empresas Cablevisión, S.A.B. de C.V.

4. Administrative Agent: JPMorgan Chase Bank, N.A.

5. Credit Agreement: The Credit Agreement dated as of December 19, 2007 among Empresas Cablevisión, S.A.B. de C.V., the Lenders parties thereto and JPMorgan Chase Bank, N.A., as Administrative Agent.

---

[1] Select if and as applicable

6. Assigned Interest:

| Aggregate Amount of Loans for all Lenders | Amount of Loans Assigned | Percentage Assigned of Loans[2] |
|---|---|---|
| $ | $ | % |
| $ | $ | % |
| $ | $ | % |

Effective Date: ________________, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The Assignee agrees to deliver to the Administrative Agent a completed Administrative Questionnaire in which the Assignee designates one or more Credit Contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower, the Obligors and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws.

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

[NAME OF ASSIGNOR]

By:_______________________________
Title:

ASSIGNEE

[NAME OF ASSIGNEE]

By:_______________________________
Title:

---

[2] Set forth, to at least 9 decimals, as a percentage of the Loans of all Lenders thereunder.

Consented to and Accepted:

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent

By_______________________________
Title:

Consented to:

EMPRESAS CABLEVISIÓN, S.A.B. DE C.V.,
as Borrower

By_______________________________
Title:

ANNEX I

Credit Agreement
dated as of December 19, 2007
Empresas Cablevisión, S.A.B. de C.V.

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1. Representations and Warranties.

1.1 Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2. Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received and/or had the opportunity to review a copy of the Credit Agreement to the extent it has in its sole discretion deemed necessary, together with copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, as applicable, and such other documents and information as it has in its sole discretion deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, and (v) if it is a Foreign Lender or a Lender which is not a resident of Mexico, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the

obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.   Payments.   From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.   General Provisions. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

EXHIBIT B-1

# OPINION OF SPECIAL NEW YORK COUNSEL TO THE BORROWER

Writer's Direct Dial: (212) 225-2590
E-Mail: spodolsky@cgsh.com

December [ ], 2007

To each of the Lenders and the Agent referred to below
c/o JPMorgan Chase Bank, N.A.,
as Administrative Agent
270 Park Avenue
New York, NY 10017

Ladies and Gentlemen:

      We have acted as special United States counsel to Empresas Cablevisión, S.A.B. de C.V., a limited liability stock corporation (*sociedad anónima bursátil de capital variable*) organized under the laws of the United Mexican States (the "Borrower"), in connection with the $225,000,000 Credit Agreement dated as of December 19, 2007 (hereinafter referred to as the "Credit Agreement") among the Borrower, the lenders party thereto (the "Lenders"), and JPMorgan Chase Bank, N.A., as Administrative Agent. This opinion letter is furnished to you pursuant to Section 4.01(b)(i) of the Credit Agreement.

      Unless otherwise defined herein, capitalized terms defined in the Credit Agreement are used herein as defined therein.

      In arriving at the opinions expressed below, we have reviewed the following documents:

    (a)    an executed copy of the Credit Agreement; and

    (b)    an executed copy of the promissory note dated as of the Drawdown Date and delivered to the Administrative Agent pursuant to Section 4.01(o) of the Credit Agreement (the "Note" and, together with the Credit Agreement, the "Opinion Documents").

In addition, we have reviewed such certificates of representatives of the Borrower, and we have made such investigations of law, as we have deemed appropriate as a basis for the opinions expressed below.

In rendering the opinions expressed below, we have assumed the authenticity of all documents submitted to us as originals and the conformity to the originals of all documents submitted to us as copies. In addition, we have assumed and have not verified the accuracy as to factual matters of each document we have reviewed (including, without limitation, the accuracy of the representations and warranties of the Borrower in the Opinion Documents).

Based upon the foregoing, and subject to the further assumptions and qualifications set forth below, it is our opinion that:

1. The Credit Agreement has been duly executed and delivered under the law of the State of New York by the Borrower and is a valid and binding obligation of the Borrower, enforceable in accordance with its terms.

2. The Note has been duly executed and delivered under the law of the State of New York by the Borrower and is a valid and binding obligation of the Borrower, enforceable in accordance with its terms.

3. The execution and delivery by the Borrower of each of the Opinion Documents do not, and the performance by the Borrower of its obligations under each of the Opinion Documents will not, (a) require any consent, approval or authorization of, registration, qualification or filing with, or notice to, any governmental authority of the United States of America or the State of New York that in our experience normally would be applicable to general business entities with respect to such execution, delivery or performance, or (b) result in a violation of any United States federal or New York State law or published rule or regulation that in our experience normally would be applicable to general business entities with respect to such execution, delivery or performance.

4. The Borrower is not required to be registered as an "investment company" under the U.S. Investment Company Act of 1940, as amended.

5. The making of the Loans and the use of proceeds thereof as contemplated by the Credit Agreement do not violate Regulation T, U or X of the Board of Governors of the Federal Reserve System (the "Board").

In rendering the opinions set forth above, we express no opinion with respect to:

(i) the Spanish text of the Note or whether the terms of the Credit Agreement or of the Note will control in the event of a conflict between one or more provisions of such documents;

(ii) the effect of the proviso to the governing law provision contained in the Note on the validity or effectiveness of the choice of New York law contained in the Note or any other provision of the Note;

(iii) the provisions of the Opinion Documents providing for the submission by the Borrower to the jurisdiction of any court other than the Supreme Court of the State of New York sitting in New York County or the United States District Court of the Southern District of New York; or

(iv) the validity, binding effect or enforceability of any provision in the Opinion Documents that purports to (a) provide indemnification of any person to the extent such provision covers or could be construed to cover losses or claims under U.S. federal or state securities laws or to the extent inconsistent with public policy or (b) render conclusive any determination or calculation made by a party to any Opinion Document.

Insofar as the foregoing opinions relate to the validity, binding effect or enforceability of any agreement or obligation of the Borrower, (a) we have assumed that each party to such agreement or obligation has satisfied those legal requirements that are applicable to it to the extent necessary to make such agreement or obligation enforceable against it (except that no such assumption is made as to the Borrower regarding matters of the federal law of the United States of America or the law of the State of New York that in our experience normally would be applicable to general business entities with respect to such agreement or obligation) and (b) such opinions are subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and to general principles of equity.

The opinions set forth above are subject to the following qualifications:

(a) In rendering the opinion in paragraph 3 above, we have assumed that the Borrower is not subject to any New York State laws and regulations other than those laws and regulations generally applicable to general business entities doing business in the State of New York.

(b) In rendering the opinion in paragraph 5 above, we have assumed that none of the Lenders is a "creditor" within the meaning of Regulation T of the Board or a "foreign branch of a broker-dealer" within the meaning of Regulation X of the Board.

(c). We express no opinion as to the applicability or effect of the law of any jurisdiction other than the State of New York wherein any Lender may be located or wherein enforcement of the Credit Agreement or of the Note may be sought that limits the rates of interest legally chargeable or collectible.

(d) We have assumed that any assignments made by or among the Lenders of their rights and obligations under the Credit Agreement will not contravene New York Judiciary Law Section 489 (which makes it a criminal offense to take an assignment of a debt obligation with the intent of and for the purpose of bringing an action or proceeding thereon).

(e) We express no opinion with respect to the enforceability of the restriction on assignment of the Borrower's rights contained in Section 9.04(a)(i) of the Credit Agreement, to the extent Part 4 of Article 9 of the Uniform Commercial Code of the State of New York is applicable thereto.

(f) We express no opinion as to the enforceability of Section 9.12(b) of the Credit Agreement relating to currency indemnity.

(g) Except as set forth in paragraphs 4 and 5 above, we express no opinion as to any United States federal or state securities laws.

(h) With respect to the submission in any Opinion Document to the jurisdiction of a United States federal court sitting in the State of New York, we express no opinion as to the subject matter jurisdiction of any such court to adjudicate any action relating to the Opinion Document where jurisdiction based on diversity of citizenship under 28 U.S.C. §1332 does not exist.

(i) The enforceability of the waiver of immunities by the Borrower set forth in Section 9.11 of the Credit Agreement is subject to the limitations imposed by the Foreign Sovereign Immunities Act of 1976.

(j) The enforceability of the obligations of the Borrower under the Opinion Documents is also subject to judicial application of foreign laws or foreign governmental actions affecting creditors' rights.

The foregoing opinions are limited to the federal law of the United States of America and the law of the State of New York, but we express no opinion as to any regulations or laws specific to the telecommunications industry or to the provision of cable or internet services.

We are furnishing this opinion letter to you, as a Lender, and in the case of JPMorgan Chase Bank, N.A., as Administrative Agent, solely for your benefit in your capacity as such in connection with the transactions contemplated by the Credit Agreement. This opinion letter is not to be relied on by or furnished to any other person or used, circulated, quoted or otherwise referred to for any other purpose. Notwithstanding the foregoing, a copy of this opinion may be furnished to, and relied upon by, any transferee of a Lender's rights and obligations under the Credit Agreement properly transferred in accordance with the Credit Agreement, and any such transferee may show this opinion to any governmental authority pursuant to requirements of applicable law or regulations. The opinions expressed herein are rendered on and as of the date hereof, and we assume no obligation to advise you or any such transferee or governmental authority or any other person, or to make any investigations, as to any legal developments or factual matters arising subsequent to the date hereof that might affect the opinions expressed herein.

JPMorgan Chase Bank, N.A.
As Administrative Agent, et al.
December [ ], 2007
p. 5

Very truly yours,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By______________________________

Andrea G. Podolsky, a Partner

EXHIBIT B-2

**OPINION OF SPECIAL MEXICAN COUNSEL TO THE BORROWER**

Final Form

December 19, 2007

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent for the benefit of the Lenders under the Credit Agreement
1111 Fannin Street
10th Floor
Houston, Texas 77002

Ladies and Gentlemen:

We have acted as Mexican counsel to Empresas Cablevisión, S.A.B. de C.V. (the "Company" or the "Borrower"), a Mexican limited liability public stock corporation with variable capital (*sociedad anónima bursátil de capital variable*) in connection with the preparation, execution and delivery of the Credit Agreement dated December 19, 2007 among the Company, the Persons listed in Schedule 2.01 thereto, JPMorgan Chase Bank, N.A., as Administrative Agent, and J.P. Morgan Securities Inc. as Sole Bookruner and Lead Arranger (the "Credit Agreement"). This opinion is furnished to you, at your request, pursuant to Section 4.01(b)(ii) of the Credit Agreement.

All capitalized terms used herein that are defined in the Credit Agreement, have the meanings assigned to such terms therein, unless otherwise defined herein. All assumptions and statements of reliance herein have been made without any independent investigation or verification on our part, except to the extent otherwise expressly stated, and we express no opinion with respect to the subject matter or accuracy of such assumptions or items relied upon.

In rendering the opinions expressed below, we have examined originals, or copies identified to our satisfaction, of the following documents:

(i) the Credit Agreement;

(ii) the Notes;

(iii) copies of the deed of incorporation (*escritura constitutiva*) and of the current by-laws (*estatutos sociales*) of the Borrower;

(iv) copies of the deed of incorporation (*escritura constitutiva*) and of the current by-laws (*estatutos sociales*) of each of the Guarantors;

(v) copy of public deed No. [•], dated [•], granted before Mr. [•], notary public No. [•] of Mexico, Federal District, evidencing the powers of attorney granted to [•], to execute each of the Loan Documents on behalf of the Borrower;

(vi) the public deed which contains the special power of attorney granted by the Borrower in favor of the Process Agent pursuant to the Credit Agreement (the "Power of Attorney of Process Agent").

We have further examined originals or copies of all such other corporate records, certificates of public officials, corporate resolutions, certificates and other documents, as we have deemed necessary as a basis for the opinions hereinafter expressed. However, we have made no independent investigation in any public registry.

In rendering the opinions expressed below, we have assumed without any independent investigation or verification of any kind, the legal capacity of all natural persons, the genuineness of all signatures, the authenticity of all documents submitted to us as originals and the conformity with authentic original documents of all documents submitted to us as copies. As to questions of fact material to the opinions hereinafter expressed, we have, when relevant facts were not independently established by us, relied upon the accuracy of the representations and warranties of the Borrower set forth in the Loan Documents and we have also relied upon originals or copies, certified or otherwise identified to our satisfaction, of all such corporate records of the Borrower, the Administrative Agent and the Lenders, and certificates and oral or written statements of public officials, officers and representatives of the Borrower and such other persons, and assume compliance on the part of all parties to the Loan Documents with their covenants and agreements contained therein. We have further assumed that:

(a) the Credit Agreement has been duly authorized by, has been duly executed and delivered by, and constitutes legal, valid, binding and enforceable obligations of, all of the parties to such documents (other than the Borrower;

(b) the validity, binding effect and enforceability of the Loan Documents under the laws of the State of New York, United States of America, and all other applicable laws and regulations (other than Mexican laws and regulations); and

(c) that all of the parties to the Credit Agreement (other than the Borrower are duly organized and validly existing and have the power and authority (corporate or other) under all applicable laws, rules, regulations and their constitutive documents to execute, deliver and perform their respective obligations under the Credit Agreement and that all corporate and governmental authorizations required under applicable law, other than Mexican law, have been obtained and are in full force and effect.

Based on the foregoing and subject to the assumptions and qualifications set forth herein, we are of the opinion that:

1. The Borrower (i) is a *sociedad anónima bursátil de capital variable*, duly organized and validly existing under the laws of the United Mexican States, and (ii) has the corporate power and authority to execute, deliver and perform its obligations arising under each Loan Document and has taken all necessary corporate action to authorize the execution, delivery and performance by it of each Loan Document.

2. The Borrower has duly executed and delivered each Loan Document, and assuming the due authorization, execution and delivery thereof by the Lenders and the Administrative Agent, constitutes a valid and binding obligation of the Borrower, enforceable against it in accordance with its respective terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, *concurso mercantil*, insolvency, reorganization, moratorium or similar laws generally affecting creditors' rights.

3. Neither the execution, delivery or performance by the Borrower of each of the Loan Documents nor compliance by it with the terms and provisions thereof (i) contravenes any provisions of any existing applicable Mexican law, statute, rule or regulation, (ii) violates any provision of the bylaws (*estatutos sociales*) of the Borrower, or (iii)

contravenes the terms of any concession, authorization or license or any judgment of any Mexican governmental body or agency or court having jurisdiction over the Borrower or its respective properties or assets, or any agreement or instrument known to us to which the Borrower is a party or under which it is bound.

4. No authorization or approval by, and no notice to or filing with, any Mexican governmental, judicial or legislative authority, or approval from any shareholder or third party, is required for the execution or performance by the Borrower of each of the Loan Documents or for the validity or enforceability thereof, except for those which have been obtained or made and are in full force and effect on the date hereof.

5. The Notes, when duly executed, issued and delivered on the Effective Date in accordance with the Credit Agreement, will constitute legal, valid and enforceable obligations of the Borrower, that qualify each as a *pagaré* under Mexican law, enforceable against the Borrower in accordance with their terms. The Notes may be enforced against the Borrower in Mexico pursuant to executory proceedings (*juicio ejecutivo mercantil*) or ordinary proceedings (*juicio ordinario mercantil*).

6. The choice of the laws of the State of New York, United States of America, in the Credit Agreement and in the Notes, under which each of them is stated to be governed by such laws is a valid and binding choice of law that will be observed and be given effect by the courts of Mexico.

7. None of the Borrower's properties or assets in the United Mexican States is entitled to immunity from suit, execution, attachment or other legal process in the United Mexican States or in connection with any procedure initiated in the courts of the United Mexican States.

8. Any judgment rendered in a New York court, arising out of or in relation to the obligations of the Borrower under the Credit Agreement and the Notes, may be enforced by Mexican courts, provided that:

(a) such judgment is obtained in compliance with legal requirements of the jurisdiction of the court rendering such judgment and in compliance with legal requirements and terms set forth in the Credit Agreement or the Notes, as applicable;

(b)    such judgment is strictly for the payment of a certain sum of money and has been rendered in an *in personam* action as opposed to an *in rem* action;

(c)    process was served personally on the Borrower or on the process agent;

(d)    such judgment does not contravene Mexican law, Mexican public policy, international treaties or agreements binding upon Mexico or general accepted principles of international law;

(e)    the applicable procedure under the laws of Mexico with respect to the enforcement of foreign judgments (including, but not limited to, the issuance of a letter rogatory by the competent authority of such jurisdiction requesting enforcement of such judgments as being final and the certification of such judgments as authentic by the corresponding authorities of such jurisdiction in accordance with the laws thereof) is complied with;

(f)    such judgment is final in the jurisdiction in which it was obtained;

(g)    the action in respect of which such judgment was rendered is not the subject matter of a lawsuit among the same parties pending before a Mexican court;

(h)    the judgment and related documents are translated into Spanish by an expert duly authorized for their admissibility before the Mexican courts before which enforcement is requested, being such translation subject to approval by the Mexican court after the defendant has been given an opportunity to be heard with respect to the accuracy of the translation, and such proceedings would thereafter be based upon the translated documents, and

(i)    any such foreign court would enforce final judgments rendered by the federal or state courts of Mexico as a matter of reciprocity.

9.    To the best of our knowledge, there is no pending or threatened action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator, involving the Borrower or any of its subsidiaries or its or their respective property which,

if determined adversely to the Borrower, or to any of its subsidiaries, would individually or in the aggregate, have or be reasonably expected to have, a Material Adverse Effect.

10. The Borrower has duly appointed CT Corporation System as its authorized agent for service of process, such appointment is legal, valid and binding under Mexican law, and such process agent will be entitled to receive process on behalf of the Borrower [and each of the Guarantors.

11. The payment obligations of the Borrower under the Credit Agreement and the Notes, will rank, at all times, at least *pari passu* in priority of payment with all other present and future unsecured and unsubordinated obligations of the Borrower from time to time outstanding.

12. There is no tax, deduction or withholding imposed by the United Mexican States, on or by virtue of (i) the execution and delivery of each of the Loan Documents, or (ii) any payments to be made to the Administrative Agent or the Lenders under any of the Loan Documents by the Borrower, except for payments to the Administrative Agent or to Lenders that are non-resident of Mexico for tax purposes, of interest or payments that are deemed to be interest for Mexican tax purposes, which are subject to the payment of withholding taxes.

13. None of the Lenders, the Administrative Agent or the Lead Arranger is required to be licensed or qualified to carry on business in the United Mexican States, or subject to taxation as a resident of Mexico for tax purposes, solely by virtue of the execution, delivery or enforcement of any of the Loan Documents.

14. To ensure the legality, enforceability or admissibility in evidence of any of the Loan Documents, it is not necessary that any of such documents be filed or recorded with any court or governmental authority of the United Mexican States or that any Loan Document be notarized, provided that an official Spanish translation of the Credit Agreement or any related document is required to bring an action thereon in the courts of Mexico.

The foregoing opinions are subject to the following qualifications:

(a) The enforceability of the obligations of the Borrower under the Loan Documents are subject to applicable tax, labor, *concurso mercantil*, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally.

(b) In the event that legal proceedings are brought in the courts of Mexico with respect to the Credit Agreement, a Spanish translation of such document will be required to be prepared by a court-authorized translator and approved by the court after the defendant has been given an opportunity to be heard with respect to the accuracy of the translation, and proceedings would thereafter be based upon the translated documents.

(c) In any proceeding brought before the courts of Mexico for the enforcement of the Credit Agreement, or with respect to any judgment related thereto obtained in a foreign jurisdiction against the Borrower, a Mexican court would apply Mexican procedural law in such proceedings.

(d) Mexican law does not permit the collection of interest-on-interest and, consequently, any relevant provisions of the Loan Documents relating to the payment of interest-on-interest may not be enforced in Mexico.

(e) We note that since service of process by mail does not constitute personal service of process under Mexican Law and since service of process is considered to be a basic procedural requirement under the laws of Mexico, if for the purposes of a legal proceeding outside Mexico service of process is made by mail or in any manner that does not constitute personal service or does not guarantee due process of law or otherwise prevents the Borrower, as the case may be, from exercising its rights as defendant to be heard and to controvert the facts which bear on the question of law in the matter involved, then a final judgment rendered in connection with such legal proceeding may not be enforced by the courts of Mexico.

(f) In case of any suit brought before Mexican courts, said courts should apply Mexican law on statute of limitations and expiration (*prescripción*) notwithstanding the fact that the parties to the Credit Agreement have selected other laws to govern such documents. We express no opinion as to the enforceability of a foreign judgment deriving from an action instituted once the Mexican statute of limitation periods have elapsed.

(g) Covenants and other agreements to perform an act other than payment of money and covenants and other agreements not to perform an act may not be specifically enforceable in Mexico, although any breach thereof may give rise to acceleration of the Credit Agreement and an action for monetary damages.

(h) Under the laws of Mexico, labor claims, claims of tax authorities for unpaid taxes, social security quotas, workers' housing fund quotas and retirement fund quotas may have priority over claims of Lenders.

(i) We express no opinion concerning the validity, binding nature and enforceability of the provisions set forth in Section 9.12 of the Credit Agreement since we consider that if a judgment is issued in Mexican currency and becomes final, no separate action in connection with such judgment may arise in order to discharge or satisfy such judgment in U.S. dollars or increase the amount of such judgment in connection with the exchange of Mexican currency for U.S. dollars or any other currency.

(j) In the event that proceedings are brought in Mexico seeking performance of the Borrower's obligations in Mexico, pursuant to Article 8 of the Mexican Monetary Law ("*Ley Monetaria de los Estados Unidos Mexicanos*"), the Borrower may discharge its obligations by paying any sums due in currency other than Mexican currency, in Mexican currency at the rate of exchange published in the Official Gazette of the Federation by the Central Bank the date when payment is made.

(k) Under the laws of Mexico, covenants of the Borrower that purport to bind it on matters reserved by law to shareholders or that purport to bind shareholders to vote or refrain from voting their shares, are not enforceable through specific performance, but may result in the acceleration of amounts due under the Credit Agreement.

(l) We note that, to the extent unenforceable under New York law, the law that governs the Credit Agreement, the indemnity provisions contained therein may be unenforceable under Mexican law.

(m) Provisions of the Loan Documents granting discretionary authority to the Administrative Agent or the Lenders cannot be exercised in a manner inconsistent with relevant facts nor defeat any requirement from a competent authority to produce satisfactory evidence as to the basis of

any determination. In addition, under the laws of Mexico, the Borrower, will have the right to contest in court any notice or certificate of the Administrative Agent of the Lenders purporting to be conclusive and binding.

(n) We note that in case of insolvency or bankruptcy proceeding (*concurso mercantil*) affecting the Borrower, any unsecured obligations of any of the parties to the Loan Documents subject to any such proceedings payable in currency other than pesos, will be converted first into pesos and then into *unidades de inversión* (UDIS) on the date the declaration of insolvency or bankruptcy (*concurso mercantil*) is made.

We express no opinion as to any laws other than the laws Mexico and we have assumed that there is nothing in any other law that affects our opinion, which is delivered based upon Mexican law applicable as of the date hereof. In particular, we have made no independent investigation of the laws of the State of New York and of the laws of the United States of America or any jurisdiction thereof as a basis for the opinions stated herein and do not express or imply any opinion on or based on the criteria or standards provided for in such laws. We express no opinion as to rights, obligations or other matters (including change of law or circumstances) arising subsequent to the date hereof.

We are furnishing this opinion to you solely for your benefit, in connection with the transactions contemplated under the Loan Documents. This opinion letter is not to be used, circulated, reproduced, quoted or otherwise referred to or relied upon by anyone else or for any other purpose without our prior written consent.

Sincerely,

Mijares, Angoitia, Cortés y Fuentes, S.C.

EXHIBIT B-3

OPINION OF SPECIAL NEW YORK COUNSEL
TO THE ADMINISTRATIVE AGENT

December [__], 2007

To the Lenders and the Administrative Agent
   referred to below
c/o JPMorgan Chase Bank, N.A.,
   as Administrative Agent
Americas Investment Bank Loan Operations
1111 Fannin, 10th Floor
Houston, Texas 77002

Ladies and Gentlemen:

     We have participated in the preparation of the Credit Agreement (the
"**Credit Agreement**") dated as of December [__], 2007 among Empresas
Cablevisión, S.A.B. de C.V., a corporation organized and existing under the laws
of the United Mexican States (the "**Borrower**"), the lenders listed therein (the
"**Lenders**") and JPMorgan Chase Bank, N.A., as Administrative Agent (the
"**Administrative Agent**") and have acted as special counsel for the
Administrative Agent for the purpose of rendering this opinion pursuant to
Section 4.01(c)(i) of the Credit Agreement. Terms defined in the Credit
Agreement are used herein as therein defined.

     We have examined originals or copies, certified or otherwise identified to
our satisfaction, of such documents, corporate records, certificates of public
officials and other instruments and have conducted such other investigations of
fact and law as we have deemed necessary or advisable for purposes of this
opinion.

     Upon the basis of the foregoing, and subject to the assumptions and
qualifications set forth below, we are of the opinion that the Credit Agreement
constitutes a valid and binding agreement of the Borrower enforceable in
accordance with its terms, except as limited by bankruptcy, insolvency or similar
laws affecting creditors' rights generally, including without limitation laws
regarding fraudulent conveyance or transfer, by possible judicial action giving
effect to governmental actions or foreign laws affecting creditors' rights and by
general principles of equity.

In giving the foregoing opinion, we have assumed, without independent investigation, that (i) the Borrower has been duly incorporated and is validly existing and in good standing under the laws of its jurisdiction of incorporation and of each other jurisdiction in which the conduct of its business or the ownership of its property makes such qualification necessary, (ii) the Borrower has full power and authority to execute, deliver and perform the Credit Agreement, (iii) the execution, delivery and performance of the Credit Agreement by the Borrower have been duly authorized by all requisite corporate action on the part of the Borrower, (iv) the Credit Agreement has been duly executed and delivered by the Borrower, (v) the execution, delivery and performance of the Credit Agreement by the Borrower do not require any action by or in respect of, or filing with, any governmental body, agency or official, and do not and will not violate or constitute a default under any provision of applicable law or regulation, the memorandum or articles of association or any other organizational document of the Borrower, or any contract, undertaking, judgment, injunction, order, decree or other instrument to which the Borrower is a party or by which it is bound and (vi) the Credit Agreement constitutes a valid and binding agreement of all parties thereto (other than the Borrower), enforceable against such parties in accordance with its terms. In addition, we express no opinion as to the effect (if any) of any law of any jurisdiction (except the State of New York) in which any Lender is located which limits the rate of interest that such Lender may charge or collect. We express no opinion as to provisions in the Credit Agreement which subject the Borrower to any claim for deficiency resulting from a judgment being rendered in a currency other than the currency called for in the Credit Agreement, and we express no opinion as to (i) whether a New York State or United States federal court would render or enforce a judgment in a currency other than U.S. Dollars or (2) the exchange rate that such a court would use in rendering a judgment in U.S. Dollars in respect of an obligation in any other currency. We express no opinion as to the subject matter jurisdiction of the Federal courts of the United States over any action between two parties neither of which is a "citizen" of any state for purposes of 28 U.S.C. Section 1332. We note that the selection of U.S. federal courts sitting in New York City contained in Section 9.09 of the Credit Agreement as the venue for actions for proceedings relating to the Credit Agreement is subject to the power of such courts to transfer actions pursuant to 28 U.S.C. Section 1404(a).

We are members of the Bar of the State of New York and the foregoing opinion is limited to the laws of the State of New York and the federal laws of the United States of America. In particular, we do not purport to be experts on the laws of the United Mexican States and to the extent that such laws are relevant to the opinions set forth herein, we understand that you will receive opinions from Mijares, Angoitia, Cortés y Fuentes, S.C., special Mexican counsel to the Borrower, and Ritch Mueller, S.C., special Mexican counsel to the Administrative Agent.

This opinion is rendered solely to you in connection with the above matter. This opinion may not be relied upon by you for any other purpose or relied upon by or any other person without our prior written consent.

Very truly yours,

EXHIBIT B-4

# OPINION OF SPECIAL MEXICAN COUNSEL TO THE ADMINISTRATIVE AGENT

RM DRAFT
12/19/07

December ___, 2007

To the Lenders and the Administrative Agent
Party to the Credit Agreement referred to below
c/o JPMorgan Chase Bank, N.A.
270 Park Avenue
New York, New York 10017
United States of America

Ladies and Gentlemen:

We have acted as special Mexican counsel to JPMorgan Chase Bank, N.A., as administrative agent (the "Administrative Agent"), and to the Lenders specified therein, in connection with the preparation and execution of the Credit Agreement dated as of December ___, 2007 (the "Credit Agreement"), entered into among Empresas Cablevisión, S.A.B. de C.V. (the "Borrower"), the Administrative Agent and the Lenders therein specified. This opinion is delivered to you pursuant to Section 4.01(c)(ii) of the Credit Agreement. Unless otherwise defined herein, terms defined in the Credit Agreement are used herein as therein defined.

In rendering the opinion expressed below, we have examined copies of the following documents:

(a) the Credit Agreement;

(b) forms of the Notes;

(c) the *estatutos sociales* of the Borrower;

(d) the powers-of-attorney granted to the attorneys-in-fact acting for the Borrower, in connection with the execution of the Credit Agreement and the Notes;

(e) such other documents and instruments, and such Mexican laws, rules or regulations, as we have deemed necessary or appropriate as a basis for the opinion expressed below.

We have assumed, without any independent investigation or verification of any kind, (i) the due authorization and execution by all parties thereto (other than the Borrower) of the Credit Agreement, and the power and authority of each such party (other than the Borrower), under all applicable laws, rules, regulations and their constitutive documents, to enter into,

execute and perform their respective obligations under the Credit Agreement,
(ii) that each of the aforementioned powers-of-attorney granted by the
Borrower has been duly registered with the relevant *Registro Público de
Comercio*, (iii) that all approvals (other than approvals required under the
laws of Mexico, which are addressed in this opinion) necessary for the
validity and enforceability of the Credit Agreement and the Notes, have been
obtained and are in full force and effect, (iv) the effectiveness, validity,
binding effect and enforceability of the Credit Agreement and the Notes under
the laws of the State of New York and of the United States of America, (v)
the genuineness of all signatures and the authenticity of the Credit
Agreement, the Notes and all opinions, documents, instruments and papers
submitted to us, (vi) that copies of all opinions, documents, instruments and
papers submitted to us are complete and conform to the originals thereof, and
(vii) that the documents submitted to us have not been amended or modified
after the date thereof in a manner that could reasonably affect the opinion
hereinafter expressed.  As to questions of fact material to the opinion
hereinafter expressed, we have, when relevant facts were not independently
established by us, relied upon originals or copies, certified or otherwise
identified to our satisfaction, of all such corporate records of the
Borrower, and such other instruments, representations and certificates of
public officials, officers and representatives of the Borrower and such other
persons, and we have made such investigations of law, as we have deemed
necessary or appropriate as a basis for the opinion expressed below.  We have
made no independent investigation in any public registry.

    Based upon the foregoing and subject to the qualifications specified
below, we are of the opinion that:

    (1)   The Borrower is a *sociedad anónima de capital variable*, duly
organized and validly existing under the laws of Mexico.

    (2)   The execution and performance by the Borrower of the Credit
Agreement and the Notes, are within the Borrower's powers, have been
authorized by all corporate action, and the Credit Agreement and the Notes do
not contravene any applicable Mexican Federal law, rule or regulation or the
*estatutos sociales* of the Borrower.

    (3)   The Credit Agreement and the Notes have been duly executed by the
Borrower, and the Notes constitute a valid and binding obligation of the
Borrower, enforceable against the Borrower in accordance with their terms.

    (4)   No authorization or approval by, and no notice to or filing with,
any Mexican governmental authority is required for the execution and
performance by the Borrower, of the Credit Agreement and the Notes, as the
case may be, or for the validity or enforceability thereof.

    (5)   The payment obligations of the Borrower under the Credit Agreement
and the Notes, rank at least *pari passu* in priority of payment, with all
other unsecured and unsubordinated indebtedness of the Borrower.

    (6)   There is no tax, deduction or withholding imposed by Mexico either
(i) on or by virtue of the execution of the Credit Agreement and the Notes by
the Borrower, or (ii) on any payment to be made by the Borrower pursuant to
the Credit Agreement or the Notes, except for a withholding tax on payments

of interest, commissions and fees made by the Borrower to the Administrative Agent or any Lender that is not a resident of Mexico for tax purposes, imposed under the *Ley del Impuesto Sobre la Renta* (the Mexican Income Tax Law).

(7)  The choice of New York law as the governing law of the Credit Agreement and the Notes is a valid choice of law.

(8)  The submission by the Borrower to the jurisdiction of any court of the United States of America located in New York or of the courts of the State of New York, United States of America, contained in the Credit Agreement and the Notes, is a valid submission to jurisdiction.

(9)  Any judgment obtained against the Borrower in any of the courts specified in the Credit Agreement or the Notes, as the case may be, arising out of or in relation to the obligations of the Borrower under the Credit Agreement or the Notes, as the case may be, would be enforceable in Mexico against the Borrower pursuant to Article 1347A of the Commerce Code (*Código de Comercio*), which provides, *inter alia*, that any judgment rendered outside Mexico may be enforced by Mexican courts, provided that:

(a)  such judgment is obtained in compliance with legal requirements of the jurisdiction of the court rendering such judgment and in compliance with all legal requirements of the Credit Agreement or the Notes, as the case may be;

(b)  such judgment is strictly for the payment of a certain sum of money, based on an *in personam* (as opposed to an *in rem*) action;

(c)  service of process was made personally on the Borrower or on the appropriate process agent;

(d)  such judgment does not contravene Mexican law, public policy of Mexico, international treaties or agreements binding upon Mexico or generally accepted principles of international law;

(e)  the applicable procedure under the laws of Mexico with respect to the enforcement of foreign judgments (including issuance of a letter rogatory by the competent authority of such jurisdiction requesting enforcement of such judgment and the certification of such judgment as authentic by the corresponding authorities of such jurisdiction in accordance with the laws thereof) is complied with;

(f)  such judgment is final in the jurisdiction where obtained;

(g)  the courts of such jurisdiction recognize the principles of reciprocity in connection with the enforcement of Mexican judgments in such jurisdiction; and

(h)  the action in respect of which judgment is rendered is not the subject matter of a lawsuit among the same parties pending before a Mexican court.

(10) The Notes qualify as negotiable instruments (*títulos de crédito*) under Mexican law and may be enforced through executory proceedings (*acción ejecutiva mercantil*).

The foregoing opinion is subject to the following qualifications:

(a) enforcement of the Credit Agreement and the Notes may be limited by bankruptcy, *concurso mercantil*, *quiebra*, insolvency, liquidation, reorganization, moratorium and other similar laws of general application relating to or affecting the rights of creditors generally;

(b) in any proceedings brought in the courts of Mexico for the enforcement of the Credit Agreement or the Notes against the Borrower, a Mexican court would apply Mexican procedural law;

(c) in the event that proceedings are brought in Mexico, seeking performance of the obligations of the Borrower in Mexico, pursuant to the *Ley Monetaria de los Estados Unidos Mexicanos* (the Mexican Monetary Law), the Borrower may discharge its obligations by paying any sum due in a currency other than Mexican currency, in Mexican currency at the rate of exchange prevailing in Mexico on the date when payment is made;

(d) provisions of the Credit Agreement or the Notes granting discretionary authority to the Administrative Agent or any Lender cannot be exercised in a manner inconsistent with relevant facts nor defeat any requirement from a competent authority to produce satisfactory evidence as to the basis of any determination; in addition, under Mexican law, the Borrower will have the right to contest in court any notice or certificate of the Administrative Agent or any Lender purporting to be conclusive and binding;

(e) in the event that any legal proceedings are brought to the courts of Mexico, a Spanish translation of the documents required in such proceedings prepared by a court-approved translator, would have to be approved by the court after the defendant had been given an opportunity to be heard with respect to the accuracy of the translation, and proceedings would thereafter be based upon the translated documents;

(f) in any bankruptcy proceeding initiated in Mexico pursuant to the laws of Mexico, labor claims, claims of tax authorities for unpaid taxes, Social Security quota, Workers' Housing Fund quota and Retirement Fund quota will have priority over claims of the Administrative Agent or any Lender;

(g) with respect to provisions contained in the Credit Agreement and the Notes in connection with service of process, it should be noted that service of process by mail does not constitute personal service of process under Mexican law and, since such service is considered to be a basic procedural requirement, if for purposes of proceedings outside Mexico service of process is made by mail, a final judgment based on such process would not be enforced by the courts of Mexico;

(h) covenants of the Borrower which purport to bind any of them on matters reserved by law to shareholders, or which purport to bind shareholders to vote or refrain from voting shares issued by any company

owned by them, are not enforceable through specific performance, but may result in an acceleration of amounts payable under the Credit Agreement;

(i) Mexican law does not permit the collection of interest-on-interest and, consequently, relevant provisions of the Credit Agreement and the Notes may not be enforceable in Mexico.

We are qualified to practice law in Mexico. We express no opinion as to any laws other than the laws of Mexico in effect on the date hereof or as to any matters not expressly covered herein. We express no opinion as to rights, obligations or other matters (including change of law or other circumstances) arising subsequent to the date hereof. We assume no responsibility to advise you of any change to our opinion subsequent to the date hereof.

This opinion is addressed to you solely for your benefit and it is not to be transmitted to anyone else nor is it to be relied upon by anyone else or for any other purpose or quoted or referred to in any public document or filed with anyone without our express consent.

Very truly yours,

Ritch Mueller, S.C.

By ____________________________
Luis A. Nicolau, a partner

EXHIBIT C

**FORM OF NOTE**

EXHIBIT C

FORM OF NOTE

NO NEGOCIABLE
NON-NEGOTIABLE

PAGARÉ
PROMISSORY NOTE

U.S.$225,000,000.00 Dlls.

For value received, the undersigned, Empresas Cablevisión, S.A.B. de C.V., by this Promissory Note unconditionally promises to pay to J.P. Morgan Chase Bank, N.A. (the "Bank"), the principal sum of U.S.$225,000,000.00 (TWO HUNDRED AND TWENTY FIVE MILLION DOLLARS OF THE UNITED STATES OF AMERICA 00/100), payable on December _, 2012 (the "Maturity Date"). If the Maturity Date is not a Business Day (as defined below), then payment shall be made on the next succeeding Business Day.

The undersigned also promises to pay interest on the outstanding and unpaid principal amount of this Promissory Note, for each day during each Interest Period (as defined below), from the date hereof until the amount hereof shall have been paid in full, at a rate per annum equal to the sum of the Applicable Margin (as defined below) for such day plus the Adjusted LIBO Rate (as defined below) applicable to such Interest Period. Interest shall be payable in arrears, on each Interest Payment Date (as defined below).

Any principal amount and (to the extent permitted by applicable law) interest not paid when due under this Promissory Note, shall bear interest for each day until paid, at a rate per annum equal to the sum of 2.00% plus the interest rate then applicable hereunder as provided in the preceding paragraph.

Interest hereunder shall be computed on the basis of a year of 360 days, and in each case shall be payable for the actual number of days elapsed in the relevant period (including the first day but excluding the last day).

For purposes of this Promissory Note, the following terms shall have the following meanings:

"Administrative Agent" means JPMorgan Chase Bank, N.A.

"Adjusted LIBO Rate" means an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Adjustment.

"Applicable Margin" means 0.400 % per annum.

"Business Day" means any day except a Saturday, Sunday or other day on which commercial banks in Mexico City, Mexico, or New York City, United States of America, are authorized or required by law to close, and any day on which commercial banks are not open for international business in London, England, including dealings in United States dollar deposits in the London Interbank market.

"Interest Payment Date" means the last day of each Interest Period.

E.U.A.$225,000,000.00 Dls.

Por valor recibido, la suscrita, Empresas Cablevisión, S.A.B. de C.V., por este Pagaré promete incondicionalmente pagar a J.P. Morgan Chase Bank, N.A. (el "Banco"), la suma principal de E.U.A.$225,000,000.00 (DOSCIENTOS VEINTICINCO MILLONES DE DÓLARES DE LOS ESTADOS UNIDOS DE AMÉRICA 00/100), pagadera el día __ de diciembre de 2012 (la "Fecha de Vencimiento"). Si la Fecha de Vencimiento no fuere un Día Hábil (como se define a continuación), entonces el pago se hará el siguiente Día Hábil.

La suscrita promete, así mismo, pagar intereses sobre el saldo insoluto de la suma de principal de este Pagaré, por cada día respecto de cada Periodo de Intereses (como se define a continuación), desde la fecha del presente hasta que hubiere pagado totalmente el saldo insoluto, a una tasa anual igual al Margen Aplicable (como se define a continuación) para el día de que se trate más la Tasa LIBO (como se define a continuación) aplicable a dicho Periodo de Intereses. Los intereses serán pagaderos en forma vencida, en cada Fecha de Pago de Intereses (como se define a continuación).

Cualquier monto de principal y (en la medida permitida por legislación aplicable) de intereses que no sea pagada cuando sea debida conforme a este Pagaré, devengará intereses por cada día hasta que sea pagado, a una tasa anual igual a la suma de 2.00% más la tasa de interés aplicable conforme al párrafo anterior.

Los intereses conforme al presente serán calculados sobre la base de un año de 360 días, y en cada caso serán pagaderos por el número de días transcurridos en el periodo de que se trate (incluyendo el primer día, pero excluyendo el último día).

Para efectos de éste Pagaré, los siguientes términos tendrán los siguientes significados:

"Agente Administrativo" significa JPMorgan Chase Bank, N.A.

"Tasa LIBO Ajustada" significa la tasa de interés anual (redondeada hacia arriba, de ser necesario, al siguiente 1/16 del 1%) igual a (a) la Tasa LIBO respecto de dicho Periodo de Intereses multiplicada por (b) la Reserva Legal Ajustada.

"Margen Aplicable" significa 0.400 % anual.

"Día Hábil" significa cualquier día excepto por sábado, domingo o cualquier otro día en el que los bancos comerciales en la ciudad de México, México, o de Nueva York, Estados Unidos de América, estén autorizados o sean requeridos por ley para cerrar, y cualquier otro día en que los bancos comerciales no estén abiertos para llevar a cabo operaciones internacionales en Londres, Inglaterra, incluyendo operaciones respecto de depósitos en dólares de los Estados Unidos en el mercado interbancario de Londres.

"Fecha de Pago de Intereses" significa el último día de cada Periodo de Intereses.

"Interest Period" means (i) in the case of the first Interest Period, the period commencing on the date hereof and ending on ____________, and (ii) for each subsequent Interest Period, the period commencing on the last date of the Interest Period then ending and ending on the numerically corresponding day of the ______ calendar month thereafter; provided that (x) if any Interest Period would end on a day which is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (y) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period, and (z) any Interest Period that would otherwise end after the Maturity Date, shall instead end on the Maturity Date.

"Período de Intereses" significa (i) en el caso del primer Período de Intereses, el período que inicie en la fecha del presente y que termine el __ de _________ de ____, y (ii) en el caso de cada Período de Intereses siguiente, el período que inicie el último día del Período de Intereses anterior y que termine en el día numéricamente correspondiente del ______ mes calendario siguiente; en el entendido que (x) si cualquier Período de Intereses terminaría en una fecha que no sea un Día Hábil, tal Período de Intereses se extenderá al siguiente Día Hábil salvo que tal Día Hábil siguiente tuviere lugar en otro mes calendario, caso en el cual tal Período de Intereses terminará en el Día Hábil anterior, (y) cualquier Período de Intereses que inicie en el último Día Hábil de un mes calendario (o en un día en que no haya día numéricamente correspondiente en el último mes calendario de tal Período de Intereses) terminará el último Día Hábil del último mes calendario de tal Período de Intereses, y (z) cualquier Período de Intereses que terminaría después de la Fecha de Vencimiento, terminará en la Fecha de Vencimiento.

"LIBO Rate" means, for any Interest Period, the rate per annum equal to the British Bankers Association LIBOR Rate ("BBA LIBOR") from Telerate Successor Page 3750, as published by Reuters (or, if such source is unavailable, other commercially available source providing quotations of BBA LIBOR as designated by the Administrative Agent from time to time to the undersigned) at approximately 11:00 a.m., London time, [three] Business Days prior to the commencement of such Interest Period, as the rate (rounded upwards, if necessary, to the next 1/16 of 1%) for deposits in United States dollars with a maturity comparable to such Interest Period. If such rate is not available at such time for any reason, then the "LIBO Rate" for such Interest Period shall be the rate at which United States dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, [three] Business Days before the beginning of such Interest Period.

"Tasa LIBO" significa, respecto de cualquier Período de Intereses, la tasa anual igual a la Tasa LIBOR de la Asociación de Banqueros Británicos ("LIBOR BBA") que aparezca en la Página Sucesora Telerate 3750, que publique Reuters (o si dicha fuente no está disponible, cualquier otra fuente comercialmente disponible que divulgue cotizaciones de la LIBOR BBA según lo determine periódicamente el Agente Administrativo a la suscrita), aproximadamente a las 11:00 a.m., hora de Londres, [tres] Días Hábiles antes del inicio de tal Período de Intereses, como la tasa (redondeada hacia arriba, de ser necesario, al siguiente 1/16 del 1%) para depósitos en dólares de los Estados Unidos con vencimiento comparable a tal Período de Intereses. En el caso que tal tasa no estuviere disponible en ese momento por cualquier causa, entonces la "Tasa LIBO" para tal Período de Intereses será el la tasa a la que depósitos en dólares de los Estados Unidos, por una suma de principal de EUA$5,000,000 y con una fecha de vencimiento comparable a dicho Período de Intereses, sean ofrecidos por la oficina principal en Londres del Agente Administrativo, en fondos inmediatamente disponibles, en el mercado interbancario de Londres, aproximadamente a las 11:00 a.m., hora de Londres, [tres] Días Hábiles antes del inicio de tal Período de Intereses.

"Other Taxes" means any and all documentary taxes and any other excise or property taxes, or similar charges or levies, including any penalties, fines or interest arising therefrom or with respect thereto imposed by Mexico, and which arise from any payment made by the undersigned under this Promissory Note or from the enforcement of, or otherwise with respect to, this Promissory Note (including any of the foregoing that are imposed or that arise in the future).

"Otros Impuestos" significa cualesquiera impuestos del timbre o documentales y cualquier otra contribución o impuesto sobre la propiedad, o cargas o aportaciones gubernamentales, incluyendo recargos, multas e intereses que resulten de los anteriores o relacionados con los mismos, que sean impuestos por México, y que resulten de cualquier pago hecho por la suscrita conforme a este Pagaré o de la ejecución de, o con respecto a, este Pagaré (incluyendo cualquiera de los anteriores que sean impuestos o existan en el futuro).

"Statutory Reserve Adjustment" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board of Governors of the Federal Reserve System of the United States of America (the "Federal Reserve Board") to which the Administrative Agent is subject with respect to eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Federal Reserve Board). Such reserve percentages will include those imposed pursuant to such Regulation D. The Statutory Reserve Adjustment will be adjusted automatically on and as of the effective date of any change in any applicable reserve percentage.

"Reserva Legal Ajustada" significa la fracción (expresada en decimales), el numerador de la cual es el número uno y el denominador de la cual es el número uno menos el total de los porcentajes máximos de reserva (incluyendo cualesquiera reservas marginales, especiales, de emergencia o complementarias) expresada como un decimal señalada por la Junta de Gobierno del Sistema de la Reserva Federal de los Estados Unidos de América (la "Reserva Federal") a la que el Agente Administrativo está sujeto con respecto de pasivos en euromonedas (referidas en esta fecha como "Pasivos en Euromonedas" en la Regla D de la Reserva Federal. Tales porcentajes de reserva incluirán los que se impongan de acuerdo a la Regla D. La Reserva Legal Ajustada será ajustada automáticamente precisamente en la fecha de eficacia de cualquier modificación a cualquier porcentaje de reserva aplicable.

"Taxes" means any and all taxes, duties, levies, imposts, contributions, deductions, charges or withholdings, of any nature, imposed by Mexico (or any political subdivision thereof, or taxing authority therein), and any penalties, fines or interest thereon, excluding, in the case of the holder hereof, taxes, duties, levies, imposts, deductions, charges and withholdings imposed on (or measured by) its net income, and branch profits, franchise or taxes imposed on it (other than Other Taxes due to a connection between such holder and Mexico other than the holding of this Promissory Note).

"Impuestos" significa cualesquiera impuestos, derechos, aportaciones, contribuciones, deducciones, cargas o retenciones, de cualquier naturaleza, determinadas por México (o cualquier división política de México o autoridad fiscal mexicana), y cualesquiera recargos, multas e intereses que resulten de los anteriores, excluyendo, respecto del tenedor del presente, impuestos, derechos, aportaciones, contribuciones, deducciones, cargas o retenciones impuestas respecto de (o determinadas considerando) sus ingresos netos, y cualquier impuesto a sucursales, de franquicias y otros impuestos determinados tenedor (excepto por Otros Impuestos resultantes de que exista un punto de contacto entre el tenedor y México distinto de la tenencia de este Pagaré).

All payments by the undersigned of principal, interest and other payments hereunder shall be made without setoff or counterclaim not later than 12:00 (noon), New York City time, on the date due, in immediately available funds, at the office of the Administrative Agent located at JPMorgan Chase Bank, N.A., Americas Investment Bank Loan Operations, 1111 Fannin, 10th Floor, Houston, Texas 77002. The undersigned agrees to pay all reasonable out-of-pocket expenses incurred by the holder hereof, including any fees, charges and disbursements of any counsel for such holder, in connection with the enforcement or protection of its rights under this Promissory Note.

Todos los pagos que deban hacerse conforme a este Pagaré por la suscrita, de principal, intereses y por otros conceptos serán efectuados sin compensación o defensa, antes de las 12:00 p.m., hora de la ciudad de Nueva York, en la fecha en que sean pagaderos, en fondos disponibles inmediatamente, en la oficina del Agente Administrativo localizada en JPMorgan Chase Bank, N.A., Americas Investment Bank Loan Operations, 1111 Fannin, 10th Floor, Houston, Texas 77002. La suscrita conviene en pagar todos los costos y gastos razonables en que incurra el tenedor del presente, incluyendo honorarios, gastos y desembolsos del representante legal de dicho tenedor, respecto de la ejecución y protección de sus intereses conforme al presente Pagaré.

Any and all payments by the undersigned to or for the account of the holder hereof shall be made without deduction or withholding for any Taxes or Other Taxes; provided that, if the undersigned shall be required by law, rule or regulation to deduct or withhold any Taxes or Other Taxes from any such payments, then (i) the sum payable by the undersigned to the holder hereof shall be increased as necessary so that after making all required deductions and withholdings (including deductions and withholding applicable to additional sums payable hereunder), the holder hereof receives an amount equal to the sum it would have received, had no deductions or withholdings been made, (ii) the undersigned shall make such deductions or withholdings, and (iii) the undersigned shall pay the full amount deducted or withheld to the relevant taxation authority or other authority in accordance with applicable law.

Todos los pagos por parte de la suscrita a favor y para beneficio del tenedor del presente se realizarán libres de y sin deducción o retención alguna respecto de cualesquiera Impuestos u Otros Impuestos; en el entendido que, si la suscrita estuviere obligada, por ley, reglamento o regla a deducir o retener cualesquiera Impuestos u Otros Impuestos de dichos pagos, entonces (i) la cantidad pagadera por la suscrita al tenedor del presente Pagaré se incrementará en la medida necesaria para que, una vez que todas las deducciones o retenciones requeridas (incluyendo las deducciones o retenciones aplicables a las cantidades adicionales pagaderas conforme al presente) hayan sido realizadas, el tenedor del presente Pagaré reciba una cantidad igual a la cantidad que hubiere recibido, si no se hubieren realizado dichas deducciones o retenciones, (ii) la suscrita realizará dichas deducciones o retenciones, y (iii) la suscrita pagará la cantidad total deducida o retenida a la autoridad fiscal o cualquier otra autoridad correspondiente de conformidad con la legislación aplicable.

This Promissory Note shall be governed by, and construed in accordance with, the laws of the State of New York, United States of America; provided, however that if any action or proceedings in connection with this Promissory Note were brought to any courts in the United Mexican States, this Promissory Note shall be deemed as governed under the laws of the United Mexican States.

Este Pagaré se regirá e interpretará de acuerdo con las leyes del Estado de Nueva York, Estados Unidos de América; en el entendido, sin embargo de que si cualquier acción o procedimiento en relación con este Pagaré se iniciara en los tribunales de los Estados Unidos Mexicanos, este Pagaré se considerará regido de acuerdo con las leyes de los Estados Unidos Mexicanos.

Any legal action or proceeding arising out of or relating to this Promissory Note may be brought before the Supreme Court of the State of New York, sitting in New York County, State of New York, United States of America, and the United States District Court of the Southern District of New York, State of New York, United States of America, and any appellate court from any thereof, or in the courts located in the City of Mexico, Federal District, United Mexican States; the undersigned waives the jurisdiction of any other courts.

Cualquier acción o procedimiento legal que derive o se relacione con este Pagaré podrá ser instituido ante la Suprema Corte del Estado de Nueva Cork, con asiento en el Condado de Nueva York, Estado de Nueva York, Estados Unidos de América, y en el Tribunal de Distrito de los Estados Unidos para Distrito Sur de Nueva York, Estado de Nueva York, Estados Unidos de América, y cualquier tribunal de apelación respecto de los anteriores, o cualquier tribunal localizado en la ciudad de México, Distrito Federal, Estados Unidos Mexicanos, renunciando la suscrita a la jurisdicción de cualesquiera otros tribunales.

The undersigned hereby waives diligence, demand, protest, presentment, notice of dishonor or any other notice or demand whatsoever in respect of this Promissory Note.

La suscrita en este acto renuncia a diligencia, demanda, protesto, presentación, notificación de no aceptación y a cualquier notificación o demanda de cualquier naturaleza respecto de este Pagaré.

This Promissory Note is executed in both English and Spanish versions. In the case of any conflict or doubt as to the proper construction of this Promissory Note, the English version shall govern. Notwithstanding the foregoing, any action or proceeding brought in any court in the United Mexican States, the Spanish version shall be controlling.

El presente Pagaré se suscribe en versiones en inglés y español. En caso de conflicto o duda en relación con la debida interpretación de este Pagaré, la versión en inglés prevalecerá. No obstante lo anterior, cualquier procedimiento iniciado en los Estados Unidos Mexicanos, prevalecerá la versión en español.

IN WITNESS WHEREOF, the undersigned has duly executed this Promissory Note as of the date mentioned below.

EN VIRTUD DE LO CUAL, la suscrita ha firmado este Pagaré en la fecha abajo mencionada.

México, Distrito Federal, Estados Unidos Mexicanos, a __ de diciembre de 2007.
Mexico, Federal District, United Mexican States, December __, 2007.

Empresas Cablevisión, S.A.B. de C.V.

Por/By ________________
Nombre/Name:
Cargo/Title:

EXHIBIT D

## FORM OF BORROWING REQUEST

JPMorgan Chase Bank, N.A.,
as Administrative Agent
Attention of Tokunbo Tayo
Americas Investment Bank Loan Operations
1111 Fannin, 10th Floor
Houston, Texas 77002

This notice shall constitute a "**Borrowing Request**" pursuant to Section 2.02 of the Credit Agreement dated as of December 19, 2007 among Empresas Cablevisión, S.A.B. de C.V., the Lenders parties thereto and JPMorgan Chase Bank, N.A., as Administrative Agent (as the same may be amended from time to time, the "**Credit Agreement**"). Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Credit Agreement.

1. The date of the Borrowing shall be _______, 2007.

2. The aggregate amount of the Borrowing shall be $_____________.

3. The duration of the initial Interest Period for the Loans comprising this Borrowing shall be ________.

EMPRESAS CABLEVISIÓN, S.A.B. DE C.V.

By: ______________________________
Name:

Date: ______________________________

EXHIBIT E

NOTICE OF INTEREST PERIOD ELECTION[3]

JPMorgan Chase Bank, N.A.,
as Administrative Agent
Attention of Tokunbo Tayo
Americas Investment Bank Loan Operations
1111 Fannin, 10th Floor
Houston, Texas 77002

This notice shall constitute a "**Notice of Interest Period Election**" pursuant to Section 2.06 of the Credit Agreement dated as of December 19, 2007 among Empresas Cablevisión, S.A.B. de C.V., the Lenders parties thereto and JPMorgan Chase Bank, N.A., as Administrative Agent (as the same may be amended from time to time, the "**Credit Agreement**"). Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Credit Agreement.

1. The date on which the continuation selected is to be effective is __________, 20__.

2. The duration of the new Interest Period for the Loans shall be ____________.[4]

EMPRESAS CABLEVISIÓN, S.A.B. DE C.V.

By: ______________________________
Name:
Title:

Date: _________________, ____

[3] Deliver to the Administrative Agent not later than 12:00 Noon (New York City time) on the third Business Day before such election is to be effective.

[4] Insert appropriate Interest Period pursuant to the definition thereof.

EXHIBIT F

TERMS OF SUBORDINATION

The Subordinate Debt shall, to the extent hereinafter set forth, be subordinate to the Senior Debt.

(a) Unless and until the Senior Debt shall have been paid in full and all commitments to extend Senior Debt shall have terminated, neither the Borrower nor any of its Subsidiaries shall make, and the Subordinated Lender shall not demand, accept or receive, or attempt to collect or commence any legal proceedings to collect, any direct or indirect payment (in cash or property or by setoff, exercise of contractual or statutory rights or otherwise) of or on account of the Subordinated Debt (including any payment in respect of redemption or purchase or other acquisition of the Subordinated Debt) or any interest thereon.

(b) Unless and until the Senior Debt shall have been paid in full and all commitments to extend Senior Debt shall have terminated, the Subordinated Lender will not commence or maintain any action, suit or any other legal or equitable proceeding against the Borrower or any of its Subsidiaries, or join with any creditor in any such proceeding, under any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar law, unless the Senior Debt Holders shall also join in bringing such proceeding; *provided* that the foregoing shall not prohibit the Subordinated Lender from filing a proof of claim or otherwise participating in any such proceeding not commenced by it (subject to subsection (l) below).

(c) In the event of any Bankruptcy Proceeding relative to the Borrower or to substantially all of the property of the Borrower and its Subsidiaries, then:

(i) the Senior Debt Holders shall first be entitled to receive payment in full of the Senior Debt before the Subordinated Lender is entitled to receive any payment on account or in respect of Subordinated Debt; and

(ii) any payment or distribution of assets of the Borrower or any of its Subsidiaries of any kind or character, whether in cash, property or securities to which the Subordinated Lender would be entitled in respect of the Subordinated Debt, but for the provisions of these terms of subordination, shall be paid or distributed by the liquidating trustee or agent or other person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or other trustee or agent, directly to the Senior Debt Representative on behalf of and for the benefit of the Senior Debt Holders to the extent necessary to make payment in full of all amounts of Senior Debt remaining unpaid, after giving effect to any concurrent payment or distribution to the Senior Debt Holders.

(d) Should any payment or distribution or security or the proceeds of any thereof be collected or received by the Subordinated Lender in respect of the Subordinated Debt, at a time when the payment thereof by the Borrower or any of its Subsidiaries is prohibited by these terms of subordination, the Subordinated Lender will

forthwith deliver the same to the Senior Debt Representative on behalf of the Senior Debt Holders for the equal and ratable benefit of the Senior Debt Holders in precisely the form received (except for the endorsement or the assignment of or by the Subordinated Lender where necessary) for application to payment of the Senior Debt in accordance with the Credit Agreement, after giving effect to any concurrent payment or distribution to the Senior Debt Holders and, until so delivered, the same shall be held in trust by the Subordinated Lender as the property of the Senior Debt Holders.

(e)     The Subordinated Lender shall not be subrogated to the rights of the Senior Debt Holders to receive payments or distributions of assets of the Borrower or any of its Subsidiaries until all amounts payable with respect to the Senior Debt shall be paid in full; and, for the purposes of such subrogation, no payments or distributions to the Senior Debt Holders of any cash, property or securities with respect to the Subordinated Debt to which the Subordinated Lender would be entitled except for these provisions shall, as among the Borrower, its Subsidiaries, their respective creditors other than the Senior Debt Holders, and the Subordinated Lender, be deemed to be a payment by the Borrower to or on account of the Senior Debt. These terms of subordination are and are intended solely for the purpose of defining the relative rights of the Subordinated Lender, on the one hand, and the Senior Debt Holders, on the other hand with respect to the Subordinated Debt.

(f)     Subject to the payment in full of the Senior Debt, the Subordinated Lender shall be subrogated to the rights of the Senior Debt Holders to receive payments or distributions of cash, property or securities of the Borrower or any of its Subsidiaries applicable to the Senior Debt until all amounts owing on the Subordinated Debt shall be paid in full. For purposes of such subrogation, no payments or distributions to the Subordinated Lender of cash, property, securities or other assets by virtue of the subrogation herein provided which otherwise would have been made to the Senior Debt Holders shall, as between the Borrower, its Subsidiaries, their respective creditors other than the Senior Debt Holders and the Subordinated Lender, be deemed to be a payment to or on account of the Subordinated Debt. The Subordinated Lender agrees that, in the event that all or any part of any payment made on account of the Senior Debt is recovered from the Senior Debt Holders as a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law, any payment or distribution received by the Subordinated Lender on account of the Subordinated Debt at any time after the date of the payment so recovered, whether pursuant to the right of subrogation provided for in these terms of subordination or otherwise, shall be deemed to have been received by the Subordinated Lender in trust as the property of the Senior Debt Holders and the Subordinated Lender shall forthwith deliver the same to the Senior Debt Representative and any other representative on behalf of the Senior Debt Holders for the equal and ratable benefit of the Senior Debt Holders for application to payment of the Senior Debt in full.

(g)     The Subordinated Lender hereby waives any and all notice in respect of the Senior Debt, present or future, and agrees and consents that without notice to or assent by the Subordinated Lender:

(i)     the obligation and liabilities of the Borrower or any of its Subsidiaries or any other party or parties for or upon the Senior Debt (or any

promissory note, security document or guaranty evidencing or securing the same) may, from time to time, in whole or in part, be renewed, extended, modified, amended, restated, accelerated, compromised, supplemented, terminated, sold, exchanged, waived or released in accordance with the Loan Documents;

      (ii)    the Senior Debt Representative and the Senior Debt Holders may exercise or refrain from exercising any right, remedy or power granted by or in connection with any agreements relating to the Senior Debt in connection with the Loan Documents; and

      (iii)    any balance or balances of funds with any Senior Debt Holders at any time standing to the credit of the Borrower or any of its Subsidiaries may, from time to time, in whole or in part, be surrendered or released;

all as the Senior Debt Representative or the Senior Debt Holders may deem advisable and all without impairing, abridging, diminishing, releasing or affecting the subordination of the Subordinated Debt to the Senior Debt provided for herein.

      (h)    Nothing contained in these terms of subordination is intended to or shall impair, as between the Borrower, its Subsidiaries, their respective creditors other than the Senior Debt Holders, and the Subordinated Lender, the obligation of the Borrower and/or its Subsidiaries, which is absolute and unconditional, to pay to the Subordinated Lender the principal of, premium, if any, and interest and other amounts due on the Subordinated Debt, as and when the same shall become due and payable (subject to the subordination provisions in these terms of subordination for the benefit of the Senior Debt Holders) in accordance with its terms, or is intended to or shall affect the relative rights of the Subordinated Lender and other creditors of the Borrower or any of its Subsidiaries other than the Senior Debt Holders.

      (i)    The Subordinated Lender acknowledges and agrees that the Senior Debt Holders have relied upon and will continue to rely upon the subordination provided for herein in entering into the Loan Documents and in extending credit to the Borrower pursuant thereto.

      (j)    No present or future Senior Debt Holder shall be prejudiced in its right to enforce the subordination contained herein in accordance with the terms hereof by any act or failure to act on the part of the Borrower, any of its Subsidiaries or the Subordinated Lender. The subordination provisions contained herein are for the benefit of the Senior Debt Holders from time to time and, so long as the Senior Debt is outstanding, may not be rescinded, cancelled or modified in any way without the prior written consent thereto of all Senior Debt Holders.

      (k)    Notwithstanding anything to the contrary in these subordination provisions, upon any payment or distribution of assets of the Borrower or any of its Subsidiaries in any Bankruptcy Proceeding, the Subordinated Lender shall be entitled to rely upon any final order or decree made by any court of competent jurisdiction in which any such proceedings are pending for the purpose of ascertaining the persons entitled to participate in such payment or distribution, the Senior Debt Holders and other debt of the

Borrower or any of its Subsidiaries, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto.

(l)       The Subordinated Lender hereby irrevocably authorizes the Senior Debt Representative, to the extent permitted by law and so long as the Senior Debt remains outstanding, (i) to file on the Subordinated Lender's behalf proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims with respect to the Subordinated Debt allowed in any Bankruptcy Proceeding and (ii) to authorize or consent to, or accept or adopt on behalf of the Subordinated Lender, any plan of reorganization, arrangement, adjustment or composition affecting the Subordinated Debt or the rights of the Subordinated Lender with respect thereto, or otherwise vote the claim or claims in respect of the Subordinated Debt in any Bankruptcy Proceeding.  The Senior Debt Representative is further entitled and empowered to the extent permitted by law and so long as Senior Debt remains outstanding to collect, receive and distribute any money, securities or other property payable or deliverable upon conversion or exchange of the Subordinated Debt or upon any such claims.  Any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by the Subordinated Lender to make such payments to the Senior Debt Representative and, if the Senior Debt Representative consents to the making of such payments directly to the Senior Debt Holders, to pay to the Senior Debt Representative any amount due to it under the Loan Documents.

(m)       These Terms of Subordination shall be binding upon any holder of Subordinated Debt and upon the successors and assigns of the Subordinated Lender; and all references herein to the Subordinated Lender shall be deemed to include any successor or successors, whether immediate or remote, to the Subordinated Lender.

(n)       Notwithstanding anything contained herein, the Borrower or any of its Subsidiaries may (i) pay any fees, costs and expenses due to the Subordinated Lender and (ii) if the Subordinated Lender (at its discretion) agrees, pay any of the Subordinated Debt, in each case by means of an issuance of equity interests (other than indebtedness) of the Borrower or any of its Subsidiaries.

Definitions:

"*Bankruptcy Proceeding*" means any proceeding, whether voluntary or involuntary, with respect to the Borrower or its debts or assets under any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar law now or hereafter in effect, including for the winding up or dissolution of the Borrower, and including any such proceeding involving the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the foregoing.

"*Borrower*" means Empresas Cablevisión, S.A.B. de C.V.

"*Credit Agreement*" means the Credit Agreement dated as of December 19, 2007 between the Borrower, the lenders parties thereto and the Senior Debt Representative.

"*Loan Documents*" means the Credit Agreement and any promissory note delivered in connection therewith.

"*Senior Debt*" means all principal, interest, fees, expenses, and other amounts payable to the Lenders parties to the Credit Agreement under the Credit Agreement on or in respect of loans under the Credit Agreement.

"*Senior Debt Holders*" means any holder or holders of Senior Debt, together with their respective successors and permitted assigns.

"*Senior Debt Representative*" means the Administrative Agent, as defined in the Credit Agreement, including its successors in such capacity.

"*Subordinated Debt*" means the payment obligations being subordinated to the Senior Debt.

"*Subordinated Lender*" means Grupo Televisa, S.A.B. and/or its Affiliates, as applicable.

"*subsidiary*" means, with respect to any Person at any date, any corporation, limited liability company, partnership or other entity of which voting stock representing more than 50% of the total voting power of the outstanding voting stock is owned, directly or indirectly, by such Person and/or one or more other subsidiaries of such Person.

"*Subsidiary*" means any subsidiary of the Borrower.

NO NEGOCIABLE
NON-NEGOTIABLE

PAGARÉ
PROMISSORY NOTE

U.S.$225,000,000.00 Dlls.

E.U.A.$225,000,000.00 Dls.

For value received, the undersigned, Empresas Cablevisión, S.A.B. de C.V., by this Promissory Note unconditionally promises to pay to J.P. Morgan Chase Bank, N.A. (the "Bank"), the principal sum of U.S.$225,000,000.00 (TWO HUNDRED AND TWENTY FIVE MILLION DOLLARS OF THE UNITED STATES OF AMERICA 00/100), payable on December 21, 2012 (the "Maturity Date"). If the Maturity Date is not a Business Day (as defined below), then payment shall be made on the next succeeding Business Day.

Por valor recibido, la suscrita, Empresas Cablevisión, S.A.B. de C.V., por este Pagaré promete incondicionalmente pagar a J.P. Morgan Chase Bank, N.A. (el "Banco"), la suma principal de E.U.A.$225,000,000.00 (DOSCIENTOS VEINTICINCO MILLONES DE DÓLARES DE LOS ESTADOS UNIDOS DE AMÉRICA 00/100), pagadera el día 21 de diciembre de 2012 (la "Fecha de Vencimiento"). Si la Fecha de Vencimiento no fuere un Día Hábil (como se define a continuación), entonces el pago se hará el siguiente Día Hábil.

The undersigned also promises to pay interest on the outstanding and unpaid principal amount of this Promissory Note, for each day during each Interest Period (as defined below), from the date hereof until the amount hereof shall have been paid in full, at a rate per annum equal to the sum of the Applicable Margin (as defined below) for such day plus the Adjusted LIBO Rate (as defined below) applicable to such interest Period. Interest shall be payable in arrears, on each Interest Payment Date (as defined below).

La suscrita promete, así mismo, pagar intereses sobre el saldo insoluto de la suma de principal de este Pagaré, por cada día respecto de cada Periodo de Intereses (como se define a continuación), desde la fecha del presente hasta que hubiere pagado totalmente el saldo insoluto, a una tasa anual igual al Margen Aplicable (como se define a continuación) para el día de que se trate más la Tasa LIBO (como se define a continuación) aplicable a dicho Periodo de Intereses. Los intereses serán pagaderos en forma vencida, en cada Fecha de Pago de Intereses (como se define a continuación).

Any principal amount and (to the extent permitted by applicable law) interest not paid when due under this Promissory Note, shall bear interest for each day until paid, at a rate per annum equal to the sum of 2.00% plus the interest rate then applicable hereunder as provided in the preceding paragraph.

Cualquier monto de principal y (en la medida permitida por legislación aplicable) de intereses que no sea pagada cuando sea debida conforme a este Pagaré, devengará intereses por cada día hasta que sea pagado, a una tasa anual igual a la suma de 2.00% más la tasa de interés aplicable conforme al párrafo anterior.

Interest hereunder shall be computed on the basis of a year of 360 days, and in each case shall be payable for the actual number of days elapsed in the relevant period (including the first day but excluding the last day).

Los intereses conforme al presente serán calculados sobre la base de un año de 360 días, y en cada caso serán pagaderos por el número de días transcurridos en el periodo de que se trate (incluyendo el primer día, pero excluyendo el último día).

For purposes of this Promissory Note, the following terms shall have the following meanings:

Para efectos de éste Pagaré, los siguientes términos tendrán los siguientes significados:

"Administrative Agent" means JPMorgan Chase Bank, N.A.

"Agente Administrativo" significa JPMorgan Chase Bank, N.A.

"Adjusted LIBO Rate" means an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Adjustment.

"Tasa LIBO Ajustada" significa la tasa de interés anual (redondeada hacia arriba, de ser necesario, al siguiente 1/16 del 1%) igual a (a) la Tasa LIBO respecto de dicho Periodo de Intereses multiplicada por (b) la Reserva Legal Ajustada.

"Applicable Margin" means 0.425% per annum.

"Margen Aplicable" significa 0.425% anual.

"Business Day" means any day except a Saturday, Sunday or other day on which commercial banks in Mexico City, Mexico, or New York City, United States of America, are authorized or required by law to close, and any day on which commercial banks are not open for international business in London, England, including dealings in United States dollar deposits in the London interbank market.

"Día Hábil" significa cualquier día excepto por sábado, domingo o cualquier otro día en el que los bancos comerciales en la ciudad de México, México, o de Nueva York, Estados Unidos de América, estén autorizados o sean requeridos por ley para cerrar, y cualquier otro día en que los bancos comerciales no estén abiertos para llevar a cabo operaciones internacionales en Londres, Inglaterra, incluyendo operaciones respecto de depósitos en dólares de los Estados Unidos en el mercado interbancario de Londres.

"Interest Payment Date" means the last day of each Interest Period.

"Fecha de Pago de Intereses" significa el último día de cada Periodo de Intereses.

"Interest Period" means (i) in the case of the first Interest Period, the period commencing on the date hereof and ending on March 21, 2008, and (ii) for each subsequent Interest Period, the period commencing on the last date of the Interest Period then ending and ending on the numerically corresponding day of the third calendar month thereafter; provided that (x) if any Interest Period would end on a day which is not

"Periodo de Intereses" significa (i) en el caso del primer Periodo de Intereses, el periodo que inicie en la fecha del presente y que termine el 21 de marzo de 2008, y (ii) en el caso de cada Periodo de Intereses siguiente, el periodo que inicie el último día del Periodo de Intereses anterior y que termine en el día numéricamente correspondiente del tercer mes calendario

a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (y) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period, and (z) any Interest Period that would otherwise end after the Maturity Date, shall instead end on the Maturity Date.

siguiente; en el entendido que (x) si cualquier Periodo de Intereses terminaría en una fecha que no sea un Día Hábil, tal Periodo de Intereses se extenderá al siguiente Día Hábil salvo que tal Día Hábil siguiente tuviere lugar en otro mes calendario, caso en el cual tal Periodo de Intereses terminará en el Día Hábil anterior, (y) cualquier Periodo de Intereses que inicie en el último Día Hábil de un mes calendario (o en un día en que no haya día numéricamente correspondiente en el último mes calendario de tal Periodo de Intereses) terminará el último Día Hábil del último mes calendario de tal Periodo de Intereses, y (z) cualquier Periodo de Intereses que terminaría después de la Fecha de Vencimiento, terminará en la Fecha de Vencimiento.

"LIBO Rate" means, for any Interest Period, the rate per annum equal to the British Bankers Association LIBOR Rate ("BBA LIBOR") from Telerate Successor Page 3750, as published by Reuters (or, if such source is unavailable, other commercially available source providing quotations of BBA LIBOR as designated by the Administrative Agent from time to time to the undersigned) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate (rounded upwards, if necessary, to the next 1/16 of 1%) for deposits in United States dollars with a maturity comparable to such Interest Period. If such rate is not available at such time for any reason, then the "LIBO Rate" for such Interest Period shall be the rate at which United States dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days before the beginning of such Interest Period.

"Tasa LIBO" significa, respecto de cualquier Periodo de Intereses, la tasa anual igual a la Tasa LIBOR de la Asociación de Banqueros Británicos ("LIBOR BBA") que aparezca en la Página Sucesora Telerate 3750, que publique Reuters (o si dicha fuente no está disponible, cualquier otra fuente comercialmente disponible que divulgue cotizaciones de la LIBOR BBA según lo determine periódicamente el Agente Administrativo a la suscrita), aproximadamente a las 11:00 a.m., hora de Londres, dos Días Hábiles antes del inicio de tal Periodo de Intereses, como la tasa (redondeada hacia arriba, de ser necesario, al siguiente 1/16 del 1%) para depósitos en dólares de los Estados Unidos con vencimiento comparable a tal Periodo de Intereses. En el caso que tal tasa no estuviere disponible en ese momento por cualquier causa, entonces la "Tasa LIBO" para tal Periodo de Intereses será el la tasa a la que depósitos en dólares de los Estados Unidos, por una suma de principal de EUA$5,000,000 y con una fecha de vencimiento comparable a dicho Periodo de Intereses, sean ofrecidos por la oficina principal en Londres del Agente Administrativo, en fondos inmediatamente disponibles, en el mercado interbancario de Londres, aproximadamente a las 11:00 a.m., hora de Londres, dos Días Hábiles antes del inicio de tal Periodo de Intereses.

"Other Taxes" means any and all documentary taxes and any other excise or property taxes, or similar charges or levies, including any penalties, fines or interest arising therefrom or with respect thereto imposed by Mexico, and which arise from any payment made by the undersigned under this Promissory Note or from the enforcement of, or otherwise with respect to, this Promissory Note (including any of the foregoing that are imposed or that arise in the future).

"Otros Impuestos" significa cualesquiera impuestos del timbre o documentales y cualquier otra contribución o impuesto sobre la propiedad, o cargas o aportaciones gubernamentales, incluyendo recargos, multas e intereses que resulten de los anteriores o relacionados con los mismos, que sean impuestos por México, y que resulten de cualquier pago hecho por la suscrita conforme a este Pagaré o de la ejecución de, o con respecto a, este Pagaré (incluyendo cualquiera de los anteriores que sean impuestos o existan en el futuro).

"Statutory Reserve Adjustment" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board of Governors of the Federal Reserve System of the United States of America (the "Federal Reserve Board") to which the Administrative Agent is subject with respect to eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Federal Reserve Board). Such reserve percentages will include those imposed pursuant to such Regulation D. The Statutory Reserve Adjustment will be adjusted automatically on and as of the effective date of any change in any applicable reserve percentage.

"Reserva Legal Ajustada" significa la fracción (expresada en decimales), el numerador de la cual es el número uno y el denominador de la cual es el número uno menos el total de los porcentajes máximos de reserva (incluyendo cualesquiera reservas marginales, especiales, de emergencia o complementarias) expresada como un decimal señalada por la Junta de Gobierno del Sistema de la Reserva Federal de los Estados Unidos de América (la "Reserva Federal") a la que el Agente Administrativo está sujeto con respecto de pasivos en euromonedas (referidas en esta fecha como "Pasivos en Euromonedas" en la Regla D de la Reserva Federal. Tales porcentajes de reserva incluirán los que se impongan de acuerdo a la Regla D. La Reserva Legal Ajustada será ajustada automáticamente precisamente en la fecha de eficacia de cualquier modificación a cualquier porcentaje de reserva aplicable.

"Taxes" means any and all taxes, duties, levies, imposts, contributions, deductions, charges or withholdings, of any nature, imposed by Mexico (or any political subdivision thereof, or taxing authority therein), and any penalties, fines or interest thereon, excluding, in the case of the holder hereof, taxes, duties, levies, imposts, deductions, charges and withholdings imposed on (or measured by) its net income, and branch profits, franchise or taxes imposed on it (other than Other Taxes due to

"Impuestos" significa cualesquiera impuestos, derechos, aportaciones, contribuciones, deducciones, cargas o retenciones, de cualquier naturaleza, determinadas por México (o cualquier división política de México o autoridad fiscal mexicana), y cualesquiera recargos, multas e intereses que resulten de los anteriores, excluyendo, respecto del tenedor del presente, impuestos, derechos, aportaciones, contribuciones, deducciones,

a connection between such holder and Mexico other than the holding of this Promissory Note).

cargas o retenciones impuestas respecto de (o determinadas considerando) sus ingresos netos, y cualquier Impuesto a sucursales, de franquicias y otros impuestos determinados tenedor (excepto por Otros Impuestos resultantes de que exista un punto de contacto entre el tenedor y México distinto de la tenencia de este Pagaré).

All payments by the undersigned of principal, interest and other payments hereunder shall be made without setoff or counterclaim not later than 12:00 (noon), New York City time, on the date due, in immediately available funds, at the office of the Administrative Agent located at JPMorgan Chase Bank, N.A., Americas Investment Bank Loan Operations, 1111 Fannin, 10th Floor, Houston, Texas 77002. The undersigned agrees to pay all reasonable out-of-pocket expenses incurred by the holder hereof, including any fees, charges and disbursements of any counsel for such holder, in connection with the enforcement or protection of its rights under this Promissory Note.

Todos los pagos que deban hacerse conforme a este Pagaré por la suscrita, de principal, intereses y por otros conceptos serán efectuados sin compensación o defensa, antes de las 12:00 p.m., hora de la ciudad de Nueva York, en la fecha en que sean pagaderos, en fondos disponibles inmediatamente, en la oficina del Agente Administrativo localizada en JPMorgan Chase Bank, N.A., Americas Investment Bank Loan Operations, 1111 Fannin, 10th Floor, Houston, Texas 77002. La suscrita conviene en pagar todos los costos y gastos razonables en que incurra el tenedor del presente, incluyendo honorarios, gastos y desembolsos del representante legal de dicho tenedor, respecto de la ejecución y protección de sus intereses conforme el presente Pagaré.

Any and all payments by the undersigned to or for the account of the holder hereof shall be made without deduction or withholding for any Taxes or Other Taxes; provided that, if the undersigned shall be required by law, rule or regulation to deduct or withhold any Taxes or Other Taxes from any such payments, then (i) the sum payable by the undersigned to the holder hereof shall be increased as necessary so that after making all required deductions and withholdings (including deductions and withholding applicable to additional sums payable hereunder), the holder hereof receives an amount equal to the sum it would have received, had no deductions or withholdings been made, (ii) the undersigned shall make such deductions or withholdings, and (iii) the undersigned shall pay the full amount deducted or withheld to the relevant taxation authority or other authority in accordance with applicable law.

Todos los pagos por parte de la suscrita a favor y para beneficio del tenedor del presente se realizarán libres de y sin deducción o retención alguna respecto de cualesquiera Impuestos u Otros Impuestos; en el entendido que, si la suscrita estuviere obligada, por ley, reglamento o regla a deducir o retener cualesquiera Impuestos u Otros Impuestos de dichos pagos, entonces (i) la cantidad pagadera por la suscrita al tenedor del presente Pagaré se incrementará en la medida necesaria para que, una vez que todas las deducciones o retenciones requeridas (incluyendo las deducciones o retenciones aplicables a las cantidades adicionales pagaderas conforme al presente) hayan sido realizadas, el tenedor del presente Pagaré reciba una cantidad igual a la cantidad que hubiere recibido, si no se hubieren realizado dichas deducciones o retenciones, (ii) la suscrita realizará dichas deducciones o retenciones, y (iii) la suscrita pagará la cantidad total deducida o retenida a la autoridad fiscal o cualquier otra autoridad correspondiente de conformidad con la legislación aplicable.

This Promissory Note shall be governed by, and construed in accordance with, the laws of the State of New York, United States of America; provided, however that if any action or proceedings in connection with this Promissory Note were brought to any courts in the United Mexican States, this Promissory Note shall be deemed as governed under the laws of the United Mexican States.

Este Pagaré se regirá e interpretará de acuerdo con las leyes del Estado de Nueva York, Estados Unidos de América; en el entendido, sin embargo de que si cualquier acción o procedimiento en relación con este Pagaré se iniciara en los tribunales de los Estados Unidos Mexicanos, este Pagaré se considerará regido de acuerdo con las leyes de los Estados Unidos Mexicanos.

Any legal action or proceeding arising out of or relating to this Promissory Note may be brought before the Supreme Court of the State of New York, sitting in New York County, State of New York, United States of America, and the United States District Court of the Southern District of New York, State of New York, United States of America, and any appellate court from any thereof, or in the courts located in the City of Mexico, Federal District, United Mexican States; the undersigned waives the jurisdiction of any other courts.

Cualquier acción o procedimiento legal que derive o se relacione con este Pagaré podrá ser instituido ante la Suprema Corte del Estado de Nueva Cork, con asiento en el Condado de Nueva York, Estado de Nueva York, Estados Unidos de América, y en el Tribunal de Distrito de los Estados Unidos para Distrito Sur de Nueva York, Estado de Nueva York, Estados Unidos de América, y cualquier tribunal de apelación respecto de los anteriores, o cualquier tribunal localizado en la ciudad de México, Distrito Federal, Estados Unidos Mexicanos, renunciando la suscrita a la jurisdicción de cualesquiera otros tribunales.

The undersigned hereby waives diligence, demand, protest, presentment, notice of dishonor or any other notice or demand whatsoever in respect of this Promissory Note.

La suscrita en este acto renuncia a diligencia, demanda, protesto, presentación, notificación de no aceptación y a cualquier notificación o demanda de cualquier naturaleza respecto de este Pagaré.

This Promissory Note is executed in both English and Spanish versions. In the case of any conflict or doubt as to the proper construction of this Promissory Note, the English version shall govern. Notwithstanding the foregoing, any action or proceeding brought in any court in the United Mexican States, the Spanish version shall be controlling.

El presente Pagaré se suscribe en versiones en inglés y español. En caso de conflicto o duda en relación con la debida interpretación de este Pagaré, la versión en inglés prevalecerá. No obstante lo anterior, cualquier procedimiento iniciado en los Estados Unidos Mexicanos, prevalecerá la versión en español.

IN WITNESS WHEREOF, the undersigned has duly executed this Promissory Note as of the date mentioned below.

EN VIRTUD DE LO CUAL, la suscrita ha firmado este Pagaré en la fecha abajo mencionada.

México, Distrito Federal, Estados Unidos Mexicanos, a 21 de diciembre de 2007.
Mexico, Federal District, United Mexican States, December 21, 2007.

Empresas Cablevisión, S.A.B. de C.V.

Por/By ____________
Nombre/Name:
Cargo/Title:

Por/By ____________
Nombre/Name:
Cargo/Title:

Signature page to the Promissory Note issued by Empresas Cablevisión, S.A.B. de C.V. in favor of JPMorgan Chase Bank, N.A., in the principal amount of U.S.$225,000,000.00 (TWO HUNDRED AND TWENTY FIVE MILLION DOLLARS OF THE UNITED STATES OF AMERICA 00/100), payable on December 21, 2012.

Hoja de firma del Pagaré emitido por Empresas Cablevisión, S.A.B. de C.V. a favor de JPMorgan Chase Bank, N.A., por la suma principal de EUA$225,000,000.00 (DOSCIENTOS VEINTICINCO MILLONES DE DÓLARES DE LOS ESTADOS UNIDOS DE AMÉRICA 00/100), pagaderos el 21 de diciembre de 2012.

# EXHIBIT B

RANSPERFECT

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

City of New York, State of New York, County of New York

I, Pearl Leo, hereby certify that the document "E-mail from Jacqueline C. Truzzell to Jesus Granillo Rodriguez on June 10, 2009 at 4:17 p.m." is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Pearl Leo

Sworn to before me this

Tuesday, December 15, 2009

Signature, Notary Public

Stephanie Dill
Notary Public, State of New York
No. 01DI6180934
Qualified in NEW YORK County
Commission Expires Jan 22, 2012

Stamp, Notary Public

**From:** truzzell_jacqueline@jpmorgan.com [mailto:truzzell_jacqueline@jpmorgan.com]
**Sent:** Wednesday, June 10 2009 04:17 p.m.
**To:** Jesus Granillo Rodriguez
**Subject:** RE: Inbursa Participation Agreement

Jesus, as per our conversation, I am providing you with our position in detail (after having discussed it with our company lawyer) concerning each one of the points which were raised in the Participation Agreement.

1. Section 2.04. You had brought up the need to include language in section 2.04 which expressed that all of the financial benefits generated by the loan would be received.

We reviewed this matter once again, and came to the agreement that, although the document does not allow us to consult you regarding the amendments or waivers beyond those which are listed in Section 9.02 (b), we would agree to apply the financial benefits received for fees resulting from amendments, waivers and consents, in a pro-rated fashion, to you.

2. You would like to change Section 2.04 (c) to establish a mechanism by means of which you would be able to exercise your rights against the Borrower.

While it is not possible to establish this mechanism either directly or via a side letter, as this would go against that which is established in Section 9.04 (e) of the Credit Agreement, we can agree to incorporating language which establishes that, in the Event of a Default, we would be willing to turn the Participation Agreement into an Assignment Agreement (as, in this case, we would not need the Borrower's consent); at this time you would become the Lenders of Record and would have a direct contractual relationship with the Borrower.

3. You would like to be involved in all of the waivers and amendments which may occur as a result of the contract.

According to that which is established in Section 9.04 (e), we can only ask you for your opinion concerning the changes which are stipulated in Section 9.02 (b). To diverge from this in any way would be a failure to respect our contractual obligations within the Credit Agreement, and this would expose us to legal problems with the Borrower; for this reason, we cannot accept this point.

4. You wish to modify Section 3.04, removing the section which reads, "which resulted in actual loss to the Participant".

JPMorgan would not take any responsibility, inasmuch as the Participant has not suffered any damages. In other words, action or omission by JPMorgan must be the **direct cause** of the damages suffered by the Participant; only in this event would JPMorgan take responsibility. We must leave this in the language.

5. You wish to include language in Section 3.01 which clarifies that you would receive all information sent by the Borrower.

We can adjust the language to indicate that we sent [or "send", present tense, or "will send"] you all of the information which the Lenders receive regarding the loan.

6. You wish to have full freedom to transfer your right to participate.

Although we have no problem with you eventually transferring the Participation Agreement, we do have a strict internal policy to not deal with certain banks / funds / financial institutions (for example, those which are located in certain countries—this is the result of the US Patrior [sic] Act—or which are involved in legal proceedings due to fraud, etc.); while any banks to which you would sell your participation would certainly be acceptable to us, we would, nonetheless, need to leave the language of consent as-is, as

concerns us [or "leave the language of consent in our favor"] (**not to be unreasonably witheld** [sic; written in English in original]).

I hope that this clarifies the pending matters.

Let me know if you are OK with these clarifications.

Regards

Jackie

---

**De:** truzzell_jacqueline@jpmorgan.com [mailto:truzzell_jacqueline@jpmorgan.com]
**Enviado el:** Miércoles, 10 de Junio de 2009 04:17 p.m.
**Para:** Jesus Granillo Rodriguez
**Asunto:** RE: Inbursa Participation Agreement

Jesus, de acuerdo a lo que conversamos, te detallo nuestra posicion (despues de haberla consultado con nuestro abogado interno) sobre cada uno de los puntos levantados en el Participation Agreement.

1. Seccion 2.04. Uds plantearon la necesidad de incluir en la seccion 2.04 lenguaje que indique que recibirian todos los beneficios economicos generados por el prestamo.

Volvimos a revisar este tema y acordamos que aunque el documento no nos permite consultarles sobre los amendments o waivers que esten fuera de los enumerados en la seccion 9.02 (b), si estariamos de acuerdo en aplicar los beneficios economicos recibidos por fees generados de amendments, waivers y consents de forma pro-rata con uds.

2. Quisieran cambiar la seccion 2.04 (c) para establecer un mecanismo por el cual si puedan ejercer sus derechos contra el Borrower.

Aunque no es posible establecer este mecanismo, ni en forma directa ni via un side letter ya que va encontra de lo establecido en la Seccion 9.04 (e) del Credit Agreement, si podemos acceder a incorporar un lenguaje que establezca que ante un Event of Default estariamos dispuestos a convertir el Participation Agreement en un Assignment Agreement (ya que en este caso no necesitariamos Borrower's consent) a partir del cual uds se converitirian en Lender of Record y tendrian una relacion contractual directa con el Borrower.

3. Quisieran tener ingerencia en todos los waivers y amendments que puedan surgir del contrato.

Segun lo establecido en la Seccion 9.04 (e), solo podemos pedir su opinion para los cambios estipulados en la seccion 9.02 (b). Cualquier divergencia de esto seria no respetar nuestras obligaciones contractuales dentro del Credit Agreement, lo cual nos expondria a problemas judiciales con el Borrower, razon por la cual no podemos aceptar este punto.

4. Quieren modificar la seccion 3.04 sacando la parte " which resulted in actual loss to the Participant".

JPMorgan no asumiria ningun tipo de responsabilidad en la medida que el Participant no haya sufrido daños. En otras palabras, la accion u omision por parte de JPMorgan debe ser **la causa directa** de los daños ocasionados al Participant - y solo en ese caso, JPMorgan asume responsabilidad. Necesitamos dejar ese lenguaje.

5. Quieren incluir lenguaje en la seccion 3.01 para clarificar que recibirian toda la informacion enviada por el Borrower

Podemos ajustar el lenguaje para indicar que les enviamos toda la informacion que reciben los Lenders del prestamo.

6. Queiren tener total libertad para ceder sus derechos de participacion.

Aunque no tenemos problemas con su eventual cesion del Participation Agmt si tenemos politicas internas

estrictas de no poder lidiar con algunos  bancos/fondos/instituciones financieras (por ejemplo los que estan situados en ciertos paises, esto surge del US Patrior Act  o involucrados en procesos judiciales por fraude; etc.); Aunque seguramente los bancos a los cuales uds le podrian vender su participacion serian aceptables para nosotros, si necesitariamos dejar el lenguaje de consentimiento por nuestro lado (**not to be unreasonably witheld**).

Espero que esto aclare los puntos pendientes.

Avisame si estan ok con las aclaraciones.

Saludos

Jackie

# EXHIBIT C

Execution Version

PARTICIPATION AGREEMENT (this "Agreement") dated as of July 15, 2009 between JPMORGAN CHASE BANK, NATIONAL ASSOCIATION (the "Bank") and Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa, Grand Cayman Branch (the "Participant").

RECITALS

The Bank wishes to grant to the Participant, and the Participant wishes to acquire and assume from the Bank, without recourse to the Bank, a participation in that certain loan made to Empresas Cablevisión, S.A.B. de C.V a Mexican *sociedad anónima bursátil de capital variable* (the "Borrower"), evidenced by the Credit Agreement dated as of December 19, 2007 among the Borrower, the Bank and certain other parties stated therein (as amended from time to time, the "Credit Document").

Accordingly, the parties hereto agree as follows:

ARTICLE 1. DEFINITIONS

As used herein, the following terms shall have the following meanings (all terms defined in this Article 1 or in the other provisions of this Agreement in the singular to have the same meanings when used in the plural and vice versa). Terms not defined herein shall have the meaning ascribed to them in the Credit Document:

"Business Day" means any day on which commercial banks are not authorized or required to close in New York City and Mexico City.

"Discount Rate" means 87.80%

"Dollars" and the sign "$" mean lawful money of the United States of America.

"Effective Date" means July 15, 2009

"Federal Funds Rate" means, for any day, the weighted average of the rates on overnight Federal funds transactions, with members of the Federal Reserve System only, arranged by Federal funds brokers, as published for such day by the Federal Reserve Bank of New York (or, in the absence of such publication, as reasonably determined by the Bank).

"Loan Documents" has the meaning assigned thereto in Section 3.01 hereof.

"Participation" has the meaning assigned thereto in Section 2.01 hereof.

"Participation Percentage" means 90 %.

"Participation Rate" means the rate defined as Applicable Margin in the Credit Document.

"Person" means an individual, partnership, corporation, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"Purchase Price" has the meaning assigned thereto in Section 2.03(a) hereof.

ARTICLE 2. THE PARTICIPATION

Section 2.01. The Participation. As of the Effective Date, the Bank hereby grants to the Participant, and the Participant hereby acquires and assumes, a participation in the Credit Document in an amount of $202,500,000.00 and/ or equal to the Participation Percentage of the Credit Document (the "Participation"). The Participation is without recourse, representation or warranty except as specifically set forth herein.

Section 2.02. Evidence of Participation. The Bank will maintain records of all payments received from the Participant and all payments made by the Bank to the Participant hereunder. The Bank will furnish an accounting to the Participant as promptly as practicable following the Participant's request therefor.

Section 2.03. Payments by Participant. The Participant hereby agrees to pay to the Bank (without reduction for or on account of any set-off, counterclaim or other right against the Bank or the Borrower) an amount (the "Purchase Price") equal to the Participation Percentage of the unpaid principal amount of the Credit Document at the time that the Purchase Price is paid times the Discount Rate, such Purchase Price to be payable on the Effective Date. Upon receipt by the Bank of such Purchase Price in full, the Participation in the Credit Document shall become effective.

Section 2.04. Payments by Bank. (a) Subject to Section 2.04(b) and Section 4.06 hereof, the Bank will, immediately upon receipt by the Bank thereof, pay to the Participant an amount equal to the Participant's share of each amount received and applied by the Bank in payment of (A) principal of or interest on (including default interest, if any) or (B) any type of compensation or fees collected by the Bank in its capacity as Lender under the Credit Document, such share to be (i) in the case of principal, the related Participation Percentage thereof and (ii) in the case of interest, the Participation Percentage of the interest on the unpaid principal amount of the Credit Document computed at the Participation Rate for the period for which such interest was paid (or, if the Participation has been outstanding for a shorter period, for such shorter period); provided that if the amount of interest so received and applied is less than the interest on such unpaid principal amount computed at the stated rate therefor in the Credit Document for the period for which such interest was paid, then the amount payable under this clause (ii) shall be reduced proportionately.

(b) Except for amounts specified in Section 2.04(a) hereof, the Participant shall not be entitled to receive any amounts payable by the Borrower to or received by the Bank under the Credit Document, nor (except as expressly provided herein) shall the Participant have, by reason of this Agreement, the Participation, any rights with respect to the Credit Document, any other Loan Document or any other extension of credit by the Bank to the Borrower. Without limiting the effect of the foregoing, the Bank shall have sole discretion in applying amounts received by it from or for the account of the Borrower under the Credit Document or otherwise (provided that amounts received for application to

particular amounts owed under the Credit Document shall be promptly applied to such amounts) and in exercising or refraining from exercising any of its rights (including, without limitation, any right of set-off) with respect to any collateral, any account maintained by the Borrower with the Bank or any other property or right which may be or become available for the payment of the Credit Document, except that if any such right is exercised by the Bank and the amounts recovered thereby are applied in payment of any amount in which the Participant is entitled to share as provided in Section 2.04(a) hereof, the Bank will promptly pay to the Participant its share thereof as provided therein.

(c) In the event that this Agreement or the Credit Document would give, or is interpreted so as to give, the Participant the right to exercise rights under the Credit Document or to commence and prosecute any proceedings to enforce its right to payment of all or any amounts in which the Participant has been granted a participation hereunder, or to directly make any claim in connection therewith, the Participant shall not exercise such right or commence any such proceedings without the prior written consent of the Bank (which shall not be unreasonably withheld), provided, however, that such consent shall not be required in connection with the Participant's exercise of rights created under this Agreement against the Bank or prosecution of proceedings hereunder against the Bank.

(d) The Bank and the Participant hereby agree that if an Event of Default occurs and is continuing, this Agreement shall be terminated and replaced by an assignment agreement (in the form of Exhibit A in the Credit Document) whereupon the Participant shall become a Lender.

ARTICLE 3. BANK UNDERTAKINGS

Section 3.01. Loan Documents; Information. To the extent requested by the Participant and subject to Section 4.03 hereof, the Bank will furnish to the Participant copies of the Credit Document and any amendments, consents, waivers or notices, or any other material received by the Bank in its capacity as Lender, relating to any of the foregoing (collectively, the "Loan Documents"). The Bank will request from the Borrower (to the extent that it is entitled under the Credit Document to do so) and (if and to the extent received by the Bank from the Borrower and subject to Section 4.03 hereof) furnish to the Participant such information concerning the business, affairs or financial condition of the Borrower as the Participant may reasonably request.

Section 3.02. Nonrecourse Participation. The Participation will be acquired by the Participant without recourse to the Bank and for the Participant's own account and risk. The Bank makes no representation or warranty as to, and shall have no responsibility for: (i) the due authorization, execution or delivery of the Loan Documents by the Borrower or any other Person; (ii) the value, legality, genuineness, validity, sufficiency, enforceability or collectability of the Loan Documents; (iii) any representation or warranty made by, or the accuracy, completeness, currentness or sufficiency of any information (or the validity, completeness or adequate disclosure of assumptions underlying any estimates, forecasts or projections contained in such information) provided (directly or indirectly through the Bank) by, the Borrower or any other Person; (iv) the performance or observance by the Borrower or any other Person (at any time, whether prior to or after the Effective Date) of any of the provisions of the Loan Documents (or any of the Borrower's or such other Person's other obligations in connection therewith); (v) the financial condition of the Borrower or any other Person; or (vi) (except as otherwise expressly provided herein) any other matter relating to the Borrower or any other Person, the Credit Document or any other Loan Document.

Section 3.03. Amendments, Waivers, Etc. (a) The Bank may (without the Participant's consent) give or withhold its agreement to any amendments of the Loan Documents or any waivers or consents in respect thereof or exercise or refrain from exercising any other rights or remedies which the Bank may have under the Loan Documents or otherwise (and the sale or granting of the Participation by the Bank shall not limit or otherwise affect its discretion in respect of any of the foregoing), except that (subject to the provisions of the Loan Documents) the Bank will not, without the consent of the Participant, agree to reduce the principal of the Credit Document or reduce the interest rate thereon; extend any stated payment date for principal of or interest on the Credit Document, change Section 2.14 (b) or 2.14 (c) of the Credit Document in a manner that would alter the pro rata sharing of payments required thereby, or change any provision Section 9.02 or the percentage set forth in the definition of Required Lenders of the Credit Documents or any other provision of any Credit Document specifying the number or percentage of Lenders required to take any action thereunder.

(b) In the event that the Bank requests the consent of the Participant pursuant to Section 3.03(a) hereof and the Participant does not respond within ten Business Days after delivery of such request (or within the time period specified by the Bank in such request which period shall in any event be not less than one Business Day), the Bank, in its sole discretion, may deem that the Participant has given its consent thereto. Subject to Section 4.03 hereof, the Bank will endeavor to inform the Participant prior to agreeing to any other amendment, waiver or consent relating to the Loan Documents (it being understood however that, except as expressly provided in this Section 3.03, the Bank shall have sole discretion with respect to the action to be taken).

(c) Subject to Section 4.03 hereof, the Bank will notify the Participant of each executed and delivered amendment, waiver or consent in respect of the Loan Documents, the occurrence of any "Event of Default" of which the Bank gives to the Borrower, its exercise of any rights or remedies against the Borrower in respect of the Credit Document.

Section 3.04. Standard of Care. In handling the Credit Document, the Bank will exercise the same care as it normally exercises with respect to notes in which no participations are sold, but the Bank shall have no further responsibility to the Participant except as expressly provided herein and except for its own gross negligence or willful misconduct which resulted in actual loss to the Participant, and, except to such extent, the Bank shall have no responsibility to the Participant for the failure by the Bank to make any loan or other extension of credit to the Borrower or to comply with any of the Bank's other obligations to the Borrower under the Loan Documents or otherwise. In administering the Participation, the Bank may consult with legal counsel (including counsel for the Borrower), independent accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in reliance on the advice of any such Person. The Bank shall not by reason of this Agreement have a fiduciary relationship with the Participant.

ARTICLE 4. PARTICIPANT UNDERTAKINGS

Section 4.01. Non-Reliance on Bank. The Participant represents to and agrees with the Bank that: (i) it has made, independently and without reliance on the Bank, its own analysis of the Borrower and the Loan Documents (including, without limitation, its own credit analysis of the Borrower and its own legal review of such Loan Documents) for the purpose of acquiring the Participation based on (and the Participant has had access to) such documents and information as it has deemed to be appropriate and sufficient for such purpose; (ii) it will continue to make its own decisions with respect to the

Participation without such reliance and on such basis and will continue to have, independently from the Bank (subject to the Bank's fulfilling its obligation to furnish documents and information to the Participant as and to the extent provided in Sections 3.01 and 3.03 hereof), access to such documents and information as it deems to be appropriate and sufficient for such purpose; and (iii) it will not rely upon the Bank to furnish any documents or information regarding the credit, affairs, financial condition or business of, or any other matter concerning, the Borrower or any of its affiliates (including documents and information received from the Borrower under any Loan Documents or otherwise), except for documents and information expressly required to be furnished by the Bank under Sections 3.01 and 3.03 hereof.

Section 4.02.   Other Relationships.   The Participant acknowledges that the Bank and its affiliates may have commercial banking, trust or other fiduciary relationships and/or other business relationships, including extensions of credit, financial advisory arrangements and deposits, with the Borrower and its affiliates in addition to the Credit Document.

Section 4.03.   Confidentiality.   The Participant agrees to maintain the confidentiality of any Loan Documents or any non-public information relating to the Borrower which it may obtain from the Bank in connection herewith. Anything in this Agreement to the contrary notwithstanding, the Bank shall not be obligated to disclose to the Participant any information of a confidential nature relating to the Credit Document or the Borrower (except for the documents and information expressly required to be furnished by the Bank under Sections 3.01 and 3.03 hereof).

Section 4.04.   Notice to Borrower.   The Participant acknowledges that the Bank may notify the Borrower of the Participation, but the Participant will not, except as otherwise required by law or required or requested by governmental authorities having jurisdiction over the Participant, disclose, and will not permit to be disclosed, to any Person other than the Participant's counsel, independent accountants, affiliates and such governmental authorities the terms of this Agreement without the Bank's prior written consent; provided that the Participant may disclose the existence of the Participation (but not its terms) to the Borrower.

Section 4.05.   Indemnification.   Unless recovered by the Bank from or for the account of the Borrower promptly after demand therefore (and upon submission by the Bank to the Participant of reasonable evidence in connection thereto), the Participant will pay to the Bank the Participant's pro rata share (equal to the Participation Percentage) of (a) all expenses of collection or enforcement of the Credit Document and (b) all expenses and liabilities incurred by the Bank in connection with the Credit Document, except for those incurred by reason of the Bank's gross negligence or willful misconduct. In addition, if the Bank makes any payment to the Participant pursuant to Section 2.04(a) hereof and either does not receive promptly thereafter, or for any reason is required to return or to pay to any Person, the corresponding payment by or for the account of the Borrower, the Participant will repay to the Bank upon request the amount paid to the Participant to the extent of the Participation Percentage of the amount not received or required to be returned or paid by the Bank (together with (i) in the case of an amount not received by the Bank, interest on the Participation Percentage thereof for the period commencing on the date that the Bank makes such payment to the Participant at the rate(s) specified in Section 5.02(b) hereof, and (ii) in the case of an amount required to be returned or paid by the Bank, an amount equal to (A) the Participation Percentage of the interest, if any, required to be paid by the Bank thereon and (B) interest on the Participation Percentage of the amount to be returned or paid by the Bank for the period commencing on the date such amount was returned or paid by the Bank at the rate(s) specified in Section 5.02(b) hereof).

Section 4.06.  Withholding Taxes.  The Participant represents that it is entitled to receive any payments to be made to it hereunder without the withholding of any tax and will furnish to the Bank such forms, certifications, statements and other documents as the Bank may request from time to time to evidence the Participant's exemption from the withholding of any tax imposed by any jurisdiction or to enable the Bank to comply with any applicable laws or regulations relating thereto.  Without limiting the effect of the foregoing, if the Participant is not created or organized under the laws of the United States or any state thereof, in the event that the payment of interest by the Borrower is treated for U.S. income tax purposes as derived in whole or in part from sources from within the U.S., the Participant will furnish to the Bank Form W8-ECI or Form W8-BEN of the Internal Revenue Service, or such other forms, certifications, statements or documents as the Bank may reasonably request, duly executed and completed by the Participant as evidence of the Participant's exemption from the withholding of U.S. tax with respect thereto.  The Bank shall not be obligated to make any payments hereunder to the Participant in respect of the Participation until the Participant shall have furnished to the Bank the requested form, certification, statement or document.  In the event that the Participant is subject to U.S. withholding taxes and the Borrower or the Bank is held liable for such withholding taxes, the Participant agrees to promptly reimburse the Bank for any such amount.

Section 4.07.  Additional Representations.  (a) The Participant represents to the Bank that: (i) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization or incorporation; (ii) it has full power, authority and legal right to execute and deliver this Agreement and to perform its obligations hereunder; (iii) the making and performance by it of this Agreement have been duly authorized by all necessary action and will not violate any provisions of applicable law or regulation, any provision of its charter or by-laws (or comparable, constituent documents) or any order of any court or regulatory body and will not result in the breach of, or constitute a default or require any consent under, any agreement, instrument or document to which it is a party or by which it or any of its property may be bound or affected; (iv) all authorizations, consents, approvals and licenses of, and filings and registrations with, any governmental authority required under applicable law or regulations for it to make and perform this Agreement have been obtained and are in full force and effect; and (v) this Agreement constitutes a legal, valid and binding obligation of the Participant, enforceable against it in accordance with its terms.

(b) The Bank represents to the Participant that: (i) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization or incorporation; (ii) it has full power, authority and legal right to execute and deliver this Agreement and to perform its obligations hereunder; (iii) the making and performance by it of this Agreement have been duly authorized by all necessary action and will not violate any provisions of applicable law or regulation, any provision of its charter or by-laws (or comparable, constituent documents) or any order of any court or regulatory body and will not result in the breach of, or constitute a default or require any consent under, any agreement, instrument or document to which it is a party or by which it or any of its property may be bound or affected; (iv) all authorizations, consents, approvals and licenses of, and filings and registrations with, any governmental authority required under applicable law or regulations for it to make and perform this Agreement have been obtained and are in full force and effect; and (v) this Agreement constitutes a legal, valid and binding obligation of the Bank, enforceable against it in accordance with its terms.

ARTICLE 5.  MISCELLANEOUS

Section 5.01.  Assignments; Participations.  The Participant acknowledges that the Bank may assign, and may grant participations in, the Credit Document to other Persons; provided, that the Bank shall offer the Participant, within 3 Business Days after having an offer, a right of first refusal with respect to any participations of the Credit Document and accordingly, the Participant shall have the right to match any competing proposal received by the Bank within 10 Business Days after receiving written notification from the Bank, in connection thereto.  The Participant may not sell, assign or transfer the Participation (or any part thereof) without the Bank's prior written consent (which consent shall not be unreasonably withheld).

Section 5.02.  Payments Generally.  (a)  All payments by the Bank to the Participant shall be made in U.S. Dollars by wire transfer of immediately available funds (or, in the case of any such payment under Section 2.04(a) hereof, such other type of funds in which the Bank shall have received the corresponding payment from or for the account of the Borrower) to the account or the address which the Participant specifies to the Bank from time to time.  All payments to the Bank by the Participant shall be made in U.S. Dollars by wire transfer of immediately available funds to such account of which the Bank shall notify the Participant.  The Bank may (but shall not be obligated to) apply any amounts due and payable by it to the Participant to and in satisfaction of any amount then due and payable by the Participant hereunder to the Bank.

(b)  In the event that the Participant fails to pay any amount (including, to the extent permitted by applicable law, interest) payable by it to the Bank hereunder when due, the Participant will pay to the Bank, upon demand, interest on the amount of such payment, for the period from and including the date on which such amount became due to but excluding the date the same is paid in full, at a rate per annum (computed on the basis of a year of 360 days and actual days elapsed) equal to the Federal Funds Rate for that portion of such period ending on the date two Business Days after the first day of such period and, thereafter, at that rate of interest from time to time announced by the Bank at its office in New York City as its prime rate, as in effect from time to time.

(c)  In the event that the Bank fails to pay any amount (including, to the extent permitted by applicable law, interest) payable by it to the Participant hereunder when due, the Bank will pay to the Participant, upon demand, interest on the amount of such payment, for the period from and including the date on which such amount became due to but excluding the date the same is paid in full, at a rate per annum (computed on the basis of a year of 360 days and actual days elapsed) equal to the Federal Funds Rate for that portion of such period ending on the date two Business Days after the first day of such period and, thereafter, at that rate of interest from time to time announced by the Bank at its office in New York City as its prime rate, as in effect from time to time.

(d)  The specification of U.S. Dollars for payment hereunder and the place of payment stated in Section 5.02(a) hereof are of the essence, and U.S. Dollars shall be the currency of account in all events.  The payment obligations of the Participant hereunder shall not be discharged by any amount paid in another currency or in another place, whether pursuant to a judgment or otherwise, to the extent that the amount so paid on prompt conversion to U.S. Dollars and transfer to New York, New York under normal banking procedures does not yield the amount of U.S. Dollars in New York, New York due hereunder.  In the event that any payment by the Participant, whether pursuant to a judgment or otherwise, upon conversion and transfer does not result in payment of such amount of U.S. Dollars in New York, New York, the Bank shall have a separate cause of action against the Participant for the additional amount necessary to yield the amount due and owing to the Bank.

Section 5.03.  Notices.  Except as otherwise provided herein, all communications hereunder by either party hereto shall be given in writing or by facsimile transmitter to the other party at its address specified beneath its signature hereto or at such other address as it shall have notified the first-named party, and shall be effective when received. Telephonic notices permitted hereunder shall be promptly confirmed in writing. The Bank may rely upon, and will incur no liability in taking or omitting to take action upon, any notice, instruction, consent or other communication (oral or otherwise) from the Participant that the Bank believes to be genuine and correct or to have been signed, sent or made by a proper person or persons, and the Bank will have no obligation to verify or inquire into any matters pertaining thereto.

Section 5.04.  Entire Agreement.  This Agreement sets forth the entire agreement between the Bank and the Participant relating to the Participation and supersedes any prior written or oral statements or agreements with respect to the matters covered hereby and may not be altered orally.

Section 5.05.  Captions.  The captions and headings hereunder are for convenience only and shall not affect the interpretation or construction of this Agreement.

Section 5.06.  Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH NEW YORK LAW.  THE PARTICIPANT HEREBY WAIVES ANY RIGHT THE PARTICIPANT MAY HAVE TO JURY TRIAL.

Section 5.07.  Jurisdiction; Immunities.  (a) The Participant hereby irrevocably submits to the jurisdiction of any New York State or United States Federal court sitting in New York County over any action or proceeding arising out of or relating to this Agreement, and the Participant hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court. The Participant hereby irrevocably appoints CT Corporation System (the "Process Agent"), with an office on the date hereof at 111 Eighth Avenue, 13th Floor, New York, New York 10011, as its agent for service of process in connection with this Agreement. The Participant irrevocably consents to the service of any and all process in any such action or proceeding by the mailing or delivering of copies of such process to the Participant in care of the Process Agent at the Process Agent's above address and the Participant hereby irrevocably authorizes and directs the Process Agent to accept such service on its behalf. As an alternative method of service, the Participant also irrevocably consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process to the Participant at its address specified on the signature page hereof. The Participant agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. The Participant further waives any objection to venue in any court referred to in the first sentence of this Section 5.07(a) and any objection to an action or proceeding in such court on the basis of forum non conveniens. The Participant further agrees that any action or proceeding brought against the Bank shall be brought only in a New York State or United States Federal court sitting in New York County.

(b)  Nothing in this Section 5.07 shall affect the right of the Bank to serve legal process in any other manner permitted by law or affect the right of the Bank to bring any action or proceeding against the Participant or its property in the courts of any other jurisdiction.

(c) To the extent that the Participant has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, the Participant hereby irrevocably waives such immunity in respect of its obligations under this Agreement.

Section 5.08. Cumulative Rights; No Waiver. The rights, powers and remedies of the Bank hereunder are cumulative and in addition to all rights, powers and remedies provided under any and all agreements between the Participant and the Bank relating hereto, at law, in equity or otherwise. Neither any delay nor any omission by the Bank to exercise any right, power or remedy shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise thereof or any exercise of any other right, power or remedy.

Section 5.09. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be an original but all of which, taken together, shall constitute one and the same instrument.

Section 5.10. Expenses. Each party hereto agrees to bear its own expenses in connection with this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first above written.

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION

By: ______________________
Name: Katie Rose
Title: Associate

Katie Rose
Authorized Signatory

Address:
4 New York Plaza
New York, New York 10004

Attention: Victoria Yarisantos
Tel. No.: (212) 623-2055

BANCO INBURSA, S.A., INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO INBURSA, GRAND CAYMAN BRANCH

By: ______________________
Name: Luis Frías Humphrey
Title: Attorney in Fact

LEGAL INBURSA

Address: Avenida Paseo de las Palmas 736
Col. Lomas de Chapultepec
11000, México D.F.

Attention: Jesús Granillo Rodríguez
Tel. No: 5255 5625 4900
Fax No: 5255 5625 4966

# POLLOCK DECLARATION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EMPRESAS CABLEVISION, S.A.B DE C.V.,

Plaintiff,

- against -

JPMORGAN CHASE BANK, N.A. AND J.P. MORGAN SECURITIES, INC.,

Defendants.

09 Civ. 9972 (JSR)

**DECLARATION OF SHELDON L. POLLOCK**

I, SHELDON L. POLLOCK, declare, pursuant to 28 U.S.C. § 1746, that the following is true:

1. I am an attorney with Davis Polk & Wardwell LLP, counsel of record for Defendants JP Morgan Chase Bank, N.A. and J.P. Morgan Securities, Inc.

2. Attached hereto as Exhibit A is a true and correct copy of the transcript of the Deposition of Jaquelina Truzzell, taken on December 16, 2009.

3. Attached hereto as Exhibit B is a true and correct copy of the Authorization to Request Credit Reports, dated May 8, 2009 and signed by the legal representatives of Empresas Cablevision, S.A.B. de C.V, and a certified English translation thereof.

4. Attached hereto as Exhibit C is a true and correct copy of an e-mail chain beginning with an e-mail from Julian Lautersztain to Pablo Camacho, et al., dated May 22, 2009 and ending with an e-mail from Gilberto Sotelo to Gilberto Sotelo dated December 9, 2009.

5. Attached hereto as Exhibit D is a true and correct copy of an e-mail chain beginning with an e-mail from Guadalupe Phillips to Joaquin Balcarcel, et al., dated May 22, 2009 and ending with an e-mail from Jonas Knoll to Gilberto Sotelo dated May 22, 2009.

6. Attached hereto as Exhibit E is a true and correct copy of an e-mail chain beginning with an e-mail from Julian Lautersztain to Jesus Granillo Rodriguez dated June 2, 2009 and ending with an e-mail from Jacqueline Truzzell to Jesus Granillo Rodriguez dated June 10, 2009, including an attachment sent by Jacqueline Truzzell to Jesus Granillo Rodriguez on June 3, 2009, and a certified English translation thereof.

7. Attached hereto as Exhibit F is a true and correct copy of a markup of a participation agreement under negotiation attached to an e-mail from Jesus Granillo Rodriguez to Jacqueline Truzzell dated June 8, 2009, and a certified English translation thereof.

8. Attached hereto as Exhibit G is a true and correct copy of an e-mail chain beginning with an e-mail from Salvi Folch to Sjoerd Leenart dated June 16, 2009 and ending with an e-mail from Sjoerd Leenart to Salvi Folch dated June 17, 2009.

9. Attached hereto as Exhibit H is a true and correct copy of an e-mail chain beginning with an e-mail from Salvi Folch to Alfonso de Angoitia on June 16, 2009 and ending with an e-mail from Salvi Folch to Guadalupe Phillips dated June 16, 2009, and a certified English translation thereof.

10. Attached hereto as Exhibit I is a true and correct copy of an e-mail chain beginning with an email from Salvi Folch to Alfonso de Angoitia dated June 17, 2009

and ending with an e-mail from Alfonso de Angoitia to Guadalupe Phillips dated June 18, 2009, and a certified English translation thereof.

11.     Attached hereto as Exhibit J is a true and correct copy of an e-mail chain beginning with an e-mail from Salvi Folch to Alfonso de Angoitia dated June 16, 2009 and ending with an e-mail from Salvi Folch to Alfonso de Angoitia dated June 16, 2009, and a certified English translation thereof.

12.     I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.


Dated: New York, New York
        December 17, 2009


Sheldon L. Pollock

# EXHIBIT A

C O N F I D E N T I A L

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

A,

Plaintiff,

-against- 09 CV. 9972 (JSR)

B & C,

Defendants.

-----------------------------------x

December 16, 2009

11:59 a.m.

Videotaped deposition of JAQUELINA TRUZZELL, pursuant to notice, at the offices of Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York, before Gail F. Schorr, a Certified Shorthand Reporter, Certified Realtime Reporter and Notary Public within and for the State of New York.

C O N F I D E N T I A L

A P P E A R A N C E S:

QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
Attorneys for the Plaintiff
51 Madison Avenue
22nd Floor
New York, NY 10010

BY: STEPHEN R. NEUWIRTH, ESQ.
DANIEL P. CUNNINGHAM, ESQ.
BEN HARRINGTON, ESQ.
-and-
GABRIEL LOZANO, ESQ.

DAVIS POLK & WARDWELL LLP
Attorneys for Defendants and the Witness
450 Lexington Avenue
New York, NY 10017

BY: D. SCOTT WISE, ESQ.
AMELIA T.R. STARR, ESQ.
-and-
ELVIRA CASTILLO, ESQ.

ALSO PRESENT:

ADRIANA DIAZ GALINDO
Televisa

GERARDO RIVERA, ESQ.
JPMorgan

C O N F I D E N T I A L

10:59:48 THE VIDEOGRAPHER: This is the
10:59:59 video operator, John Hagin,
11:00:01 speaking, of Merrill. Today is
11:00:03 Wednesday, December 16th, 2009 and
11:00:05 the time on the video monitor is
11:00:07 10:59 a.m. We're at the offices of
11:00:10 Davis Polk, 450 Lexington Avenue,
11:00:14 New York, New York, to take the
11:00:16 videotaped deposition of Ms.
11:00:18 Jaquelina Truzzell, in the matter
11:00:21 of Empresas Cablevision versus JP
11:00:28 Morgan Chase Bank N.A. and JP
11:00:28 Morgan Securities, Inc., in the
11:00:29 United States District Court,
11:00:31 Southern District of New York.

11:00:32 Will questioning and defending
11:00:33 counsel please introduce themselves
11:00:35 for the record.

11:00:37 MR. NEUWIRTH: For the
11:00:38 plaintiff, Stephen Neuwirth from
11:00:40 Quinn Emanuel Urquhart Oliver &
11:00:43 Hedges, and I'm also joined by
11:00:45 Daniel Cunningham, Ben Harrington
11:00:48 and Gabriel Lozano from our firm.

C O N F I D E N T I A L

11:00:52 And also with us is Adriana Diaz,
11:00:56 who is an attorney with Grupo
11:00:59 Televisa.

11:01:01 MR. WISE: For the defendants
11:01:02 and for the witness, Scott Wise
11:01:04 from Davis Polk & Wardwell.

11:01:06 MS. STARR: Also Amelia Starr
11:01:07 and Elvira Castillo from Davis Polk
11:01:11 & Wardwell, and also present is Mr.
11:01:15 Gerardo Rivera, from JPMorgan.

11:01:16 THE VIDEOGRAPHER: The court
11:01:17 reporter is Ms. Gail Schorr of
11:01:19 Merrill.

11:01:19 Will the reporter please swear
11:01:21 the witness.

J A Q U E L I N A T R U Z Z E L L,

called as a witness, having been first duly sworn by the Notary Public (Gail F. Schorr), was examined and testified as
11:01:35 follows:

11:01:35 MR. WISE: Fire away.

11:01:36 EXAMINATION BY MR. NEUWIRTH:

11:01:36 Q. Good morning, Ms. Truzzell.

JAQUELINA TRUZZELL - CONFIDENTIAL

11:01:39 Am I pronouncing your name correctly?

11:01:41 A. Truzzell.

11:01:42 Q. Truzzell. My name is Stephen

11:01:45 Neuwirth and I'm going to be questioning

11:01:46 you this morning. If at any point a

11:01:48 question I ask you is unclear please let

11:01:50 me know and I'll try to clarify it.

11:01:52 As I've discussed with counsel

11:01:54 from Davis Polk, this is scheduled to be

11:01:56 a two-hour deposition. I think we have

11:01:59 an understanding that if any point you

11:02:01 need to take a break you can let us know

11:02:02 and we'll stop the clock, so to speak --

11:02:05 A. Thanks.

11:02:05 Q. -- so you can do so. But

11:02:07 please, if you need to do so don't

11:02:10 hesitate and we'll accommodate you.

11:02:12 Ms. Truzzell, by whom are you

11:02:15 currently employed?

11:02:15 A. By JP Morgan Chase Bank N.A.,

11:02:21 Buenos Aires branch.

11:02:23 Q. That's Buenos Aires,

11:02:24 Argentina?

11:02:25 A. Yes.

JAQUELINA TRUZZELL - CONFIDENTIAL

11:02:25 Q. Is that where you maintain an office?

11:02:27 A. Yes.

11:02:28 Q. Where is your office located?

11:02:31 A. In Avenida Eduardo Madero 900, 25th floor.

11:02:36 Q. Are you an American citizen?

11:02:39 A. No.

11:02:40 Q. Are you a citizen of Argentina?

11:02:42 A. Yes.

11:02:43 Q. And what is your current title at JP Morgan Chase Bank?

11:02:48 A. I'm an executive director working in the debt capital markets group for Latin America.

11:02:55 Q. Have you held that position since the start of this year, 2009?

11:03:01 A. Yes.

11:03:01 Q. You are familiar, I take it, with a $225 million loan that JPMorgan made in 2007 to Cablevision; is that correct?

11:03:20 A. Yes, I am.

11:03:21 Q. Do you understand that that loan was made pursuant to a credit agreement in 2007?

11:03:28 A. Yes.

11:03:29 Q. Now, either prior to this year or during 2009, did you have any role in efforts to syndicate that loan?

11:03:42 A. Yes, I did. I actively tried to syndicate the loan starting in January 2009, or February 2009 actually. So I did have an active role in trying to -- to syndicate that loan to third parties.

11:03:59 Q. And is it correct that when you undertook those efforts in early 2009, you discussed with either Cablevision or Grupo Televisa the banks that you were considering to approach about purchasing an interest in the loan?

11:04:22 A. Yes, initially when the -- when we launched the syndication, since, given the market conditions, we were pretty sure that the -- that the banks that would have an interest in participating in the loans -- in the

11:04:35 loan, or buying the loan, would be those
11:04:38 banks who have a direct relationship or a
11:04:40 strong relationship with Grupo Televisa
11:04:44 group.

11:04:45 So as part of the syndication
11:04:47 strategy, we had discussed with Grupo
11:04:52 Televisa who were those banks that had a
11:04:55 strong relationship with them and who
11:04:56 would be, who we thought would have the
11:04:58 most -- would be most interested in -- in
11:05:01 participating in the syndication.

11:05:02 Q. And when you were working on
11:05:04 that syndication in early 2009, did you
11:05:09 understand that any assignment of all or
11:05:13 a portion of the loan would need to be
11:05:16 approved by Cablevision?

11:05:19 A. Yes.

11:05:19 Q. You understood that that was
11:05:21 pursuant to this credit agreement that we
11:05:23 referenced, correct?

11:05:24 A. Yes, correct.

11:05:25 Q. Prior to any approach that
11:05:30 JPMorgan made to Banco Inbursa, was there
11:05:35 any other potential purchaser of an

11:05:40 interest in the loan that JPMorgan
11:05:43 approached without first discussing the
11:05:47 approach with Grupo Televisa?
11:05:51 MR. WISE: Object to the form
11:05:52 of that question. It misstates
11:05:54 what the evidence will be in the
11:05:55 case.
11:05:55 MR. NEUWIRTH: I think if you
11:05:56 want to object to form you can.
11:05:58 You know speaking objections aren't
11:06:00 permitted.
11:06:01 Q. But if you understand the
11:06:02 question, you can answer it.
11:06:05 MR. WISE: Read it back, if
11:06:06 you would, please.
11:06:07 A. Can you read it back.
11:06:22 (Record read as requested.)
11:06:24 MR. WISE: Same objection to
11:06:25 form. You can answer.
11:06:26 Q. You can answer.
11:06:26 A. I believe that the -- I didn't
11:06:33 contact any other banks because my main
11:06:37 -- main responsibility was to have
11:06:40 conversations with those banks that we

JAQUELINA TRUZZELL - CONFIDENTIAL

11:06:42 had -- that we had discussed with Grupo
11:06:48 Televisa. I believe that there is a
11:06:50 possibility that other people who weren't
11:06:54 -- who weren't directly working on the
11:06:59 syndication might have discussed
11:07:02 possibility of other -- of other banks
11:07:04 being interested in the purchase.

11:07:06 Q. Okay. Well let me ask it this
11:07:09 way. You are not personally aware of any
11:07:12 circumstance where JPMorgan approached a
11:07:16 bank other than Banco Inbursa?

11:07:19 A. I do have recollections that
11:07:21 the -- the possibility of other -- of
11:07:24 other teammates discussing the -- we had
11:07:29 a number of assets that we were trying to
11:07:31 unload. Televisa was not the only one.
11:07:34 So I am aware, I do have a recollection
11:07:38 of meetings that different peoples within
11:07:41 our group had with other banks where they
11:07:45 described the situation of the loans that
11:07:48 we were trying to sell where I believe
11:07:50 that -- where -- where our assets, our --
11:07:56 our Cablevision asset was part of. So
11:07:58 there were -- there were discussions with

11:08:02 other banks trying to gauge interest for them to buy the assets that we were trying to sell, not only the Cablevision one.

11:08:10 Q. Was there an understanding within JPMorgan that before any discussions took place with Banco Inbursa it would be appropriate to first ask for Televisa's consent?

11:08:31 A. Yes. Through -- assuming that the -- that the sale was done through an assignment -- well, the initial approach was to -- to ask for Televisa's permission to discuss the -- to be able to show the asset to Inbursa, yes.

11:08:50 Q. And was that consent obtained before approaching Banco Inbursa?

11:08:56 A. Yes, it was.

11:08:56 Q. In what way was it obtained?

11:08:59 A. We heard from Gilberto Sotelo that he had had a telephone -- telephone conversation with Guadalupe Phillips where he -- where he discussed the possibility of showing the information to

JAQUELINA TRUZZELL - CONFIDENTIAL

Televisa -- to Inbursa for them to consider the purchase of the loan, and in that telephone conversation Guadalupe Phillips consented the sharing of the information.

Q. And when do you understand that conversation with Ms. Phillips took place?

A. It was around -- it was around end of March probably, beginning of April. I don't have the exact date.

Q. What is your understanding, if you have one, of what Ms. Phillips was told in that conversation?

A. My understanding is that she was told that we would like to share the information regarding the loan to Inbursa for them to consider, to consider their interest in potentially purchasing part of the loan that we were selling.

Q. And you say that this was a conversation that Mr. Sotelo had you think sometime in late March?

A. I believe so, yes.

JAQUELINA TRUZZELL - CONFIDENTIAL

11:10:26 MR. NEUWIRTH: Let me mark as Truzzell Exhibit number 1 a document that has been produced by JPMorgan bearing the Bates number JPM 157 to 158, and attached to it is on top a certified translation of the document.

11:10:50 (Truzzell Exhibit 1 for identification, Bates stamped JPM 157 to 158.)

11:11:15 MS. STARR: That's the only copy you've got? I just wondered if you had a copy that we could share, but if you don't that's okay.

11:11:25 MR. NEUWIRTH: Sure.

11:11:26 MS. STARR: Thank you very much.

11:11:29 Q. And I'd like you to look on page JPM 157. And I'm going to work off the English version but you can work off the Spanish version if you prefer.

11:11:51 A. Right.

11:11:51 Q. There's an email on March 16th

11:11:54 from Mr. Sotelo to a group of people and
11:12:00 you see it says, "I think they would
11:12:03 object. Before talking to Inbursa, we'd
11:12:07 have to ask TV if they have any
11:12:09 objection."
11:12:10 A. Right.
11:12:10 Q. Who is it that you understood
11:12:15 Mr. Sotelo thought would object?
11:12:18 A. Televisa.
11:12:20 Q. What was your understanding of
11:12:22 why he thought Televisa would object, if
11:12:26 you have such an understanding?
11:12:28 A. The objection could be raised
11:12:34 given -- given Inbursa's shared ownership
11:12:38 in other -- their shareholder structure
11:12:42 whereby their shareholders do own other
11:12:45 competing -- competing businesses with
11:12:49 Cablevision. However, just to -- there
11:12:52 was back and forth since we were also
11:12:54 aware that they also have, Inbursa also,
11:12:58 or the shareholder group also has
11:13:02 shareholder -- is also a shareholder of
11:13:04 Cablevision, so we weren't sure, I mean
11:13:07 we thought it could be a possibility that

they might object, and that's why we -- and that's why the decision was made to check with them before going forward.

Q. Okay. And it's your testimony that Mr. Sotelo spoke to Ms. Phillips at Televisa prior to making any approach to Inbursa. Is that recollection based on your recollection of events at the time, or have you done something in connection with this deposition to refresh your recollection?

A. No, the -- that -- I remember we had a telephone conversation with Gilberto Sotelo where he confirmed that conversation, but aside from that, I haven't done anything, anything else.

Q. Do you know whether in that conversation there was any discussion of the size of the interest that Inbursa might acquire in the loan?

A. No, I don't, I don't recollect that there was any discussion. At this point, I think at the point that Gilberto Sotelo discussed this with Ms. Phillips

11:14:18 there wasn't an indication for Inbursa
11:14:21 they would be interested in the loan. So
11:14:24 it was just the approval for them or the
11:14:27 approval for us to show -- to show them
11:14:29 the asset, which I received -- for them
11:14:34 to consider the purchase.

11:14:36 Q. Did JPMorgan contemplate at
11:14:41 this time when you say this discussion
11:14:42 occurred, that Inbursa might be
11:14:46 interested in acquiring an interest as
11:14:48 large as 90 percent of the loan?

11:14:50 A. No. At this point, again, we
11:14:53 just wanted to give them the information
11:14:55 for them to consider the purchase. The
11:14:58 amount of the purchase wasn't open for
11:15:01 discussion at that point.

11:15:02 Q. Did you have any expectation
11:15:05 that Inbursa might be interested in
11:15:08 purchasing as much as 90 percent of the
11:15:10 loan?

11:15:10 A. No.

11:15:12 Q. Now, at what point do you
11:15:38 understand JPMorgan reached an agreement
11:15:41 with Banco Inbursa for Inbursa to acquire

11:15:46 a 90 percent interest in the loan?

11:15:49 A. I believe it was -- it was

11:15:51 around beginning of May, first days of

11:15:57 May.

11:15:57 Q. And just to be clear, my

11:15:59 question was at what point do you

11:16:02 understand JPMorgan reached an agreement

11:16:04 for Inbursa to acquire. And is it your

11:16:08 understanding that that's when an

11:16:10 agreement was reached?

11:16:11 MR. WISE: Let me object to

11:16:11 the form.

11:16:12 MR. NEUWIRTH: You can object

11:16:13 to the form.

11:16:14 Q. You can answer the question.

11:16:14 A. The actual agreement was --

11:16:16 MR. WISE: Thank you for your

11:16:18 permission, counsel. I'll object

11:16:19 to the form. Go ahead.

11:16:21 THE WITNESS: Do I go ahead?

11:16:23 MR. WISE: Go ahead.

11:16:24 A. The actual -- I mean there's

11:16:26 -- in -- there's -- there's two stages

11:16:27 when you -- when you sell a loan to an --

JAQUELINA TRUZZELL - CONFIDENTIAL

11:16:30 to an assignment -- to a potential buyer.
11:16:33 The first is the agreement of the sale
11:16:36 and at what price, and that was done at
11:16:39 the beginning of May.

11:16:39 The actual agreement to sell
11:16:41 the loan wasn't until the final
11:16:46 participation agreement was executed.

11:16:47 Q. Right, but would it be fair to
11:16:49 say that there was an agreement on the
11:16:53 material pricing terms in early May?

11:16:56 A. There was a handshake. There
11:17:01 wasn't -- there wasn't any document that
11:17:02 was signed, but there was a -- there was
11:17:06 a verbal recognition from both parties
11:17:09 that they would -- that the loan would be
11:17:13 sold.

11:17:13 Q. Okay. And at that point the
11:17:17 idea was that it would be done by means
11:17:18 of an assignment; is that correct?

11:17:19 A. Exactly, yes.

11:17:21 Q. Now at the time that that
11:17:23 handshake took place, JPMorgan had not
11:17:28 obtained Televisa's consent to an
11:17:32 assignment, correct?

JAQUELINA TRUZZELL - CONFIDENTIAL

11:17:32 A. That's correct. They hadn't obtained -- Televisa hadn't signed any agreement. We had gotten indications from them that they would -- that they would be okay with Inbursa purchasing the loan, but that's -- but they hadn't -- they hadn't signed the assignment agreement.

11:17:52 Q. You say they got indications. Did anybody as of the time of this handshake disclose to Televisa that there was a plan for Inbursa to purchase 90 percent of the loan?

11:18:06 MR. WISE: You mean other than she's already testified to?

11:18:08 Q. You can answer the question.

11:18:09 A. At the point -- the -- the impression that we -- the impression that we had was that first I mean we had given -- Televisa had accepted the sale to Inbursa given the, sort of the green light that we had got from Ms. Phillips that she wouldn't -- that she wouldn't object to Inbursa participating. We had

11:18:37 also contacted them regarding some
11:18:40 administrative issues that needed to be
11:18:42 completed on Inbursa's side and needed
11:18:46 some documents from Cablevision and those
11:18:49 were sent. So -- and the percentage
11:18:53 point in itself didn't -- didn't -- we
11:18:57 didn't think that would be an objection,
11:18:59 the company -- Televisa knew we were
11:19:01 selling 90 percent of the loan. So
11:19:05 whether -- whether they bought 5 percent
11:19:08 or 90 percent, we didn't think it would
11:19:09 be an issue for Televisa.

11:19:12 Q. Can you tell me what question
11:19:13 you were just answering?

11:19:15 MR. WISE: Object to the form
11:19:16 of the question. Don't be
11:19:17 argumentative, counsel. Come on.

11:19:19 Q. Can you tell me what question
11:19:20 you were just answering?

11:19:21 A. The last one where you asked
11:19:25 if somebody had contacted Televisa to
11:19:29 tell them that we had sold 90 percent of
11:19:33 the loan.

11:19:33 Q. Right. Did anybody --

11:19:33 A. Or there was --

11:19:38 Q. Prior to this handshake that you described in early May, had anybody contacted either Cablevision or Grupo Televisa to advise that JPMorgan was contemplating an assignment of a 90 percent interest in the loan to Banco Inbursa?

11:19:55 MR. WISE: Asked and answered.

11:19:56 Go ahead.

11:19:57 A. I don't have a recollection that Televisa was advised.

11:20:02 Q. Do you have a recollection that Cablevision was advised?

11:20:05 A. No. We -- no. We always dealt directly with Televisa.

11:20:28 Q. Let me ask you this. At a certain point, JPMorgan began discussions with Banco Inbursa about the possibility of having the 90 percent interest acquired by means of a participation as opposed to an assignment; is that correct?

11:20:48 A. That is correct.

JAQUELINA TRUZZELL - CONFIDENTIAL

11:20:49 Q. Who initiated the idea to discuss a participation as opposed to an assignment?

11:20:59 A. I believe that after we -- we had approached Televisa to get their consent on the assignment and Televisa was -- was not forthcoming with the consent, they hadn't -- they hadn't directly denied it, but they were -- they were taking awhile to get back to us with a response as to whether they were -- they would consent or not to an assignment.

11:21:27 I think we -- we discussed with Inbursa the possibility of structuring the sale through the other permitted -- the other permitted structure in the credit agreement which was the participation. I believe we received an email from Inbursa suggesting if we could move forward and close the trade through a participation.

11:21:52 Q. Okay. Let me show you a document that has been designated JPM

11:22:03 3020.

11:22:14 MR. NEUWIRTH: And we'll mark

11:22:16 this as Truzzell Exhibit 2.

11:22:17 (Truzzell Exhibit 2 for

11:22:01 identification, Bates stamped JPM

11:22:03 3020.)

11:22:35 Q. You'll see in the -- you'll

11:22:40 see in the middle of the page in this

11:22:42 email from Mr. Leenart of JPMorgan to

11:22:47 several people that there's an item 2

11:22:49 which references indemnification for

11:22:52 legal costs. Do you see that?

11:22:55 A. Yes.

11:22:55 Q. Did you participate in any

11:22:59 discussions with Banco Inbursa about the

11:23:02 possibility of either Banco Inbursa

11:23:07 indemnifying JPMorgan or JPMorgan

11:23:10 indemnifying Banco Inbursa for any claims

11:23:15 that Cablevision might make about the

11:23:19 sale of an interest in the loan to Banco

11:23:22 Inbursa?

11:23:22 A. No, I did not.

11:23:25 Q. Did you have any knowledge

11:23:26 that this issue was being discussed

JAQUELINA TRUZZELL - CONFIDENTIAL

11:23:30 within JPMorgan?

11:23:31 A. No, I did not. Can I take a

11:23:35 minute to read this?

11:23:37 Q. Sure.

11:24:10 A. Okay.

11:24:12 Q. Having read this, do you feel

11:24:13 a need to amend any of the answers you

11:24:16 just gave about this topic?

11:24:17 A. No.

11:24:18 Q. Okay. Let me show you a

11:24:25 document bearing Bates number JPM 3050.

11:24:40 MR. NEUWIRTH: And we'll mark

11:24:41 this as Truzzell Exhibit 3.

11:24:42 (Truzzell Exhibit 3 for

11:24:28 identification, Bates stamped JPM

11:24:31 3050.)

11:24:58 Q. And this is another email from

11:25:02 Mr. Leenart of JPMorgan to a group of

11:25:05 people dated June 19th. Again, you're

11:25:09 not one of the recipients of this

11:25:10 document, correct?

11:25:11 A. Correct.

11:25:11 Q. And you'll see about

11:25:15 two-thirds of the way down the page it

11:25:18 says "Next step is to meet Slim and
11:25:25 explain our story," and then there are
11:25:27 several points.
11:25:27 Do you know who the Slim is
11:25:31 that is being referred to here?
11:25:32 A. I think it's one of the sons,
11:25:35 but I'm not really sure who -- who the
11:25:37 contact is.
11:25:39 Q. Now when you say sons, you
11:25:40 mean one of the sons of Carlos Slim?
11:25:43 A. Exactly.
11:25:43 Q. And is that a son that you
11:25:45 understood had a -- had a management role
11:25:50 at Banco Inbursa?
11:25:52 A. I'm not aware of. I don't
11:25:55 know what the management structure at
11:25:56 Inbursa is.
11:25:57 Q. Did you have -- did you
11:25:59 yourself have any discussions with any
11:26:02 members of the Slim family in connection
11:26:05 with the sale of an interest in the loan
11:26:09 to Banco Inbursa?
11:26:12 A. No, I did not.
11:26:13 Q. Were you told by any of your

JAQUELINA TRUZZELL - CONFIDENTIAL

11:26:16 colleagues that they were having
11:26:17 discussions with Mr. Slim or any member
11:26:19 of the Slim family?
11:26:20 A. No, I was not.
11:26:25 Q. As you sit here today, do you
11:26:27 have any understanding that any members
11:26:30 of the Slim family were involved in
11:26:32 discussions with JPMorgan about the terms
11:26:37 on which Banco Inbursa would acquire an
11:26:39 interest in the loan to Cablevision?
11:26:41 A. No, I don't think -- no.
11:26:43 Q. You don't know or you don't
11:26:45 think they did?
11:26:46 A. I don't think they did.
11:26:49 Q. Do you have any understanding
11:26:51 then of why on June 19th Mr. Leenart
11:26:56 would have said that "the next step is to
11:26:58 meet Slim and explain our story"?
11:27:03 MR. WISE: Do you want to take
11:27:04 a second and read it and go ahead.
11:27:09 THE WITNESS: Yes, I just --
11:27:11 MR. WISE: She's not on the
11:27:13 document.
11:27:13 MR. NEUWIRTH: I think we

11:27:14 established that at the beginning,
11:27:15 Scott.
11:27:15 A. I'm -- I'm assuming, and this
11:27:19 is just what I can conclude from his
11:27:22 email that, I mean Mr. Leenart is a
11:27:25 senior, pretty senior person in our
11:27:27 group, so he would want to meet with --
11:27:31 with a senior person at Inbursa to
11:27:33 explain the situation.
11:27:35 Q. And did you ever have an
11:27:37 understanding of why there would be a
11:27:43 need to explain the situation to Inbursa?
11:27:45 A. It seems here at this point
11:27:47 that there -- that there was a
11:27:49 possibility that we were contemplating
11:27:53 the sale to -- to Televisa of the -- of
11:27:59 the loan. It says here "We have no
11:28:02 interest to being caught up between these
11:28:04 two parties," and we wanted to come to a
11:28:07 compromise that would be okay with
11:28:09 Inbursa, Televisa and ourselves. So I
11:28:12 think they were trying to find a solution
11:28:15 to this sort of -- to the issue that had
11:28:17 -- that had arised with Cablevision and

JAQUELINA TRUZZELL - CONFIDENTIAL

at this point Inbursa was also upset of why we weren't closing the transaction. So I think a -- he was trying to -- to solve the problem that had been caused.

Q. And when you say "the problem that had been caused," caused by what?

A. Caused by the nonapproval of Televisa on the assignment and the sale of the loan to Inbursa.

Q. A point came in July when Banco Inbursa and JPMorgan entered into a written agreement pursuant to which Banco Inbursa acquired a 90 percent interest in the loan, correct?

A. Acquired the economic interest through a participation agreement, yes.

Q. An agreement labeled participation, correct?

A. Exactly, yes.

Q. And what reason was there, if you know of one, not to tell either Grupo Televisa or Cablevision that this agreement was entered at the time it was entered?

JAQUELINA TRUZZELL - CONFIDENTIAL

11:29:50 A. Specifically it was, I think the participation -- the participation was -- was an agreement and document between JPMorgan and -- and Banco Inbursa, and documents signed with -- I mean the agreement was only privy to those parties. And not to be shared with third parties.

11:30:15 Q. Well, it's the case, isn't it, that prior to July 15th, JPMorgan was having discussions with Grupo Televisa about the potential sale of an interest in the loan to Inbursa, correct?

11:30:37 A. JPMorgan was disclosed that they were having discussions for a potential sale, yes.

11:30:45 Q. And so if the discussions about a potential sale were disclosed, what is your understanding, if you have any, of why when the transaction was completed no one would have told Grupo Televisa about it?

11:31:03 A. The same reason that I -- that I just said. It's a document signed by

11:31:07 -- between two parties of which only
11:31:09 those two parties have -- should have the
11:31:14 benefit of that information.

11:31:17 Q. And did you have an agreement
11:31:19 with Banco Inbursa, by you I mean did
11:31:23 JPMorgan to your knowledge have an
11:31:24 agreement with Banco Inbursa that the
11:31:28 fact of the entry of this agreement on
11:31:31 July 15th would not be disclosed to
11:31:34 Televisa? Did you have any discussions
11:31:36 where it was agreed that you would not
11:31:37 make that disclosure?

11:31:38 A. No.

11:31:39 MR. WISE: Object to the form.
11:31:40 Go ahead.

11:31:41 A. No. There wasn't any specific
11:31:43 discussion regarding disclosure.

11:31:45 Q. In fact it's the case, isn't
11:31:57 it, that as late as August, September and
11:32:04 October, JPMorgan did not disclose to
11:32:10 Grupo Televisa or Cablevision that it had
11:32:12 entered this agreement on July 15th; is
11:32:15 that correct?

11:32:15 A. That's probably correct. I

11:32:19 don't think we -- that we -- I mean there wasn't a specific reason or action to which we proactively had to inform the borrower, Televisa or Cablevision.

11:32:34 Q. But there was no legal prohibition on informing the borrower, to your knowledge, was there?

11:32:42 MR. WISE: Object to the form of the question. You can answer if you want.

11:32:44 Q. Let me reframe it. Were you aware of any legal impediment to JPMorgan advising Grupo Televisa or Cablevision that on July 15th, JPMorgan had entered an agreement with Banco Inbursa?

11:33:02 A. There was no impediment and no obligation to do so.

11:33:12 Q. No legal obligation?

11:33:13 A. No legal obligation.

11:33:16 Q. Did you have any discussions within JPMorgan about whether it would be appropriate or not appropriate to disclose the July 15th agreement to Grupo Televisa or Cablevision?

11:33:39 A. No, I did not.

11:33:42 Q. Now, did you have any role in discussions that JPMorgan had with Grupo Televisa during 2009 about the possibility of Televisa acquiring an interest in two other loans that JPMorgan had made, one to a company called Cablemas and the other to a company called TVI?

11:34:15 A. I had a role. The role of negotiating or discussing the purchase was not handled by me. I did have an active role in the settlement of those, of those. Once those -- those agreements were reached and the prices were agreed to, I did have a role in -- in negotiating or in preparing the, sort of the executing documents and the settlement.

11:34:43 Q. Did Televisa end up purchasing an interest in either the loan to Cablemas or the loan to TVI?

11:34:55 A. Yes, to both loans. Excuse me, not directly. I believe that the

11:35:04 Cablemas was done indirectly through two
11:35:06 of their subsidiaries and the TVI, I
11:35:10 can't remember if it was -- it was Grupo
11:35:12 Televisa or one of their subsidiaries
11:35:14 also, but they did buy both loans.

11:35:16 Q. Had both of those acquisitions
11:35:19 been made by July 15th, 2009?

11:35:22 A. I think one was done later. I
11:35:29 can -- I believe one was done prior and
11:35:32 one was done later. I don't remember the
11:35:34 exact dates.

11:35:35 Q. Now, as of July, were there
11:35:47 any banks besides Banco Inbursa that had
11:35:53 expressed an interest in purchasing all
11:35:58 or some of the loan to Cablevision, the
11:36:03 $225 million loan?

11:36:05 A. Right. As of July, I think
11:36:07 from the nine banks that we had
11:36:09 originally approached, HSBC was the one
11:36:12 who was the only one who was -- who
11:36:15 obtained credit approval and was -- and
11:36:19 was -- and was willing to buy the loan.
11:36:22 Actually it was only 40 million of the
11:36:27 202.5 that was on sale, so it was only a

11:36:29 portion of the loan, but HSBC was -- was
11:36:33 the only bank that had gotten sort of
11:36:36 approval and had moved to the stages
11:36:38 where -- where they would be interested
11:36:40 in -- in negotiating an assignment
11:36:42 agreement for a $40 million ticket.

11:36:45 Q. And was there any other bank
11:36:46 during this period that had expressed an
11:36:49 interest in acquiring all or some of the
11:36:54 Cablevision loan?

11:36:56 MR. WISE: Any other bank
11:36:58 other than -- I'm just a little
11:36:59 unclear on the question.

11:37:00 Q. Other than Banco Inbursa --

11:37:00 MR. WISE: And HSBC.

11:37:02 Q. Or HSBC.

11:37:04 A. BBVA had expressed interest at
11:37:07 the beginning when we -- when we
11:37:09 initially -- when we initially launched
11:37:12 the deal. They took about three months
11:37:15 to take a decision and they never
11:37:17 actually came back with a final offer.

11:37:19 Bank of Tokyo Mitsubishi had
11:37:26 expressed interest, but they were also

11:37:28 very slow in getting back and in the end
11:37:32 weren't able to come up with their final
11:37:34 sort of approval.
11:37:37 Those were the two banks. And
11:37:39 then there were a number of other banks
11:37:40 who sort of quickly after we launched the
11:37:43 deal in mid-February, maybe took two --
11:37:47 two weeks or three weeks to come back
11:37:49 with -- with the decline. But by July I
11:37:54 would say that the only bank who would be
11:37:56 -- who had obtained the approval was
11:37:58 HSBC.
11:38:01 Q. What efforts, if any, did
11:38:05 JPMorgan make to explore the possibility
11:38:11 in July of the Tokyo Mitsubishi Bank
11:38:16 acquiring an interest in the Cablevision
11:38:18 loan?
11:38:19 A. By July, but by July the
11:38:23 participation agreement had already been
11:38:25 -- what do you mean by July? The
11:38:26 participation agreement you said was
11:38:28 signed in?
11:38:29 Q. July 15th.
11:38:30 A. Okay.

JAQUELINA TRUZZELL - CONFIDENTIAL

11:38:30 Q. So in the first two weeks of July, what efforts did JPMorgan make, if any, to explore whether it was feasible for the Tokyo Mitsubishi Bank you mentioned to acquire some or all of the 90 percent interest you were trying to sell in the Cablevision loan?

11:38:48 A. Right. We had -- I had personally spoken to Bank of Tokyo Mitsubishi and given -- the basis of their response was that they could be interested. But any consideration to be able to get to an approval would -- would probably take them another six to eight weeks. But it would take -- it would take them some time to be able to get approval.

11:39:15 So at the beginning of July, given that response, we didn't pursue -- I mean given -- given the timing, Bank of Tokyo Mitsubishi was contacted at the beginning of February -- mid-February. So in July, if in July they told us that they still needed eight weeks to consider

11:39:35 the -- to consider their approval, we
11:39:38 didn't actively pursue -- pursue.
11:39:42 Although we did tell them to start taking
11:39:44 a look at it, to start taking a look at
11:39:46 it because at that point we weren't sure
11:39:51 what the end result was going to be
11:39:54 regarding the asset.

11:39:56 So we did ask them to take a
11:39:59 look at it, to later inform them that --
11:40:02 that it was -- that we weren't going to
11:40:04 -- it wasn't for sale anymore.

11:40:07 Q. The other bank you mentioned,
11:40:13 I think you said BBBC?

11:40:16 A. BBVA.

11:40:17 Q. Is that also known as
11:40:18 Bancomer?

11:40:19 A. Yes, I believe so.

11:40:20 Q. Another Mexican bank?

11:40:22 A. It's a Spanish -- it's a
11:40:24 Spanish -- it's a Spanish bank that has
11:40:28 its subsidiary in Mexico is Bancomer.

11:40:36 Q. What efforts were made in June
11:40:37 or the first half of July to explore
11:40:40 whether Bancomer could acquire an

JAQUELINA TRUZZELL - CONFIDENTIAL

11:40:43 interest in the Cablevision loan?

11:40:44 A. Well, the efforts with BBVA were started in mid-February. So we kept on -- we kept on following up with Bancomer. Obviously, if they started mid-February and they didn't have a final -- a final approval to buy, usually credit approvals within banks could take, usually would take three weeks, given the situation in the market, we were seeing that banks were taking much longer to -- to get, to obtain their approval.

11:41:16 But I would say two months is a fairly long time and if we approached them in February, if by July they didn't have an approval, it was clear that they weren't going to be able to purchase the loan.

11:41:30 Q. And what was the reason in your view that JPMorgan decided that it made more sense to conclude a deal with Banco Inbursa in July than to pursue any current expressions of interest at that time by HSBC, Bancomer and the Tokyo

11:42:07 Mitsubishi Bank?

11:42:09 A. At that point we only -- we knew that the only certain buyer was HSBC for 40 million. There was -- there was -- given the market crisis and given JPMorgan's position in holding the amount of the loan that we held at that point on the Cablevision specifically and then on other names where we held much more exposure than we had originally obtained approval for, there was a significant amount of internal pressure due to regulatory issues and due to capital issues to decrease -- to decrease our exposure in that loan.

11:42:56 So given the certainty of Inbursa to purchase the amount that we were selling, and that's why it was decided to go ahead and close the deal with Inbursa, mainly driven -- I mean from the pressure that everybody was having internally to decrease the amount of assets that we held on our books.

11:43:16 Q. Why did -- well let me ask,

11:43:23 did JPMorgan explore with Inbursa the possibility of Inbursa taking a smaller interest in the loan and letting at least HSBC acquire a $40 million interest in the loan?

11:43:36 A. It did explore it, but we were told by Inbursa that they wanted to buy the 90 percent.

11:43:44 Q. Did you have an understanding of why at a time when you say all these other banks were unwilling to step up to the plate --

11:43:53 A. Right.

11:43:53 Q. -- Banco Inbursa was willing to acquire 90 percent of the loan and wasn't even willing to share any of that with any other interested bank like HSBC?

11:44:02 MR. WISE: Object to the form, but you can certainly answer that question.

11:44:05 A. Okay. At that point, I mean again, we have to situate ourselves in -- in the time frame where the market, the financial crisis was -- hadn't still sort

11:44:17 of completely ended. The banks that we
11:44:20 had approached initially, which were all
11:44:23 sort of the strong relationship banks
11:44:26 from Grupo Televisa were all subsidiaries
11:44:30 of foreign banks and each of the foreign
11:44:33 banks were having their own problems in
11:44:36 terms of capital reallocation. And this
11:44:39 wasn't only true for the Cablevision
11:44:43 deal, but for the market in general,
11:44:45 where no -- no additional lines or no new
11:44:48 loans or no additional -- it was very
11:44:50 difficult to obtain approval for new
11:44:53 money to be funded into -- into Latin
11:44:58 American borrowers.
11:44:59 Grupo Inbursa was the only one
11:45:03 who -- I mean is the only sort of true
11:45:06 local player, it's owned by the Mexican
11:45:09 shareholders, and the fact that they
11:45:10 might have been -- I mean they knew the
11:45:12 company, and mainly the discount we were
11:45:14 offering for the loan I think was -- was
11:45:16 pretty significant and we believed that,
11:45:21 or I believed that they have -- I mean
11:45:23 they weren't affected by the global

11:45:26 liquidity crisis that all the other banks
11:45:30 -- banks were, and they were able to take
11:45:32 the opportunity of purchasing the asset
11:45:35 at this pretty significant discount.

11:45:42 Q. So did JPMorgan have an
11:45:45 understanding that Banco Inbursa was the
11:45:49 only bank in the world that was not
11:45:51 affected by the global liquidity crisis?

11:45:57 MR. WISE: Object to the form.
11:45:58 It's also kind of asked and
11:46:00 answered in the last answer, but
11:46:02 you can expand on it if you want.

11:46:03 Q. You can actually answer the
11:46:04 question.

11:46:05 MR. NEUWIRTH: And I think
11:46:06 coaching the witness is
11:46:08 inappropriate and you know it. You
11:46:09 can say asked and answered, you can
11:46:11 object to form.

Why don't you read the
question back and let the witness
answer the question.

MR. WISE: I know what I can
do. I don't need instructions from

11:46:11 you.

11:46:11 MR. NEUWIRTH: Well then why
11:46:12 don't you do what you know you're
11:46:12 allowed instead of coaching the
11:46:16 witness.

11:46:16 MR. WISE: You want to spend
11:46:17 your time arguing with me? Go at
11:46:19 it.

11:46:19 MR. NEUWIRTH: I want you to
11:46:20 stop coaching the witness.

11:46:22 MR. WISE: Go at it.

11:46:23 MR. NEUWIRTH: Can you read
11:46:24 the question back and have the
11:46:25 witness answer the question.

11:46:28 (Record read as requested.)

11:46:39 A. No, I don't think that's a
11:46:41 correct characterization, but it --

11:46:42 Q. What other banks then --

11:46:44 MR. WISE: I don't think she
11:46:45 was finished with her answer.

11:46:46 A. But -- but we did believe that
11:46:48 it was -- the bank -- I mean one -- one
11:46:52 of the only banks that would be
11:46:54 interested in this particular --

JAQUELINA TRUZZELL - CONFIDENTIAL

11:46:57 particular loan that we knew -- that we
11:46:59 knew about would have interest in this
11:47:01 loan in that current situation.
11:47:02 Q. Okay. And what type of
11:47:05 situation is that?
11:47:07 A. The current financial crisis,
11:47:11 market meltdown, restriction of credit
11:47:15 lines to countries other than where the
11:47:21 bank's home base is, which we had a lot
11:47:25 of that. I mean it was the -- the Bear
11:47:36 Stearns sell-down, the general financial
11:47:39 crisis.
11:47:39 Q. Now, during this period did
11:47:50 Grupo Televisa make an offer to acquire
11:47:52 some or all of the Cablevision loan?
11:47:54 MR. WISE: Object to the form
11:47:55 of that question. It's vague as to
11:47:57 this period. I don't quite know
11:47:58 what time period you're talking
11:47:59 about, Steve.
11:48:00 Q. Why don't we say during the
11:48:03 period between June 1st and July 15th,
11:48:05 2009, did you have an understanding that
11:48:10 Grupo Televisa directly or indirectly was

11:48:14 offering to acquire some or all of the
11:48:19 $225 million loan to Cablevision?
11:48:21 A. I -- I do understand that they
11:48:25 were considering purchasing the loan.
11:48:31 Q. Did you have an understanding
11:48:33 of the discount at which Televisa was
11:48:40 considering acquiring an interest in the
11:48:43 loan?
11:48:43 A. That was discussed with --
11:48:45 with, I believe with Carlos Ruiz de
11:48:47 Gamboa who -- who did -- who did inform
11:48:51 us the price that -- that Televisa was
11:48:55 considering.
11:48:56 Q. And you referred a couple of
11:48:58 times, a couple of minutes ago first to
11:49:02 the substantial discount, second, to the
11:49:04 significant discount at which Banco
11:49:09 Inbursa was able to acquire the 90
11:49:12 percent interest in the Cablevision loan.
11:49:14 A. Right.
11:49:14 Q. Was the discount rate at which
11:49:24 Televisa was considering acquiring an
11:49:27 interest greater than or less than the
11:49:30 discount that was approved in the July

11:49:34 15th agreement with Banco Inbursa?

11:49:38 A. I believe -- I can't -- I can't remember the exact -- the exact discount. I believe -- I believe Grupo Televisa's discount was -- was -- I believe that it was less. I don't -- I can't recall exactly what the -- what the numbers are.

11:49:59 Q. So if the discount was less, that means that Televisa would have been paying a higher number of dollars to acquire the loan than Banco Inbursa would have paid at a higher discount rate?

11:50:12 A. Right.

11:50:12 Q. Is that correct?

11:50:13 A. That is correct. If they were to acquire it. What we had was an indication of price and not an agreement.

11:50:22 Q. Right. But you had --

11:50:32 MR. NEUWIRTH: Can you read back that last answer.

11:50:34 (Record read as requested.)

11:50:47 Q. Let me show you a document that bears the Bates number JPM 3519

11:51:01 through 3525.

11:51:14 MR. NEUWIRTH: And this is

11:51:16 Truzzell Exhibit 4.

11:51:17 (Truzzell Exhibit 4 for

11:50:56 identification, Bates stamped JPM

11:50:59 3519 through 3525.)

11:51:31 Q. And again, this is a document

11:51:33 which is a Spanish language document and

11:51:34 on top of it, bearing the corresponding

11:51:38 Bates numbers, there is a certified

11:51:40 translation of the document.

11:51:41 Ms. Truzzell, you can please

11:51:46 take whatever time you want to look at

11:51:48 this, but what I'm going to ask you about

11:51:52 first is an email that you sent to

11:52:03 Gilberto Sotelo on June 10th which

11:52:07 appears, the from/to indication appears

11:52:12 at the bottom of page JPM 3521 and then

11:52:16 the text of your email appears on page

11:52:21 3522. So I'm going to ask you about

11:52:25 that. But if you need to look at any

11:52:26 other part of this, please do. And let

11:52:28 me know when you're ready, please.

11:53:07 A. Okay.

11:53:08 Q. Okay?

11:53:09 A. Yes.

11:53:09 Q. All right. So in this document, and I'm now on page JPM 3522, you see there is a paragraph there which refers to Inbursa?

11:53:24 A. Right.

11:53:25 Q. And I'm working off the translation which translates that Spanish language paragraph to read "Yesterday we continued discussing their comments about the part agreement," the participation agreement. "Their attorneys responded with two important comments."

11:53:53 And you see that there are two comments there, an (a) and a (b). The first one says "They want to have a say in any amendments and waiver (this isn't possible since the credit agreement only permits consulting them concerning economic issues involving the loan)," and (b) says "They want a mechanism by which they can start direct proceedings against the borrower in the case of breach."

11:54:21 Okay.

11:54:22 MR. WISE: You want to just

11:54:23 finish reading that.

11:54:24 Q. And then it says "We can't

11:54:27 give them this because it's contrary to

11:54:30 the participation structure."

11:54:33 Correct?

11:54:33 A. Correct.

11:54:34 Q. What was the reason that you

11:54:41 wrote "we can't give them this because

11:54:46 it's contrary to the participation

11:54:47 structure"?

11:54:48 A. The reason is that there's two

11:54:50 very different ways in -- in which you

11:54:55 can -- in which you can sell a loan. One

11:54:57 is through an assignment whereby the

11:55:00 buyer becomes a lender of record and has

11:55:03 all of the rights that -- that a lender

11:55:06 has in -- in the credit agreement in

11:55:09 terms of -- in terms of their voting

11:55:13 rights and their ability to make

11:55:16 decisions, to enforce the credit

11:55:18 agreement.

11:55:19 The participation agreement is

11:55:21 -- is very different to an assignment
11:55:23 because the participant doesn't get all
11:55:27 of the rights, it only gets voting rights
11:55:29 in very limited instances.
11:55:33 And if there's a breach in
11:55:37 specific -- in covenants, the participant
11:55:39 doesn't have any say, or doesn't have a
11:55:41 direct -- any say in terms of -- in terms
11:55:46 of their objection or not to amend any --
11:55:51 any -- any -- any of those covenants.
11:55:57 And the participant doesn't have a direct
11:55:59 relationship with the borrower. It's the
11:56:01 lender of record that has that
11:56:03 relationship with the borrower.
11:56:04 Q. When you say in the case of
11:56:06 breach, are you using the term breach
11:56:10 there to mean default?
11:56:12 A. No, breach of covenant. Yes,
11:56:14 well, breach of covenants would be a
11:56:16 default.
11:56:19 Q. And so you are using -- so the
11:56:21 term breach there would include a
11:56:23 default?
11:56:23 A. Yes.

JAQUELINA TRUZZELL - CONFIDENTIAL

11:56:24 Q. And let me ask you, between the time that you wrote this in June, on June 10th, to today as you sit here, have you changed your opinion on any of the points that you wrote in this paragraph?

11:56:50 A. No, no. I think it's still true that the participant has no say in amendments, waivers other than those that are specifically outlined in the credit agreement, and the participant has no direct relationship, but in terms of proceeding has no direct say as to -- or it can't claim directly any -- any breach of covenants to the borrower.

11:57:27 Q. Right. And I take it this means and they would have no rights to do anything to the borrower directly?

11:57:32 A. And they would have --

11:57:33 MR. WISE: Object to the form of that, but go ahead.

11:57:36 A. Yes, they would have no rights -- the -- they would have no rights to do anything to the borrower directly.

11:57:42 Q. In the event of a default?

11:58:58 Q. I just want to cross-reference
11:59:00 it now.
11:59:01 A. I'm not sure it was March or
11:59:02 April. I mean I'm not exactly sure about
11:59:04 the dates. I think it was somewhere
11:59:07 between March, beginning of April.
11:59:09 Q. And just to be clear, you were
11:59:12 not personally present when any such
11:59:14 conversation with Ms. Phillips occurred;
11:59:16 is that correct?
11:59:16 A. That's correct. Regarding
11:59:17 that situation.
11:59:18 Q. Right. Do you have specific
11:59:24 recollection of being told by Mr. Sotelo
11:59:27 that he had had a conversation with Ms.
11:59:30 Phillips?
11:59:30 A. Yes.
11:59:30 Q. And do you have a specific
11:59:32 recollection of Mr. Sotelo telling you
11:59:37 that -- well, let me ask you, what is
11:59:40 your specific recollection of what Mr.
11:59:42 Sotelo told you about that conversation?
11:59:43 A. I remember we had -- we had a
11:59:49 telephone conversation regarding, I mean

                    11:59:51 just the routine telephone, internal
11:59:55 conversations we would have regarding the
11:59:57 syndication. I don't recall exactly what
11:59:59 Mr. Sotelo said, but I remember he said
12:00:03 that he had talked to her and there was
12:00:05 the green light to go ahead and -- and
12:00:07 share the information with Inbursa.

12:00:10 MR. NEUWIRTH: So I think now
12:00:13 you're going to be turning to some
12:00:15 materials that are attorneys' eyes
12:00:19 only produced by JPMorgan. So I
12:00:22 don't think there's a need for you
12:00:23 to leave, but Ms. Diaz will step
12:00:27 out.

12:00:27 (At this time, Ms. Diaz left
12:00:36 the deposition room.)

12:00:50 Q. Did a point ever come where
12:01:17 you deleted from your email files any
12:01:22 drafts of the agreement that was
12:01:27 ultimately entered on July 15th between
12:01:32 JPMorgan and Banco Inbursa?

12:01:34 A. Specifically deleted an
12:01:36 attachment?

12:01:36 Q. Did you ever delete --

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

A. No.

Q. -- whether it was an attachment or otherwise --

A. No.

Q. -- any files associated with email that contained drafts of the agreement that was entered on July 15th?

A. I -- I never deleted an attachment. The system, the way the system works in, the email system works in the bank is that if you're sent an email with an attachment and you respond without the attachment, the system will automatically delete that file.

So there's -- there's a lot of emails where you originally received the file, but if you don't -- if you just -- there's two ways of responding, or there's a number of ways, responding, respond to all, respond with attachment. So if you only respond or respond to all, the email gets -- gets deleted by the system.

I usually, if I get a file I

usually respond without the file just because it makes the email lighter. So if -- if there's an email that specifically might say deleted by whoever responded, it's because that person responded without the attachment.

Q. And if you received a draft agreement what would you do to keep a copy of that agreement? Would you print it out?

MR. WISE: Are you asking in this specific instance or general practice?

MR. NEUWIRTH: I'm just asking in general.

A. In general, it depends what I'd have to review of that agreement. If there was only -- if there was only a couple of revisions in the -- in the agreement, I would read it on the computer. If there was -- if I had to read 150 page agreement, I would print it out.

Q. Was it your normal practice

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:03:33 when working on this agreement with
12:03:38 JPMorgan not to preserve drafts?
12:03:42 MR. WISE: "This agreement"
12:03:44 meaning the agreement --
12:03:44 Q. The July 15th agreement.
12:03:46 A. The participation agreement.
12:03:47 Q. Between JPMorgan and Banco
12:03:49 Inbursa.
12:03:49 A. Yes, I don't preserve --
12:03:50 preserve the drafts. I mean I don't
12:03:53 preserve all of the drafts. I mean --
12:03:57 yes, no, I don't preserve all -- all of
12:03:59 the drafts, all the coming and going of
12:04:02 negotiations.
12:04:03 Q. Who prepared the very first
12:04:05 draft of the agreement that was
12:04:06 ultimately entered on July 15th?
12:04:08 A. The prepared -- the first
12:04:11 draft was prepared -- I was given the
12:04:15 form by our legal department, so it was
12:04:20 me together with our legal department.
12:04:23 Q. And what -- does that form
12:04:26 have a particular name or does it come
12:04:28 from a particular place?

12:04:29 A. Yes. The person in the legal department would send the initial form.

12:04:35 Q. And do you know what that form was called?

12:04:39 A. No, because it has -- it has a -- no. It's NYC a number of numbers -- no, I don't know what -- what it's called.

12:04:49 Q. So let me ask you this. If you -- if you -- if you prepared a draft agreement and sent it to someone, would it be normal to delete what you were sending?

12:05:08 A. No.

12:05:09 Q. Let me give you a document that bears the Bates numbers JPM 2898 through 2913.

12:05:44 MR. NEUWIRTH: And we'll mark this as Truzzell Exhibit 5.

12:05:47 (Truzzell Exhibit 5 for identification, Bates stamped JPM 2898 through 2913.)

12:06:11 Q. So you'll see that what you have here is an email string followed by

12:06:19 a draft participation agreement.

12:06:23 A. Okay.

12:06:24 Q. And this is an email string, the first email is an email that you sent on June 8th to someone at Banco Inbursa, and then I'd like to start first on page JPM 2903.

12:06:46 MR. WISE: Take enough time to look at it.

12:06:49 A. Okay. Okay.

12:06:57 Q. You'll see that if you -- if you look, I think the email, it's not clear from the production exactly who sent it, but it looks like it's an email that may have come from Mr. Julian Lautersztain with you cc'd. And you'll see it says "Subject: LSTA part forms," and the English translation says "Hi Jesus, As discussed, I'm sending you the participation agreement that was based on the blank LSTA form so your attorneys can start reviewing it now."

12:07:41 Do you see that?

12:07:41 A. Yes.

12:07:42 Q. Is this participation
12:07:50 agreement that was based on the blank
12:07:52 LSTA form what you were referring to
12:07:54 earlier as an initial draft that was
12:07:56 based on a blank form you had received
12:07:58 from your legal department?

12:07:59 A. No. This was when we -- when
12:08:01 we worked on the settlement we were
12:08:04 incorrectly told by our settlement
12:08:06 department that we had to follow the LSTA
12:08:11 form which is not a form that is usually
12:08:13 used in Latin America.

12:08:15 So we were sent this form, we
12:08:17 were trying to figure out why it was
12:08:19 different. We wanted to get out the --
12:08:21 we wanted to send the documents to
12:08:23 Inbursa so we sent this form, which is
12:08:26 the standard LSTA form and it's not the
12:08:28 form that we usually use in the legal
12:08:30 department.

12:08:30 So after sending that I
12:08:33 contacted the Latin American legal
12:08:36 department because I think this was sent,
12:08:38 I remember it was -- it was late Friday

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:08:43  or something like that, but we sent it

12:08:45  out and then after contacting the legal

12:08:49  department and -- and having a call

12:08:52  between the legal department and the

12:08:54  settlement group, we clarified that we

12:08:57  were able to use the part- -- the

12:08:59  participation agreement that is usually

12:09:01  used for our Latin American businesses

12:09:03  which is based on the form that was

12:09:05  finally signed.

12:09:09          But this was an internal

12:09:10  mistake in terms of what form we would

12:09:12  use as a participation agreement.

12:09:18      Q.    Do you know what happened to

12:09:24  this initial draft of the participation

12:09:26  agreement that was based on the LSTA

12:09:29  form?

12:09:29      A.    I don't think we ever got to

12:09:32  see it because we called them early the

12:09:34  next day saying disregard that, we'll

12:09:36  send the one that we -- we usually use in

12:09:42  Latin America.

12:09:43      Q.    And did this just -- do you

12:09:44  know what happened to this initial draft

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:09:46 at JPMorgan?

12:09:48 MR. WISE: Which one, the --

12:09:50 Q. The one based on the LSTA

12:09:52 form?

12:09:52 A. It might be in -- no, I mean

12:09:57 it was never used, so in terms of it --

12:10:00 Q. Do you know what happened to

12:10:01 it?

12:10:01 A. It might -- no, I don't know

12:10:05 what happened. I mean it was never used.

12:10:06 It might be in somebody's -- in

12:10:09 somebody's -- in somebody's file. If --

12:10:13 if it was changed and if I included it, I

12:10:16 probably have it saved in one of -- in

12:10:18 one of my disks in my hard drive. I

12:10:20 could provide that copy if necessary.

12:10:22 Q. Okay. We would like to get it

12:10:24 as soon as possible.

12:10:25 A. No problem.

12:10:28 Q. If you could make an inquiry

12:10:30 and produce it to us promptly, we'd

12:10:32 appreciate it.

12:10:33 A. If I have it available I'll

12:10:35 send it over.

12:10:35 Q. Thank you.

12:10:36 Then I think you referred to switching to a different form and if you look on page JPM 2902 you say -- I think you sent an email on June 3rd to Jesus Granillo. And he's at Inbursa; is that correct?

12:10:52 A. That's correct.

12:10:52 Q. In which you said, among other things, "The internal attorneys asked us if we could please change the document format to something much simpler, which is now ready."

12:11:03 A. Right.

12:11:04 Q. Do you know what happened to that draft of the agreement?

12:11:08 A. That was sent -- that was the first draft that would have -- that was sent to Inbursa.

12:11:13 Q. And do you think there's still a copy of that somewhere on your computer or in the email file?

12:11:17 A. There should be.

12:11:19 MR. WISE: Do we have it?

12:11:20 MR. NEUWIRTH: It was not produced to us. We sent an email yesterday asking for it.

12:11:24 MS. STARR: We produced everything we've got, so.

12:11:26 Q. So if you can check.

12:11:27 A. I can check that, too.

12:11:29 Q. Thank you.

12:11:29 A. Sure.

12:11:30 MR. NEUWIRTH: Obviously, our request under the circumstances is to get it today if possible.

12:11:35 MS. STARR: It's in Argentina.

12:11:36 A. I work in Argentina. I don't know if I'm going to have access to --to the computer today.

12:11:41 Q. Is there nobody else at JPMorgan who has access to your computer?

12:11:44 A. It's -- it's against -- for compliance issues we can't give our password to anybody, under -- under strict compliance issues of confidentiality issues, so...

12:11:58 Q. What was done to search your

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:11:59 computer for relevant documents?

12:12:00 A. I went -- I went personally

12:12:03 into my computer.

12:12:04 Q. And you didn't think that

12:12:06 initial drafts of this agreement were

12:12:07 important to produce?

12:12:08 A. On the LSTA, no. I --

12:12:11 MR. WISE: He's asking about

12:12:11 the JPM form agreement.

12:12:14 Q. The one that you say was the

12:12:15 right one, the one that you sent on June

12:12:17 3rd to Jesus Granillo, you didn't think

12:12:21 it was necessary to produce that as a

12:12:23 responsive document?

12:12:23 A. I sent in -- I thought that we

12:12:25 had all of the -- all of the

12:12:27 participation agreements, but no, I

12:12:30 didn't send it, so I'll make sure I do.

12:12:36 MR. WISE: If it's there. You

12:12:38 know, we'll find it if it's there.

12:12:41 THE WITNESS: Sure.

12:12:47 Q. Now, if you could just look

12:12:48 quickly, and you can look at the Spanish

12:12:50 or English version at JPM 2903, you'll

12:12:54 see that there is a doc.zip, a doc.zip,
12:12:59 which I assume is a zip file which says
12:13:02 deleted by Jacqueline Truzzell.

12:13:05 A. Right.

12:13:05 Q. Does that notation only appear
12:13:08 if you delete a file in connection with
12:13:13 an email or can you manually go in and
12:13:16 delete files?

12:13:16 A. That appears -- that appears
12:13:20 only if you respond. I believe that if
12:13:23 you manually delete a file it doesn't
12:13:26 show up as deleted. It only gets deleted
12:13:29 if the system deletes it.

12:13:31 Q. Okay. Now, do you have a
12:13:44 recollection of at what price the
12:13:51 handshake agreement you had referred to
12:13:54 earlier had been made at? You said there
12:13:59 was an agreement on price. What was the
12:14:00 price for that original -- at the time of
12:14:04 that handshake you described?

12:14:05 MR. WISE: This is between the
12:14:06 bank and Inbursa, correct?

12:14:09 MR. NEUWIRTH: Correct.

12:14:09 A. I believe it was around 87

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:14:14 cents. That's my recollection. I'm not
12:14:16 sure if I'm being accurate on the number.
12:14:18 Q. Okay. And that was when it
12:14:22 was anticipated that there would be an
12:14:25 assignment?
12:14:25 A. An assignment, exactly.
12:14:27 Q. Was the price used in the July
12:14:33 15th agreement different than the price
12:14:36 that had been contemplated for the
12:14:38 assignment?
12:14:39 A. Yes, I believe it was. Yes,
12:14:41 it was.
12:14:42 Q. Was it a bigger discount or a
12:14:44 smaller discount?
12:14:45 A. It was a smaller discount.
12:14:46 Q. Do you have an understanding
12:14:47 of why the discount was smaller for the
12:14:51 participation that was done in July than
12:14:59 for the -- let me rephrase that question.
12:15:03 Do you have an understanding
12:15:03 of why the price in the July 15th
12:15:08 agreement was greater, that is with a
12:15:13 lower discount rate --
12:15:15 A. Right.

12:15:15 Q. -- than the price that was going to be used for the assignment at the time of the handshake in May?

12:15:20 A. I understand -- I was not involved in the price negotiations, but I understand that -- that Inbursa was willing to match the price that, or the indication that JPMorgan had received regarding the sale, the potential sale of the loan to Televisa.

12:15:44 Q. And who was involved in the negotiations of price if you were not?

12:15:50 A. It was mainly Carlos Ruiz de Gamboa.

12:15:56 Q. Carlos -- say that again?

12:15:59 A. Carlos Ruiz de Gamboa.

12:16:02 Q. Now, is price considered by JPMorgan to be an essential term of an agreement to sell an interest in a loan?

12:16:13 A. It's -- it's one of the -- one of the essential pieces.

12:16:20 Q. Is it your testimony that you had nothing to do with the negotiation of the price?

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:16:25 A. For the Inbursa specific -- no, that was dealt directly with Carlos, between Carlos and Inbursa.

12:16:36 MR. NEUWIRTH: What I'd like to do is mark several documents as exhibits so that we can look at them together.

12:17:11 MR. WISE: Okay.

12:17:21 MR. NEUWIRTH: First we'll mark as Truzzell Exhibit 6, and this is not Bates numbered, but it is a copy of the July 15th, 2009 agreement that was produced to us by JPMorgan's attorneys at Davis Polk.

12:17:37 (Truzzell Exhibit 6 for identification, copy of the July 15th, 2009 agreement.)

12:18:13 MR. NEUWIRTH: And then I'd also like to mark as an exhibit, which we will mark as Truzzell Exhibit 7, a document that bears Bates numbers JPM 2778 through JPM 2791. And this is Truzzell Exhibit

1          JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:18:33  2              7.

12:18:33  3                  (Truzzell Exhibit 7 for

12:18:22  4              identification, Bates stamped JPM

12:18:23  5              2778 through JPM 2791.)

12:18:52  6          Q.    Now please take whatever time

12:18:54  7      you need to look at this, but I'd like if

12:18:56  8      you can just confirm that what we've just

12:19:03  9      marked as Exhibit 7 is an email string

12:19:09 10      the last email of which is from Monday,

12:19:11 11      June 8th, where you transmitted, or where

12:19:16 12      you received, I'm sorry, from Banco

12:19:19 13      Inbursa a draft of the PA, or

12:19:24 14      participation agreement, with our

12:19:26 15      comments and attached to it, attached to

12:19:30 16      this email string is the draft that you

12:19:33 17      received from Banco Inbursa on June 8th.

12:19:36 18      So take whatever time you need to figure

12:19:40 19      that out, but we'd just like to establish

12:19:42 20      that that's the case.  And these pages

12:19:44 21      were all produced together by Davis Polk.

12:19:46 22          A.    Okay.  But in this June 8th --

12:20:00 23      how do you know -- how can we see that

12:20:02 24      there was an attachment to this email?

12:20:06 25                  MR. WISE:  Do you know that --

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:20:07 A. Oh, here it says an attachment
12:20:09 to participation. There's no way to know
12:20:16 if this attachment -- we're assuming that
12:20:18 this attachment is from this email?
12:20:19 Q. I'm not assuming anything.
12:20:21 I'm telling you that these documents were
12:20:23 produced to us together with the Bates
12:20:25 numbers that appear.
12:20:27 A. Okay.
12:20:27 Q. There's an email string with
12:20:29 this draft agreement.
12:20:32 A. Okay.
12:20:32 Q. And the question is, is it
12:20:34 your understanding that this draft of the
12:20:38 agreement that's attached here is what
12:20:41 Mr. Granillo from Banco Inbursa sent to
12:20:45 you on June 8th?
12:20:46 A. I mean there were a number of
12:20:49 emails where we -- where we -- where we
12:20:52 exchanged drafts. I'm not sure if this
12:20:56 draft actually pertains to this email.
12:20:58 Q. Okay. So you think it's
12:21:00 possible that this draft has nothing to
12:21:02 do with this email string?

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

1

12:21:05 2        A.    No, I'm pretty sure it -- I

12:21:07 3    mean it does relate to the discussions.

12:21:11 4    If it's from this email stream or from --

12:21:13 5    or from this specific email or from some

12:21:15 6    other email.

12:21:16 7        Q.    Right.  And if you look at the

12:21:17 8    very back of this document, the original

12:21:19 9    Spanish language version has all of the

12:21:22 10   comments in Spanish.  So I don't know if

12:21:25 11   that helps you to --

12:21:27 12       A.    Yes, that --

12:21:28 13       Q.    -- see what this document may

12:21:29 14   have been.  But from looking at this,

12:21:34 15   would it be fair to conclude that this

12:21:38 16   draft would have been prepared on or

12:21:41 17   before June 8th, which is the latest date

12:21:44 18   in this email string?

12:21:45 19       A.    Probably.

12:21:54 20       Q.    So I'd like you to turn if you

12:21:56 21   could first to section 2.04 of the draft

12:22:07 22   agreement.  And is it correct that

12:22:17 23   section 2.04 (a) as drafted here includes

12:22:23 24   no provision for Banco Inbursa to share

12:22:29 25   in any fees that JPMorgan might earn

12:22:36 through its role as lender?

12:22:40 MR. WISE: As agent or as lender?

12:22:46 MR. NEUWIRTH: My question was lender.

12:23:07 A. That's correct, it refers to interest payments and principal.

12:23:10 Q. Now I'd like you to look at what we marked as Exhibit 6, which is the participation agreement itself, and if we turn to section 2.04 (a) you'll see that now in sub capital (B) the payments to the bank include on a -- the participant's share of B, "any type of compensation or fees collected by the bank in its capacity as Lender under the Credit Document."

12:23:56 Did you participate in discussions with Banco Inbursa about adding this language with this capital (B) to section 2.04 (a)?

12:24:07 A. Yes, I did.

12:24:07 Q. And who initiated the idea to include this language in section 2.04

12:24:17 (a)? By that language I mean "any type of compensation or fees collected by the bank in its capacity as lender under the credit agreement"?

12:24:28 A. They initially started -- came up with the issue that if they were to hold -- if they were to hold the economic rights to -- to the loan through the participation, they should also receive the economic benefits that the bank -- that the bank receives, and those economic benefits are derived by the payment of interest and payment of any other compensation that the bank as lender may receive.

12:25:01 So our -- our initial response to that was to -- to decline that because we tied that to the idea that since they were -- were not going to have any -- any role in terms of waivers or consents other than those permitted under the participation section, that they would have, they wouldn't be entitled to the economic benefits of -- of those

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:25:28 amendments or waivers.

12:25:29 I -- we did have a specific

12:25:34 discussion with them where they

12:25:35 understood that even though, I mean even

12:25:37 though they understood and were okay with

12:25:39 not having an active role in terms of --

12:25:45 of a say in the -- in waivers or

12:25:47 amendments that could pertain to -- to

12:25:49 the credit agreement, they were still

12:25:52 entitled to the economic benefits. And

12:25:55 we got to an agreement and we checked

12:25:57 with -- with our legal department and we

12:25:58 got to an agreement that -- that that was

12:26:01 a fair point and that would be

12:26:03 acceptable, that in no way would this

12:26:06 give them the rights to have a say in the

12:26:11 -- in the waivers or amendments, but we

12:26:13 would share with them the economic

12:26:15 benefits of them, of such.

12:26:16 Q. Did you get a formal written

12:26:18 opinion from your -- when you say your

12:26:22 legal department, do you mean the

12:26:23 internal legal department --

12:26:25 A. Internal.

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:26:25 Q. -- legal department at

12:26:27 JPMorgan?

12:26:27 A. Yes.

12:26:28 Q. And who at the internal legal

12:26:30 department was involved in looking at

12:26:32 that issue?

12:26:32 A. Gerardo Rivera.

12:26:35 Q. And did Mr. Rivera provide you

12:26:38 with a written opinion that it would be

12:26:40 appropriate under the circumstances to

12:26:41 add the language in section 2.04 sub (B)?

12:26:48 MR. WISE: I'm wondering if

12:26:49 whether --

12:26:49 MR. NEUWIRTH: I'm just asking

12:26:50 if she got a written opinion.

12:26:52 MR. WISE: You're asking for

12:26:52 the substance of it in the same

12:26:54 question.

12:26:54 MR. NEUWIRTH: No, I'm just

12:26:55 asking whether she got a written

12:26:57 opinion on that topic. She already

12:26:59 testified she got it.

12:27:00 MR. WISE: She can answer

12:27:01 whether she got an opinion yes or

12:27:02 no.

12:27:02 MR. NEUWIRTH: I can ask her whether she got a written opinion on this topic.

12:27:06 A. A written opinion, I mean the opinion was the drafting of the -- of the clause. I mean I discussed with him --

12:27:15 MR. WISE: Wait, wait, wait, I don't want -- we won't get into your discussions with your lawyer, that's kind of off-bounds.

12:27:21 THE WITNESS: Okay.

12:27:21 MR. WISE: But I think what he's asking you is whether the legal department issued a memorandum or a written opinion to you on this point.

12:27:30 A. No, they did not.

12:27:32 Q. Okay. Now --

12:27:39 A. Sorry, but they approved the language.

12:27:42 MR. WISE: Okay. She wants to testify about it.

12:27:43 Q. But they approved it orally,

12:27:45 not in writing, correct?

12:27:46 A. They approved it orally and
12:27:48 they -- and I'm pretty sure they drafted
12:27:52 the language.

12:27:53 Q. Okay. So you did not put this
12:27:56 language in yourself?

12:27:57 A. It was either the lawyer or I
12:28:01 putting it in and checking word by word
12:28:04 with him and him making sure that he was
12:28:06 okay with that language.

12:28:07 Q. Right. And the person was Mr.
12:28:10 Rivera?

12:28:10 A. Yes.

12:28:11 Q. And apart from looking at the
12:28:15 language, there was no other writing that
12:28:17 you received on the topic of whether this
12:28:19 was legally appropriate?

12:28:20 A. Right.

12:28:24 Q. Now, this language, of course,
12:28:44 was not in the original draft that
12:28:46 JPMorgan prepared, correct?

12:28:47 A. Correct.

12:28:48 Q. And it's thus fair to say,
12:28:52 isn't it, that this language in this 2.04

12:28:59 sub capital (B) sentence is not language that's included in the standard agreement for Latin America that you referred to earlier?

12:29:08 A. That's correct.

12:29:09 Q. Now, let's look again at Truzzell Exhibit 7 which was --

12:29:21 MR. WISE: Is that the draft or the final?

12:29:23 MR. NEUWIRTH: That's the draft of the agreement.

12:29:25 MR. WISE: Okay.

12:29:26 Q. That you testified earlier would have been prepared on or before June 8th.

12:29:31 A. Okay.

12:29:32 Q. And I'd like you to -- if you'd turn to page JPM 2785, there's no subsection (d) here, but in the -- if we look at the final version of the agreement there is a section 2.04 (d). Do you see that?

12:30:14 MR. WISE: Hold on.

12:30:15 A. Yes.

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:30:15 Q. My only question is do you
12:30:17 know when in the process section 2.04 (d)
12:30:21 was added? Was it right before the final
12:30:26 draft? Was it early in the process?
12:30:28 A. Yes, I recall it was -- it was
12:30:38 in the middle -- I mean between -- I mean
12:30:42 it wasn't right -- right before, it was
12:30:44 something that was discussed when we were
12:30:46 going through the participation
12:30:47 agreement.
12:30:49 Q. And is it fair to say given
12:30:51 that this subsection (d) in the final
12:30:55 agreement was added at some point between
12:30:57 June 8th and July 15th, that this is also
12:31:01 something that was not in the form for
12:31:03 Latin America that you had referenced
12:31:05 earlier?
12:31:05 A. Yes, that's correct. And what
12:31:06 I do recall correctly is that this was
12:31:09 one of the latter points discussed when
12:31:12 we discussed this with -- with Inbursa.
12:31:14 Q. Okay. If we can look again at
12:31:19 the draft which we marked as Truzzell
12:31:20 Exhibit 6, I'd like you to look at

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:31:24 section 3.01.

12:31:27 MR. WISE: I think it's

12:31:28 Exhibit 7, sorry.

12:31:30 MR. NEUWIRTH: I'm sorry.

12:31:32 MR. WISE: Unfortunately the

12:31:33 draft is seven and the final is

12:31:35 six.

12:31:35 MR. NEUWIRTH: That's fine,

12:31:36 thank you for the clarification.

12:31:37 Q. So Exhibit 7, the draft that

12:31:38 we talked about as the date from June 8th

12:31:40 or before.

12:31:41 A. Right.

12:31:41 Q. Section 3.01, you'll see that

12:31:46 there it says, "To the extent requested

12:31:52 by the participant and subject to section

12:31:54 4.03 hereof, the bank will furnish to the

12:31:58 participant copies of the credit document

12:32:01 and any amendments, consents, or waivers

12:32:05 relating to any of the foregoing."

12:32:08 And I will represent we all

12:32:10 know I think that that's not the full

12:32:12 text of the paragraph. I'm just looking

12:32:13 at that one sentence.

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:32:14  And then if we look at Exhibit

12:32:16  6 in the final version, that sentence

12:32:20  reads a little differently.  It says.

12:32:23  "To the extent requested by the

12:32:24  participant and subject to section 4.03

12:32:28  hereof, the bank will furnish to the

12:32:30  participant copies of the credit document

12:32:33  and any amendments, consents, waivers or

12:32:36  notices, or any other material received

12:32:43  by the bank in its capacity as lender

12:32:47  related to any of the foregoing."

12:32:49  So do you agree that one

12:32:52  difference between the final version and

12:32:53  the draft is that the draft refers to

12:32:58  amendments, consents or waivers, and the

12:33:01  final version relates to amendments,

12:33:04  consents, waivers or notices?

12:33:06  A.    Yes.

12:33:06  Q.    Were you involved in

12:33:09  discussions with Banco Inbursa that led

12:33:12  to the inclusion of notices in that list?

12:33:16  A.    Yes.

12:33:16  Q.    And what is your understanding

12:33:18  of the reason why the parties agreed to

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:33:22 add notices to that list?

12:33:23 A. Well, mainly what -- what 12:33:27 happened was, I mean when Inbursa 12:33:30 receives the form, obviously this is a 12:33:32 form drafted by JPMorgan which is more 12:33:35 sort of bank friendly, or the initial 12:33:39 draft is more towards -- in favor of the 12:33:42 bank. So it's market practice that we 12:33:46 send the form and then the form comes 12:33:48 back with a number of clauses that the 12:33:50 purchaser wants to balance out to be able 12:33:53 to have more benefits than what we're 12:33:56 offering.

12:33:56 So one of the benefits that 12:33:59 the -- that Inbursa was looking for is to 12:34:03 get -- to get the information that the 12:34:05 bank was -- was -- was receiving as 12:34:09 lender, which was not only limited to 12:34:12 amendments, consents and waivers, but 12:34:14 also to the notice or material received 12:34:16 by the bank as lenders.

12:34:17 So -- so that -- that point 12:34:21 did come up. We did check the credit 12:34:23 agreement to make sure that we were able

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:34:24 to provide that information. And since the credit agreement allows -- allows the participant to receive such information, we agreed to include that in the participation agreement.

12:34:36 Q. Who checked the credit agreement and made the determination you just described?

12:34:42 A. It was myself and the person in the legal -- and the person in the legal department.

12:34:48 Q. Which person was that?

12:34:50 A. It's Gerardo Rivera.

12:34:53 Q. Was there any separate written opinion on this?

12:34:56 A. No.

12:34:56 Q. Or was it, again, just working on the language?

12:34:59 A. It was -- all conversations that -- held with the legal department is -- I mean and approvals or not approvals aren't done through legal opinions, they're done through conversations.

12:35:09 Q. Okay. Now, it's correct,

12:35:11 isn't it, that amendments, consents and
12:35:15 waivers are what is actually approved by
12:35:23 the parties, whereas a notice refers to
12:35:30 something that happens in advance of the
12:35:31 actual decision to grant an amendment, a
12:35:33 consent or a waiver; isn't that correct?

12:35:35 MR. WISE: Objection to the
12:35:36 form of the question. He's asking
12:35:38 about notice.

12:35:38 Q. You can answer.

12:35:39 A. Sorry, can you rephrase,
12:35:42 repeat.

12:35:42 Q. Sure. Well, it's correct,
12:35:45 isn't it, that amendments, consents and
12:35:47 waivers refer to actual amendments,
12:35:53 consents or waivers that have been
12:35:56 approved by the parties to the credit
12:36:00 agreement?

12:36:00 A. Right.

12:36:01 Q. Whereas a notice would cover a
12:36:04 circumstance where the borrower is asking
12:36:09 for an amendment, consent or a waiver but
12:36:11 it may not yet have been approved; isn't
12:36:13 that right?

12:36:14 MR. WISE: Objection to the
12:36:15 form of the question.
12:36:16 Q. You can answer if you
12:36:17 understand the question.
12:36:18 A. Notices in this case are any
12:36:20 type of notification that -- that the --
12:36:24 that the -- that the borrower sends to
12:36:27 the -- to the administrative agent. It's
12:36:30 -- and to be shared with the -- with the
12:36:33 syndicate lenders. It's not a -- it's
12:36:37 not a specific request on a -- amendment,
12:36:40 it's a notice that they could have filed
12:36:42 a specific notice to the SEC or to the --
12:36:45 or to the local SEC. That's what notice
12:36:48 refers to.
12:36:48 Notices doesn't -- it refers
12:36:52 to that type of information and not to
12:36:55 any information that the borrower sends
12:36:57 us which is not syndicate level
12:37:01 information, which is not to be shared
12:37:03 with -- with other lenders.
12:37:05 Q. Okay. Would notices include
12:37:09 any information related to requests for
12:37:12 amendments, consents or waivers by the

12:37:14 borrower?

12:37:15 A. No. In -- in the case -- in 12:37:19 the case the borrower would send the 12:37:22 admin agent for -- for the distribution 12:37:26 to other lenders. I mean the -- the 12:37:28 borrower would have to indicate to the 12:37:30 admin agent that a request for an 12:37:36 amendment is provided and distributed.

12:37:39 Usually when -- when -- in the 12:37:42 loan market you have two ways of note -- 12:37:44 of getting information to the lenders. 12:37:46 The borrower can send it directly to the 12:37:49 admin agent, which is usually done in the 12:37:51 -- in the normal reporting requirements 12:37:53 done under the loan, or when there's a 12:37:55 specific requirement for an amendment, 12:37:57 the borrower -- the borrower usually 12:38:00 doesn't contact the admin agent, it would 12:38:02 contact sort of their relation -- the 12:38:04 credit people who take a look at the 12:38:06 amendment.

12:38:06 And it would tell us if that 12:38:09 is -- if at the point of notification if 12:38:11 it would be -- it the information that --

12:38:15 that they've sent is information to be shared with the rest of the -- of the lenders or if it's something for JPMorgan in this case specifically to analyze.

12:38:26 Q. And there's also the language which we identified which was not in the draft, but which is in the final version, which says, "Or any other material received by the bank in its capacity as lender relating to any of the foregoing."

12:38:44 Do you see that?

12:38:44 A. Yes.

12:38:45 Q. And is it correct that that language does not appear in the standard form for Latin America on which you based the initial draft?

12:39:04 A. That is correct.

12:39:05 Q. Now, in negotiating the various things that we've just been talking about, section 2.04 (d), the language in section 2.04 (a), section 3.01, was there anyone at JPMorgan who was supervising you in your work that you did in connection with negotiating with

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:39:28 Banco Inbursa?

12:39:30 A. It was Gerardo Rivera from the legal department in terms of what could and couldn't be -- be agreed upon regarding what was written in the credit agreement.

12:39:41 Q. But in terms of the business terms, were you -- was there anyone supervising you, or did you have sole authority to make decisions with respect to what would go into the agreement?

12:39:52 A. Usually if -- if they're -- if they're business decisions, I would send an update to the senior people in my group saying this is -- this is -- these are the points that have been raised, these are the points that -- most of the points were probably legal issues, so these were the points that I've raised -- that I've discussed with legal and this is the approach that we would -- that we're taking.

12:40:14 Q. And did you have to receive approval from any of those people before

12:40:19 you could agree to changes in the agreement with Banco Inbursa?

12:40:25 A. Not really on the -- on the -- probably the important issues I would make sure that they were okay with my approach.

12:40:33 Q. Was Mr. de Gamboa one of the people you would have run these things by?

12:40:39 A. Yes, probably, yes. He would have been copied in the emails if sent or I would have -- I wouldn't have discussed it with him personally because again, the -- the economic -- the economic agreement had already been reached. It was more of the legal credit issue -- the legal issues that were being discussed in the -- in the -- were being discussed.

12:41:10 So the main -- the focal point was to make sure that our legal department was onboard with -- with the final form.

12:41:24 Q. Now the final agreement also includes a right of first refusal for

12:41:29 Banco Inbursa to purchase the remaining
12:41:31 10 percent of the loan if JPMorgan were
12:41:34 to make a decision that it wanted to sell
12:41:36 that as well, correct?

12:41:37 A. That's correct.

12:41:38 Q. Was that in the original draft
12:41:42 of the agreement, or was that something
12:41:43 that was added over the course of the
12:41:45 negotiations?

12:41:45 A. That was something that was
12:41:46 added over the course of the
12:41:48 negotiations.

12:41:48 Q. And what is your understanding
12:41:51 of why the parties agreed to include that
12:41:54 in the agreement?

12:41:56 A. Mainly it was a request from
12:41:58 Inbursa which we understood didn't go
12:42:00 against what was allowed in the credit
12:42:02 agreement, so we didn't have any
12:42:07 objection in including it.

12:42:09 Q. And what is the reason that if
12:42:12 JPMorgan didn't have any objection to
12:42:15 including that, JPMorgan didn't do an
12:42:19 agreement covering 100 percent of the

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:42:21 loan as opposed to 90 percent?

12:42:23 A. Because it's usually market practice that we, when we lead, originally lead a loan and we -- and we are admin agents, it's -- it's JPMorgan's practice to keep at least, we call it the 10 percent rule, where we keep at least 10 percent of the loan so we're involved in -- in the -- so first we maintain some responsibility with the borrower and -- and are sure that, as the one structuring the loan, if something happens -- I mean if there is any dealings that need to be done between the day the loan is closed and it finally matures, that JPMorgan is involved and helps the borrower in dealing with other lenders or dealing with approvals, but when we're -- when we're admin agents, we make sure that we're also lenders to make -- to ensure that the -- that the information flow or the relationship with the other -- with the borrower and the rest of the bank group is maintained.

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:43:26 So the 10 percent is the
12:43:28 standard percentage that we hold in
12:43:30 loans.
12:43:30 Q. For how many years have you
12:43:33 been employed by JPMorgan?
12:43:34 A. 14 years.
12:43:37 Q. And over the course of those
12:43:39 14 years from the time you started
12:43:41 through today, other than the July 15th
12:43:44 agreement with Banco Inbursa, how many
12:43:48 times have you been involved in the
12:43:51 negotiation of an agreement that was
12:43:53 called a participation agreement?
12:43:56 A. Maybe probably, I don't know,
12:44:01 eight times, five times, somewhere
12:44:05 between five and ten times.
12:44:07 Q. And in any of those other
12:44:10 agreements that you worked on, was there
12:44:11 a provision that not only the interest,
12:44:16 but also JPMorgan's fees would be
12:44:21 allocated on a proportional basis to
12:44:24 everyone's interest in the loan?
12:44:25 A. I don't have a recollection of
12:44:29 any specific of that requirement being

12:44:34 included, but I -- I mean if it's something that would -- would have been requested by the participant we would have included. I -- I don't remember if it has been or not.

12:44:42 Q. But as you sit here today, is there any -- can you recall any -- can you actually recall any circumstance where you, where JPMorgan agreed to do that other than in the Banco Inbursa loan?

12:44:56 A. I don't have a recollection of it, no.

12:45:00 Q. In any of those other circumstances where you were involved in the negotiation of a participation agreement, do you recall any instance where JPMorgan gave any loan participant a right of first refusal to acquire the 10 percent or more of the loan that JPMorgan retained?

12:45:29 A. There are some instances where we participated a hundred percent, so obviously in those instances -- instances

it -- it wouldn't apply.

In the ones where we participated less than a hundred percent, I don't recall of participants requesting that.

Q. And I think you testified a few minutes ago that there's a 10 percent rule?

A. Right.

Q. But now you've just testified that you think there may have been instances where JPMorgan did participate 100 percent of a loan.

A. Mm-hmm.

MR. WISE: Did sell 100 percent in a participation, right.

MR. NEUWIRTH: Right.

Q. So when does this 10 percent rule get applied and when doesn't it?

A. The 10 percent rule is the general rule. If a participation is done in the -- and the borrower doesn't object for us selling, in some instances the borrower is aware of the participation,

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:46:29 and doesn't object to the participation
12:46:33 and the participant is willing to
12:46:37 purchase the hundred percent and the
12:46:39 borrower's fine that JPMorgan sell a
12:46:42 hundred percent.

12:46:44 Q. So with that information, what
12:46:47 is the reason that in this case JPMorgan
12:46:52 did not agree to give Banco Inbursa 100
12:46:57 percent, a 100 percent participation
12:47:01 interest right up front?

12:47:02 A. Because we --

12:47:03 Q. As opposed to giving it a
12:47:05 right of first refusal for the remaining
12:47:07 10 percent.

12:47:08 A. Right. The strategy, all --
12:47:10 since the beginning, JPMorgan's --

12:47:13 MR. WISE: Since the
12:47:14 beginning?

12:47:14 A. Goal -- since the beginning,
12:47:16 sorry.

12:47:16 MR. WISE: Of what?

12:47:17 MR. NEUWIRTH: Are you asking
12:47:18 questions now, Scott?

12:47:19 MR. WISE: No.

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:47:19 A. Since the beginning of the
12:47:21 process, JPMorgan's goal and JPMorgan's I
12:47:24 mean ultimate objective was to only
12:47:27 syndicate 90 percent. We -- we -- we
12:47:34 liked the Cablevision credit, we valued
12:47:36 the relationship we had with Grupo
12:47:38 Televisa and we still wanted to maintain
12:47:40 the 10 percent exposure that we had. Our
12:47:43 interest was always only to sell the 90
12:47:46 percent.

12:47:46 Q. Well, if you cared about the
12:47:47 relationship, if you, by that I mean if
12:47:50 JPMorgan --

12:47:50 A. By JPMorgan.

12:47:51 Q. -- if JPMorgan cared about the
12:47:52 relationship with Televisa, why in July
12:47:55 or August or September did JPMorgan not
12:47:59 disclose to Grupo Televisa that it had
12:48:02 entered this participation agreement with
12:48:05 Banco Inbursa?

12:48:06 A. For the same reason that I --
12:48:09 that I answered at the beginning, it
12:48:11 wasn't obliged to, and --

12:48:14 Q. But you just testified that

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:48:20 JPMorgan cared about the relationship.

12:48:21 A. Right.

12:48:22 Q. Do you believe based on your experience at JPMorgan over 14 years that it is consistent with caring about a relationship not to disclose that a 90 percent interest in a $225 million loan was given to a competitor of the borrower?

12:48:43 A. That's something that -- that the people who deal with the relation -- with the Grupo Televisa relationship need to decide on.

12:48:50 Q. And who are those people?

12:48:52 A. It would be Gilberto Sotelo, Eduardo Cepeda and Nicolas Aguzin, those are the people who deal with -- the client managers.

12:49:07 Q. So you had no dealings with Televisa yourself that would allow you to express an opinion on this?

12:49:12 A. No, that's -- I deal with specifically the negotiation of documents and not with client management.

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:49:19  2      Q.     Other than price?  Well you

12:49:24  3   testified you had no role here --

12:49:26  4      A.     Right.

12:49:26  5      Q.     -- in the negotiation of the

12:49:27  6   price?

12:49:28  7      A.     Right.  With the negotiation

12:49:30  8   of the documents, not of the price,

12:49:32  9   right.

12:49:36  10     Q.     Now, you had mentioned earlier

12:49:40  11  that there had been some discussions with

12:49:44  12  the Tokyo Mitsubishi Bank and with

12:49:48  13  Bancomer, or BBVA.

12:49:51  14     A.     BBVA.

12:49:52  15     Q.     During those discussions, did

12:49:57  16  JPMorgan ever disclose the discount rate

12:50:01  17  that was being offered to Inbursa?

12:50:04  18     A.     No.  The discount, I mean --

12:50:08  19  firstly, the conversations that we held

12:50:11  20  with them were -- were prior to -- were

12:50:17  21  prior to -- to -- to the discussions that

12:50:21  22  -- that we held with Inbursa and no, the

12:50:24  23  -- the discount that was -- the price

12:50:27  24  that was being discussed with the

12:50:29  25  different parties weren't disclosed

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:50:31 between -- amongst themselves.

12:50:33 Q. Did anyone ever offer at any
12:50:37 point to the Tokyo Mitsubishi Bank the
12:50:42 opportunity to participate at the same
12:50:44 discount rate that was being offered to
12:50:46 Banco Inbursa?

12:50:48 A. No, I don't think -- I don't
12:50:52 believe we -- we -- we offered the
12:50:55 discount rate just because of the issue
12:50:57 of timing that we discussed earlier.

12:50:58 Q. And was it ever offered to
12:51:00 Bancomer? Was that discount rate ever
12:51:03 offered to Bancomer?

12:51:04 A. The discussions that we held
12:51:09 with the banks we had pre-established a
12:51:13 price and each of the banks were coming
12:51:15 back to us to -- and stating at what
12:51:19 price they would be willing, they would
12:51:21 be willing to participate, and obviously
12:51:23 if the price was better than the one that
12:51:28 -- that was -- was being offered or
12:51:30 different to the one that was being
12:51:32 offered, we weren't sharing prices among
12:51:34 -- among lenders.

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:51:35  2      Q.      Okay.  Was anybody -- was

12:51:42  3   anybody other than Banco Inbursa offered

12:51:47  4   the discount rate that was included in

12:51:52  5   the July 15th agreement?

12:51:56  6      A.      We didn't -- once we -- once

12:51:59  7   we had reached an agreement, we didn't

12:52:01  8   use the price offered to go and try to

12:52:04  9   market the loan somewhere else.

12:52:07 10      Q.      Okay.  Did you ever hear that

12:52:12 11   any banks were told that the loan was

12:52:16 12   being participated at par?

12:52:18 13      A.      No.

12:52:20 14      Q.      Were you involved in the

12:52:23 15   discussions with HSBC about the possible

12:52:26 16   acquisition of a $40 million interest in

12:52:28 17   the loan?

12:52:29 18      A.      Yes.

12:52:29 19      Q.      Were you involved in the

12:52:31 20   discussions with HSBC about the price at

12:52:35 21   which HSBC was potentially going to

12:52:38 22   acquire a $40 million interest in the

12:52:41 23   loan?

12:52:41 24      A.      Yes.

12:52:42 25      Q.      How did the price that HSBC

12:52:48 was going to pay for the $40 million interest in the loan compare with the price that Banco Inbursa paid pursuant to the July 15th agreement?

12:53:02 A. I believe HSBC's price was -- was better.

12:53:05 Q. Better for whom?

12:53:06 A. Better for JPMorgan. Obviously for a smaller amount, right, but at that point I -- I can't -- I don't -- I can't recollect the exact amount, but I believe it was a better price.

12:53:21 Q. And did anyone at JPMorgan ever go to HSBC and explore the possibility of whether HSBC would have been willing to acquire a larger interest in the loan if it had been offered the same discount rate that was being offered to Banco Inbursa?

12:53:39 A. We had had a conversation, conversations with HSBC regarding the amount that they would be able to purchase, and it was always very clear from -- from them that -- that it was --

12:53:52 it would be something between -- they had
12:53:54 always stated I think it was in between
12:53:56 30 and 40 million, and that was the --
12:54:00 that was the, sort of the maximum amount
12:54:03 obviously at a specific price.

12:54:05 Q. Right. You never told them
12:54:07 that they -- that it was possible to
12:54:09 acquire a larger portion at a bigger
12:54:13 discount?

12:54:13 A. At a steeper price?

12:54:15 Q. At a bigger discount?

12:54:17 A. I don't think that was
12:54:18 discussed with HSBC.

12:54:22 Q. Was Grupo --

12:54:24 A. But we also --

12:54:25 MR. WISE: Hold on a second.

12:54:27 A. But we also were -- we were
12:54:29 pretty certain that HSBC wouldn't be able
12:54:31 to match at least the amount that Inbursa
12:54:33 was willing to buy.

12:54:34 Q. And what made you certain of
12:54:36 that?

12:54:36 A. Just the dynamics of the
12:54:37 market and the knowledge that we had in

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:54:39 terms of the amount of exposure that is
12:54:42 usually approved from banks.

12:54:45 Q. But you never checked?

12:54:46 A. No, we did not -- we did not
12:54:49 call them.

12:54:50 Q. Were you involved in any
12:54:55 discussions at JPMorgan in October or
12:55:00 November of 2009 about whether at that
12:55:06 time to disclose to Grupo Televisa in
12:55:11 response to specific inquiries, that the
12:55:15 July 15th agreement had been entered with
12:55:18 Banco Inbursa?

12:55:18 A. Was I involved? No, I was
12:55:20 not.

12:55:21 Q. Okay. Were you aware that
12:55:23 Televisa had made that request?

12:55:25 A. I believe so, yes.

12:55:26 Q. And how did you find out about
12:55:28 that?

12:55:28 A. I don't specifically recollect
12:55:32 if it was somebody forwarded an email or
12:55:34 somebody commented that -- that Televisa
12:55:38 had -- had requested that information.

12:55:40 Q. Did you have an understanding

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:55:42 that by entering into the July 15th agreement JPMorgan had made a decision that having decided to make a choice between doing a deal with Banco Inbursa or doing a deal with Televisa, JPMorgan had decided it was in JPMorgan's interest to pursue the relationship with Banco Inbursa and the Slim family companies?

12:56:15 A. I think JPMorgan decided that it was in their best interest to sell the loan to Inbursa through the participation. I don't think that directly relates to any relationship with the Slims. It was for this specific transaction. The urgency of getting -- getting the loan -- the sale closed because of this exposure issue is what prompted the decision.

12:56:44 Q. But you were not involved in any of the discussions with any members of the Slim family about the loan, were you?

12:56:53 A. No.

12:56:54 Q. But you were aware that they

12:56:55 occurred?

12:56:56 A. I was aware that -- that senior people were meeting with senior people in Inbursa and Televisa to try -- to try to solve the situation.

12:57:05 Q. And had you reached a conclusion in July that it would have been possible to do a deal quickly with Televisa for Televisa to acquire an interest in the loan --

12:57:22 MR. WISE: Sorry, had she reached that?

12:57:24 Q. Yes, had you reached a conclusion in mid-July that it would have been possible quickly to acquire, for Televisa to acquire the loan as an alternative to giving the 90 percent interest to Banco Inbursa?

12:57:38 A. No, I think I hadn't reached that conclusion basically because if that would have been the case, that could have happened prior to July, or in June or in late May and by July 15 it hadn't happened.

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:58:00 MR. NEUWIRTH: Let me mark as
12:58:02 an exhibit a document bearing the
12:58:05 Bates number JPM 3041 through 3042.
12:58:26 This is Truzzell Exhibit 8.
12:58:28 (Truzzell Exhibit 8 for
12:58:06 identification, Bates stamped JPM
12:58:07 3041 through 3042.)
12:58:37 Q. Now, if you look at page JPM
12:58:42 3041, there is an email that says it's
12:58:47 from Jacqueline Truzzell to Gilberto
12:58:52 Sotelo with a group of people cc'd, dated
12:58:56 June 18th, 2009, right?
12:58:59 A. Yes.
12:58:59 Q. Did you send this email?
12:59:00 A. Yes.
12:59:01 Q. It starts out with the phrase
12:59:04 "On the settlement side." That's
12:59:07 referring to the settlement of the
12:59:12 Cablevision loan, correct?
12:59:13 A. Let me check because we were
12:59:16 selling another -- the other loans also.
12:59:27 Right. Okay, it does refer to the
12:59:29 Cablevision loan.
12:59:30 Q. So when you said on the

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

12:59:32 settlement side you were talking about

12:59:33 the Cablevision loan, correct?

12:59:34 A. Correct.

12:59:35 Q. And you wrote "Assuming Grupo

12:59:38 Televisa S.A.B. is the buyer, the same

12:59:40 entity that bought TVI, we should be good

12:59:44 to go in three business days," correct?

12:59:47 A. That's correct.

12:59:47 Q. By business day you mean a 24

12:59:50 hour period when business is conducted?

12:59:52 A. Exactly.

12:59:53 MR. NEUWIRTH: We have no

12:59:54 further questions.

12:59:55 A. But this relates -- this

12:59:56 relates to the actual signing of the

12:59:58 agreement, right, and that's what it was

13:00:00 referring to. It wasn't referring to --

13:00:03 to the agreement of purchasing the loan

13:00:05 which is what had taken some time. The

13:00:07 settlement, once the agreement had been

13:00:08 reached, the settlement wouldn't be

13:00:10 complicated.

13:00:11 Q. Right. You said we would be

13:00:13 good to go in three business days,

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

13:00:15 correct?

13:00:15 A. On the settle -- for the

13:00:16 settlement of the loan.

13:00:18 Q. Right.

13:00:18 A. That's correct.

13:00:19 MR. NEUWIRTH: Thank you.

13:00:20 MR. WISE: I've just got a

13:00:22 couple of questions.

13:00:23 THE VIDEOGRAPHER: I need to

13:00:25 put in a new tape. This marks the

13:00:28 end of tape number 1 in the

13:00:29 deposition of Ms. Jaquelina

13:00:31 Truzzell. We're going off the

13:00:33 record, the time is 1:p.m.

13:01:54 Individual.

13:02:34 (Discussion off the record.)

13:02:34 THE VIDEOGRAPHER: This marks

13:02:35 the beginning of tape number 2 in

13:02:36 the deposition of Ms. Jaquelina

13:02:38 Truzzell. We're back on the

13:02:39 record, the time is 1:02 p.m.

13:02:42 MR. NEUWIRTH: I just want to

13:02:43 -- I assume this is the case, since

13:02:45 we're now going into time past the

13:02:47 two hours, I don't have an
13:02:50 objection to you asking some
13:02:52 questions, but I just want to
13:02:54 confirm that if we decide to do it,
13:02:57 we have an opportunity to do
13:02:58 follow-up.

13:02:59 MR. WISE: Sure, any
13:03:00 reasonable follow-up, totally fine,
13:03:02 totally fine.

13:03:03 MR. NEUWIRTH: Go ahead.

13:03:04 EXAMINATION BY MR. WISE:

13:03:06 Q. In this last interchange you
13:03:08 had with Mr. Neuwirth you were talking
13:03:09 about Exhibit 8, and I think you said
13:03:13 that what you were expressing in this
13:03:15 email was that if an agreement were ever
13:03:17 reached with Televisa it would take, you
13:03:21 could see getting the deal settled in
13:03:24 three days; is that right?

13:03:25 A. That's correct.

13:03:26 MR. NEUWIRTH: Objection;
13:03:27 leading.

13:03:27 Q. If you look down at the bottom
13:03:29 of the preceding email, it says, "As

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

13:03:36 discussed with Sjeord, I got a call from Televisa (Lupe Phillips). Apparently Salvi spoke to her this morning on our proposed pricing. He told Sjeord they were taking the proposal to buy 90 percent of Cablevision at LIBOR plus 475 to their investment committee on Monday."

13:03:57 MR. NEUWIRTH: Please finish the sentence.

13:03:58 Q. "But now they are telling me they would go tomorrow. They need to know if it is a go on our end and whether we could close in T plus 2 or 3 days."

13:04:09 What happened here?

13:04:12 A. I'm not sure if they -- if we ever got a -- a specific response as to whether they -- they did go to the investment committees and that was a firm offer or not.

13:04:25 Q. Okay. Now, Mr. Neuwirth also asked you about the final participation agreement with Inbursa, which is Exhibit 6, and he directed his questioning at some point to section 3.01?

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

13:04:44 A. Right.

13:04:45 Q. And he was pointing out to you
13:04:46 that 3.01 had some language in it that
13:04:49 was not contained in the original draft.

13:04:51 A. That's correct.

13:04:51 Q. Right.

13:04:51 A. Yes.

13:04:52 Q. Part of the language that's in
13:04:55 the final version, which is Exhibit 6,
13:04:59 which is not in the first version, which
13:05:01 is Exhibit 7, is the phrase "or any other
13:05:05 material received by the bank in its
13:05:07 capacity as lender."

13:05:09 Do you see that?

13:05:10 A. Yes, I do.

13:05:10 Q. What is the meaning of that
13:05:12 phrase?

13:05:13 MR. NEUWIRTH: Object to the
13:05:14 form of the question.

13:05:15 MR. WISE: Excuse me?

13:05:17 MR. NEUWIRTH: Object to the
13:05:18 form of the question.

13:05:18 Q. What's your understanding of
13:05:20 the meaning of that phrase?

13:05:21 MR. NEUWIRTH: Object to the
13:05:22 form of the question.
13:05:23 A. My understanding is that -- is
13:05:25 that we would be able to share with the
13:05:27 participant any information that JPMorgan
13:05:31 in its capacity as a lender under the
13:05:35 Cablevision credit agreement would --
13:05:38 would receive. Typical of those -- of
13:05:41 that information are the reporting
13:05:43 requirements that are enumerated in the
13:05:45 loan, financial statements, compliance
13:05:49 certificates, and that -- that type of
13:05:55 information.
13:05:55 Q. So specific requests for
13:05:57 modifications or waivers of covenants and
13:06:02 that kind of information coming from the
13:06:04 borrower to the bank would not be
13:06:05 included in that phrase?
13:06:06 A. Those specific requests
13:06:08 usually come to JPMorgan directly by the
13:06:15 company and we're asked by the company to
13:06:18 -- to analyze and review those -- those
13:06:21 amendments.
13:06:22 If -- if -- if Cablevision

13:06:27 would allow us to share that information

13:06:29 with the participants, we -- we -- we

13:06:32 probably would. If not -- if not, then

13:06:38 we would analyze the -- we would analyze

13:06:40 the amendment request or waiver request

13:06:42 as our position as lenders and then once

13:06:44 the amendment was agreed to we would --

13:06:47 we would send it over to -- to the

13:06:49 participant.

13:07:03 Q. Other than this Exhibit 6, the

13:07:05 final version of the participation

13:07:07 agreement with Inbursa, did you enter

13:07:10 into any other agreements with Inbursa

13:07:12 with respect to the participation -- with

13:07:16 respect to the Cablevision loan?

13:07:17 A. No, the participation

13:07:19 agreement is the only agreement that was

13:07:21 entered into with -- with Inbursa.

13:07:27 MR. WISE: That's all I have.

13:07:28 You want to --

13:07:29 MR. NEUWIRTH: Yes.

13:07:30 MR. WISE: Go ahead.

13:07:34 EXAMINATION BY MR. NEUWIRTH:

13:07:34 Q. Did you have any personal role

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

13:07:36 in discussions with Televisa about whether Televisa would acquire an interest in the Cablevision loan?

13:07:42 A. If I had any personal, no, I didn't have any personal discussions with Televisa.

13:07:46 Q. Who had those discussions from JPMorgan, if you know?

13:07:50 A. I'm assuming -- I believe it would be Sjeord Leenart, Carlos Ruiz de Gamboa, maybe Gilberto Sotelo. I believe it was more Sjeord Leenart and Carlos Ruiz de Gamboa.

13:08:08 Q. Since 2007, have you had any role personally whatsoever in handling any request that was made by Cablevision for an amendment to any of the restrictive covenants in the credit agreement?

13:08:27 A. Yes, what I had was a role in reviewing -- in reviewing the documentation regarding to -- regarding both amendments that were done under the Cablevision deal.

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

13:08:38 Q. And what provision of the credit agreement defines the information that JPMorgan is allowed to request from Cablevision in connection with the loan?

13:08:57 A. What sections under the credit agreement do we -- can you -- I don't understand the question, I'm sorry.

13:09:03 Q. What section -- what provisions in the credit agreement define JPMorgan's right to request information from Cablevision?

13:09:16 A. You usually find it in the reporting requirements which are the affirmative covenant section in the credit agreement which outlines -- outlines all of the documents that Cablevision is supposed to provide the lenders on a regular basis.

13:09:33 Q. And it's true under the credit agreement, isn't it, that JPMorgan has the right to request, on its own, at any time, information about Cablevision's business, finances, plans?

13:09:53 A. I believe reasonably it can --

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

13:09:56 it can reasonably request information.

13:10:00 Q. You're sure the word

13:10:01 reasonably is in there?

13:10:03 A. If I can check the credit

13:10:04 agreement, I confirm. But it's -- but

13:10:07 usually the borrowers don't allowed sort

13:10:09 of any requests. They usually put in the

13:10:12 qualifier of reasonability just to make

13:10:16 sure the banks are reasonable when they

13:10:17 make the request.

13:10:18 Q. And you agree, don't you, that

13:10:20 section 3.01 in the sentence, the second

13:10:24 sentence that I don't believe Mr. Wise

13:10:29 pointed to, states that Banco Inbursa has

13:10:38 the right to ask JPMorgan to request

13:10:43 information under the provisions of the

13:10:45 credit agreement that permit JPMorgan to

13:10:48 request information; isn't that right?

13:10:53 MR. WISE: Object to the form

13:10:54 of the question. I got confused

13:10:55 there.

13:10:58 A. If -- if the bank is -- is,

13:11:07 yes, is entitled to receive the

13:11:09 information as a lender in the credit

13:11:11 document, it's -- it's -- it's permitted
13:11:17 to furnish that information that it
13:11:19 receives to the participant.

13:11:21 Q. And this provision actually
13:11:22 says Banco Inbursa, the participant, can
13:11:24 request the information, correct?

13:11:27 A. It says the bank will request
13:11:32 from the borrower and furnish to -- it
13:11:37 says the bank will request from the
13:11:38 borrower.

13:11:40 Q. Yes.

13:11:41 A. And furnish -- as the -- as
13:11:43 the participant may reasonably request,
13:11:46 yes.

13:11:46 Q. So this provision gives Banco
13:11:48 Inbursa the right to ask JPMorgan to
13:11:51 request --

13:11:52 A. To request.

13:11:52 Q. -- information that it's
13:11:54 entitled to request under the request
13:11:56 agreement, correct?

13:11:57 A. That's correct.

13:11:59 MR. WISE: And what is your --
13:12:02 are you done? You've got more?

13:12:04 MR. NEUWIRTH: Now I'm not.

13:12:08 Q. One other question. Since the

13:12:13 time of the --

13:12:19 MR. NEUWIRTH: This is within

13:12:20 -- are we okay?

13:12:22 MR. WISE: Yes, go ahead, I'm

13:12:23 just --

13:12:24 Q. Within the time period since

13:12:25 the July 15th agreement to now, have you

13:12:29 become aware of any business transactions

13:12:35 that JPMorgan is entering with Banco

13:12:42 Inbursa or any other entity in Mexico

13:12:44 controlled by the Slim family?

13:12:46 MR. WISE: That's really not

13:12:48 proper recross or whatever we're on

13:12:49 here now.

13:12:50 MR. NEUWIRTH: No, I think

13:12:51 it's within the scope of what you

13:12:53 asked her. We can go back.

13:12:55 MR. WISE: I didn't ask her

13:12:56 anything about the Slim family.

13:12:57 MR. NEUWIRTH: No, but you

13:12:58 asked her questions about the

13:12:59 relationship.

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

13:13:00 MR. WISE: I didn't ask any
13:13:01 questions about any relationships.
13:13:03 But go ahead, you can answer.
13:13:04 A. I wouldn't have that
13:13:06 information, I'm not involved in the
13:13:07 dealings of the Mexican office and their
13:13:08 relationship with our clients.
13:13:09 Q. Including Televisa?
13:13:11 A. I'm only involved when it's
13:13:14 specifically related to the drafting of a
13:13:15 loan agreement or negotiation of a loan
13:13:17 agreement.
13:13:18 MR. NEUWIRTH: Okay.
13:13:19 MR. WISE: Done? I'm done.
13:13:21 Thank you very much.

JAQUELINA TRUZZELL - ATTORNEY'S EYES ONLY

13:13:22 THE VIDEOGRAPHER: This marks
13:13:23 the end of the deposition of Ms.
13:13:25 Jaquelina Truzzell. Going off the
13:13:26 record, the time is 1:13 p.m.

(Time noted: 1:13 p.m.)

______________________________

JAQUELINA TRUZZELL

Subscribed and sworn to before me

this _____ day of _________, 2009.

________________________________________

Notary Public

NAME OF CASE: A v. B & C

DATE OF DEPOSITION: December 16, 2009

NAME OF WITNESS: Jaquelina Truzzell

I wish to make the following changes, for the following reasons:

PAGE LINE

_____ _____ CHANGE: ______________________

REASON: ______________________

_____ _____ CHANGE: ______________________

REASON: ______________________

_____ _____ CHANGE: ______________________

REASON: ______________________

_____ _____ CHANGE: ______________________

REASON: ______________________

_____ _____ CHANGE: ______________________

REASON: ______________________

_____ _____ CHANGE: ______________________

REASON: ______________________

_____ _____ CHANGE: ______________________

REASON: ______________________

_____ _____ CHANGE: ______________________

REASON: ______________________

Subscribed and sworn to before me

this ____ day of ____________, 2009.

____________________ ____________________

(Notary Public) My Commission Expires:

C E R T I F I C A T E

STATE OF NEW YORK )

: ss.

COUNTY OF NEW YORK )

I, GAIL F. SCHORR, a Certified Shorthand Reporter, Certified Realtime Reporter and Notary Public within and for the State of New York, do hereby certify:

That JAQUELINA TRUZZELL, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 16 day of December, 2009.

Gail F Schorr

GAIL F. SCHORR, C.S.R., C.R.R.

E X H I B I T S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| (Truzzell Exhibit 1 for identification, Bates stamped JPM 157 to 158.) | 13 | 9 |
| (Truzzell Exhibit 2 for identification, Bates stamped JPM 3020.) | 23 | 5 |
| (Truzzell Exhibit 3 for identification, Bates stamped JPM 3050.) | 24 | 15 |
| (Truzzell Exhibit 4 for identification, Bates stamped JPM 3519 through 3525.) | 47 | 5 |
| (Truzzell Exhibit 5 for identification, Bates stamped JPM 2898 through 2913.) | 58 | 21 |
| (Truzzell Exhibit 6 for identification, copy of the July 15th, 2009 agreement.) | 69 | 17 |

(Truzzell Exhibit 7 for identification, Bates stamped JPM 2778 through JPM 2791.) 70 3

(Truzzell Exhibit 8 for identification, Bates stamped JPM 3041 through 3042.) 107 6

# WORD INDEX

**A**

**ability** 49:22
**able** 11:15 35:3
   36:14,17 38:18
   42:3 45:19 61:7
   83:12,25 102:23
   103:19 113:5
**acceptable** 75:16
**accepted** 19:21
**access** 64:16,19
**accommodate**
   5:18
**accurate** 67:3
**acquire** 15:21
   16:25 17:9
   26:10 36:6
   37:25 40:5,16
   44:15 45:2,19
   46:13,18 52:9
   94:20 101:22
   102:17 103:9
   106:10,16,17
   115:3
**acquired** 21:22
   28:14,16
**acquiring** 16:11
   32:6 34:10
   35:17 45:8,23
**acquisition**
   101:16
**acquisitions** 33:7
**action** 31:3
   123:16
**active** 7:12 32:14
   75:7
**actively** 7:9 37:3
**actual** 17:17,23
   18:6 85:6,16
   108:16
**add** 76:12 83:2
**added** 80:4,14
   91:9,12
**adding** 73:21
**additional** 41:11
   41:12
**admin** 87:5,8,14
   87:19 92:6,20

**administrative**
   20:3 86:9
**Adriana** 2:16 4:2
**advance** 85:5
**advise** 21:6
**advised** 21:13,15
**advising** 31:14
**affirmative**
   116:15
**agent** 73:3 86:9
   87:5,8,14,19
**agents** 92:6,20
**ago** 45:16 95:8
**agree** 82:13 90:2
   96:9 117:12
**agreed** 30:12
   32:16 82:25
   84:5 89:5 91:15
   94:10 114:8
**agreement** 7:4
   8:20 16:24 17:8
   17:11,17 18:3,6
   18:8,10 19:4,9
   22:19 28:13,17
   28:18,24 29:4,7
   30:5,8,9,23
   31:16,24 34:7
   35:20,22 46:2
   46:19 48:13,14
   48:20 49:20,24
   49:25 51:11
   52:5 54:20 55:8
   56:9,10,18,21
   56:23 57:2,4,5,6
   57:7,17 58:12
   59:2,21 60:3
   61:8,14,17
   63:17 65:6,10
   66:17,19 67:9
   67:23 68:20
   69:14,19 70:14
   71:12,16 72:22
   73:11 74:5
   75:10,12,14
   79:3,12,22
   80:11,14 83:25
   84:3,6,8 85:19

   89:7,12 90:3,15
   90:24 91:8,16
   91:20,25 93:11
   93:13,14 94:18
   97:20 101:5,7
   102:5 104:12
   105:3 108:17,19
   108:21 110:17
   111:23 113:8
   114:13,18,18
   115:20 116:3,7
   116:10,16,21
   117:6,18 118:22
   119:10 120:12
   120:13 124:23
**agreements** 32:15
   65:18 93:19
   114:14
**Aguzin** 98:17
**ahead** 17:20,21
   17:22 21:11
   26:21 30:16
   39:20 51:21
   54:7 110:11
   114:23 119:7
   120:4
**Aires** 5:22,23
**allocated** 93:22
**allow** 98:21 114:2
**allowed** 43:5
   91:19 116:4
   117:7
**allows** 84:3,3
**alternative**
   106:18
**Amelia** 2:13 4:8
**amend** 24:8
   50:10
**amendment** 85:6
   85:23 86:12
   87:9,17,22
   114:6,8 115:18
**amendments**
   48:19 51:9 75:2
   75:9,18 81:20
   82:9,16,17
   83:20 85:2,15

   85:16 86:25
   113:24 115:24
**America** 6:17
   60:13 61:23
   79:4 80:17
   88:16
**American** 6:8
   41:15 60:23
   61:9
**amount** 16:16
   39:7,13,18,23
   102:10,12,23
   103:5,20 104:2
**analyze** 88:5
   113:23 114:5,5
**answer** 9:14,20
   9:21 17:16
   19:17 31:10
   40:20 42:12,14
   42:23 43:15,21
   46:22 76:24
   85:11 86:4
   120:4
**answered** 21:10
   42:12,19 97:23
**answering** 20:15
   20:20
**answers** 24:8
**anticipated** 67:5
**anybody** 19:11
   20:25 21:4
   64:22 101:2,3
**anymore** 37:12
**apart** 78:15
**Apparently**
   111:3
**appear** 66:6 71:9
   88:15
**appears** 47:18,18
   47:20 66:10,10
**applied** 95:20
**apply** 95:2
**appreciate** 62:23
**approach** 7:18
   8:23 9:4 11:13
   15:7 89:22 90:7
**approached** 9:3

   10:11 22:6
   33:20 38:15
   41:3
**approaching**
   11:18 52:18
**appropriate** 11:9
   31:23,23 76:11
   78:18
**approval** 16:4,5
   33:22 34:4 35:4
   35:12 36:14,18
   37:2 38:8,13,17
   39:12 41:13
   89:25
**approvals** 38:9
   84:22,22 92:19
**approved** 8:17
   45:25 77:21,25
   78:3 85:3,18,24
   104:3
**April** 12:12 53:5
   53:7
**Argentina** 5:24
   6:11 64:14,15
**arguing** 43:8
**argumentative**
   20:18
**arised** 27:25
**aside** 15:16
**asked** 20:21
   21:10 42:11,19
   63:11 111:22
   113:22 119:20
   119:24
**asking** 56:12,15
   64:4 65:9 76:15
   76:17,21 77:15
   85:9,22 96:23
   110:3
**asset** 10:24 11:16
   16:6 37:8 42:4
**assets** 10:16,23
   11:3 39:24
**assignment** 8:15
   11:13 18:2,20
   18:25 19:8 21:7
   21:23 22:4,7,14

28:9 34:6 49:17 50:2 67:6,7,11 68:3
**associated** 55:6
**assume** 66:3 109:24
**assuming** 11:11 27:4 71:4,6 108:5 115:10
**attached** 13:6 70:15,15 71:16
**attachment** 54:24 55:4,10,13,14 55:21 56:7 70:24 71:2,4,5
**attorney** 4:3
**attorneys** 2:4,10 48:14 54:11 59:22 63:11 69:15
**ATTORNEY'S** 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1
**August** 30:20 97:18
**authority** 89:11
**automatically** 55:15
**available** 62:24
**Avenida** 6:6
**Avenue** 1:17 2:4 2:11 3:8
**aware** 10:10,18 14:21 25:16 31:13 52:11 95:25 104:16 105:25 106:3 119:11
**awhile** 22:11
**a.m** 1:11 3:7

**B**

**b** 1:7 48:17,23 73:13,15,22 76:12 79:2 122:1 124:1
**back** 9:15,17 14:20 22:11 34:23 35:2,9 42:22 43:14 46:22 72:8 83:11 100:18 109:21 119:20
**balance** 83:12
**Banco** 8:24 10:12 11:8,18 16:25 21:8,20 23:16 23:17,19,21 25:15,23 26:10 28:12,13 29:5 30:6,8 31:16 33:14 34:15 38:23 40:15 42:7 45:18 46:2 46:13 52:19 54:22 57:8 59:6 70:12,17 71:17 72:24 73:20 82:21 89:2 90:3 91:2 93:11 94:11 96:9 97:21 100:7 101:3 102:4,20 104:13 105:5,8 106:19 117:15 118:6,16 119:12
**Bancomer** 37:17 37:22,25 38:6 38:25 99:13 100:13,14
**bank** 3:13 5:21 6:14 10:12 34:3 34:8,12,24 35:11,16 36:5 36:10,21 37:13 37:19,21 39:2 40:18 42:8 43:23 55:12 66:23 73:14,17 74:4,11,12,15 81:18 82:7,11 83:7,9,18,22 88:10 92:24 99:12 100:4 112:13 113:18 117:23 118:8,10
**banks** 7:17,23 8:3 8:8 9:23,25 10:7,20 11:2 33:14,19 35:5,6 38:9,12 40:12 41:2,4,6,7 42:2 42:3 43:19,24 100:16,17 101:11 104:3 117:10
**bank's** 44:10
**base** 44:10
**based** 15:8 59:21 60:3,6 61:10,17 62:4 88:16 98:4
**basically** 106:21
**basis** 36:11 93:22 116:19
**Bates** 13:5,10 23:6 24:12,16 46:25 47:6,11 58:17,22 69:12 69:24 70:4 71:8 107:4,7 124:5,8 124:11,14,18 125:2,6
**BBBC** 37:14
**BBVA** 34:18 37:15 38:3 99:13,14
**Bear** 44:11
**bearing** 13:5 24:12 47:10 107:3
**bears** 46:25 58:17 69:23
**began** 21:19
**beginning** 12:11 17:4 18:5 27:2 34:19 36:19,23 53:7 96:17,19 96:20 97:2,23 109:19
**believe** 9:22 10:3 10:22 12:25 17:3 22:5,20 32:25 33:10 37:18 43:22 45:11 46:3,5,5,7 66:11,25 67:12 98:4 100:9 102:6,13 104:18 115:10,12 116:25 117:14
**believed** 41:23,24
**Ben** 2:7 3:24
**benefit** 30:4
**benefits** 74:11,13 74:25 75:11,20 83:13,15
**best** 105:11
**better** 100:21 102:7,8,9,13
**bigger** 67:14 103:9,12
**blank** 59:22 60:3 60:6
**blood** 123:17
**books** 39:24
**borrower** 31:5,7 48:25 50:13,15 51:15,18,24 85:22 86:8,19 87:2,4,7,13,18 87:18 92:11,17 92:24 95:23,25 98:10 113:18 118:9,11
**borrowers** 41:15 117:7
**borrower's** 96:5
**bottom** 47:19 110:24
**bought** 20:11 108:7
**branch** 5:22
**breach** 48:25 50:6,17,17,19 50:20,23 51:14
**break** 5:13
**Buenos** 5:22,23
**business** 89:8,14 108:8,10,11,25 116:24 119:11
**businesses** 14:18 61:9
**buy** 11:3 33:6,23 38:8 40:8 103:21 111:6
**buyer** 18:2 39:4 49:18 108:6
**buying** 8:2

**C**

**C** 1:1,7 2:1,2 3:1 4:1 122:1 123:1 123:1
**Cablemas** 32:9 32:23 33:2
**Cablevision** 3:12 6:23 7:17 8:17 10:24 11:4 14:19,24 20:5 21:5,15 23:20

26:11 27:25
28:23 30:22
31:5,14,25
33:16 34:11
35:17 36:8 38:2
39:9 41:9 44:16
45:3,20 52:10
97:6 107:20,24
108:3 111:7
113:8,25 114:16
115:4,17,25
116:5,12,18
**Cablevision's**
116:23
**call** 61:4 92:7
104:6 111:2
**called** 4:18 32:8
32:10 58:5,9
61:20 93:14
**capacity** 73:17
74:4 82:11
88:10 112:14
113:7
**capital** 6:16
39:14 41:8
73:13,21 79:2
**cared** 97:12,16
98:2
**caring** 98:6
**Carlos** 25:11
45:11 68:14,16
68:17 69:3,4
115:11,13
**case** 9:8 29:10
30:19 48:25
50:16 70:20
86:6 87:3,4
88:5 96:8
106:22 109:24
122:1
**Castillo** 2:14 4:9
**caught** 27:19
**caused** 28:5,7,7,8
**cc'd** 59:17 107:12
**cents** 67:2
**Cepeda** 98:17
**certain** 21:19

39:4 103:19,22
**certainly** 40:20
**certainty** 39:17
**certificates**
113:13
**certified** 1:18,19
13:7 47:11
123:6,7
**certify** 123:9,15
**change** 52:24
63:12 122:4,6,8
122:10,12,14,16
122:18
**changed** 51:5
62:14
**changes** 90:2
122:2
**characterization**
43:18
**Chase** 3:13 5:21
6:14
**check** 15:4 64:7,8
83:24 107:21
117:5
**checked** 75:12
84:7 104:4
**checking** 78:9
**choice** 105:4
**circumstance**
10:11 85:22
94:9
**circumstances**
64:12 76:11
94:16
**citizen** 6:8,10
**claim** 51:14
**claims** 23:19
**clarification**
81:10
**clarified** 61:6
**clarify** 5:8
**clause** 77:8
**clauses** 83:11
**clear** 17:6 38:17
52:20 53:8
59:14 102:24
**client** 98:19,25

**clients** 120:8
**clock** 5:14
**close** 22:22 39:20
111:14
**closed** 92:15
105:17
**closing** 28:3
**coaching** 42:17
43:5,11
**colleagues** 26:2
**collected** 73:16
74:3
**come** 20:18 27:20
35:3,9 54:18
57:24 59:16
83:24 113:21
**comes** 83:10
**coming** 57:14
100:17 113:17
**commented**
104:23
**comments** 48:12
48:15,17 70:15
72:10
**Commission**
122:25
**committee** 111:8
**committees**
111:19
**companies** 105:9
**company** 20:9
32:8,9 41:21
113:22,22
**compare** 102:3
**compensation**
73:16 74:3,15
**competing** 14:18
14:18
**competitor** 98:9
**completed** 20:4
29:22
**completely** 41:2
**compliance** 64:21
64:23 113:12
**complicated**
108:23
**compromise**

27:21
**computer** 56:22
63:22 64:17,19
65:2,4
**concerning** 48:21
**conclude** 27:5
38:22 72:15
**conclusion** 106:8
106:15,21
**conditions** 7:22
**conducted**
108:11
**CONFIDENTI...**
5:1 6:1 7:1 8:1
9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
**confidentiality**
64:24
**confirm** 70:8
110:5 117:6
**confirmed** 15:15
**confused** 117:21
**connection** 15:10
25:21 66:7
88:25 116:5
**consent** 11:10,17
18:24 22:7,9,13
85:7,23
**consented** 12:5
**consents** 74:21
81:20 82:9,16
82:18 83:20
85:2,15,17
86:25

**consider** 12:3,19
12:19 16:7,15
36:25 37:2
**consideration**
36:13
**considered** 68:18
**considering** 7:18
45:5,8,14,23
**consistent** 98:6
**consulting** 48:21
**contact** 9:23 25:9
87:19,20
**contacted** 20:2,22
21:5 36:22
60:23
**contacting** 61:3
**contained** 55:7
112:5
**contemplate** 16:8
**contemplated**
67:10
**contemplating**
21:7 27:16
**continued** 48:12
**contrary** 49:6,12
**controlled** 119:14
**conversation**
11:23 12:4,8,15
12:23 15:14,16
15:19 52:17
53:10,16,23,25
102:21
**conversations**
9:25 54:3 84:20
84:24 99:19
102:22
**copied** 90:12
**copies** 81:19 82:8
**copy** 13:13,14
56:10 62:17
63:22 69:13,18
124:22
**correct** 6:24 7:14
8:21,22 18:20
18:25 19:2
21:24,25 24:22
24:23 28:15,19

29:14 30:24,25
43:18 46:16,17
49:8,9 53:11,12
63:8,9 66:23,24
72:22 73:7 78:2
78:22,23 79:6
80:19 84:25
85:7,14 88:14
88:18 91:5,6
107:20 108:3,4
108:8,9 109:2,6
110:21 112:6
118:7,22,23
**correctly** 5:2
80:20
**corresponding**
47:10
**costs** 23:13
**counsel** 3:18 5:9
17:19 20:18
**countries** 44:9
**COUNTY** 123:4
**couple** 45:15,16
56:20 109:9
**course** 78:20 91:9
91:12 93:8
**court** 1:2 3:15
4:12
**covenant** 50:19
116:15
**covenants** 50:7
50:11,20 51:15
113:16 115:19
**cover** 85:21
**covering** 91:25
**credit** 7:3 8:20
22:19 33:22
38:9 44:8 48:20
49:20,23 51:10
52:5 73:18 74:5
75:10 81:19
82:8 83:24 84:3
84:7 85:18
87:21 89:6
90:17 91:19
97:6 113:8
115:19 116:3,6

116:10,16,20
117:5,18,25
**crisis** 39:6 40:25
42:2,9 44:7,13
**cross-reference**
53:2
**Cunningham** 2:7
3:24
**current** 6:13
38:24 44:4,7
**currently** 5:20
**CV** 1:6
**C.R.R** 123:25
**C.S.R** 123:25

**D**

**d** 1:1 2:1,12 3:1
4:1 79:20,22
80:3,13 88:21
**Daniel** 2:7 3:24
**date** 12:12 72:17
81:12 122:1
**dated** 24:20
107:12
**dates** 33:12 53:6
**Davis** 1:16 2:10
3:8 4:7,9 5:10
69:15 70:21
**day** 61:21 92:15
108:10 121:13
122:21 123:21
**days** 17:4 108:8
108:25 110:20
111:14
**de** 45:11 68:14,17
90:8 115:11,14
**deal** 34:21 35:8
38:22 39:20
41:10 98:12,18
98:23 105:5,6
106:9 110:19
115:25
**dealing** 92:18,18
**dealings** 92:14
98:20 120:7
**dealt** 21:17 69:3
**debt** 6:16

**December** 1:10
3:5 122:1
**decide** 98:14
110:5
**decided** 38:21
39:20 105:4,7
105:10
**decision** 15:3
34:22 85:6 91:4
105:3,19
**decisions** 49:23
89:11,14
**decline** 35:10
74:18
**decrease** 39:15
39:15,23
**default** 50:18,21
50:24 51:25
52:2,4
**defendants** 1:8
2:10 4:5
**defending** 3:17
**define** 116:10
**defines** 116:3
**delete** 54:25
55:15 58:13
66:7,9,12
**deleted** 54:19,23
55:9,23 56:5
66:4,13,13
**deletes** 66:14
**denied** 22:10
**department**
57:21,22 58:3
60:7,11,21,24
61:4,5 75:13,23
75:24 76:2,6
77:16 84:12,21
89:4 90:22
**depends** 56:17
**deposition** 1:14
3:10 5:11 15:11
54:17 109:13,20
121:3 122:1
123:11,13
**derived** 74:13
**described** 10:21

21:4 66:21 84:9
**DESCRIPTION**
124:3
**designated** 22:25
**determination**
84:8
**Diaz** 2:16 4:2
54:14,16
**difference** 82:14
**different** 10:19
49:15 50:2
60:16 63:4 67:9
99:25 100:23
**differently** 82:4
**difficult** 41:13
**direct** 8:3 48:24
50:9,12 51:12
51:13
**directed** 111:24
**directly** 10:5
21:17 22:10
32:25 44:25
51:14,18,24
69:3 87:13
105:14 113:21
**director** 6:15
**disclose** 19:12
30:21 31:24
97:19 98:7
99:16 104:10
**disclosed** 29:15
29:19 30:10
99:25
**disclosure** 30:13
30:18
**discount** 41:21
42:5 45:7,17,18
45:22,25 46:5,6
46:10,14 67:14
67:15,16,18,24
99:16,18,23
100:6,10,13
101:4 102:19
103:10,12
**discuss** 11:15
22:3
**discussed** 5:9

7:16 8:7 10:2,6
11:24 15:25
22:15 23:25
45:10 59:20
77:8 80:9,21,22
89:21 90:13,18
90:19 99:24
100:11 103:14
111:2
**discussing** 9:3
10:15 32:12
48:12
**discussion** 15:19
15:23 16:9,17
30:18 75:4
109:17
**discussions** 10:25
11:8 21:19
23:16 25:20
26:3,9 29:12,16
29:18 30:11
31:21 32:4 72:3
73:20 77:11
82:21 99:11,15
99:21 100:15
101:15,20 104:8
105:21 115:2,6
115:8
**disks** 62:16
**disregard** 61:21
**distributed** 87:9
**distribution** 87:5
**District** 1:2,2
3:15,16
**document** 13:4,8
18:13 22:25
24:12,22 26:24
29:4,25 46:24
47:8,9,12 48:5
58:16 63:12
65:15 69:23
72:8,13 73:18
81:19 82:8
107:3 118:2
**documentation**
115:23
**documents** 20:5

29:6 32:19
60:17 65:2 69:6
71:7 98:24 99:8
116:17
**doc.zip** 66:2,2
**doing** 105:5,6
**dollars** 46:12
**draft** 56:8 57:17
57:20 58:11
59:2 60:5 61:16
61:25 63:17,19
70:13,16 71:12
71:15,22,24
72:16,21 78:21
79:9,12 80:5,24
81:7,11 82:15
82:15 83:8 88:8
88:17 91:7
112:5
**drafted** 72:23
78:4 83:6
**drafting** 77:7
120:11
**drafts** 54:20 55:7
57:3,11,12,14
65:6 71:21
**drive** 62:16
**driven** 39:21
**due** 39:13,14
**duly** 4:19 123:12
**dynamics** 103:24

**E**

**E** 1:1 2:1,2,2 3:1
4:1,17,17 123:1
123:1 124:1
**earlier** 52:15 60:5
66:18 79:5,14
80:18 99:10
100:11
**early** 7:15 8:14
18:11 21:4
61:20 80:5
**earn** 72:25
**economic** 28:16
48:22 74:8,11
74:13,25 75:11

75:19 90:15,15
**Eduardo** 6:6
98:17
**efforts** 7:8,15
35:14 36:3
37:23 38:3
**eight** 36:15,25
93:16
**either** 7:6,16 21:5
23:17 28:22
32:22 78:8
**Elvira** 2:14 4:9
**email** 13:25 22:21
23:10 24:18
27:6 47:16,20
54:19 55:7,11
55:13,23 56:3,4
58:25 59:4,5,5
59:13,15 63:6
63:23 64:3 66:8
70:9,10,16,24
71:5,11,22,25
72:4,5,6,18
104:22 107:10
107:15 110:17
110:25
**emails** 55:17
71:20 90:12
**Emanuel** 2:3 3:22
**employed** 5:20
93:6
**Empresas** 3:12
**ended** 41:2
**enforce** 49:23
**English** 13:22
59:19 65:25
**ensure** 92:21
**enter** 114:13
**entered** 28:12,24
28:25 30:23
31:15 54:21
55:8 57:18
97:20 104:12
114:19
**entering** 105:2
119:12
**entitled** 74:24

75:11 117:24
118:21
**entity** 108:7
119:13
**entry** 30:9
**enumerated**
113:11
**ESQ** 2:6,7,7,8,12
2:13,14,17
**essential** 68:19,22
**establish** 70:19
**established** 27:2
**event** 51:25 52:2
**events** 15:9 52:3
**everybody** 39:22
**everyone's** 93:23
**evidence** 9:7
**exact** 12:12 33:12
46:4,4 102:12
**exactly** 18:21
25:12 28:20
46:8 53:5 54:4
59:14 67:7
108:12
**EXAMINATI...**
4:24 110:12
114:24
**examined** 4:21
**exchanged** 71:21
**Excuse** 32:24
112:21
**executed** 18:8
**executing** 32:19
**executive** 6:15
**exhibit** 13:3,9
23:4,5 24:14,15
47:4,5 58:20,21
69:11,17,21,23
69:25 70:3,9
73:10 79:8
80:25 81:4,11
82:2 107:3,5,6
110:15 111:23
112:10,12
114:11 124:4,7
124:10,13,17,21
125:1,5

**exhibits** 69:7
**expand** 42:13
**expectation**
16:18
**experience** 98:5
**Expires** 122:25
**explain** 25:3
26:19 27:10,13
**explore** 35:15
36:4 37:24 40:2
40:7 102:15
**exposure** 39:11
39:16 97:9
104:2 105:18
**express** 98:22
**expressed** 33:15
34:9,18,25
**expressing**
110:16
**expressions**
38:24
**extent** 81:16 82:5
**eyes** 54:1,11 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1

119:1 120:1
121:1

**F**

**F** 1:1,18 2:1 3:1
4:1,20 123:1,6
123:25
**fact** 30:9,19
41:19
**fair** 18:9 72:15
75:15 78:24
80:12
**fairly** 38:15
**familiar** 6:21
**family** 25:21 26:4
26:8 105:9,22
119:14,22
**favor** 83:8
**feasible** 36:4
**February** 7:11
36:23 38:16
**feel** 24:7
**fees** 72:25 73:16
74:3 93:21
**figure** 60:15
70:18
**file** 55:15,18,25
56:2 62:13
63:23 66:3,7,12
**filed** 86:13
**files** 54:19 55:6
66:9
**final** 18:7 34:23
35:3 38:7,8
79:10,21 80:4
80:13 81:7 82:3
82:14,17 88:8
90:23,24 111:22
112:10 114:12
**finally** 61:11
92:16
**finances** 116:24
**financial** 40:25
44:7,12 113:12
**find** 27:23 65:21
104:19 116:13
**fine** 81:9 96:5

110:9,10
**finish** 49:4 111:9
**finished** 43:21
**Fire** 4:23
**firm** 3:25 111:19
**first** 4:19 9:3 11:9 17:4 18:3 19:20 36:2 37:24 45:16 47:16 48:18 57:16,19 59:5,7 63:19 69:10 72:21 90:25 92:10 94:20 96:14 112:11
**firstly** 99:19
**five** 93:16,17
**floor** 2:5 6:7
**flow** 92:22
**focal** 90:20
**follow** 60:11
**followed** 58:25
**following** 38:5 122:2,3
**follows** 4:22
**follow-up** 110:7,9
**foregoing** 81:21 82:12 88:11
**foreign** 41:6,6
**form** 9:5,10,20 17:13,15,20 20:16 30:15 31:9 40:19 42:10,20 44:17 51:20 57:21,23 58:3,4 59:22 60:4,6,12,12,14 60:18,19,20 61:10,13,18 62:5 63:4 65:10 80:16 83:5,6,10 83:10 85:9 86:3 88:16 90:23 112:20,23 113:3 117:20
**formal** 75:21
**formally** 52:9
**format** 63:13
**forms** 59:18
**forth** 14:20 123:12
**forthcoming** 22:8
**forward** 15:4 22:22
**forwarded** 104:22
**frame** 40:24
**Friday** 60:25
**friendly** 83:7
**from/to** 47:18
**front** 96:11
**full** 81:23
**funded** 41:14
**furnish** 81:18 82:7 118:3,9,13
**further** 108:14 123:15

**G**

**Gabriel** 2:8 3:25
**Gail** 1:18 4:13,20 123:6,25
**GALINDO** 2:16
**Gamboa** 45:12 68:15,17 90:8 115:12,14
**gauge** 11:2
**general** 41:10 44:12 56:13,16 56:17 95:22
**Gerardo** 2:17 4:11 76:8 84:14 89:3
**getting** 35:2 87:12 105:16,17 110:19
**Gilberto** 11:21 15:15,24 47:17 98:16 107:11 115:12
**give** 16:14 49:6 49:11 58:16 64:21 75:17 96:9
**given** 7:22 14:15 14:15 19:20,22 36:11,20,21,21 38:10 39:6,6,17 57:20 80:12 98:9 123:14
**gives** 118:16
**giving** 96:13 106:18
**global** 41:25 42:9
**go** 17:20,21,22 21:11 26:21 30:16 39:20 43:8,12 51:21 54:7 66:8 89:12 91:18 101:8 102:15 108:8,25 110:11 111:12 111:13,18 114:23 119:7,20 120:4
**goal** 96:20 97:3
**going** 5:5 13:21 15:4 37:7,11 38:18 47:15,21 54:10 57:14 64:16 68:3 74:20 80:10 101:21 102:2 109:14,25 121:4
**good** 4:25 108:7 108:25
**gotten** 19:4 34:3
**Granillo** 63:7 65:13 71:17
**grant** 85:6
**greater** 45:24 67:23
**green** 19:22 54:7
**group** 6:16 8:5 10:20 14:2,22 24:19 27:8 61:6 89:16 92:25 107:12
**Grupo** 4:3 7:17 8:4,7 9:4 10:2 21:5 28:22 29:12,22 30:22 31:14,24 32:4 33:4 41:5,16 44:15,25 46:5 97:7,19 98:13 103:15 104:10 108:5
**Guadalupe** 11:23 12:4

**H**

**H** 124:1
**Hagin** 3:3
**half** 37:24
**hand** 123:21
**handled** 32:13
**handling** 115:16
**handshake** 18:12 18:23 19:12 21:3 66:17,21 68:4
**happened** 61:15 61:25 62:8,11 63:16 83:4 106:23,25 111:15
**happens** 85:5 92:13
**hard** 62:16
**Harrington** 2:7 3:24
**hear** 101:10
**heard** 11:21
**Hedges** 2:3 3:23
**held** 6:18 39:8,10 39:24 84:21 99:19,22 100:15
**helps** 72:11 92:17
**hereinbefore** 123:11
**hereof** 81:18 82:7
**hereunto** 123:21
**hesitate** 5:18
**Hi** 59:19
**higher** 46:12,14
**hold** 74:8,8 79:24 93:3 103:17
**holding** 39:7
**home** 44:10
**hour** 108:11
**hours** 110:2
**HSBC** 33:20 34:2 34:16,17 35:13 38:25 39:4 40:5 40:18 101:15,20 101:21,25 102:15,16,22 103:14,19
**HSBC's** 102:6
**hundred** 94:24 95:4 96:4,6

**I**

**idea** 18:19 22:2 73:24 74:19
**identification** 13:10 23:6 24:16 47:6 58:22 69:18 70:4 107:7 124:5,8,11,14 124:18,22 125:2 125:6
**identified** 88:7
**impediment** 31:13,17
**important** 48:15 65:7 90:5
**impression** 19:19 19:19
**inappropriate** 42:18
**Inbursa** 8:24 10:12 11:8,16 11:18 12:2,18 14:4,21 15:8,20 16:2,10,19,25 16:25 17:9 19:6 19:13,22,25 21:9,20 22:16 22:21 23:16,17 23:19,22 25:15 25:18,23 26:10 27:9,13,22 28:2

28:10,12,14 29:6,14 30:6,8 31:16 33:14 34:15 38:23 39:18,21 40:2,3 40:8,15 41:16 42:7 45:19 46:2 46:13 48:7 52:19 54:8,22 57:9 59:6 60:18 63:7,20 66:23 68:7 69:2,4 70:13,17 71:17 72:24 73:20 80:22 82:21 83:4,16 89:2 90:3 91:2,18 93:11 94:11 96:9 97:21 99:17,22 100:7 101:3 102:4,20 103:20 104:13 105:5,9,12 106:5,19 111:23 114:13,14,19 117:15 118:6,17 119:13
**Inbursa's** 14:15 20:4
**include** 50:23 73:14,25 84:5 86:23 91:15
**included** 62:14 79:3 94:2,5 101:4 113:19
**includes** 72:23 90:25
**including** 91:21 91:24 120:9
**inclusion** 82:22
**incorrectly** 60:10
**indemnification** 23:12
**indemnifying** 23:18,19
**indicate** 87:7
**indication** 16:2 46:19 47:18 68:9
**indications** 19:4 19:10
**indirectly** 33:2 44:25
**Individual** 109:16
**inform** 31:4 37:10 45:12
**information** 11:25 12:6,18 16:14 30:4 54:8 83:17 84:2,4 86:18,19,21,24 87:12,25 88:2 92:22 96:7 104:24 113:6,10 113:14,17 114:2 116:3,11,23 117:2,17,19,25 118:3,7,20 120:6
**informing** 31:7
**initial** 11:13 58:3 60:5 61:16,25 65:6 74:17 83:7 88:17
**initially** 7:20 34:20,20 41:3 74:6
**initiated** 22:2 73:24
**inquiries** 104:11
**inquiry** 62:21
**instance** 56:13 94:18
**instances** 50:5 94:23,25,25 95:13,24
**instructions** 42:25
**interchange** 110:13
**interest** 7:19,24 9:2 11:2 12:20 15:20 16:11 17:2 21:8,21 23:21 25:22 26:11 27:19 28:14,16 29:13 32:7,22 33:15 34:10,18,25 35:17 36:7 38:2 38:24 40:4,5 44:3 45:8,20,24 52:10,13 68:20 73:8 74:14 93:20,23 96:11 97:10 98:8 101:16,22 102:3 102:17 105:7,11 106:11,19 115:4
**interested** 8:11 10:8 16:3,11,19 34:5 36:13 40:18 43:25 123:18
**internal** 39:13 54:2 61:12 63:11 75:24,25 76:5
**internally** 39:23
**introduce** 3:18
**investment** 111:8 111:19
**involved** 26:8 68:6,12 76:6 82:20 92:9,17 93:12 94:16 101:14,19 104:7 104:14 105:20 120:6,10
**involving** 48:22
**issue** 20:13 23:25 27:24 74:7 76:7 90:17 100:10 105:18
**issued** 77:16
**issues** 20:3 39:14 39:15 48:22 64:21,23,24 89:19 90:5,18
**item** 23:11
**items** 52:4

## J

**J** 4:17
**Jacqueline** 66:4 107:11
**January** 7:10
**Jaquelina** 1:14 3:11 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1,13,20 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1,4 121:10 122:2 123:10
**Jesus** 59:20 63:6 65:13
**John** 3:3
**joined** 3:23
**JP** 3:12,13 5:21 6:14
**JPM** 13:6,10,21 22:25 23:6 24:12,16 46:25 47:6,19 48:5 58:17,22 59:8 63:5 65:10,25 69:24,24 70:4,5 79:19 107:4,7,9 124:6,9,12,15 124:19 125:3,3 125:7
**JPMorgan** 2:18 4:11 6:22 8:24 9:2 10:11 11:7 13:5 16:8,24 17:8 18:23 21:6 21:19 23:10,18 23:18 24:2,19 26:9 28:12 29:5 29:11,15 30:7 30:21 31:13,15 31:22 32:4,7 35:15 36:3 38:21 40:2 42:6 54:12,22 57:3,8 62:2 64:19 68:9 68:19 72:25 76:3 78:22 83:6 88:4,23 91:3,23 91:24 92:16 93:6 94:10,19 94:22 95:13 96:5,8 97:14,15 97:16,18 98:2,5 99:16 102:9,14

104:8 105:3,6 105:10 113:6,21 115:9 116:4,21 117:16,18 118:17 119:12
**JPMorgan's** 39:7 69:15 92:6 93:21 96:17 97:3,3 105:7 116:11
**JSR** 1:6
**Julian** 59:16
**July** 28:11 29:11 30:10,23 31:15 31:24 33:8,13 33:18 35:10,16 35:19,19,21,24 36:3,19,24,24 37:24 38:16,23 44:23 45:25 54:21 55:8 57:6 57:18 67:8,19 67:22 69:13,18 80:15 93:10 97:17 101:5 102:5 104:12 105:2 106:8,23 106:24 119:10 124:23
**June** 24:20 26:17 37:23 44:23 47:17 51:3,4 59:6 63:6 65:12 70:11,17,22 71:18 72:17 79:16 80:15 81:12 106:23 107:13

**K**

**keep** 56:9 92:7,8
**kept** 38:4,5
**kind** 42:11 77:12 113:17
**knew** 20:9 39:4 41:20 44:2,3
**know** 5:8,13 9:11 15:18 25:5,17 26:13 28:22 42:18,24 43:4 44:19 47:24 58:4,8 61:15,25 62:8,10 63:16 64:16 65:21 70:23,25 71:3 72:10 80:3 81:23 93:15 111:13 115:9
**knowledge** 23:24 30:7 31:8 52:8 103:25
**known** 37:16

**L**

**L** 1:1 2:1 3:1 4:1 4:17,17,17
**labeled** 28:18
**language** 47:9 48:11 72:9 73:21,25 74:2 76:12 77:22 78:5,7,11,16,20 78:25 79:2 84:19 88:6,15 88:22 112:4,9
**large** 16:12
**larger** 102:17 103:9
**late** 12:24 30:20 60:25 106:24
**latest** 72:17
**Latin** 6:17 41:14 60:13,23 61:9 61:23 79:4 80:17 88:16
**launched** 7:21 34:20 35:7
**Lautersztain** 59:17
**lawyer** 77:11 78:8
**lead** 92:4,5
**leading** 110:23
**leave** 54:14
**led** 82:21
**Leenart** 23:10 24:19 26:17 27:6 115:11,13
**left** 54:16
**legal** 23:13 31:6 31:13,19,20 57:21,22 58:2 60:7,20,23 61:3 61:5 75:13,23 75:24 76:2,5 77:16 84:11,12 84:21,23 89:4 89:19,21 90:17 90:17,21
**legally** 78:18
**lender** 49:18,19 50:14 73:2,4,6 73:17 74:4,16 82:11 83:19 88:11 112:14 113:7 117:25
**lenders** 83:22 86:11,22 87:6 87:12 88:4 92:18,21 100:25 114:7 116:19
**letting** 40:4
**let's** 79:7
**level** 86:20
**Lexington** 1:17 2:11 3:8
**LIBOR** 111:7
**light** 19:23 54:7
**lighter** 56:3
**liked** 97:6
**limited** 50:5 83:19
**LINE** 122:3 124:3
**lines** 41:11 44:9
**liquidity** 42:2,9
**list** 82:22 83:2
**little** 34:13 82:4
**LLP** 2:3,10
**loan** 6:22 7:3,8,10 7:13,19 8:2,2,16 9:2 12:3,18,21 15:21 16:3,12 16:21 17:2,25 18:7,16 19:7,14 20:10,24 21:8 23:21 25:22 26:11 27:18 28:10,15 29:14 32:22,23 33:16 33:17,23 34:2 34:11 35:18 36:8 38:2,19 39:8,16 40:4,6 40:16 41:22 44:2,4,16 45:3,5 45:9,20 46:13 48:22 49:16 52:10,14 68:11 68:20 74:9 87:11,16 91:3 92:2,5,9,13,15 93:23 94:12,19 94:21 95:14 98:8 101:9,11 101:17,23 102:3 102:18 105:12 105:17,22 106:11,17 107:20,24 108:3 108:19 109:4 113:12 114:16 115:4 116:5 120:12,12
**loans** 7:25 10:21 32:7,24 33:6 41:12 93:4 107:22
**local** 41:18 86:15
**located** 6:5
**long** 38:15
**longer** 38:12
**look** 13:20 37:5,5 37:10 47:14,22 59:10,13 63:5 65:23,24 69:7 70:7 72:7 73:9 79:7,21 80:23 80:25 82:2 87:21 107:9 110:24
**looking** 72:14 76:6 78:15 81:24 83:16
**looks** 59:15
**lot** 44:10 55:16
**lower** 67:24
**Lozano** 2:8 3:25
**LSTA** 59:18,22 60:4,11,19 61:17 62:4 65:8
**Lupe** 111:3

**M**

**Madero** 6:6
**Madison** 2:4
**main** 9:23,24 90:20
**maintain** 6:2 92:10 97:8
**maintained** 92:25
**making** 15:7 78:10
**management** 25:14,17 98:25
**managers** 98:19
**manually** 66:8,12
**March** 12:11,24 13:25 52:16 53:4,7
**mark** 13:2 23:3 24:13 58:19 69:6,11,21,22 107:2
**marked** 70:9 73:10 80:24
**market** 7:22 38:11 39:6 40:24 41:10 44:8 83:9 87:11 92:3 101:9 103:25
**markets** 6:16
**marks** 109:11,18 121:2

**marriage** 123:17
**match** 68:8 103:20
**material** 18:11 82:10 83:21 88:9 112:13
**materials** 54:11
**matter** 3:11 123:19
**matures** 92:16
**maximum** 103:5
**mean** 14:24 17:23 19:15,20 25:11 27:6 29:7 30:6 31:2 35:21 36:21 39:21 40:22 41:17,20 41:24 43:23 44:11 50:18 53:5,25 57:11 57:12 62:6,11 71:19 72:3 74:2 75:5,23 77:6,8 80:7,7 83:4 84:22 87:6 92:13 94:2 97:4 97:13 99:18 108:10
**meaning** 57:5 112:17,25
**means** 18:19 21:22 46:11 51:17
**mechanism** 48:23
**meet** 25:2 26:19 27:8
**meeting** 106:4
**meetings** 10:19
**meltdown** 44:8
**member** 26:3
**members** 25:21 26:7 105:21
**memorandum** 77:17
**mentioned** 36:6 37:13 52:15 99:10
**Merrill** 3:4 4:14
**Mexican** 37:19 41:18 120:7
**Mexico** 37:22 119:13
**middle** 23:9 80:7
**mid-February** 35:8 36:23 38:4 38:7
**mid-July** 106:15
**million** 6:22 33:17,24 34:7 39:5 40:5 45:3 98:8 101:16,22 102:2 103:4
**minute** 24:4
**minutes** 45:16 95:8
**misstates** 9:6
**mistake** 61:13
**Mitsubishi** 34:24 35:16 36:5,11 36:22 39:2 99:12 100:4
**Mm-hmm** 95:15
**modifications** 113:16
**Monday** 70:10 111:8
**money** 41:14
**monitor** 3:6
**months** 34:21 38:14
**Morgan** 3:13,14 5:21 6:14
**morning** 4:25 5:6 111:4
**move** 22:22
**moved** 34:4

**N**

**N** 1:1,1 2:1,1,2 3:1,1 4:1,1,17
**name** 5:2,4 57:24 122:1,2
**names** 39:10
**necessary** 62:17 65:14
**need** 5:13,17 8:16 24:8 27:13 42:25 47:22 54:13 70:7,18 92:14 98:13 109:10 111:12
**needed** 20:3,4 36:25
**negotiating** 32:12 32:18 34:6 88:19,25
**negotiation** 68:24 93:13 94:17 98:24 99:5,7 120:12
**negotiations** 57:15 68:6,13 91:10,13
**Neuwirth** 2:6 3:20,21 4:24 5:5 9:9 13:2,17 17:14 23:3 24:13 26:25 42:16 43:3,10 43:13 46:21 47:3 54:9 56:15 58:19 64:2,11 66:24 69:5,10 69:20 73:5 76:15,20 77:3 79:11 81:5,9 95:18 96:23 107:2 108:13 109:7,23 110:11 110:14,22 111:9 111:21 112:19 112:22 113:2 114:22,24 119:2 119:5,18,23 120:14
**never** 34:22 55:9 62:7,11 103:7 104:4
**new** 1:2,17,17,21 2:5,11 3:9,9,16 41:11,13 109:11 123:2,4,9
**Nicolas** 98:17
**nine** 33:19
**nonapproval** 28:8
**normal** 56:25 58:13 87:15
**Notary** 1:20 4:19 121:16 122:25 123:8
**notation** 66:6
**note** 87:11
**noted** 121:6
**notice** 1:15 83:21 85:4,10,21 86:13,14,15
**notices** 82:10,18 82:22 83:2 86:6 86:17,23
**notification** 86:7 87:24
**November** 104:9
**number** 10:16 13:3,5 24:12 35:6 46:12,25 55:20 58:7 67:3 71:19 83:11 107:4 109:12,19
**numbered** 69:12
**numbers** 46:9 47:11 58:7,17 69:24 71:9
**NY** 2:5,11
**NYC** 58:7
**N.A** 3:13 5:21

**O**

**O** 1:1 2:1 3:1 4:1
**object** 9:5,10 14:4,9,12 15:2 17:12,14,19 19:25 20:16 30:15 31:9 40:19 42:10,20 44:17 51:20 95:23 96:2 112:19,22 113:2 117:20
**objection** 9:19 14:6,14 20:8 50:10 85:8 86:2 91:21,23 110:3 110:22
**objections** 9:11
**objective** 97:4
**obligation** 31:18 31:19,20
**obliged** 97:24
**obtain** 38:13 41:13
**obtained** 11:17 11:20 18:24 19:3 33:22 35:12 39:11
**obviously** 38:6 64:11 83:5 94:25 100:20 102:10 103:6
**occurred** 16:10 53:10 106:2
**October** 30:21 104:8
**offer** 34:23 44:15 52:9 100:3 111:20
**offered** 99:17 100:6,9,12,14 100:22,24 101:3 101:8 102:18,19
**offering** 41:22 45:2 83:14
**office** 6:3,5 120:7
**offices** 1:16 3:7
**off-bounds** 77:12
**Oh** 71:2
**okay** 10:9 13:16 15:5 18:18 19:6 22:24 24:6,11 27:21 35:25 40:22 44:5 47:25 48:2 49:2 52:7,25 59:3,11 59:11 62:18 66:15 67:4 69:9

70:22 71:10,13 71:23 75:6 77:13,20,23 78:6,11 79:13 79:17 80:23 84:25 86:23 90:6 101:2,10 104:16 107:23 111:21 119:6 120:14
**Oliver** 2:3 3:22
**onboard** 90:22
**once** 32:15 101:6 101:6 108:21 114:7
**ones** 95:3
**open** 16:16
**operator** 3:3
**opinion** 51:5 75:22 76:10,16 76:22,25 77:4,6 77:7,17 84:16 98:22
**opinions** 84:23
**opportunity** 42:4 100:5 110:6
**opposed** 21:23 22:3 92:2 96:13
**orally** 77:25 78:3
**original** 66:20 72:8 78:21 91:7 112:5
**originally** 33:20 39:11 55:17 92:5
**outcome** 123:18
**outlined** 51:10 52:5
**outlines** 116:16 116:17
**owned** 41:18
**ownership** 14:15

**P**

**P** 2:2,2,7
**PA** 70:13
**page** 13:21 23:9 24:25 47:19,20 48:5 56:23 59:7 63:5 79:19 107:9 122:3 124:3
**pages** 70:20
**paid** 46:14 102:4
**par** 101:12
**paragraph** 48:6 48:11 51:6 81:24
**part** 8:6 10:24 12:20 47:23 48:13 59:18 61:7 112:9
**participant** 50:3 50:7,12 51:8,11 81:17,19 82:6,8 84:4 94:4,19 96:3 113:6 114:10 118:4,6 118:14
**participants** 95:5 114:3
**participant's** 73:15
**participate** 23:15 73:19 95:13 100:5,20
**participated** 94:24 95:4 101:12
**participating** 7:25 8:12 19:25
**participation** 18:8 21:22 22:3 22:20,23 28:17 28:19 29:3,3 35:20,22 48:13 49:7,12,25 57:7 59:2,21 60:2 61:8,14,16 65:18 67:19 70:14 71:3 73:11 74:10,23 80:10 84:6 93:14 94:17 95:17,22,25 96:2,10 97:20 105:13 111:22 114:12,15,17
**particular** 43:25 44:2 57:24,25
**parties** 7:13 18:15 27:20 29:8,9 30:2,3 82:25 85:4,18 91:15 99:25 123:16
**password** 64:22
**pay** 102:2
**paying** 46:12
**payment** 74:14 74:14
**payments** 73:8,13
**people** 10:4 14:2 23:11 24:20 87:21 89:15,25 90:9 98:12,15 98:18 106:4,5 107:12
**peoples** 10:19
**percent** 16:12,20 17:2 19:14 20:10,11,12,23 21:8,21 28:14 36:7 40:9,16 45:20 91:3,25 92:2,8,9 93:2 94:21,24 95:4,8 95:14,17,19,21 96:4,6,10,10,15 97:5,9,11 98:8 106:18 111:7
**percentage** 20:6 93:3
**period** 34:9 44:14 44:19,20,23 108:11 119:9
**permission** 11:15 17:19
**permit** 117:18
**permits** 48:21
**permitted** 9:12
22:18,18 74:22 118:2
**person** 27:7,9 56:6 58:2 78:12 84:10,11,13
**personal** 114:25 115:5,6
**personally** 10:10 36:10 53:9 65:3 90:14 115:16
**pertain** 75:9
**pertains** 71:22
**Phillips** 11:23 12:5,8,14 15:6 15:25 19:23 52:17 53:10,17 111:3
**phrase** 107:17 112:12,18,25 113:19
**pieces** 68:22
**place** 11:8 12:9 18:23 57:25
**plaintiff** 1:4 2:4 3:21
**plan** 19:13
**plans** 116:24
**plate** 40:13
**player** 41:18
**please** 3:18 4:15 5:7,17 9:16 47:13,23,24 63:12 70:6 111:9
**plus** 111:7,14
**point** 5:6,12 15:24,24 16:13 16:17,23 17:7 18:18 19:18 20:7 21:19 27:14 28:2,11 37:6 39:3,8 40:22 54:18 75:15 77:18 80:14 83:23 87:24 90:20 100:4 102:11 111:25
**pointed** 117:15
**pointing** 112:3
**points** 25:4 51:6 80:21 89:17,18 89:19,20
**Polk** 1:16 2:10 3:8 4:7,9 5:10 69:16 70:21
**portion** 8:16 34:2 103:9
**position** 6:18 39:7 114:7
**possibility** 10:4,7 10:14 11:25 14:25 21:20 22:16 23:17 27:16 32:6 35:15 40:3 52:18 102:16
**possible** 48:20 62:19 64:13 71:24 101:15 103:8 106:9,16
**potential** 8:25 18:2 29:13,17 29:19 68:10
**potentially** 12:20 101:21
**practice** 56:14,25 83:9 92:4,7
**preceding** 110:25
**prefer** 13:23
**prepared** 57:16 57:19,20 58:11 72:16 78:22 79:15
**preparing** 32:18
**present** 2:15 4:10 52:12 53:9
**preserve** 57:3,10 57:11,12,13
**pressure** 39:13 39:22
**pretty** 7:23 27:7 41:23 42:5 72:2 78:4 103:19

**pre-established** 100:16
**price** 18:4 45:13 46:19 66:16,19 66:20 67:8,9,22 68:2,6,8,13,18 68:25 99:2,6,8 99:23 100:17,19 100:21 101:8,20 101:25 102:4,6 102:13 103:6,11
**prices** 32:16 100:24
**pricing** 18:11 111:5
**principal** 73:8
**print** 56:10,23
**prior** 7:6 8:23 15:7 21:3 29:11 33:10 99:20,21 106:23
**privy** 29:7
**proactively** 31:4
**probably** 12:11 30:25 36:15 62:15 72:19 89:19 90:5,11 93:15 114:4
**problem** 28:5,6 62:20
**problems** 41:7
**proceeding** 51:13
**proceedings** 48:24
**process** 80:3,5 97:3
**produce** 62:22 65:7,14
**produced** 13:4 54:12 64:3,5 69:14 70:21 71:8
**production** 59:14
**prohibition** 31:7
**prompted** 105:19
**promptly** 62:22
**pronouncing** 5:2
**proper** 119:16
**proportional** 93:22
**proposal** 111:6
**proposed** 111:5
**provide** 62:17 76:9 84:2 116:18
**provided** 87:9
**provision** 72:24 93:20 116:2 118:5,16
**provisions** 116:10 117:17
**Public** 1:20 4:20 121:16 122:25 123:8
**purchase** 10:8 12:3 16:7,15,16 19:13 32:12 38:18 39:18 91:2 96:4 102:24
**purchaser** 8:25 83:12
**purchasing** 7:19 12:20 16:20 19:6 32:21 33:15 42:4 45:5 52:13,13 108:19
**pursuant** 1:15 7:3 8:20 28:13 102:4
**pursue** 36:20 37:3,3 38:23 105:8
**put** 78:6 109:11 117:8
**putting** 78:9
**p.m** 109:22 121:5 121:6

**Q**

**qualifier** 117:9
**question** 5:7 9:6 9:14 17:7,16 19:17 20:14,17 20:19 31:10 34:14 40:21 42:15,22,23 43:14,15 44:18 67:20 71:14 73:5 76:19 80:2 85:9 86:3,5 112:20,23 113:3 116:8 117:21 119:3
**questioning** 3:17 5:5 111:24
**questions** 96:24 108:14 109:9 110:4 119:24 120:3
**quickly** 35:7 65:24 106:9,16
**Quinn** 2:3 3:22
**quite** 44:19

**R**

**R** 2:2,6 4:17 123:1
**raised** 14:14 89:17,20
**rate** 45:22 46:14 67:24 99:16 100:6,10,13 101:4 102:19
**reached** 16:24 17:8,11 32:16 90:16 101:7 106:7,13,14,20 108:22 110:18
**read** 9:15,17,18 24:4,7 26:21 42:21 43:13,16 46:21,23 48:11 56:21,23
**reading** 49:4
**reads** 82:4
**ready** 47:24 63:14
**reallocation** 41:8
**really** 25:8 90:4 119:15
**Realtime** 1:19 123:7
**reason** 28:21 29:24 31:3 38:20 49:10,14 82:25 91:22 96:8 97:22 122:5,7,9,11,13 122:15,17,19
**reasonability** 117:9
**reasonable** 110:9 117:10
**reasonably** 116:25 117:2,4 118:14
**reasons** 122:3
**recall** 46:8 54:4 80:6,20 94:8,9 94:18 95:5
**receive** 74:10,16 84:4 89:24 113:9 117:24
**received** 16:6 22:21 55:17 56:8 60:6 68:9 70:12,17 78:17 82:10 83:21 88:10 112:13
**receives** 74:12 83:5 118:4
**receiving** 83:18
**recipients** 24:21
**recognition** 18:15
**recollect** 15:22 102:12 104:21
**recollection** 10:18 15:8,9,12 21:12,14 53:15 53:20,22 66:16 67:2 93:24 94:13
**recollections** 10:13
**record** 3:19 9:18 43:16 46:23 49:18 50:14 109:15,17,22 121:5 123:13
**recross** 119:16
**refer** 85:16 107:23
**referenced** 8:21 80:17
**references** 23:12
**referred** 25:6 45:15 63:3 66:17 79:4
**referring** 60:4 107:19 108:18 108:18
**refers** 48:7 73:7 82:15 85:4 86:16,17
**reframe** 31:12
**refresh** 15:11
**refusal** 90:25 94:20 96:14
**regarding** 12:18 20:2 30:18 37:8 53:12,25 54:3 68:10 89:6 102:22 115:23 115:23
**regular** 116:19
**regulatory** 39:14
**relate** 72:3
**related** 82:12 86:24 120:11 123:16
**relates** 82:17 105:14 108:15 108:16
**relating** 81:21 88:11
**relation** 87:20 98:12
**relationship** 8:3,4 8:9 41:4 50:13 50:15 51:12 92:23 97:7,13 97:17 98:2,7,13 105:8,14 119:25 120:8

**relationships** 120:3
**relevant** 65:2
**remaining** 91:2 96:14
**remember** 15:13 33:4,11 46:4 53:24 54:5 60:25 94:5
**repeat** 85:13
**rephrase** 67:20 85:12
**reporter** 1:19,20 4:13,15 123:7,8
**reporting** 87:15 113:10 116:14
**represent** 81:22
**request** 64:12 86:12 87:8 91:17 104:17 114:6,6 115:17 116:4,11,22 117:2,11,16,19 118:7,8,10,14 118:18,19,21,21
**requested** 9:18 43:16 46:23 81:16 82:5 94:4 104:24
**requesting** 95:5
**requests** 86:24 113:15,20 117:8
**requirement** 87:17 93:25
**requirements** 87:15 113:11 116:14
**respect** 89:11 114:15,16
**respond** 55:13,21 55:21,22,22 56:2 66:11
**responded** 48:14 56:6,7
**responding** 55:19 55:20
**response** 22:12 36:12,20 74:17 104:11 111:17
**responsibility** 9:24 92:11
**responsive** 65:15
**rest** 88:3 92:24
**restate** 52:19
**restriction** 44:8
**restrictive** 115:19
**result** 37:7
**retained** 94:22
**review** 56:18 113:23
**reviewing** 59:23 115:22,22
**revisions** 56:20
**right** 13:24 14:7 18:9 20:25 33:18 36:9 40:14 45:21 46:15,20 48:4,8 51:16 52:6,7 53:14 63:15 65:12 66:5 67:25 72:7 78:12,19 80:4,8 80:8 81:14 85:20,25 90:25 94:20 95:10,17 95:18 96:11,14 96:16 98:3 99:4 99:7,9 102:10 103:7 107:13,23 108:17,24 109:5 110:20 112:2,7 116:11,22 117:16,19 118:17
**rights** 49:19,22 50:4,4 51:17,22 51:23 74:9 75:17
**Rivera** 2:17 4:11 76:8,9 78:13 84:14 89:3
**role** 7:7,12 25:14 32:3,11,11,14 32:17 73:2 74:21 75:7 99:3 114:25 115:16 115:21
**room** 54:17
**routine** 54:2
**Ruiz** 45:11 68:14 68:17 115:11,14
**rule** 92:8 95:9,20 95:21,22
**run** 90:9

**S**

**S** 2:2 124:1
**sale** 11:12 18:3 19:21 22:17 23:21 25:22 27:17 28:9 29:13,17,19 33:25 37:12 68:10,10 105:17
**Salvi** 111:4
**saved** 62:15
**saying** 61:21 89:16
**says** 14:3 25:2 27:18 48:18,23 49:5 59:18,19 66:3 71:2 81:16 82:4 88:9 107:10 110:25 118:6,8,10
**scheduled** 5:10
**Schorr** 1:18 4:13 4:20 123:6,25
**scope** 119:19
**Scott** 2:12 4:6 27:3 96:24
**search** 64:25
**SEC** 86:14,15
**second** 26:21 45:17 103:17 117:13
**section** 72:21,23 73:12,22,25 74:23 76:12 79:22 80:3 81:2 81:15,17 82:6 88:21,22,22 111:25 116:9,15 117:13
**sections** 116:6
**Securities** 3:14
**see** 14:3 23:8,9,13 24:24 48:6,16 58:24 59:12,18 59:24 61:20 66:2 70:23 72:13 73:12 79:23 81:15 88:12 110:19 112:15
**seeing** 38:11
**sell** 10:22 11:4 17:25 18:6 36:8 49:16 68:20 91:4 95:16 96:5 97:10 105:11
**selling** 12:21 20:10 39:19 95:24 107:22
**sell-down** 44:12
**send** 58:3 60:17 61:22 62:25 65:19 83:10 87:4,13 89:14 107:15 114:9
**sending** 58:14 59:20 60:22
**sends** 86:8,19
**senior** 27:7,7,9 89:15 106:4,4
**sense** 38:22
**sent** 20:6 47:16 55:12 58:12 59:5,15 60:14 60:18,24 61:2 63:6,18,20 64:3 65:12,16 71:17 88:2 90:12
**sentence** 79:2 81:25 82:3 111:10 117:13 117:14
**separate** 84:15
**September** 30:20 97:18
**set** 123:11,21
**settle** 109:3
**settled** 110:19
**settlement** 32:14 32:20 60:9,10 61:6 107:18,19 108:2,21,22 109:4
**seven** 81:7
**share** 12:17 13:15 40:17 54:8 72:24 73:15 75:19 113:5 114:2
**shared** 14:15 29:8 86:10,21 88:3
**shareholder** 14:16,22,23,23
**shareholders** 14:17 41:19
**sharing** 12:5 100:24
**Shorthand** 1:19 123:7
**show** 11:16 16:5 16:5 22:24 24:11 46:24 66:13
**showing** 11:25
**side** 20:4 107:18 108:2
**signed** 18:14 19:3 19:8 29:6,25 35:23 61:11
**significant** 39:12 41:23 42:5 45:18
**signing** 108:16
**simpler** 63:13
**sit** 26:6 51:4 94:7
**situate** 40:23
**situation** 10:21 27:10,13 38:11

44:4,6 53:13 106:6
**six** 36:15 81:8
**size** 15:20
**Sjeord** 111:2,5 115:11,13
**Slim** 25:2,5,11,21 26:3,4,8,19 105:9,22 119:14 119:22
**Slims** 105:15
**slow** 35:2
**smaller** 40:3 67:15,16,18 102:10
**sold** 18:17 20:23
**sole** 89:10
**solution** 27:23
**solve** 28:5 106:6
**somebody** 20:22 104:22,23
**somebody's** 62:12,13,13
**son** 25:13
**sons** 25:7,10,11
**soon** 62:19
**sorry** 70:12 77:21 81:4,5 85:12 96:21 106:12 116:8
**sort** 19:22 27:24 32:18 34:3 35:4 35:7 40:25 41:4 41:17 83:7 87:20 103:5 117:7
**Sotelo** 11:21 12:23 14:2,9 15:6,15,25 47:17 53:15,20 53:23 54:5 98:16 107:12 115:12
**Southern** 1:2 3:16
**Spanish** 13:23 37:20,21,21
47:9 48:10 65:24 72:9,10
**speak** 5:14
**speaking** 3:4 9:11
**specific** 30:17 31:3 50:7 52:4 53:14,19,22 56:13 69:2 72:5 75:3 86:12,14 87:17 93:25 103:6 104:11 105:15 111:17 113:15,20
**specifically** 29:2 39:9 51:10 54:23 56:5 88:5 98:24 104:21 120:11
**spend** 43:7
**spoke** 15:6 111:4
**spoken** 36:10
**ss** 123:3
**stages** 17:24 34:4
**stamped** 13:10 23:6 24:16 47:6 58:22 70:4 107:7 124:6,9 124:12,15,19 125:3,7
**standard** 60:19 79:3 88:15 93:3
**Starr** 2:13 4:8,8 13:12,18 64:5 64:14
**start** 6:19 37:4,5 48:24 59:7,23
**started** 38:4,6 74:6 93:9
**starting** 7:10
**starts** 107:17
**State** 1:21 123:2 123:9
**stated** 103:3
**statements** 113:12
**states** 1:2 3:15 117:15
**stating** 100:18
**Stearns** 44:12
**steeper** 103:11
**step** 25:2 26:18 40:12 54:14
**Stephen** 2:6 3:21 5:4
**Steve** 44:21
**stop** 5:14 43:11
**story** 25:3 26:19
**strategy** 8:7 96:16
**stream** 72:4
**strict** 64:23
**string** 58:25 59:4 70:9,16 71:11 71:25 72:18
**strong** 8:4,9 41:4
**structure** 14:16 22:19 25:17 49:7,13
**structuring** 22:17 92:12
**sub** 73:13 76:12 79:2
**subject** 59:18 81:17 82:6
**Subscribed** 121:12 122:20
**subsection** 79:20 80:13
**subsidiaries** 33:3 33:5 41:5
**subsidiary** 37:22
**substance** 76:18
**substantial** 45:17
**suggesting** 22:21
**supervising** 88:24 89:10
**supposed** 116:18
**sure** 7:23 13:17 14:24 24:5 25:8 37:6 53:4,5 64:10 65:19,22 67:3 71:21 72:2 78:4,10 83:25 85:14 90:6,21
92:12,20 110:8 111:16 117:3,10
**swear** 4:15
**switching** 63:4
**sworn** 4:19 121:12 122:20 123:12
**syndicate** 7:8,10 7:13 86:11,20 97:5
**syndication** 7:21 8:6,12,14 10:6 54:4
**system** 55:10,11 55:11,14,24 66:14
**S.A.B** 108:6

**T**

**T** 1:1 2:1 3:1 4:1 4:17 111:14 123:1,1 124:1
**take** 3:9 5:13 6:21 24:3 26:20 34:22 36:15,16 36:17 37:9 38:9 38:10 42:3 47:14 51:16 59:9 70:6,18 87:21 110:18
**taken** 108:20
**talked** 52:21 54:6 81:12
**talking** 14:4 44:20 88:21 108:2 110:14
**tape** 109:11,12,19
**teammates** 10:15
**telephone** 11:22 11:22 12:4 15:14 53:25 54:2
**Televisa** 2:16 4:4 7:17 8:4,8 9:4 10:3,17 12:2 14:10,12 15:7 19:3,12,21 20:9
20:13,22 21:6 21:13,17 22:6,7 27:17,22 28:9 28:23 29:12,23 30:11,22 31:5 31:14,25 32:5,6 32:21 33:5 41:5 44:15,25 45:7 45:13,23 46:11 52:9 68:11 97:8 97:17,19 98:13 98:21 104:10,17 104:23 105:6 106:5,10,10,17 108:6 110:18 111:3 115:2,3,7 120:9
**Televisa's** 11:10 11:14 18:24 46:6
**tell** 20:14,19,23 28:22 37:4 87:23
**telling** 53:20 71:7 111:11
**ten** 93:17
**term** 50:17,23 68:19
**terms** 18:11 26:9 41:8 49:21,21 50:9,9 51:12 61:13 62:7 74:21 75:7 89:4 89:8,9 104:2
**testified** 4:21 19:16 76:23 79:14 95:7,11 97:25 99:3
**testify** 77:24
**testimony** 15:5 52:20,24 68:23 123:13
**text** 47:20 81:24
**thank** 13:18 17:18 63:2 64:9 81:10 109:7 120:16

**Thanks** 5:15
**things** 63:11 88:20 90:9
**think** 5:11 9:9 12:24 14:3 15:24 20:8,12 22:15 25:7 26:12,14,15,25 27:23 28:4 29:2 31:2 33:9,18 37:14 41:22 42:16 43:17,20 51:7 53:6 54:9 54:13 59:13 60:24 61:19 63:3,5,21 65:5 65:13 71:23 77:14 81:3,23 95:7,12 100:8 103:3,13 105:10 105:13 106:20 110:15 119:18
**third** 7:13 29:9
**thought** 8:10 14:9 14:12,25 65:16
**three** 34:21 35:9 38:10 108:8,25 110:20
**ticket** 34:7
**tied** 74:19
**time** 3:6 15:9 16:9 18:22 19:11 28:24 36:17 38:15,25 40:11,24 43:8 44:20 47:14 51:3 54:16 59:9 66:20 68:4 70:6 70:18 93:9 104:10 108:20 109:15,22,25 116:23 119:4,9 121:5,6
**times** 45:16 93:12 93:16,16,17
**timing** 36:21 100:11
**title** 6:13
**today** 3:4 26:6 51:4 64:13,17 93:10 94:7
**Tokyo** 34:24 35:16 36:5,10 36:22 38:25 99:12 100:4
**told** 12:15,17 25:25 29:22 36:24 40:8 53:15,23 60:10 101:11 103:7 111:5
**tomorrow** 111:12
**top** 13:7 47:10
**topic** 24:9 76:22 77:5 78:17
**totally** 110:9,10
**trade** 22:23
**transaction** 28:3 29:21 105:16
**transactions** 119:11
**translates** 48:10
**translation** 13:7 47:12 48:10 59:19
**transmitted** 70:11
**tried** 7:9
**true** 41:9,17 51:8 116:20 123:13
**Truzzell** 1:15 3:11 4:25 5:1,3 5:4,19 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 13:3,9 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 23:4,5 24:1,14 24:15 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 47:4,5,13 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1,20,21 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1,4 67:1 68:1 69:1,11,17 69:22,25 70:1,3 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 79:8 80:1,24 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1,5,6,11 108:1 109:1,14 109:21 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1,4,10 122:2 123:10 124:4,7,10,13 124:17,21 125:1 125:5
**try** 5:8 101:8 106:5,6
**trying** 7:12 10:16 10:22 11:2,4 27:23 28:4 36:7 52:19,23 60:15
**turn** 72:20 73:12 79:19
**turning** 54:10
**TV** 14:5
**TVI** 32:10,23 33:3 108:7
**two** 17:24 27:20 30:2,3 32:7 33:2 35:5,8,9 36:2 38:14 48:15,16 49:14 55:19 87:11 110:2
**two-hour** 5:11
**two-thirds** 24:25
**type** 44:5 73:15 74:2 86:7,18 113:13
**Typical** 113:9
**T.R** 2:13

**U**

**U** 4:17,17
**ultimate** 97:4
**ultimately** 54:21 57:18
**unclear** 5:7 34:14
**understand** 7:2 8:15 9:13 12:7 16:24 17:8 45:4 68:5,7 86:5 116:8
**understanding** 5:12 11:6 12:13 12:16 14:11,13 17:10 26:7,16 27:12 29:20 40:10 42:7 44:24 45:6 67:17,21 71:15 82:24 91:14 104:25 112:24 113:4
**understood** 8:19 14:8 25:14 52:16 75:5,6 91:18
**undertook** 7:15
**Unfortunately** 81:6
**United** 1:2 3:15
**unload** 10:17
**unwilling** 40:12
**update** 89:15
**upset** 28:2
**urgency** 105:16
**Urquhart** 2:3 3:22
**use** 60:20 61:7,14 61:22 101:8
**usually** 38:8,10 55:25 56:2 60:12,20 61:8 61:22 87:10,14 87:18 89:13 92:3 104:3 113:21 116:13 117:7,8

**V**

**v** 122:1
**vague** 44:18
**valued** 97:6
**various** 88:20
**verbal** 18:15
**version** 13:22,23 65:25 72:9 79:21 82:3,14 82:17 88:8 112:10,11 114:12
**versus** 3:12
**video** 3:3,6
**VIDEOGRAP...** 3:2 4:12 109:10 109:18 121:2
**videotaped** 1:14 3:10
**view** 38:21
**voting** 49:21 50:4

**W**

**wait** 77:9,9,9
**waiver** 48:19

85:7,23 114:6
**waivers** 51:9
74:21 75:2,8,18
81:20 82:9,16
82:18 83:20
85:3,16,17
86:25 113:16
**want** 9:10 26:20
27:8 31:11
42:13 43:7,10
47:14 48:18,23
49:3 52:20 53:2
77:10 109:23
110:4 114:21
**wanted** 16:14
27:20 40:8
60:16,17 91:4
97:8
**wants** 77:23
83:12
**Wardwell** 1:16
2:10 4:7,10
**wasn't** 16:2,16
18:7,13,13
30:17 31:3
37:12 40:17
41:9 80:8 97:24
108:18
**way** 10:10 11:20
24:25 52:23
55:10 71:3
75:16 123:18
**ways** 49:15 55:19
55:20 87:11
**Wednesday** 3:5
**weeks** 35:9,9 36:2
36:16,25 38:10
**went** 65:3,3
**weren't** 10:4,5
14:24 28:3 35:3
37:6,11 38:18
41:25 99:25
100:24
**we'll** 5:14,18 23:3
24:13 58:19
61:21 65:21
69:10

**we're** 3:7 71:4
83:13 89:23
92:9,19,20,21
109:14,21,25
113:22 119:16
**we've** 64:6 70:8
88:20
**whatsoever**
115:16
**WHEREOF**
123:20
**willing** 33:23
40:15,17 68:8
96:3 100:19,20
102:17 103:21
**Wise** 2:12 4:5,6
4:23 9:5,15,19
17:12,18,22
19:15 20:16
21:10 26:20,23
30:15 31:9
34:12,16 40:19
42:10,24 43:7
43:12,20 44:17
49:3 51:20
56:12 57:4 59:9
62:3 63:25 65:9
65:20 66:22
69:9 70:25 73:3
76:13,17,24
77:9,14,23 79:9
79:13,24 81:3,6
85:8 86:2 95:16
96:18,22,25
103:17 106:12
109:8 110:8,12
112:21 114:20
114:23 117:14
117:20 118:24
119:7,15,21
120:2,15
**wish** 122:2
**witness** 2:10 4:6
4:16,18 17:21
26:22 42:17,22
43:6,11,15
65:22 77:13

122:2 123:11,14
123:20
**wondered** 13:13
**wondering** 76:13
**word** 78:9,9
117:3
**work** 13:21,22
64:15 88:24
**worked** 60:9
93:19
**working** 6:16
8:13 10:5 48:9
57:2 84:18
**works** 55:11,11
**world** 42:8
**wouldn't** 19:24
19:24 74:24
90:13 95:2
103:19 108:22
120:5
**writing** 78:2,16
**written** 28:13
75:21 76:10,16
76:21 77:4,6,17
84:15 89:6
**wrote** 49:11 51:3
51:6 108:5

**X**

**x** 1:3,9 124:1

**Y**

**year** 6:19 7:6
**years** 93:5,7,9
98:5
**yesterday** 48:11
64:4
**York** 1:2,17,17
1:21 2:5,11 3:9
3:9,16 123:2,4,9

**Z**

**Z** 4:17,17
**zip** 66:3

**$**

**$225** 6:22 33:17
45:3 98:8

**$40** 34:7 40:5
101:16,22 102:2

**0**

**09** 1:6

**1**

**1** 13:3,9 109:12
124:4
**1st** 44:23
**1:p.m** 109:15
**1:02** 109:22
**1:13** 121:5,6
**10** 91:3 92:8,9
93:2 94:21 95:8
95:19,21 96:15
97:9
**10th** 47:17 51:4
**10:59** 3:7
**100** 91:25 95:14
95:16 96:9,10
**10010** 2:5
**10017** 2:11
**107** 125:5
**11:59** 1:11
**13** 124:4
**14** 93:7,9 98:5
**15** 106:24 124:10
**15th** 29:11 30:10
30:23 31:15,24
33:8 35:24
44:23 46:2
54:21 55:8 57:6
57:18 67:9,22
69:13,19 80:15
93:10 101:5
102:5 104:12
105:2 119:10
124:23
**150** 56:23
**157** 13:6,11,21
124:6
**158** 13:6,11 124:6
**16** 1:10 122:1
**16th** 3:5 13:25
**17** 124:21
**18th** 107:13

**19th** 24:20 26:17

**2**

**2** 23:4,5,11
109:19 111:14
124:7
**2.04** 72:21,23
73:12,22,25
76:12 78:25
79:22 80:3
88:21,22
**2007** 6:23 7:4
115:15
**2009** 1:10 3:5
6:19 7:7,11,11
7:16 8:14 32:5
33:8 44:24
69:13,19 104:9
107:13 121:13
122:1,21 123:22
124:23
**202.5** 33:25
**21** 124:17
**22nd** 2:5
**23** 124:7
**24** 108:10 124:10
**25th** 6:7
**2778** 69:24 70:5
125:3
**2785** 79:19
**2791** 69:25 70:5
125:4
**2898** 58:17,23
124:19
**2902** 63:5
**2903** 59:8 65:25
**2913** 58:18,23
124:20

**3**

**3** 24:14,15 111:14
124:10 125:1
**3rd** 63:6 65:13
**3.01** 81:2,15
88:23 111:25
112:4 117:13
**30** 103:4

**3020** 23:2,7 124:9
**3041** 107:4,8,10 125:7
**3042** 107:4,8 125:8
**3050** 24:12,17 124:12
**3519** 46:25 47:7 124:15
**3521** 47:19
**3522** 47:21 48:5
**3525** 47:2,7 124:16

**4**

**4** 47:4,5 124:13
**4.03** 81:18 82:6
**40** 33:24 39:5 103:4
**450** 1:16 2:11 3:8
**47** 124:13
**475** 111:7

**5**

**5** 20:11 58:20,21 124:7,13,17
**51** 2:4
**58** 124:17

**6**

**6** 69:11,17 73:10 80:25 82:3 111:24 112:10 114:11 124:21 125:5
**69** 124:21

**7**

**7** 69:23 70:2,3,9 79:8 81:4,11 112:12 125:1
**70** 125:1

**8**

**8** 107:5,6 110:15 125:5
**8th** 59:6 70:11,17 70:22 71:18 72:17 79:16 80:15 81:12
**87** 66:25

**9**

**9** 124:4
**90** 16:12,20 17:2 19:13 20:10,12 20:23 21:7,21 28:14 36:7 40:9 40:16 45:19 92:2 97:5,10 98:7 106:18 111:6
**900** 6:6
**9972** 1:6

# EXHIBIT B



'RANSPERFECT

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
/ASHINGTON, DC

City of New York, State of New York, County of New York

I, Pearl Leo, hereby certify that the document "Authorization to Request Credit Report" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Pearl Leo

Sworn to before me this

Tuesday, December 15, 2009

Signature, Notary Public

Stephanie Dill
Notary Public, State of New York
No. 01DI6180934
Qualified in NEW YORK County
Commission Expires Jan 22, 2012

Stamp, Notary Public

[logo] BANCO INBURSA, S.A.
Multiple Banking Institution
INBURSA FINANCIAL GROUP

**Authorization to request Credit Reports**
**Legal Entities**

For this matter I expressly authorize BANCO INBURSA, S.A. so that by the conduct of its authorized officers it may carry out investigations about the credit behavior of the Company which I represent in the Credit Information Bureaus which it deems appropriate.

Likewise, I declare that I know the nature and scope of the information which will be requested, for the use of BANCO INBURSA, S.A., it will be of such information and so that the latter may carry out periodic consultations of its credit history, consenting that this authorization is valid for a period of 3 years effective from the date of its issuance and in any case, during the time that it maintains a legal relationship with my client. Under penalty of perjury to tell the truth, I declare myself **To Be the Legal Representative** of the Company mentioned in this authorization.

Name of the Company: Empresas Cablevision, S.A.B. de C.V.

Name of the Legal Representative: José Antonio Lara del Olmo and Julio Barba Hurtado

Federal Taxpayers' Registry: ECA9412083J8

Domicile: Dr. Rio de la Loza 182, Colonia Doctores, Delegación Cuauhtemoc, Mexico, Federal District, Postal Code 06720

Telephone(s): 5169 9699

Date on which consultation is authorized: May 8, 2009

**Annex Official Identification**

**I am aware of and I accept that this document should remain in the possession of BANCO INBURSA, S.A. for purposes of control and fulfillment of article 28 of the Law to Regulate The Credit Information Bureaus.**

[signature] [signature]

José Antonio Lara del Olmo Julio Barba Hurtado



BANCO INBURSA, S. A.
Institución de Banca Múltiple
GRUPO FINANCIERO INBURSA

## Autorización para solicitar Reportes de Crédito
## Personas Morales

Por este conducto autorizo expresamente a BANCO INBURSA, S.A., para que por conducto de sus funcionarios facultados lleve a cabo investigaciones sobre el comportamiento crediticio de la Empresa que represento en las Sociedades de Información Crediticia que estime conveniente.

Asimismo, declaro que conozco la naturaleza y alcance de la información que se solicitará, del uso que BANCO INBURSA, S.A., hará de tal información y de que ésta podrá realizar consultas periódicas de su historial crediticio, consintiendo que esta autorización se encuentre vigente por un período de 3 años contados a partir de la fecha de su expedición y en todo caso, durante el tiempo que mantenga relación jurídica con mi representada. Bajo protesta de decir verdad manifiesto ***Ser Representante Legal*** de la Empresa mencionada en esta autorización.

Nombre de la Empresa: Empresas Cablevisión, S.A.B. de C.V.

Nombre del Representante Legal: José Antonio Lara del Olmo y Julio Barba Hurtado

Registro Federal de Causantes: ECA9412083J8

Domicilio: Dr. Rio de la Loza 182, Colonia Doctores, Delegación Cuauhtemoc, México, D.F., Código Postal 06720

Teléfono(s): 5169 9699

Fecha en que se autoriza la consulta: 08 de Mayo de 2009

## Anexar Identificación Oficial

**Estoy consciente y acepto que este documento quede bajo propiedad de BANCO INBURSA, S.A. para efectos de control y cumplimiento del artículo 28 de la Ley para Regular a Las Sociedades de Información Crediticia.**

José Antonio Lara del Olmo

Julio Barba Hurtado

# EXHIBIT C

---

**De**: Gilberto Sotelo
**Para**: Gilberto Sotelo
**Enviado**: Wed Dec 09 17:43:10 2009
**Asunto**: FW: Cablevision loan assignment

---

**From:** Julian N Lautersztain [mailto:julian.n.lautersztain@jpmorgan.com]
**Sent:** Thursday, May 21, 2009 3:42 PM
**To:** pcamachog@televisa.com.mx; adiazg@televisa.com.mx; nafarjatc@televisa.com.mx; Castillo Campos America; arnoldo.adame@cablevision.net.mx
**Cc:** Gilberto Sotelo; Raimundo A Langlois; Jacqueline C Truzzell; Jonas Knoll; Victoria X Yarisantos
**Subject:** Cablevision loan assignment

**This item has been archived. View the original item**

Pablo, America

Please find attached the assignment agreement from ScheduleA of the Cablevision credit agreement with all the necessary information filledin. Inbursa would like to execute this transaction early next week, which wouldrequire your agreement and signature by tomorrow morning at the latest. Pleasedo not hesitate to contact me if you have any questions.

Saludos,

Julia

**Attachments:**

Inbursa Assignment Agreement May 21, 2009.doc (68 KB)

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.

# EXHIBIT D

---

**De**: Gilberto Sotelo
**Para**: Gilberto Sotelo
**Enviado**: Fri Dec 11 17:02:37 2009
**Asunto**: FW: inbursa

---

**From:** Gilberto Sotelo
**Sent:** Wednesday, December 09, 2009 4:49 PM
**To:** Gilberto Sotelo
**Subject:** FW: inbursa

---

**From:** Julian N Lautersztain [mailto:julian.n.lautersztain@jpmorgan.com]
**Sent:** Friday, May 22, 2009 1:46 PM
**To:** Carlos Ruiz de Gamboa; Jonas Knoll; Gilberto Sotelo
**Cc:** Jacqueline C Truzzell; Raimundo A Langlois; Roberto X D'avola; Marcelo X Avogadro
**Subject:** RE: inbursa

Acabo de recibir una llamada de Jesus Granillo de Inbursa tratando de averiguar si la compania ha firmado el assignment o no. Le dije que no he recibido nada todavia ni he hablado con la compania. Me pidio que le avisara cuando lo firme.

---

**Julian Lautersztain** | Investment Banking | Latin America Capital Markets | **J.P. Morgan** | 7th Floor, 270 Park Avenue, New York, NY 10017 | T: +1 (212) 834-3689 | F: +1 (917) 464-6462 | julian.n.lautersztain@jpmorgan.com | jpmorgan.com

---

**From:** Carlos Ruiz de Gamboa
**Sent:** Friday, May 22, 2009 2:39 PM
**To:** Jonas Knoll; Gilberto Sotelo
**Cc:** Jacqueline C Truzzell; Julian N Lautersztain; Raimundo A Langlois; Roberto X D'avola; Marcelo X Avogadro
**Subject:** Re:

Hable con Lupe. Llamenme a las 3pm a mi cel.

Marcelo,
Mandale los calculos a L+600 para que compren TVI, ojala el Martes. Mandale la planilla ganadora a un tal Pablo Camacho (?) con copia a Lupe y a mi.

---

**From**: Jonas Knoll
**To**: Gilberto Sotelo
**Cc**: Carlos Ruiz de Gamboa; Jacqueline C Truzzell; Julian N Lautersztain; Raimundo A Langlois; Roberto X D'avola
**Sent**: Fri May 22 13:56:57 2009
**Subject**: Re:

Creo que deberiamos hacer un call entre todos (interno) para ver con que volver a la compania. Me parece que ellos entendieron que el assignement ya estaba cerrado sin el consent de ellos y la verdad es que por ahora no firmamos los docs justamente porque nos falta el consentimiento.
Creo que deberiamos comentarle esto a Lupe por telefono. Avisen cuando pueden hacer un call para hablar de esto

Jonas Knoll
Executive Director
Emerging Markets Syndicate Desk
J.P. Morgan Securities Inc.
Phone: (212) 834-4307

Gilberto Sotelo/MX/ONE

**Gilberto Sotelo/MX/ONE**

05/22/2009 01:42 PM

To Carlos Ruiz de Gamboa/JPMCHASE@JPMCHASE, Jonas Knoll/JPMCHASE@JPMCHASE, Raimundo A Langlois/JPMCHASE@JPMCHASE1, Jacqueline C Truzzell/JPMCHASE@JPMCHASE, Julian N Lautersztain/JPMCHASE@JPMCHASE1

cc

Subject

----- Forwarded by Gilberto Sotelo/MX/ONE on 05/22/2009 12:41 PM -----

**"Phillips Margain Guadalupe" <gphilips@televisa.com.mx>**

05/22/2009 12:23 PM

To <gilberto.sotelo@jpmorgan.com>

cc "Balcarcel Santa Cruz Joaquin" <jbalcarcel@televisa.com.mx>, "Gallardo Islas Ignacio" <igallard@televisa.com.mx>, "Adame Rivera Jose Arnoldo" <aadamer@televisa.com.mx>

Subject

"Dear Gilberto:

I was very surprised to receive your call this morning to learn that you have been negotiating with Banco Inbursa the assignment of 90% of the $225,000,000 dollar loan (the "Loan") that JP Morgan Chase Bank N.A. ("JP Morgan"), as lender and administrative agent, granted to Empresas Cablevision S.A.B. de C.V. ("Cablevision") pursuant to the loan agreement entered into between JP Morgan and Cablevision on December 19, 2007 (the "Loan Agreement").

Since you informed me that you had already assigned this portion of the Loan, I sought the advice from internal counsel regarding the terms for assignment of a portion or the entirety of the Loan and I want to make it very clear that pursuant to Section 9.04 of the Loan Agreement, JP Morgan **requires the prior written authorization** from Cablevision to assign any portion of the Loan.

Taking the foregoing into account, I hereby inform you that Cablevision **has not** consented in writing or otherwise to any assignment to Banco Inbursa.

In order for Cablevision to analyze any possible assignment of a portion of the Loan to Banco Inbursa please send us all the information necessary therefore.

Lastly, I remind you that any possible assignment that JP Morgan may want to carry out has to follow the provisions of the Loan Agreement.

Regards."

We would send the e-mail to Gilberto with copy to the people on the notice section for JP Morgan and Cablevision.

Thanks.

---

El contenido de este mensaje es confidencial. Si usted ha recibido este mensaje por error, le ruego que no lo reenvíe y lo borre inmediatamente.

The contents of this message are confidential. If message has been received in error, please do not forward and destroy immediately.

---

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.

# EXHIBIT E



TRANSPERFECT

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

City of New York, State of New York, County of New York

I, Pearl Leo, hereby certify that the document "E-mail from Jacqueline C. Truzzell to Jesus Granillo Rodriguez on June 10, 2009 at 9:06 a.m." is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Pearl Leo

Sworn to before me this

Tuesday, December 15, 2009

Signature, Notary Public

Stephanie Dill
Notary Public, State of New York
No. 01DI6180934
Qualified in NEW YORK County
Commission Expires Jan 22, 2012

Stamp, Notary Public

From: truzzell_jacqueline@jpmorgan.com [mailto:truzzell_jacqueline@jpmorgan.com]
Sent: Wednesday, June 10 2009 09:06 AM
To: Jesus Granillo Rodriguez
Subject: RE: Inbursa Participation Agreement

Jesus, will your lawyers be able to speak today?

Regards,

J


"Jesus Granillo Rodriguez" <jgranillor@inbursa.com>

06/09/2009 11:32 AM


To

<truzzell_jacqueline@jpmorgan.com>

cc

Subject


RE: Inbursa Participation Agreement

I'm in my office now. You can call me whenever you like.

Jesús Granillo R.
(5255) 5625 4900
Ext. 1461

From: truzzell_jacqueline@jpmorgan.com [mailto:truzzell_jacqueline@jpmorgan.com]
Sent: Tuesday, June 09 2009 10:18 AM
To: Jesus Granillo Rodriguez
Subject: RE: Inbursa Participation Agreement

Jesus, I called you but I was told that you were out of the office.
I am in NY. Let me know when you'll be available and I'll call you back.
Regards,
Jackie

"Jesus Granillo Rodriguez" <jgranillor@inbursa.com>

06/08/2009 06:38 PM

To

<truzzell_jacqueline@jpmorgan.com>

Cc

<julian.n.lautersztain@jpmorgan.com>, <GERARDO.RIVERA@jpmorgan.com>

Subject

RE: Inbursa Participation Agreement

Thank you. My lawyers now have it; as soon as I hear anything about it, I'll let you know.

Jesús Granillo R.
(5255) 5625 4900
Ext. 1461

From: truzzell_jacqueline@jpmorgan.com [mailto:truzzell_jacqueline@jpmorgan.com]
Sent: June 08, 2009 04:15 PM
To: Jesus Granillo Rodriguez
CC: julian.n.lautersztain@jpmorgan.com; GERARDO.RIVERA@jpmorgan.com
Subject: RE: Inbursa Participation Agreement

Jesus,
I'm sending you the PA with the last comments. We've included the comments that we could accept, and
we would like to have a call with your lawyers to discuss the other points which you [plural] raised.
Our lawyer is available tomorrow from 10:15 a.m. and afterwards.

Can you let me know what time is best for you?

Regards,

Jackie

"Jesus Granillo Rodriguez" <jgranillor@inbursa.com>

06/08/2009 02:15 PM

To

<truzzell_jacqueline@jpmorgan.com>

cc

<julian.n.lautersztain@jpmorgan.com>

Subject

RE: Inbursa Participation Agreement

Jackie,
I'm sending you the PA with our comments.
Regards,

Jesús Granillo R.
(5255) 5625 4900
Ext. 1461

From: truzzell_jacqueline@jpmorgan.com [mailto:truzzell_jacqueline@jpmorgan.com]
Sent: Friday, June 05, 2009 01:11 PM
To: Jesus Granillo Rodriguez
CC: julian.n.lautersztain@jpmorgan.com
Subject: RE: Inbursa Participation Agreement

Jesus, as per our conversation, I'm passing on a mark-up [sic-the English phrase "mark up" was in original document; however, it appears the writer meant to write "mock-up", given the context] of the document to you.
Let me know if you are OK with these changes.

Regards,

Jackie

"Jesus Granillo Rodriguez" <jgranillor@inbursa.com>

06/05/2009 12:39 PM

To

<truzzell_jacqueline@jpmorgan.com>

cc

Subject

RE: Inbursa Participation Agreement

Jackie,
I've tried calling you a couple times, but I was told that you were out of the office.
Do you have any news about what we talked about yesterday regarding the Participation Agreement?

Regards,

Jesús Granillo R.
(5255) 5625 4900
Ext. 1461

From: truzzell_jacqueline@jpmorgan.com [mailto:truzzell_jacqueline@jpmorgan.com]
Sent: Thursday, June 04, 2009 10:04 AM
To: Jesus Granillo Rodriguez
Subject: RE: Inbursa Participation Agreement

Sure; if you want, we can take a look at it, and if there is anything I can't answer for you, I'll discuss it with our lawyer.
How does that sound?
Regards,


Jackie
(5411-4348-7276)


"Jesus Granillo Rodriguez" <jgranillor@inbursa.com>

06/04/2009 12:00 PM


To

<truzzell_jacqueline@jpmorgan.com>


cc


Subject


RE: Inbursa Participation Agreement

Jackie,

There are a few different points in the Participation Agreement that I would like to clarify; could you help me out with this?

Regards,

Jesús Granillo R.
(5255) 5625 4900
Ext. 1461

From: truzzell_jacqueline@jpmorgan.com [mailto:truzzell_jacqueline@jpmorgan.com]
Sent: Wednesday, June 03, 2009 02:06 PM
To: Jesus Granillo Rodriguez
CC: julian.n.lautersztain@jpmorgan.com; GERARDO.RIVERA@jpmorgan.com
Subject: Inbursa Participation Agreement

Jesus,

I'm sending you the Participation Agreement document with the trade information incorporated in it.
Let's coordinate to figure out when to set the Effective Date after you [plural] have been able to review the document with your lawyers.

Since we've had some problems with our e-mails, please confirm once you receive the e-mail with the document.

Thank you,

Jackie

"Jesus Granillo Rodriguez" <jgranillor@inbursa.com>

06/03/2009 01:45 PM

To

<truzzell_jacqueline@jpmorgan.com>

cc

<julian.n.lautersztain@jpmorgan.com>

Subject

RE: LSTA Parf Forms

Jackie,

I just saw your e-mail, but I didn't find the file attached; could you please send it to me so that we can go over it?

Regards,


Jesús Granillo R.
(5255) 5625 4900
Ext. 1461


From: truzzell_jacqueline@jpmorgan.com [mailto:truzzell_jacqueline@jpmorgan.com]
Sent: Wednesday, June 03, 2009 11:09 AM
To: Jesus Granillo Rodriguez
CC: julian.n.lautersztain@jpmorgan.com
Subject: Re: LSTA Part Forms


Jesus, I called you first thing this morning and called again not long ago, but I was told that you had left for a meeting.
Could you please call me as soon as you come back?

The internal lawyers have asked me if we could please change the format of the document for a much simpler format; it is already ready.

I wanted to let you know as soon as possible to avoid anyone revising it.

Sorry about the confusion.

I'd be very thankful if you could call me as soon as you get back.

Regards,
Jackie
5411-4348-7276

Julian N Lautersztain/JPMCHASE

06/02/2009 08:08 PM

To

"jgranillor@inbursa.com" <jgranillor@inbursa.com>

cc

Jacqueline C Truzzell/JPMCHASE

Subject

LSTA Part Forms

Hello Jesus,

As per our conversation, I'm sending you the Participation Agreement, which is based on the blank LSTA Form, for your lawyers to begin to go over it.

Regards,

Julian


Julian Lautersztain | Investment Banking | Latin America Capital Markets | J.P. Morgan | 7th Floor, 270 Park Avenue, New York, NY 10017 | T: +1 (212) 834-3689 | F: +1 (917) 464-6462 | julian.n.lautersztain@jpmorgan.com | jpmorgan.com [attachment "lsta par part stc - final-doc.zip" deleted by Jacqueline C Truzzell/JPMCHASE] [attachment "lsta par part tst - final-doc.zip" deleted by Jacqueline C Truzzell/JPMCHASE]


[ALL THE FOLLOWING TEXT APPEARS IN ENGLISH IN THE ORIGINAL DOCUMENT.]


This e-mail is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege and legal entity disclaimers, available at
http://www.jpmorgan.com/pages/disclosures/email.

This e-mail is confidential and subject to important disclaimers and conditions
including on offers for the purchase or sale of securities, accuracy and
completeness of information, viruses, confidentiality, legal privilege and
legal entity disclaimers, available at
http://www.jpmorgan.com/pages/disclosures/email.

This e-mail is confidential and subject to important disclaimers and conditions
including on offers for the purchase or sale of securities, accuracy and
completeness of information, viruses, confidentiality, legal privilege and
legal entity disclaimers, available at
http://www.jpmorgan.com/pages/disclosures/email.

This e-mail is confidential and subject to important disclaimers and conditions
including on offers for the purchase or sale of securities, accuracy and
completeness of information, viruses, confidentiality, legal privilege and
legal entity disclaimers, available at
http://www.jpmorgan.com/pages/disclosures/email . [attachment "Participation
Cablevision (2).doc" deleted by Jacqueline C Truzzell/JPMCHASE]

This e-mail is confidential and subject to important disclaimers and conditions
including on offers for the purchase or sale of securities, accuracy and
completeness of information, viruses, confidentiality, legal privilege and
legal entity disclaimers, available at
http://www.jpmorgan.com/pages/disclosures/email.

This e-mail is confidential and subject to important disclaimers and conditions

including on offers for the purchase or sale of securities, accuracy and
completeness of information, viruses, confidentiality, legal privilege and
legal entity disclaimers, available at
http://www.jpmorgan.com/pages/disclosures/email.


This e-mail is confidential and subject to important disclaimers and conditions
including on offers for the purchase or sale of securities, accuracy and
completeness of information, viruses, confidentiality, legal privilege and
legal entity disclaimers, available at
http://www.jpmorgan.com/pages/disclosures/email.


This e-mail is confidential and subject to important disclaimers and conditions
including on offers for the purchase or sale of securities, accuracy and
completeness of information, viruses, confidentiality, legal privilege and
legal entity disclaimers, available at
http://www.jpmorgan.com/pages/disclosures/email.


This e-mail is confidential and subject to important disclaimers and
conditions including on offers for the purchase or sale of
securities, accuracy and completeness of information, viruses,
confidentiality, legal privilege and legal entity disclaimers,
available at http://www.jpmorgan.com/pages/disclosures/email.

PARTICIPATION AGREEMENT (this "Agreement") dated as of [DATE] between JPMORGAN CHASE BANK, NATIONAL ASSOCIATION (the "Bank") and Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa, Grand Cayman Branch (the "Participant").

RECITALS

The Bank wishes to grant to the Participant, and the Participant wishes to acquire and assume from the Bank, without recourse to the Bank, a participation in that certain loan made to Empresas Cablevisión, S.A.B. de C.V a Mexican *sociedad anónima bursátil de capital variable* (the "Borrower"), evidenced by the Credit Agreement dated as of December 19, 2007among the Borrower, the Bank and certain other parties stated therein (as amended from time to time, the "Credit Document").

Accordingly, the parties hereto agree as follows:

ARTICLE 1. DEFINITIONS

As used herein, the following terms shall have the following meanings (all terms defined in this Article 1 or in the other provisions of this Agreement in the singular to have the same meanings when used in the plural and vice versa):

"Business Day" means any day on which commercial banks are not authorized or required to close in New York City.

"Discount Rate" means 85.09%

"Dollars" and the sign "$" mean lawful money of the United States of America.

"Effective Date" means [DATE].

"Federal Funds Rate" means, for any day, the weighted average of the rates on overnight Federal funds transactions, with members of the Federal Reserve System only, arranged by Federal funds brokers, as published for such day by the Federal Reserve Bank of New York (or, in the absence of such publication, as reasonably determined by the Bank).

"Loan Documents" has the meaning assigned thereto in Section 3.01 hereof.

"Participation" has the meaning assigned thereto in Section 2.01 hereof.

"Participation Percentage" means 90 %.

"Participation Rate" means the rate defined as Applicable Margin in the Credit Document.

"Person" means an individual, partnership, corporation, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"Purchase Price" has the meaning assigned thereto in Section 2.03(a) hereof.

ARTICLE 2. THE PARTICIPATION

Section 2.01. The Participation. As of the Effective Date, the Bank hereby grants to the Participant, and the Participant hereby acquires and assumes, a participation in the Credit Document in an amount equal to the Participation Percentage of the Credit Document (the "Participation"). The Participation is without recourse, representation or warranty except as specifically set forth herein.

Section 2.02. Evidence of Participation. The Bank will maintain records of all payments received from the Participant and all payments made by the Bank to the Participant hereunder. The Bank will furnish an accounting to the Participant as promptly as practicable following the Participant's request therefor.

Section 2.03. Payments by Participant. The Participant hereby agrees to pay to the Bank (without reduction for or on account of any set-off, counterclaim or other right against the Bank or the Borrower) an amount (the "Purchase Price") equal to the Participation Percentage of the unpaid principal amount of the Credit Document at the time that the Purchase Price is paid times the Discount Rate, such Purchase Price to be payable on the Effective Date. Upon receipt by the Bank of such Purchase Price in full, the Participation in the Credit Document shall become effective.

Section 2.04. Payments by Bank. (a) Subject to Section 2.04(b) and Section 4.06 hereof, the Bank will promptly pay to the Participant an amount equal to the Participant's share of each amount received and applied by the Bank in payment of principal of or interest on the Credit Document, such share to be (i) in the case of principal, the related Participation Percentage thereof and (ii) in the case of interest, the Participation Percentage of the interest on the unpaid principal amount of the Credit Document computed at the Participation Rate for the period for which such interest was paid (or, if the Participation has been outstanding for a shorter period, for such shorter period); provided that if the amount of interest so received and applied is less than the interest on such unpaid principal amount computed at the stated rate therefor in the Credit Document for the period for which such interest was paid, then the amount payable under this clause (ii) shall be reduced proportionately. The excess, if any, of the interest payable under the Credit Document on the Participation Percentage of the Credit Document over the interest rate payable to the Participant hereunder in respect thereof shall be retained by the Bank as a fee for its services in connection with this Agreement.

(b) Except for amounts specified in Section 2.04(a) hereof, the Participant shall not be entitled to receive any amounts payable by the Borrower to or received by the Bank under the Credit Document, nor (except as expressly provided herein) shall the Participant have, by reason of this Agreement, the Participation, any rights with respect to the Credit Document, any other Loan Document or any other extension of credit by the Bank to the Borrower. Without limiting the effect of the foregoing, the Bank shall have sole discretion in applying amounts received by it from or for the account of the Borrower under the Credit Document or otherwise (provided that amounts received for application to particular amounts owed under the Credit Document shall be promptly applied to such amounts) and in exercising or refraining from exercising any of its rights (including, without limitation, any right of set-off) with respect to any collateral, any account maintained by the Borrower with the Bank or any other property or right which may be or become available for the payment of the Credit Document, except that if any such right is exercised by the Bank and the amounts recovered thereby are applied in payment of any amount in which the Participant is

entitled to share as provided in Section 2.04(a) hereof, the Bank will promptly pay to the Participant its share thereof as provided therein.

(c)  In the event that this Agreement or the Credit Document would give, or is interpreted so as to give, the Participant the right to exercise rights under the Credit Document or to commence and prosecute any proceedings to enforce its right to payment of all or any amounts in which the Participant has been granted a participation hereunder, or to directly make any claim in connection therewith, the Participant shall not exercise such right or commence any such proceedings without the prior written consent of the Bank (which shall not be unreasonably withheld), provided, however, that such consent shall not be required in connection with the Participant's exercise of rights created under this Agreement against the Bank or prosecution of proceedings hereunder against the Bank.

## ARTICLE 3.  BANK UNDERTAKINGS

Section 3.01.  Loan Documents; Information.  To the extent requested by the Participant and subject to Section 4.03 hereof, the Bank will furnish to the Participant copies of the Credit Document and any amendments, consents or waivers relating to any of the foregoing (collectively, the "Loan Documents").  The Bank will request from the Borrower (to the extent that it is entitled under the Credit Document to do so) and (if and to the extent received by the Bank from the Borrower and subject to Section 4.03 hereof) furnish to the Participant such information concerning the business, affairs or financial condition of the Borrower as the Participant may reasonably request.

Section 3.02.  Nonrecourse Participation.  The Participation will be acquired by the Participant without recourse to the Bank and for the Participant's own account and risk.   The Bank makes no representation or warranty as to, and shall have no responsibility for:  (i) the due authorization, execution or delivery of the Loan Documents by the Borrower or any other Person; (ii) the value, legality, genuineness, validity, sufficiency, enforceability or collectability of the Loan Documents; (iii) any representation or warranty made by, or the accuracy, completeness, currentness or sufficiency of any information (or the validity, completeness or adequate disclosure of assumptions underlying any estimates, forecasts or projections contained in such information) provided (directly or indirectly through the Bank) by, the Borrower or any other Person; (iv) the performance or observance by the Borrower or any other Person (at any time, whether prior to or after the Effective Date) of any of the provisions of the Loan Documents (or any of the Borrower's or such other Person's other obligations in connection therewith); (v) the financial condition of the Borrower or any other Person; or (vi) (except as otherwise expressly provided herein) any other matter relating to the Borrower or any other Person, the Credit Document or any other Loan Document.

Section 3.03.  Amendments, Waivers, Etc.  (a) The Bank may (without the Participant's consent) give or withhold its agreement to any amendments of the Loan Documents or any waivers or consents in respect thereof or exercise or refrain from exercising any other rights or remedies which the Bank may have under the Loan Documents or otherwise (and the sale or granting of the Participation by the Bank shall not limit or otherwise affect its discretion in respect of any of the foregoing), except that (subject to the provisions of the Loan Documents) the Bank will not, without the consent of the Participant, agree to reduce the principal of the Credit Document or reduce the interest rate thereon; extend any stated payment date for principal of or interest on the Credit Document.

(b) In the event that the Bank requests the consent of the Participant pursuant to Section 3.03(a) hereof and the Participant does not respond within ten Business Days after delivery of such request (or within the time period specified by the Bank in such request which period shall in any event be not less than one Business Day), the Bank, in its sole discretion, may deem that the Participant has given its consent thereto. Subject to Section 4.03 hereof, the Bank will endeavor to inform the Participant prior to agreeing to any other amendment, waiver or consent relating to the Loan Documents (it being understood however that, except as expressly provided in this Section 3.03, the Bank shall have sole discretion with respect to the action to be taken).

(c) Subject to Section 4.03 hereof, the Bank will notify the Participant of each executed and delivered amendment, waiver or consent in respect of the Loan Documents, the occurrence of any "Event of Default" of which the Bank gives to the Borrower, its exercise of any rights or remedies against the Borrower in respect of the Credit Document.

Section 3.04. Standard of Care. In handling the Credit Document, the Bank will exercise the same care as it normally exercises with respect to notes in which no participations are sold, but the Bank shall have no further responsibility to the Participant except as expressly provided herein and except for its own gross negligence or willful misconduct which resulted in actual loss to the Participant, and, except to such extent, the Bank shall have no responsibility to the Participant for the failure by the Bank to make any loan or other extension of credit to the Borrower or to comply with any of the Bank's other obligations to the Borrower under the Loan Documents or otherwise. In administering the Participation, the Bank may consult with legal counsel (including counsel for the Borrower), independent accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in reliance on the advice of any such Person. The Bank shall not by reason of this Agreement have a fiduciary relationship with the Participant.

## ARTICLE 4. PARTICIPANT UNDERTAKINGS

Section 4.01. Non-Reliance on Bank. The Participant represents to and agrees with the Bank that: (i) it has made, independently and without reliance on the Bank, its own analysis of the Borrower and the Loan Documents (including, without limitation, its own credit analysis of the Borrower and its own legal review of such Loan Documents) for the purpose of acquiring the Participation based on (and the Participant has had access to) such documents and information as it has deemed to be appropriate and sufficient for such purpose; (ii) it will continue to make its own decisions with respect to the Participation without such reliance and on such basis and will continue to have, independently from the Bank (subject to the Bank's fulfilling its obligation to furnish documents and information to the Participant as and to the extent provided in Sections 3.01 and 3.03 hereof), access to such documents and information as it deems to be appropriate and sufficient for such purpose; and (iii) it will not rely upon the Bank to furnish any documents or information regarding the credit, affairs, financial condition or business of, or any other matter concerning, the Borrower or any of its affiliates (including documents and information received from the Borrower under any Loan Documents or otherwise), except for documents and information expressly required to be furnished by the Bank under Sections 3.01 and 3.03 hereof.

Section 4.02. Other Relationships. The Participant acknowledges that the Bank and its affiliates may have commercial banking, trust or other fiduciary relationships and/or other business relationships, including extensions of credit, financial advisory arrangements and deposits, with the Borrower and its affiliates in addition to the Credit Document.

Section 4.03. Confidentiality. The Participant agrees to maintain the confidentiality of any Loan Documents or any non-public information relating to the Borrower which it may obtain from the Bank in connection herewith. Anything in this Agreement to the contrary notwithstanding, the Bank shall not be obligated to disclose to the Participant any information of a confidential nature relating to the Credit Document or the Borrower (except for the documents and information expressly required to be furnished by the Bank under Sections 3.01 and 3.03 hereof).

Section 4.04. Notice to Borrower. The Participant acknowledges that the Bank may notify the Borrower of the Participation, but the Participant will not, except as otherwise required by law or required or requested by governmental authorities having jurisdiction over the Participant, disclose, and will not permit to be disclosed, to any Person other than the Participant's counsel, independent accountants, affiliates and such governmental authorities the terms of this Agreement without the Bank's prior written consent; provided that the Participant may disclose the existence of the Participation (but not its terms) to the Borrower.

Section 4.05. Indemnification. Unless recovered by the Bank from or for the account of the Borrower promptly after demand therefor, the Participant will pay to the Bank the Participant's pro rata share (equal to the Participation Percentage) of (a) all expenses of collection or enforcement of the Credit Document and (b) all expenses and liabilities incurred by the Bank in connection with the Credit Document, except for those incurred by reason of the Bank's gross negligence or willful misconduct. In addition, if the Bank makes any payment to the Participant pursuant to Section 2.04(a) hereof and either does not receive promptly thereafter, or for any reason is required to return or to pay to any Person, the corresponding payment by or for the account of the Borrower, the Participant will repay to the Bank upon request the amount paid to the Participant to the extent of the Participation Percentage of the amount not received or required to be returned or paid by the Bank (together with (i) in the case of an amount not received by the Bank, interest on the Participation Percentage thereof for the period commencing on the date that the Bank makes such payment to the Participant at the rate(s) specified in Section 5.02(b) hereof, and (ii) in the case of an amount required to be returned or paid by the Bank, an amount equal to (A) the Participation Percentage of the interest, if any, required to be paid by the Bank thereon and (B) interest on the Participation Percentage of the amount to be returned or paid by the Bank for the period commencing on the date such amount was returned or paid by the Bank at the rate(s) specified in Section 5.02(b) hereof).

Section 4.06. Withholding Taxes. The Participant represents that it is entitled to receive any payments to be made to it hereunder without the withholding of any tax and will furnish to the Bank such forms, certifications, statements and other documents as the Bank may request from time to time to evidence the Participant's exemption from the withholding of any tax imposed by any jurisdiction or to enable the Bank to comply with any applicable laws or regulations relating thereto. Without limiting the effect of the foregoing, if the Participant is not created or organized under the laws of the United States or any state thereof, in the event that the payment of interest by the Borrower is treated for U.S. income tax purposes as derived in whole or in part from sources from within the U.S., the Participant will furnish to the Bank Form W8-ECI or Form W8-BEN of the Internal Revenue Service, or such other forms, certifications, statements or documents as the Bank may reasonably request, duly executed and completed by the Participant as evidence of the Participant's exemption from the withholding of U.S. tax with respect thereto. The Bank shall not be obligated to make any payments hereunder to the Participant in respect of the Participation until the Participant shall have furnished to the Bank the requested form, certification, statement or document. In the event that the Participant is subject to U.S. withholding taxes and the Borrower or the Bank is held liable for such withholding taxes, the Participant agrees to promptly reimburse the Bank for any such amount.

Section 4.07.  Additional Representations.  The Participant represents to the Bank that: (i) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization or incorporation; (ii) it has full power, authority and legal right to execute and deliver this Agreement and to perform its obligations hereunder; (iii) the making and performance by it of this Agreement have been duly authorized by all necessary action and will not violate any provisions of applicable law or regulation, any provision of its charter or by-laws (or comparable, constituent documents) or any order of any court or regulatory body and will not result in the breach of, or constitute a default or require any consent under, any agreement, instrument or document to which it is a party or by which it or any of its property may be bound or affected; (iv) all authorizations, consents, approvals and licenses of, and filings and registrations with, any governmental authority required under applicable law or regulations for it to make and perform this Agreement have been obtained and are in full force and effect; and (v) this Agreement constitutes a legal, valid and binding obligation of the Participant, enforceable against it in accordance with its terms.

ARTICLE 5.  MISCELLANEOUS

Section 5.01.  Assignments; Participations.  The Participant acknowledges that the Bank may assign, and may grant participations in, the Credit Document to other Persons.  The Participant may not sell, assign or transfer the Participation (or any part thereof) without the Bank's prior written consent (which consent shall not be unreasonably withheld).

Section 5.02.  Payments Generally.  (a)  All payments by the Bank to the Participant shall be made in U.S. Dollars by wire transfer of immediately available funds (or, in the case of any such payment under Section 2.04(a) hereof, such other type of funds in which the Bank shall have received the corresponding payment from or for the account of the Borrower) to the account or the address which the Participant specifies to the Bank from time to time.  All payments to the Bank by the Participant shall be made in U.S. Dollars by wire transfer of immediately available funds to such account of which the Bank shall notify the Participant.  The Bank may (but shall not be obligated to) apply any amounts due and payable by it to the Participant to and in satisfaction of any amount then due and payable by the Participant hereunder to the Bank.

(b)  In the event that the Participant fails to pay any amount (including, to the extent permitted by applicable law, interest) payable by it to the Bank hereunder when due, the Participant will pay to the Bank, upon demand, interest on the amount of such payment, for the period from and including the date on which such amount became due to but excluding the date the same is paid in full, at a rate per annum (computed on the basis of a year of 360 days and actual days elapsed) equal to the Federal Funds Rate for that portion of such period ending on the date two Business Days after the first day of such period and, thereafter, at that rate of interest from time to time announced by the Bank at its office in New York City as its prime rate, as in effect from time to time.

(c)  The specification of U.S. Dollars for payment hereunder and the place of payment stated in Section 5.02(a) hereof are of the essence, and U.S. Dollars shall be the currency of account in all events.  The payment obligations of the Participant hereunder shall not be discharged by any amount paid in another currency or in another place, whether pursuant to a judgment or otherwise, to the extent that the amount so paid on prompt conversion to U.S. Dollars and transfer to New York, New York under normal banking procedures does not yield the amount of U.S. Dollars in New York, New York due hereunder.  In the event that any payment by the Participant, whether pursuant to a judgment or otherwise, upon conversion and transfer does not result in payment of such amount of U.S. Dollars in New York, New York, the Bank shall

Jesús Granillo R.
(5255) 5625 4900
Ext. 1461

De: truzzell_jacqueline@jpmorgan.com [mailto:truzzell_jacqueline@jpmorgan.com]
Enviado el: Miércoles, 10 de Junio de 2009 09:06 a.m.
Para: Jesus Granillo Rodriguez
Asunto: RE: Inbursa Participation Agreement

Jesus, podran tus abogados hablar hoy?
Slds
J

"Jesus Granillo Rodriguez" <jgranillor@inbursa.com>

06/09/2009 11:32 AM

To

<truzzell_jacqueline@jpmorgan.com>

cc

Subject

RE: Inbursa Participation Agreement

Ya estoy en mi oficina. Puedes llamarme cuando gustes.

Jesús Granillo R.
(5255) 5625 4900
Ext. 1461

De: truzzell_jacqueline@jpmorgan.com [mailto:truzzell_jacqueline@jpmorgan.com]
Enviado el: Martes, 09 de Junio de 2009 10:18 a.m.
Para: Jesus Granillo Rodriguez
Asunto: RE: Inbursa Participation Agreement

Jesus, te llame pero me dijoeron que estabas fuera de la oficina.
Estoy en NY. Avisame cuando estes disponible y te vuelvo a llamar.
Saludos
Jackie

"Jesus Granillo Rodriguez" <jgranillor@inbursa.com>

06/08/2009 06:38 PM

To

<truzzell_jacqueline@jpmorgan.com>

cc

<julian.n.lautersztain@jpmorgan.com>, <GERARDO.RIVERA@jpmorgan.com>

Subject

RE: Inbursa Participation Agreement

Gracias. Ya lo tienen mis abogados, en cuanto tenga noticias de ellos te aviso.

Jesús Granillo R.
(5255) 5625 4900
Ext. 1461

De: truzzell_jacqueline@jpmorgan.com [mailto:truzzell_jacqueline@jpmorgan.com]
Enviado el: Lunes, 08 de Junio de 2009 04:15 p.m.
Para: Jesus Granillo Rodriguez
CC: julian.n.lautersztain@jpmorgan.com; GERARDO.RIVERA@jpmorgan.com
Asunto: RE: Inbursa Participation Agreement

Jesus,
Te envio el PA con los ulitmos comentarios. Hemos incluido los comentarios que pudimos aceptar y nos gustaria tener una llamada con tus abogados para discutir los otros puntos que uds levantaron.
Nuestro abogado esta disponible mañana a partir de las 10.15 am.

Me avisas a que hora les vendria mejor?

Saludos

Jackie

"Jesus Granillo Rodriguez" <jgranillor@inbursa.com>

06/08/2009 02:15 PM

To

<truzzell_jacqueline@jpmorgan.com>

cc

<julian.n.lautersztain@jpmorgan.com>

Subject

RE: Inbursa Participation Agreement

Jackie,

Te envío el PA con nuestros comentarios.

Saludos,

Jesús Granillo R.
(5255) 5625 4900
Ext. 1461

De: truzzell_jacqueline@jpmorgan.com [mailto:truzzell_jacqueline@jpmorgan.com]
Enviado el: Viernes, 05 de Junio de 2009 01:11 p.m.
Para: Jesus Granillo Rodriguez
CC: julian.n.lautersztain@jpmorgan.com
Asunto: RE: Inbursa Participation Agreement

Jesus, segun lo que conversamos te paso un mark up del documento.
Avisame si estas ok con los cambios.

Saludos

Jackie

"Jesus Granillo Rodriguez" <jgranillor@inbursa.com>

06/05/2009 12:39 PM

To

<truzzell_jacqueline@jpmorgan.com>

cc

Subject

RE: Inbursa Participation Agreement

Jackie,

Te he marcado un par de veces, pero me dijeron que estás fuera de la oficina.
¿Tendrás alguna noticia de lo que comentamos ayer del Participation Agreement?

Saludos,

Jesús Granillo R.
(5255) 5625 4900
Ext. 1461

De: truzzell_jacqueline@jpmorgan.com [mailto:truzzell_jacqueline@jpmorgan.com]
Enviado el: Jueves, 04 de Junio de 2009 10:04 a.m.
Para: Jesus Granillo Rodriguez
Asunto: RE: Inbursa Participation Agreement

Seguro, si queres lo podemos ver y si hay algo que no te puedo contestar lo consulto con nuestro abogado.
Te parece?
Slds

Jackie
(5411-4348-7276)

"Jesus Granillo Rodriguez" <jgranillor@inbursa.com>

06/04/2009 12:00 PM

To

<truzzell_jacqueline@jpmorgan.com>

cc

Subject

RE: Inbursa Participation Agreement

Jackie,

Hay varios puntos del Participation Agreement que quisiera aclarar, tu puedes ayudarme con eso?

Saludos,

Jesús Granillo R.
(5255) 5625 4900
Ext. 1461

De: truzzell_jacqueline@jpmorgan.com [mailto:truzzell_jacqueline@jpmorgan.com]
Enviado el: Miércoles, 03 de Junio de 2009 02:06 p.m.
Para: Jesus Granillo Rodriguez
CC: julian.n.lautersztain@jpmorgan.com; GERARDO.RIVERA@jpmorgan.com
Asunto: Inbursa Participation Agreement

Jesus,

Te envio el documento del Participation Agreement con la informacion del trade ya incorporada.
Coordinemos para ver cuando fijamos el Effective Date, una vez que hayan podido revisar el document tus abogados.

Por los problemas de emails que tuvimos por favor confirmame si te llego el email con el documento.

Gracias,

Jackie

"Jesus Granillo Rodriguez" <jgranillor@inbursa.com>

06/03/2009 01:45 PM

To

<truzzell_jacqueline@jpmorgan.com>

cc

<julian.n.lautersztain@jpmorgan.com>

Subject

RE: LSTA Part Forms

Jackie,

Acabo de ver tu mail, pero no veo el archivo adjunto, me lo puedes enviar para que lo revisemos?

Saludos,

Jesús Granillo R.
(5255) 5625 4900
Ext. 1461

De: truzzell_jacqueline@jpmorgan.com [mailto:truzzell_jacqueline@jpmorgan.com]
Enviado el: Miércoles, 03 de Junio de 2009 11:09 a.m.
Para: Jesus Granillo Rodriguez
CC: julian.n.lautersztain@jpmorgan.com
Asunto: Re: LSTA Part Forms

Jesus, te llame a primera hora hoy y recien otra vez pero me dijeron que saliste a una reunion.
Me podrias llamar por favor apenas llegues?

Los abogados internos me pidieron que por favor cambiemos el formato de documento a un mucho mas sencillo, que ya esta listo.

Queria avisarte lo antes posible para evitar que alguien lo revisara.

Te pido disculpas por la confusion.

Si me puedes llamar cuando regreses te lo agradeceria,

Saludos,
Jackie
5411-4348-7276

Julian N Lautersztain/JPMCHASE

06/02/2009 08:08 PM

To

"jgranillor@inbursa.com" <jgranillor@inbursa.com>

cc

Jacqueline C Truzzell/JPMCHASE

Subject

LSTA Part Forms

Hola Jesus,

Segun lo discutido te mando el Participation Agreement que esta basado en el LSTA Form en blanco para que tus abogados puedan ya empezar a revisarlo.
Saludos,
Julian

Julian Lautersztain | Investment Banking | Latin America Capital Markets | J.P. Morgan | 7th Floor, 270 Park Avenue, New York, NY 10017 | T: +1 (212) 834-3689 | F: +1 (917) 464-6462 | julian.n.lautersztain@jpmorgan.com | jpmorgan.com
[attachment "lsta par part stc - final-doc.zip" deleted by Jacqueline C Truzzell/JPMCHASE] [attachment "lsta par part tst - final-doc.zip" deleted by Jacqueline C Truzzell/JPMCHASE]

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email. [attachment "Participation Cablevision (2).doc" deleted by Jacqueline C Truzzell/JPMCHASE]

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.

This email is confidential and subject to important disclaimers and conditions

including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.

# EXHIBIT F



TRANSPERFECT

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

City of New York, State of New York, County of New York

I, Pearl Leo, hereby certify that the document "Mark-Up of Participation Agreement Under Negotiation Attached to e-mail from Jesus Granillo Rodriguez to Jacqueline Truzzell dated June 08, 2009 2:15 p.m." is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Pearl Leo

Sworn to before me this

Tuesday, December 15, 2009

Signature, Notary Public

Stephanie Dill
Notary Public, State of New York
No. 01DI6180934
Qualified in NEW YORK County
Commission Expires Jan 22, 2012

Stamp, Notary Public

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 T 212.689.5555 F 212.689.1059 WWW.TRANSPERFECT.COM

PARTICIPATION AGREEMENT (this "Agreement") dated as of [DATE] between JPMORGAN CHASE BANK, NATIONAL ASSOCIATION (the "Bank") and Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa, [literally: "Multiple Bank Institution, Inbursa Financial Group"] Grand Cayman Branch (the "Participant").

RECITALS

The Bank wishes to grant to the Participant, and the Participant wishes to acquire and assume from the Bank, without recourse to the Bank, a participation in that certain loan made to Empresas Cablevisión, S.A.B. de C.V a Mexican *sociedad anónima bursátil de capital variable* [literal translation: "variable capital corporation"] (the "Borrower"), evidenced by the Credit Agreement dated as of December 19, 2007 among the Borrower, the Bank and certain other parties stated therein (as amended from time to time, the "Credit Document").

Accordingly, the parties hereto agree as follows:

ARTICLE 1. DEFINITIONS

As used herein, the following terms shall have the following meanings (all terms defined in this Article 1 or in the other provisions of this Agreement in the singular to have the same meanings when used in the plural and vice versa):

"Business Day" means any day on which commercial banks are not authorized or required to close in New York City.

"Discount Rate" means 85.09%

"Dollars" and the sign "$" mean lawful money of the United States of America.

"Effective Date" means [DATE].

"Federal Funds Rate" means, for any day, the weighted average of the rates on overnight Federal funds transactions, with members of the Federal Reserve System only, arranged by Federal funds brokers, as published for such day by the Federal Reserve Bank of New York (or, in the absence of such publication, as reasonably determined by the Bank).

"Loan Documents" has the meaning assigned thereto in Section 3.01 hereof.

"Participation" has the meaning assigned thereto in Section 2.01 hereof.

"Participation Percentage" means 90 %.

"Participation Rate" means the rate defined as Applicable Margin in the Credit Document.

"Person" means an individual, partnership, corporation, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"Purchase Price" has the meaning assigned thereto in Section 2.03(a) hereof.

ARTICLE 2. THE PARTICIPATION

Section 2.01. The Participation. As of the Effective Date, the Bank hereby grants to the Participant, and the Participant hereby acquires and assumes, a participation in the Credit Document in an amount equal to the Participation Percentage of the Credit Document (the "Participation"). The Participation is without recourse, representation or warranty except as specifically set forth herein.

Section 2.02. Evidence of Participation. The Bank will maintain records of all payments received from the Participant and all payments made by the Bank to the Participant hereunder. The Bank will furnish an accounting to the Participant as promptly as practicable following the Participant's request therefor [sic].

Section 2.03. Payments by Participant. The Participant hereby agrees to pay to the Bank (without reduction for or on account of any set-off, counterclaim or other right against the Bank or the Borrower) an amount (the "Purchase Price") equal to the Participation Percentage of the unpaid principal amount of the Credit Document at the time that the Purchase Price is paid times the Discount Rate, such Purchase Price to be payable on the Effective Date. Upon receipt by the Bank of such Purchase Price in full, the Participation in the Credit Document shall become effective.

Section 2.04. Payments by Bank. (a) Subject to Section 2.04(b) and Section 4.06 hereof, the Bank will promptly pay to the Participant an amount equal to the Participant's share of each amount received and applied by the Bank in payment of principal of or interest on the Credit Document, such share to be (i) in the case of principal, the related Participation Percentage thereof and (ii) in the case of interest, the Participation Percentage of the interest on the unpaid principal amount of the Credit Document computed at the Participation Rate for the period for which such interest was paid (or, if the Participation has been outstanding for a shorter period, for such shorter period); provided that if the amount of interest so received and applied is less than the interest on such unpaid principal amount computed at the stated rate therefor in the Credit Document for the period for which such interest was paid, then the amount payable under this clause (ii) shall be reduced proportionately. [SPECIFY HOW MUCH THE BANK MUST PAY TO THE PARTICIPANT]

(b) Except for amounts specified in Section 2.04(a) hereof, the Participant shall not be entitled to receive any amounts payable by the Borrower to or received by the Bank under the Credit Document, nor (except as expressly provided herein) shall the Participant have, by reason of this Agreement, the Participation, any rights with respect to the Credit Document, any other Loan Document or any other extension of credit by the Bank to the Borrower [MORATORY INTERESTS? AMOUNTS DERIVING FROM ANY COLLATERAL? COMMISSIONS FOR RESTRUCTURING, OR ANY OTHER TYPE OF COMMISSION?] Without limiting the effect of the foregoing, the Bank shall have sole discretion in applying amounts received by it from or for the account of the Borrower under the Credit Document or otherwise (provided that amounts received for application to particular amounts owed under the Credit Document shall be promptly applied to such amounts) and in exercising or refraining from exercising any of its rights (including, without limitation, any right of set-off) with respect to any collateral, any account maintained by the Borrower with the Bank or any other property or right which may be or become available for the payment of the Credit Document, except that if any such right is exercised by the Bank and the

amounts recovered thereby are applied in payment of any amount in which the Participant is entitled to share as provided in Section 2.04(a) hereof, the Bank will promptly pay to the Participant its share thereof as provided therein.

(c) In the event that this Agreement or the Credit Document would give, or is interpreted so as to give, the Participant the right to exercise rights under the Credit Document or to commence and prosecute any proceedings to enforce its right to payment of all or any amounts in which the Participant has been granted a participation hereunder, or to directly make any claim in connection therewith, the Participant shall not exercise such right or commence any such proceedings without the prior written consent of the Bank [WE WOULD LIKE TO HAVE A SIDE LETTER WHICH WOULD ALLOW US TO EXERCISE OUR RIGHTS WITHOUT THE BANK'S APPROVAL] (which shall not be unreasonably withheld), provided, however, that such consent shall not be required in connection with the Participant's exercise of rights created under this Agreement against the Bank or prosecution of proceedings hereunder against the Bank.

## ARTICLE 3. BANK UNDERTAKINGS

Section 3.01. <u>Loan Documents; Information</u>. To the extent requested by the Participant and subject to Section 4.03 hereof, the Bank will furnish to the Participant copies of the Credit Document and any amendments, consents or waivers relating to any of the foregoing (collectively, the "Loan Documents"). The Bank will request from the Borrower (to the extent that it is entitled under the Credit Document to do so) and (if and to the extent received by the Bank from the Borrower and subject to Section 4.03 hereof) furnish to the Participant such information concerning the business, affairs or financial condition of the Borrower as the Participant may reasonably request. [WE NEED ALL OF THE DOCUMENTATION WHICH THE BORROWER PROVIDES IN SUPPORT OF THE CREDIT CONTRACT TO BE SHARED WITH US]

Section 3.02. <u>Nonrecourse Participation</u>. The Participation will be acquired by the Participant without recourse to the Bank and for the Participant's own account and risk. The Bank makes no representation or warranty as to, and shall have no responsibility for: (i) the due authorization, execution or delivery of the Loan Documents by the Borrower or any other Person; (ii) the value, legality, genuineness, validity, sufficiency, enforceability or collectability of the Loan Documents; (iii) any representation or warranty made by, or the accuracy, completeness, currentness or sufficiency of any information (or the validity, completeness or adequate disclosure of assumptions underlying any estimates, forecasts or projections contained in such information) provided (directly or indirectly through the Bank) by, the Borrower or any other Person; (iv) the performance or observance by the Borrower or any other Person (at any time, whether prior to or after the Effective Date) of any of the provisions of the Loan Documents (or any of the Borrower's or such other Person's other obligations in connection therewith); (v) the financial condition of the Borrower or any other Person; or (vi) (except as otherwise expressly provided herein) any other matter relating to the Borrower or any other Person, the Credit Document or any other Loan Document.

Section 3.03. <u>Amendments, Waivers, Etc</u>. (a) The Bank may (without the Participant's consent) give or withhold its agreement to any amendments of the Loan Documents or any waivers or consents in respect thereof or exercise or refrain from exercising any other rights or remedies which the Bank may have under the Loan Documents or otherwise (and the sale or granting of the Participation by the Bank shall not limit or otherwise affect its discretion in respect of any of the foregoing), except that (subject to the provisions of the Loan Documents) the Bank will not, without the consent of the Participant, agree to reduce the principal of the Credit Document or reduce the interest rate thereon; extend any stated payment date for principal of or

interest on the Credit Document, change Section 2.14 (b) or 2.14 (c) of the Credit Document in a manner that would alter the pro rata sharing of payments required thereby, or change any provision Section 9.02 or the percentage set forth in the definition of Required Lenders of the Credit Documents or any other provision of any Credit Document specifying the number or percentage of Lenders required to take any action thereunder [sic]. [WE WOULD LIKE A SIDE LETTER WHICH WOULD ALLOW US TO MAKE DECISIONS CONCERNING ALL MATTERS RELATED TO THE GRANTING OF MANEDMENTS [sic] AND WAIVERS]

(b) In the event that the Bank requests the consent of the Participant pursuant to Section 3.03(a) hereof and the Participant does not respond within ten Business Days after delivery of such request (or within the time period specified by the Bank in such request which period shall in any event be not less than three Business Day), the Bank, in its sole discretion, may deem that the Participant has given its consent thereto. Subject to Section 4.03 hereof, the Bank will endeavor to inform the Participant prior to agreeing to any other amendment, waiver or consent relating to the Loan Documents (it being understood however that, except as expressly provided in this Section 3.03, the Bank shall have sole discretion with respect to the action to be taken).

(c) Subject to Section 4.03 hereof, the Bank will notify the Participant of each executed and delivered amendment, waiver or consent in respect of the Loan Documents, the occurrence of any "Event of Default" of which the Bank gives to the Borrower, its exercise of any rights or remedies against the Borrower in respect of the Credit Document.

Section 3.04. Standard of Care. In handling the Credit Document, the Bank will exercise the same care as it normally exercises with respect to notes in which no participations are sold, but the Bank shall have no further responsibility to the Participant except as expressly provided herein and except for its own gross negligence or willful misconduct which resulted in actual loss to the Participant, and, except to such extent, the Bank shall have no responsibility to the Participant for the failure by the Bank to make any loan or other extension of credit to the Borrower or to comply with any of the Bank's other obligations to the Borrower under the Loan Documents or otherwise. In administering the Participation, the Bank may consult with legal counsel (including counsel for the Borrower), independent accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in reliance on the advice of any such Person. The Bank shall not by reason of this Agreement have a fiduciary relationship with the Participant.

ARTICLE 4. PARTICIPANT UNDERTAKINGS

Section 4.01. Non-Reliance on Bank. The Participant represents to and agrees with the Bank that: (i) it has made, independently and without reliance on the Bank, its own analysis of the Borrower and the Loan Documents (including, without limitation, its own credit analysis of the Borrower and its own legal review of such Loan Documents) for the purpose of acquiring the Participation based on (and the Participant has had access to) such documents and information as it has deemed to be appropriate and sufficient for such purpose; (ii) it will continue to make its own decisions with respect to the Participation without such reliance and on such basis and will continue to have, independently from the Bank (subject to the Bank's fulfilling its obligation to furnish documents and information to the Participant as and to the extent provided in Sections 3.01 and 3.03 hereof), access to such documents and information as it deems to be appropriate and sufficient for such purpose; and (iii) it will not rely upon the Bank to furnish any documents or information regarding the credit, affairs, financial condition or business of, or any other matter concerning, the Borrower or any of its affiliates (including documents and information received from the Borrower under any Loan Documents or

#508759v1

otherwise), except for documents and information expressly required to be furnished by the Bank under Sections 3.01 and 3.03 hereof.

Section 4.02. Other Relationships. The Participant acknowledges that the Bank and its affiliates may have commercial banking, trust or other fiduciary relationships and/or other business relationships, including extensions of credit, financial advisory arrangements and deposits, with the Borrower and its affiliates in addition to the Credit Document.

Section 4.03. Confidentiality. The Participant agrees to maintain the confidentiality of any Loan Documents or any non-public information relating to the Borrower which it may obtain from the Bank in connection herewith. Anything in this Agreement to the contrary notwithstanding, the Bank shall not be obligated to disclose to the Participant any information of a confidential nature relating to the Credit Document or the Borrower (except for the documents and information expressly required to be furnished by the Bank under Sections 3.01 and 3.03 hereof). [WE WOULD LIKE A SIDE LETTER WHICH WOULD ALLOW US TO MAKE DECISIONS CONCERNING ALL MATTERS RELATED TO THE GRANTING OF MANEDMENTS [sic] AND WAIVERS]

Section 4.04. Notice to Borrower. The Participant acknowledges that the Bank may notify the Borrower of the Participation, but the Participant will not, except as otherwise required by law or required or requested by governmental authorities having jurisdiction over the Participant, disclose, and will not permit to be disclosed, to any Person other than the Participant's counsel, independent accountants, affiliates and such governmental authorities the terms of this Agreement without the Bank's prior written consent; provided that the Participant may disclose the existence of the Participation (but not its terms) to the Borrower.

Section 4.05. Indemnification. Unless recovered by the Bank from or for the account of the Borrower promptly after demand therefor [sic], the Participant will pay to the Bank the Participant's pro rata share (equal to the Participation Percentage) of [BEFORE CHARGING THE INVESTEE, THE BANK MUST DEMONSTRATE THAT IT ATTEMPTED TO CHARGE THE BORROWER] (a) all expenses of collection or enforcement of the Credit Document and (b) all expenses and liabilities incurred by the Bank in connection with the Credit Document, except for those incurred by reason of the Bank's gross negligence or willful misconduct. In addition, if the Bank makes any payment to the Participant pursuant to Section 2.04(a) hereof and either does not receive promptly thereafter, or for any reason is required to return or to pay to any Person, the corresponding payment by or for the account of the Borrower, the Participant will repay to the Bank upon request the amount paid to the Participant to the extent of the Participation Percentage of the amount not received or required to be returned or paid by the Bank (together with (i) in the case of an amount not received by the Bank, interest on the Participation Percentage thereof for the period commencing on the date that the Bank makes such payment to the Participant at the rate(s) specified in Section 5.02(b) hereof, and (ii) in the case of an amount required to be returned or paid by the Bank, an amount equal to (A) the Participation Percentage of the interest, if any, required to be paid by the Bank thereon and (B) interest on the Participation Percentage of the amount to be returned or paid by the Bank for the period commencing on the date such amount was returned or paid by the Bank at the rate(s) specified in Section 5.02(b) hereof).

Section 4.06. Withholding Taxes. The Participant represents that it is entitled to receive any payments to be made to it hereunder without the withholding of any tax and will furnish to the Bank such forms, certifications, statements and other documents as the Bank may request from time to time to evidence the Participant's exemption from the withholding of any tax imposed by any jurisdiction or to enable the Bank to comply with any applicable laws or regulations relating thereto. Without limiting the effect of the foregoing, if the Participant is not created or organized under the laws of the United States or any state

thereof, in the event that the payment of interest by the Borrower is treated for U.S. income tax purposes as derived in whole or in part from sources from within the U.S., the Participant will furnish to the Bank Form W8-ECI or Form W8-BEN of the Internal Revenue Service, or such other forms, certifications, statements or documents as the Bank may reasonably request, duly executed and completed by the Participant as evidence of the Participant's exemption from the withholding of U.S. tax with respect thereto. The Bank shall not be obligated to make any payments hereunder to the Participant in respect of the Participation until the Participant shall have furnished to the Bank the requested form, certification, statement or document. In the event that the Participant is subject to U.S. withholding taxes and the Borrower or the Bank is held liable for such withholding taxes, the Participant agrees to promptly reimburse the Bank for any such amount.

Section 4.07. Additional Representations. The Participant represents to the Bank that: (i) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization or incorporation; (ii) it has full power, authority and legal right to execute and deliver this Agreement and to perform its obligations hereunder; (iii) the making and performance by it of this Agreement have been duly authorized by all necessary action and will not violate any provisions of applicable law or regulation, any provision of its charter or by-laws (or comparable, constituent documents) or any order of any court or regulatory body and will not result in the breach of, or constitute a default or require any consent under, any agreement, instrument or document to which it is a party or by which it or any of its property may be bound or affected; (iv) all authorizations, consents, approvals and licenses of, and filings and registrations with, any governmental authority required under applicable law or regulations for it to make and perform this Agreement have been obtained and are in full force and effect; and (v) this Agreement constitutes a legal, valid and binding obligation of the Participant, enforceable against it in accordance with its terms. [THEY MUST MAKE THE SAME STATEMENTS; THEY MUST ALSO STATE THAT THEY ARE THE LEGITIMATE OWNERS OF WHAT THEY ARE TRANSFERRING]

## ARTICLE 5. MISCELLANEOUS

Section 5.01. Assignments; Participations. The Participant acknowledges that the Bank may assign, and may grant participations in, the Credit Document to other Persons. The Participant may not sell, assign or transfer the Participation (or any part thereof) without the Bank's prior written consent (which consent shall not be unreasonably withheld). [WE WOULD LIKE THE FREEDOM TO TRANSFER OUR PARTICIPATION]

Section 5.02. Payments Generally. (a) All payments by the Bank to the Participant shall be made in U.S. Dollars by wire transfer of immediately available funds (or, in the case of any such payment under Section 2.04(a) hereof, such other type of funds in which the Bank shall have received the corresponding payment from or for the account of the Borrower) to the account or the address which the Participant specifies to the Bank from time to time. All payments to the Bank by the Participant shall be made in U.S. Dollars by wire transfer of immediately available funds to such account of which the Bank shall notify the Participant. The Bank may (but shall not be obligated to) apply any amounts due and payable by it to the Participant to and in satisfaction of any amount then due and payable by the Participant hereunder to the Bank.

(b) In the event that the Participant fails to pay any amount (including, to the extent permitted by applicable law, interest) payable by it to the Bank hereunder when due, the Participant will pay to the Bank, upon demand, interest on the amount of such payment, for the period from and including the date on which such amount became due to but excluding the date the same is paid in full, at a rate per annum (computed on the basis of a year of 360 days and actual days elapsed) equal to the Federal Funds Rate for that

#508759v1

portion of such period ending on the date two Business Days after the first day of such period and, thereafter, at that rate of interest from time to time announced by the Bank at its office in New York City as its prime rate, as in effect from time to time. [A SIMILAR PENALTY MUST STILL BE ESTABLISHED FOR THE BANK, IN THE EVENT THAT THE INVESTEE SHOULD NOT PAY THE AMOUNT RECEIVED IN SUPPORT OF THE CREDIT CONTRACT]

(c) The specification of U.S. Dollars for payment hereunder and the place of payment stated in Section 5.02(a) hereof are of the essence, and U.S. Dollars shall be the currency of account in all events. The payment obligations of the Participant hereunder shall not be discharged by any amount paid in another currency or in another place, whether pursuant to a judgment or otherwise, to the extent that the amount so paid on prompt conversion to U.S. Dollars and transfer to New York, New York under normal banking procedures does not yield the amount of U.S. Dollars in New York, New York due hereunder. In the event that any payment by the Participant, whether pursuant to a judgment or otherwise, upon conversion and transfer does not result in payment of such amount of U.S. Dollars in New York, New York, the Bank shall have a separate cause of action against the Participant for the additional amount necessary to yield the amount due and owing to the Bank.

Section 5.03. Notices. Except as otherwise provided herein, all communications hereunder by either party hereto shall be given in writing or by facsimile transmitter to the other party at its address specified beneath its signature hereto or at such other address as it shall have notified the first-named party, and shall be effective when received. Telephonic notices permitted hereunder shall be promptly confirmed in writing. The Bank may rely upon, and will incur no liability in taking or omitting to take action upon, any notice, instruction, consent or other communication (oral or otherwise) from the Participant that the Bank believes to be genuine and correct or to have been signed, sent or made by a proper person or persons, and the Bank will have no obligation to verify or inquire into any matters pertaining thereto.

Section 5.04. Entire Agreement. This Agreement sets forth the entire agreement between the Bank and the Participant relating to the Participation and supersedes any prior written or oral statements or agreements with respect to the matters covered hereby and may not be altered orally.

Section 5.05. Captions. The captions and headings hereunder are for convenience only and shall not affect the interpretation or construction of this Agreement.

Section 5.06. Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH NEW YORK LAW. THE PARTICIPANT HEREBY WAIVES ANY RIGHT THE PARTICIPANT MAY HAVE TO JURY TRIAL.

Section 5.07. Jurisdiction; Immunities. (a) The Participant hereby irrevocably submits to the jurisdiction of any New York State or United States Federal court sitting in New York County over any action or proceeding arising out of or relating to this Agreement, and the Participant hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court. The Participant hereby irrevocably appoints CT Corporation System (the "Process Agent"), with an office on the date hereof at 111 Eighth Avenue, 13th Floor, New York, New York 10011, as its agent for service of process in connection with this Agreement. The Participant irrevocably consents to the service of any and all process in any such action or proceeding by the mailing or delivering of copies of such process to the Participant in care of the Process Agent at the Process Agent's above address and the Participant hereby irrevocably authorizes and directs the Process Agent to accept such service on its behalf. As an alternative method of service, the Participant also irrevocably consents to the service of any and all process in any such

action or proceeding by the mailing of copies of such process to the Participant at its address specified on the signature page hereof. The Participant agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. The Participant further waives any objection to venue in any court referred to in the first sentence of this Section 5.07(a) and any objection to an action or proceeding in such court on the basis of forum non conveniens. The Participant further agrees that any action or proceeding brought against the Bank shall be brought only in a New York State or United States Federal court sitting in New York County.

(b) Nothing in this Section 5.07 shall affect the right of the Bank to serve legal process in any other manner permitted by law or affect the right of the Bank to bring any action or proceeding against the Participant or its property in the courts of any other jurisdiction.

(c) To the extent that the Participant has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, the Participant hereby irrevocably waives such immunity in respect of its obligations under this Agreement.

Section 5.08. Cumulative Rights; No Waiver. The rights, powers and remedies of the Bank hereunder are cumulative and in addition to all rights, powers and remedies provided under any and all agreements between the Participant and the Bank relating hereto, at law, in equity or otherwise. Neither any delay nor any omission by the Bank to exercise any right, power or remedy shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise thereof or any exercise of any other right, power or remedy.

Section 5.09. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be an original but all of which, taken together, shall constitute one and the same instrument.

Section 5.10. Expenses. Each party hereto agrees to bear its own expenses in connection with this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first above written.

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION

By
Name:
Title:
Address:
277 Park Avenue
New York, New York 10172

BANCO INBURSA, S.A., INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO INBURSA, GRAND CAYMAN BRANCH
By:
Name:
Title:

Address:

Attention:
Tel. No.: (212) 622-
Fax: No. (646) 534-

Attention:
Tel. No:
Fax No:

#508759v1

PARTICIPATION AGREEMENT (this "Agreement") dated as of [DATE] between JPMORGAN CHASE BANK, NATIONAL ASSOCIATION (the "Bank") and Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa, Grand Cayman Branch (the "Participant").

RECITALS

The Bank wishes to grant to the Participant, and the Participant wishes to acquire and assume from the Bank, without recourse to the Bank, a participation in that certain loan made to Empresas Cablevisión, S.A.B. de C.V a Mexican *sociedad anónima bursátil de capital variable* (the "Borrower"), evidenced by the Credit Agreement dated as of December 19, 2007 among the Borrower, the Bank and certain other parties stated therein (as amended from time to time, the "Credit Document").

Accordingly, the parties hereto agree as follows:

ARTICLE 1. DEFINITIONS

As used herein, the following terms shall have the following meanings (all terms defined in this Article 1 or in the other provisions of this Agreement in the singular to have the same meanings when used in the plural and vice versa):

"Business Day" means any day on which commercial banks are not authorized or required to close in New York City.

"Discount Rate" means 85.09%

"Dollars" and the sign "$" mean lawful money of the United States of America.

"Effective Date" means [DATE].

"Federal Funds Rate" means, for any day, the weighted average of the rates on overnight Federal funds transactions, with members of the Federal Reserve System only, arranged by Federal funds brokers, as published for such day by the Federal Reserve Bank of New York (or, in the absence of such publication, as reasonably determined by the Bank).

"Loan Documents" has the meaning assigned thereto in Section 3.01 hereof.

"Participation" has the meaning assigned thereto in Section 2.01 hereof.

"Participation Percentage" means 90 %.

"Participation Rate" means the rate defined as Applicable Margin in the Credit Document.

"Person" means an individual, partnership, corporation, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"Purchase Price" has the meaning assigned thereto in Section 2.03(a) hereof.

ARTICLE 2. THE PARTICIPATION

Section 2.01. The Participation. As of the Effective Date, the Bank hereby grants to the Participant, and the Participant hereby acquires and assumes, a participation in the Credit Document in an amount equal to the Participation Percentage of the Credit Document (the "Participation"). The Participation is without recourse, representation or warranty except as specifically set forth herein.

Section 2.02. Evidence of Participation. The Bank will maintain records of all payments received from the Participant and all payments made by the Bank to the Participant hereunder. The Bank will furnish an accounting to the Participant as promptly as practicable following the Participant's request therefor.

Section 2.03. Payments by Participant. The Participant hereby agrees to pay to the Bank (without reduction for or on account of any set-off, counterclaim or other right against the Bank or the Borrower) an amount (the "Purchase Price") equal to the Participation Percentage of the unpaid principal amount of the Credit Document at the time that the Purchase Price is paid times the Discount Rate, such Purchase Price to be payable on the Effective Date. Upon receipt by the Bank of such Purchase Price in full, the Participation in the Credit Document shall become effective.

Section 2.04. Payments by Bank. (a) Subject to Section 2.04(b) and Section 4.06 hereof, the Bank will promptly pay to the Participant an amount equal to the Participant's share of each amount received and applied by the Bank in payment of principal of or interest on the Credit Document, such share to be (i) in the case of principal, the related Participation Percentage thereof and (ii) in the case of interest, the Participation Percentage of the interest on the unpaid principal amount of the Credit Document computed at the Participation Rate for the period for which such interest was paid (or, if the Participation has been outstanding for a shorter period, for such shorter period); provided that if the amount of interest so received and applied is less than the interest on such unpaid principal amount computed at the stated rate therefor in the Credit Document for the period for which such interest was paid, then the amount payable under this clause (ii) shall be reduced proportionately. [ESPECIFICAR CUÁNDO THE BANK TIENE QUE PAGAR AL PARTICIPANT]

(b) Except for amounts specified in Section 2.04(a) hereof, the Participant shall not be entitled to receive any amounts payable by the Borrower to or received by the Bank under the Credit Document, nor (except as expressly provided herein) shall the Participant have, by reason of this Agreement, the Participation, any rights with respect to the Credit Document, any other Loan Document or any other extension of credit by the Bank to the Borrower [INTERESES MORATORIOS? CANTIDADES DERIVADAS DE CUALQUIER COLATERAL? COMISIONES POR REESTRUCTURA O DE CUALQUIER OTRO TIPO?]. Without limiting the effect of the foregoing, the Bank shall have sole discretion in applying amounts received by it from or for the account of the Borrower under the Credit Document or otherwise (provided that amounts received for application to particular amounts owed under the Credit Document shall be promptly applied to such amounts) and in exercising or refraining from exercising any of its rights (including, without limitation, any right of set-off) with respect to any collateral, any account maintained by the Borrower with the Bank or any other property or right which may be or become available for the payment of the Credit Document, except that if any such right is exercised by the Bank and the

amounts recovered thereby are applied in payment of any amount in which the Participant is entitled to share as provided in Section 2.04(a) hereof, the Bank will promptly pay to the Participant its share thereof as provided therein.

(c) In the event that this Agreement or the Credit Document would give, or is interpreted so as to give, the Participant the right to exercise rights under the Credit Document or to commence and prosecute any proceedings to enforce its right to payment of all or any amounts in which the Participant has been granted a participation hereunder, or to directly make any claim in connection therewith, the Participant shall not exercise such right or commence any such proceedings without the prior written consent of the Bank [QUISIERAMOS UN SIDE LETTER QUE NOS PERMITA ACTUAREJERCER NUESTROS DERECHOS SIN LA APROBACIÓN DEL BANCO ] (which shall not be unreasonably withheld), provided, however, that such consent shall not be required in connection with the Participant's exercise of rights created under this Agreement against the Bank or prosecution of proceedings hereunder against the Bank.

ARTICLE 3. BANK UNDERTAKINGS

Section 3.01. Loan Documents; Information. To the extent requested by the Participant and subject to Section 4.03 hereof, the Bank will furnish to the Participant copies of the Credit Document and any amendments, consents or waivers relating to any of the foregoing (collectively, the "Loan Documents"). The Bank will request from the Borrower (to the extent that it is entitled under the Credit Document to do so) and (if and to the extent received by the Bank from the Borrower and subject to Section 4.03 hereof) furnish to the Participant such information concerning the business, affairs or financial condition of the Borrower as the Participant may reasonably request. [NECESITAMOS QUE NOS COMPARTAN TODA LA DOCUMENTACIÓN QUE ENTREGUE EL BORROWER AL AMPARO DEL CONTRATO DE CRÉDITO]

Section 3.02. Nonrecourse Participation. The Participation will be acquired by the Participant without recourse to the Bank and for the Participant's own account and risk. The Bank makes no representation or warranty as to, and shall have no responsibility for: (i) the due authorization, execution or delivery of the Loan Documents by the Borrower or any other Person; (ii) the value, legality, genuineness, validity, sufficiency, enforceability or collectability of the Loan Documents; (iii) any representation or warranty made by, or the accuracy, completeness, currentness or sufficiency of any information (or the validity, completeness or adequate disclosure of assumptions underlying any estimates, forecasts or projections contained in such information) provided (directly or indirectly through the Bank) by, the Borrower or any other Person; (iv) the performance or observance by the Borrower or any other Person (at any time, whether prior to or after the Effective Date) of any of the provisions of the Loan Documents (or any of the Borrower's or such other Person's other obligations in connection therewith); (v) the financial condition of the Borrower or any other Person; or (vi) (except as otherwise expressly provided herein) any other matter relating to the Borrower or any other Person, the Credit Document or any other Loan Document.

Section 3.03. Amendments, Waivers, Etc. (a) The Bank may (without the Participant's consent) give or withhold its agreement to any amendments of the Loan Documents or any waivers or consents in respect thereof or exercise or refrain from exercising any other rights or remedies which the Bank may have under the Loan Documents or otherwise (and the sale or granting of the Participation by the Bank shall not limit or otherwise affect its discretion in respect of any of the foregoing), except that (subject to the provisions of the Loan Documents) the Bank will not, without the consent of the Participant, agree to reduce the principal of the Credit Document or reduce the interest rate thereon; extend any stated payment date for principal of or

interest on the Credit Document, change Section 2.14 (b) or 2.14 (c) of the Credit Document in a manner that would alter the pro rata sharing of payments required thereby, or change any provision Section 9.02 or the percentage set forth in the definition of Required Lenders of the Credit Documents or any other provision of any Credit Document specifying the number or percentage of Lenders required to take any action thereunder. [QUISIERAMOS UN SIDE LETTER QUE NOS PERMITA TOMAR LAS DECISIONES EN TODOS LOS TEMAS RELACIONADOS CON EL OTORGAMIENTO DE MANEDMENTS Y WAIVERS]

(b) In the event that the Bank requests the consent of the Participant pursuant to Section 3.03(a) hereof and the Participant does not respond within ten Business Days after delivery of such request (or within the time period specified by the Bank in such request which period shall in any event be not less than three Business Day), the Bank, in its sole discretion, may deem that the Participant has given its consent thereto. Subject to Section 4.03 hereof, the Bank will endeavor to inform the Participant prior to agreeing to any other amendment, waiver or consent relating to the Loan Documents (it being understood however that, except as expressly provided in this Section 3.03, the Bank shall have sole discretion with respect to the action to be taken).

(c) Subject to Section 4.03 hereof, the Bank will notify the Participant of each executed and delivered amendment, waiver or consent in respect of the Loan Documents, the occurrence of any "Event of Default" of which the Bank gives to the Borrower, its exercise of any rights or remedies against the Borrower in respect of the Credit Document.

Section 3.04. Standard of Care. In handling the Credit Document, the Bank will exercise the same care as it normally exercises with respect to notes in which no participations are sold, but the Bank shall have no further responsibility to the Participant except as expressly provided herein and except for its own gross negligence or willful misconduct which resulted in actual loss to the Participant, and, except to such extent, the Bank shall have no responsibility to the Participant for the failure by the Bank to make any loan or other extension of credit to the Borrower or to comply with any of the Bank's other obligations to the Borrower under the Loan Documents or otherwise. In administering the Participation, the Bank may consult with legal counsel (including counsel for the Borrower), independent accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in reliance on the advice of any such Person. The Bank shall not by reason of this Agreement have a fiduciary relationship with the Participant.

## ARTICLE 4. PARTICIPANT UNDERTAKINGS

Section 4.01. Non-Reliance on Bank. The Participant represents to and agrees with the Bank that: (i) it has made, independently and without reliance on the Bank, its own analysis of the Borrower and the Loan Documents (including, without limitation, its own credit analysis of the Borrower and its own legal review of such Loan Documents) for the purpose of acquiring the Participation based on (and the Participant has had access to) such documents and information as it has deemed to be appropriate and sufficient for such purpose; (ii) it will continue to make its own decisions with respect to the Participation without such reliance and on such basis and will continue to have, independently from the Bank (subject to the Bank's fulfilling its obligation to furnish documents and information to the Participant as and to the extent provided in Sections 3.01 and 3.03 hereof), access to such documents and information as it deems to be appropriate and sufficient for such purpose; and (iii) it will not rely upon the Bank to furnish any documents or information regarding the credit, affairs, financial condition or business of, or any other matter concerning, the Borrower or any of its affiliates (including documents and information received from the Borrower under any Loan Documents or

otherwise), except for documents and information expressly required to be furnished by the Bank under Sections 3.01 and 3.03 hereof.

Section 4.02.   Other Relationships.   The Participant acknowledges that the Bank and its affiliates may have commercial banking, trust or other fiduciary relationships and/or other business relationships, including extensions of credit, financial advisory arrangements and deposits, with the Borrower and its affiliates in addition to the Credit Document.

Section 4.03.   Confidentiality.   The Participant agrees to maintain the confidentiality of any Loan Documents or any non-public information relating to the Borrower which it may obtain from the Bank in connection herewith.   Anything in this Agreement to the contrary notwithstanding, the Bank shall not be obligated to disclose to the Participant any information of a confidential nature relating to the Credit Document or the Borrower (except for the documents and information expressly required to be furnished by the Bank under Sections 3.01 and 3.03 hereof). [QUISIERAMOS UN SIDE LETTER QUE NOS PERMITA TOMAR LAS DECISIONES EN TODOS LOS TEMAS RELACIONADOS CON EL OTORGAMIENTO DE MANEDMENTS Y WAIVERS]

Section 4.04.   Notice to Borrower.   The Participant acknowledges that the Bank may notify the Borrower of the Participation, but the Participant will not, except as otherwise required by law or required or requested by governmental authorities having jurisdiction over the Participant, disclose, and will not permit to be disclosed, to any Person other than the Participant's counsel, independent accountants, affiliates and such governmental authorities the terms of this Agreement without the Bank's prior written consent; provided that the Participant may disclose the existence of the Participation (but not its terms) to the Borrower.

Section 4.05.   Indemnification.   Unless recovered by the Bank from or for the account of the Borrower promptly after demand therefor, the Participant will pay to the Bank the Participant's pro rata share (equal to the Participation Percentage) of [ANTES DE COBRAR AL PARTICIPADO, EL BANCO DEBERÁ DEMOSTRAR QUE INTENTÓ COBRAR AL BORROWER](a) all expenses of collection or enforcement of the Credit Document and (b) all expenses and liabilities incurred by the Bank in connection with the Credit Document, except for those incurred by reason of the Bank's gross negligence or willful misconduct.   In addition, if the Bank makes any payment to the Participant pursuant to Section 2.04(a) hereof and either does not receive promptly thereafter, or for any reason is required to return or to pay to any Person, the corresponding payment by or for the account of the Borrower, the Participant will repay to the Bank upon request the amount paid to the Participant to the extent of the Participation Percen tage of the amount not received or required to be returned or paid by the Bank (together with (i) in the case of an amount not received by the Bank, interest on the Participation Percentage thereof for the period commencing on the date that the Bank makes such payment to the Participant at the rate(s) specified in Section 5.02(b) hereof, and (ii) in the case of an amount required to be returned or paid by the Bank, an amount equal to (A) the Participation Percentage of the interest, if any, required to be paid by the Bank thereon and (B) interest on the Participation Percentage of the amount to be returned or paid by the Bank for the period commencing on the date such amount was returned or paid by the Bank at the rate(s) specified in Section 5.02(b) hereof).

Section 4.06.   Withholding Taxes.   The Participant represents that it is entitled to receive any payments to be made to it hereunder without the withholding of any tax and will furnish to the Bank such forms, certifications, statements and other documents as the Bank may request from time to time to evidence the Participant's exemption from the withholding of any tax imposed by any jurisdiction or to enable the Bank to comply with any applicable laws or regulations relating thereto.   Without limiting the effect of the foregoing, if the Participant is not created or organized under the laws of the United States or any state

thereof, in the event that the payment of interest by the Borrower is treated for U.S. income tax purposes as derived in whole or in part from sources from within the U.S., the Participant will furnish to the Bank Form W8-ECI or Form W8-BEN of the Internal Revenue Service, or such other forms, certifications, statements or documents as the Bank may reasonably request, duly executed and completed by the Participant as evidence of the Participant's exemption from the withholding of U.S. tax with respect thereto. The Bank shall not be obligated to make any payments hereunder to the Participant in respect of the Participation until the Participant shall have furnished to the Bank the requested form, certification, statement or document. In the event that the Participant is subject to U.S. withholding taxes and the Borrower or the Bank is held liable for such withholding taxes, the Participant agrees to promptly reimburse the Bank for any such amount.

Section 4.07. Additional Representations. The Participant represents to the Bank that: (i) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization or incorporation; (ii) it has full power, authority and legal right to execute and deliver this Agreement and to perform its obligations hereunder; (iii) the making and performance by it of this Agreement have been duly authorized by all necessary action and will not violate any provisions of applicable law or regulation, any provision of its charter or by-laws (or comparable, constituent documents) or any order of any court or regulatory body and will not result in the breach of, or constitute a default or require any consent under, any agreement, instrument or document to which it is a party or by which it or any of its property may be bound or affected; (iv) all authorizations, consents, approvals and licenses of, and filings and registrations with, any governmental authority required under applicable law or regulations for it to make and perform this Agreement have been obtained and are in full force and effect; and (v) this Agreement constitutes a legal, valid and binding obligation of the Participant, enforceable against it in accordance with its terms. [LAS MISMAS DECLARACIONES DEBEN HACERLAS ELLOS, Y QUE SON LEGÍTIMOS TITULARES DE LO QUE CEDEN]

ARTICLE 5. MISCELLANEOUS

Section 5.01. Assignments; Participations. The Participant acknowledges that the Bank may assign, and may grant participations in, the Credit Document to other Persons. The Participant may not sell, assign or transfer the Participation (or any part thereof) without the Bank's prior written consent (which consent shall not be unreasonably withheld).[QUISIERAMOS TENER LIBERTAD DE TRANSFERIR NUESTRA PARTICIPACIÓN]

Section 5.02. Payments Generally. (a) All payments by the Bank to the Participant shall be made in U.S. Dollars by wire transfer of immediately available funds (or, in the case of any such payment under Section 2.04(a) hereof, such other type of funds in which the Bank shall have received the corresponding payment from or for the account of the Borrower) to the account or the address which the Participant specifies to the Bank from time to time. All payments to the Bank by the Participant shall be made in U.S. Dollars by wire transfer of immediately available funds to such account of which the Bank shall notify the Participant. The Bank may (but shall not be obligated to) apply any amounts due and payable by it to the Participant to and in satisfaction of any amount then due and payable by the Participant hereunder to the Bank.

(b) In the event that the Participant fails to pay any amount (including, to the extent permitted by applicable law, interest) payable by it to the Bank hereunder when due, the Participant will pay to the Bank, upon demand, interest on the amount of such payment, for the period from and including the date on which such amount became due to but excluding the date the same is paid in full, at a rate per annum (computed on the basis of a year of 360 days and actual days elapsed) equal to the Federal Funds Rate for that

portion of such period ending on the date two Business Days after the first day of such period and, thereafter, at that rate of interest from time to time announced by the Bank at its office in New York City as its prime rate, as in effect from time to time. [FALTA ESTABLECER UNA PENALIDAD SIMILAR AL BANCO EN CASO DE QUE NO PAGUE AL PARTICIPADO LOS MONTOS QUE RECIBA AL AMPARO DEL CONTRATO DE CRÉDITO]

(c)  The specification of U.S. Dollars for payment hereunder and the place of payment stated in Section 5.02(a) hereof are of the essence, and U.S. Dollars shall be the currency of account in all events. The payment obligations of the Participant hereunder shall not be discharged by any amount paid in another currency or in another place, whether pursuant to a judgment or otherwise, to the extent that the amount so paid on prompt conversion to U.S. Dollars and transfer to New York, New York under normal banking procedures does not yield the amount of U.S. Dollars in New York, New York due hereunder.  In the event that any payment by the Participant, whether pursuant to a judgment or otherwise, upon conversion and transfer does not result in payment of such amount of U.S. Dollars in New York, New York, the Bank shall have a separate cause of action against the Participant for the additional amount necessary to yield the amount due and owing to the Bank.

Section 5.03.  Notices.  Except as otherwise provided herein, all communications hereunder by either party hereto shall be given in writing or by facsimile transmitter to the other party at its address specified beneath its signature hereto or at such other address as it shall have notified the first-named party, and shall be effective when received.  Telephonic notices permitted hereunder shall be promptly confirmed in writing.  The Bank may rely upon, and will incur no liability in taking or omitting to take action upon, any notice, instruction, consent or other communication (oral or otherwise) from the Participant that the Bank believes to be genuine and correct or to have been signed, sent or made by a proper person or persons, and the Bank will have no obligation to verify or inquire into any matters pertaining thereto.

Section 5.04.  Entire Agreement.  This Agreement sets forth the entire agreement between the Bank and the Participant relating to the Participation and supersedes any prior written or oral statements or agreements with respect to the matters covered hereby and may not be altered orally.

Section 5.05.  Captions.  The captions and headings hereunder are for convenience only and shall not affect the interpretation or construction of this Agreement.

Section 5.06.  Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH NEW YORK LAW.  THE PARTICIPANT HEREBY WAIVES ANY RIGHT THE PARTICIPANT MAY HAVE TO JURY TRIAL.

Section 5.07.  Jurisdiction; Immunities.  (a)  The Participant hereby irrevocably submits to the jurisdiction of any New York State or United States Federal court sitting in New York County over any action or proceeding arising out of or relating to this Agreement, and the Participant hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court.  The Participant hereby irrevocably appoints CT Corporation System (the "Process Agent"), with an office on the date hereof at 111 Eighth Avenue, 13th Floor, New York, New York 10011, as its agent for service of process in connection with this Agreement.  The Participant irrevocably consents to the service of any and all process in any such action or proceeding by the mailing or delivering of copies of such process to the Participant in care of the Process Agent at the Process Agent's above address and the Participant hereby irrevocably authorizes and directs the Process Agent to accept such service on its behalf.  As an alternative method of service, the Participant also irrevocably consents to the service of any and all process in any such

action or proceeding by the mailing of copies of such process to the Participant at its address specified on the signature page hereof. The Participant agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. The Participant further waives any objection to venue in any court referred to in the first sentence of this Section 5.07(a) and any objection to an action or proceeding in such court on the basis of forum non conveniens. The Participant further agrees that any action or proceeding brought against the Bank shall be brought only in a New York State or United States Federal court sitting in New York County.

(b) Nothing in this Section 5.07 shall affect the right of the Bank to serve legal process in any other manner permitted by law or affect the right of the Bank to bring any action or proceeding against the Participant or its property in the courts of any other jurisdiction.

(c) To the extent that the Participant has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, the Participant hereby irrevocably waives such immunity in respect of its obligations under this Agreement.

Section 5.08. Cumulative Rights; No Waiver. The rights, powers and remedies of the Bank hereunder are cumulative and in addition to all rights, powers and remedies provided under any and all agreements between the Participant and the Bank relating hereto, at law, in equity or otherwise. Neither any delay nor any omission by the Bank to exercise any right, power or remedy shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise thereof or any exercise of any other right, power or remedy.

Section 5.09. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be an original but all of which, taken together, shall constitute one and the same instrument.

Section 5.10. Expenses. Each party hereto agrees to bear its own expenses in connection with this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first above written.

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION

By____________________________
Name:
Title:

Address:
277 Park Avenue
New York, New York 10172

BANCO INBURSA, S.A., INSTITUCION DE BANCA MULTIPLE, GRUPO FINANCIERO INBURSA, GRAND CAYMAN BRANCH

By: ____________________
Name:
Title:

Address:

Attention:
Tel. No.:  (212) 622-
Fax: No.  (646) 534-

Attention:
Tel. No:
Fax No:

# EXHIBIT G

-----Original Message-----
From: Sjoerd Leenart
Sent: 17 June 2009 13:52
To: sfolch@televisa.com.mx
Cc: Phillips Margain Guadalupe
Subject: Cablevision/Cablemas

Salvi,

Below my answers to your questions

- We have not determined the FINAL price at which we are willing to sell to Inbursa as we have been reluctant to renegotiate the original (525) price as long as we don't know whether we are going to sell to them. So until we know for sure we will sell it to them, we won't know the final price. I am firmly of the opinion though that 525 is no longer appropriate and would not settle for anything worse than 450-475 with them.

- I would prefer to sell this particular loan to Televisa than to Inbursa. Inbursa have been a good client to us in general and on this particular occasion, but understand the complicated situation we find ourselves in. Its clear to them that there are certain objective benefits for us in selling to Televisa, namely preserving a normal working relationship with you, as well as the ability to sell the Cablemas loan at the same time. As such, I can not envisage any scenario in which we would sell to them at a better price than to you.

- I have not approached our credit department on whether they would accept the "covenant stripping" that would have to take place in order to sell to Inbursa. I suspect they won't be happy, but I am hopeful they understand that the bigger picture would require this compromise. On the information provision point, maybe we can agree that JPM would have access to the usual info while Inbursa is limited to public info.

Regards,

-----Original Message-----
From: sfolch@televisa.com.mx
Sent: 17 June 2009 07:51
To: Sjoerd Leenart
Cc: Phillips Margain Guadalupe
Subject: RE: Meeting

Thanks for your email. A couple of points:

a) What I do not clearly understand is the price at which you would sell to Inbursa in case you were allowed to? I am confussed with your intent and the firm offer that you got from Inbursa.

b) I hope you can see that yesterday conversation is another example that we are not communicating well. My question was the pricing of the transaction. As soon as I start analyzing it, we get a different price.

You undertant that we would not like to see that if we do not buy it, and we allow Inbursa purchase, that they get a better price that the one offered to us.

Regarding the 10% that JP would keep in its books, if we agree with Inbursa all those changes that we discussed (elimination of covenants, information limited to public info, etc.) I understant that JP would be OK that those terms would also be applicable to their portion of the loan?

Regards

Salvi

---

From: Sjoerd Leenart [mailto:sjoerd.leenart@jpmorgan.com]
Sent: Tue 16/06/2009 10:56 PM
To: Folch Viadero Salvi Rafael
Cc: Phillips Margain Guadalupe
Subject: Re: Meeting

Salvi,

Thanks for your email.

The indicative price Inbursa gave us about a month ago was L+525, which at the time, was reasonable. They came back with a firm order at that level 2-3 weeks ago. Since then, given that it was unclear whether we were able to sell them the loan, we have not discussed price with them.

However, we definitely (did) want to re-open the subject of price with them as the market has rallied substantially and the price indicated at that time is no longer a realistic one.

For your reference, the two instruments we follow to determine what is fair value are the Televisa and Cablemas bonds.
- Televisa 2018 is trading (mid price) at UST+322, which equates to Libor+320
- Cablemas 2015 is trading at a cash price of 105, which is equivalent to UST+464, which equates to Libor+520.

In pricing our Cablevision and Cablemas loans off these benchmarks, one can get all academic about adjustments for differences in maturity, covenants, illiquidity, etc, but I will leave that for some other time. More in general, the above trading levels underscore that the L+555 level we agreed for Cablemas is fair (if not generous), given the 6-yr bond is at 520 (that is the mid, not offer). In the same context, I think the L+450-475 range that was indicated today for Cablevision is also very reasonable.

On both prices, I think its hard to imagine a scenario where anyone would accuse you of having overpaid. From our perspective, while our monetary loss remains very large, these are probably the best prices we could get from anyone else so we prefer to transact and move on.

As a final point, I did want to clarify that the maximum position we are looking to sell in Cablevision is $202.5mm, out of the total of $225mm. This has to do with $22.5mm (ie 10%) being booked in JPM's hold-to-maturity portfolio, where its booked at par and effectively, not for sale. In Cablemas, we have a similar issue, but since the amount in our hold-to-maturity portfolio is only $5mm, we decided to accomodate your desire to own the whole loan and not have a small stub owned by a 3rd party.

I hope the above clarified matters and look forward to continuing the dialogue.

Regards,

Sjoerd

----- Original Message -----

From: sfolch@televisa.com.mx
To: Sjoerd Leenart
Cc: Phillips Margain Guadalupe <gphilips@televisa.com.mx>
Sent: Tue Jun 16 23:38:47 2009
Subject: Meeting

I think that it was good that we had an open discussion this morning. I am exploring the possibility that TV buys the loan. However, again, I am having serious trouble communicating with JP team. This morning I was told that the price that Inbursa was paying was 500 to 550bp. Your team just told Lupe 450 to 475. It is very difficult for me under this pressure to have uncertain positions. Would you be able to quote me the price discussed this morning, so I can take the matter to my boss?

Regards

Salvi

####################################################################################################

El contenido de este mensaje es confidencial. Si usted ha recibido este mensaje por error, le ruego que no lo reenv?e y lo borre inmediatamente.

The contents of this message are confidential. If message has been received in error, please do not forward and destroy immediately.

####################################################################################################

This email is confidential and subject to important disclaimers and
conditions including on offers for the purchase or sale of
securities, accuracy and completeness of information, viruses,
confidentiality, legal privilege, and legal entity disclaimers,
available at http://www.jpmorgan.com/pages/disclosures/email.

####################################################################################################

El contenido de este mensaje es confidencial. Si usted ha recibido este mensaje por error, le ruego que no lo reenvíe y lo borre inmediatamente.

The contents of this message are confidential. If message has been received in error, please do not forward and destroy immediately.

####################################################################################################
This email is confidential and subject to important disclaimers and
conditions including on offers for the purchase or sale of
securities, accuracy and completeness of information, viruses,
confidentiality, legal privilege, and legal entity disclaimers,
available at http://www.jpmorgan.com/pages/disclosures/email.

# EXHIBIT H



'RANSPERFECT

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
VASHINGTON, DC

City of New York, State of New York, County of New York

I, Pearl Leo, hereby certify that the document "E-mail from Salvi Folch Viader Rafael to Guadalupe Phillips Margain on June 16, 2009 at 12:32PM" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Pearl Leo

Sworn to before me this

Wednesday, December 16, 2009

Signature, Notary Public

KRISTIN MILORO
Notary Public - State of New York
No. 01MI6212799
Qualified in New York County
Commission Expires Oct 19, 2013

Stamp, Notary Public

From: Folch Viadero Salvi Rafael
Sent: Tuesday, June 16, 2009 12:32:46 PM
To: Phillips Margain Guadalupe
Subject: FW: JP MORGAN

Read the two emails, I thought I had copied you

From: Folch Viadero Salvi Rafael
Sent: Tue 16/06/2009 12:32 PM
To: De Angoitia Noriega Alfonso
Subject: RE: JP MORGAN

---

There is no security because it depends on the markets and any day they can turn. I believe that if cable goes to the market alone it is going to choke, but if Televisa gives the guarantee we could go out with a paper of 5 or 7 years below 9%. If with those resources Cable prepays the credit, the big winner would be who buys the Installment.

If the markets deteriorate and we cannot place, we would be left with a paper with good yield. Coo Televisa, which if you refinance we win, and if we could not refinance, at the time of maturity we could capitalize on Cable (diluting the current shareholders). The truth is I believed the price was closer to 450bp, but I believe that it is more around 525bp, that is why I think that it is a trade that should be considered. Anyway the paper has a maturity of December of 2012 (3.5 years) that is why we have to start thinking how to refinance.
Salvi

---

From: De Angoitia Noriega Alfonso
Sent: Tue 16/06/2009 12:09 PM
To: Folch Viadero Salvi Rafael
Subject: Re: JP MORGAN

It sounds good. How do you think we can place the paper in pesos? What security with there be? What conditions?

Sent via BlackBerry by AT&T

---

From: "Folch Viadero Salvi Rafael"
Date: Tue, 16 Jun 2009 11:54:11 -0500
To: De Angoitia Noriega Alfonso<aangoitia@televisa.com.mx>
Subject: JP MORGAN

We met with JPMorgan and there are several interesting things:

1) Price to Inbursa. I believe they are selling the credit to Inbursa somewhere around 525bp. Considering the terms and the credit and the credit quality of Cablevision it sounds like an attractive price. Anyway as we will have to refinance this credit, I do not know if it would be a good option to buy it and immediately come out with an issuance in pesos at 5 or 7 years (with a guarantee from Televisa for which we would charge).
In other words:

a) Buy the credit at a discount of aprox. 30 million dollars
b) Come out with an issuance in pesos at 5 or 7 years with a fixed rate, with a guarantee from TV
c) TV could charge something like 150bp for offering the guarantee
d) Credit to cable would stay in pesos with a longer term

2) If they accepts the price of 555bp for Cablemas. I think it is a super price, seeing where they are trading the paper of Cablemas and the price. "Licenciado" can you see to it that we fight for those additional basis points.

3) They were going to get back (at the latest tomorrow) to me today so that they can let me know if they guarantee us that there will be no legal conflict between JP and Televisa in the subject of the credit of Inbursa. I told them that depending on that was the Spain theme and the theme of purchasing the credit from Cablemas.

Let us see with what they return, but I wanted to bounce of you point 1). I think that perhaps we could put an aggressive offer.

Greetings,

Salvi

---

From: Folch Viadero Salvi Rafael
Sent: Tuesday, June 16, 2009 12:32:46 PM
To: Phillips Margain Guadalupe
Subject: FW: JP MORGAN

Le los dos mails, crei que te había copiado

---

From: Folch Viadero Salvi Rafael
Sent: Tue 16/06/2009 12:32 PM
To: De Angoitia Noriega Alfonso
Subject: RE: JP MORGAN

---

Seguridad no hay porque dependerá de los mercados y cualquier dia se nos voltean. Yo creo que si Cable va solita al mercado se le va a atorar, pero si Televisa le da la garantía podríamos salir con un papel a 5 o 7 anos abajo del 9%. Si con esos recursos Cable prepaga el crédito, el gran ganador sería quien compre el crédito.

Si se deteriorarán los mercados y no pudiéramos colocar, nos quedaríamos con un papel con buen yield coo Televisa, el cual si refinanciamos ganamos y si no lo pudiéramos refinanciar, al momento del vencimiento lo podríamos capitalizar en Cable (diluyendo a los actuales accionistas). La verdad yo creía que el precio estaba mas cercano a los 450bp, pero creo que están más por los 525bp, por eso me parece que sería un trade que habría que considerar. De todas formas el papel tiene vencimiento en diciembre de 2012 (3.5 años), por lo que ya tenemos que ponemos a pensar como lo refinanciamos.

Salvi

---

From: De Angoitia Noriega Alfonso
Sent: Tue 16/06/2009 12:09 PM
To: Folch Viadero Salvi Rafael
Subject: Re: JP MORGAN

Suena muy bien. Como crees que podamos colocar el papel en pesos? Que seguridad habria? Que condiciones?

Sent via BlackBerry by AT&T

---

From: "Folch Viadero Salvi Rafael"
Date: Tue, 16 Jun 2009 11:54:11 -0500
To: De Angoitia Noriega Alfonso<aangoitia@televisa.com.mx>
Subject: JP MORGAN

Nos reunimos con JPMorgan y hay varias cosas interesantes:

1) Precio a Inbursa. Creo que le están vendiendo el crédito a Inbursa por ahí de 525 bp. Considerando el plazo y del crédito y la calidad crediticia de Cablevisión suena un precio atractivo. Como de todas formas vamos a tener que refinanciar ese crédito, no se si pudiera ser una buena opción comprarlo y de inmediato salir con una emisión en pesos a 5 o 7 años (con garantía de Televisa por la cual cobraríamos). En otras palabras:

a) Comprar el crédito con un descuento de aprox 30 millones de dólares
b) Salir con una emisión en pesos a 5 o 7 anos a tasa fija, con garantía de TV
c) TV podría cobrar algo asi como 150 bp por otorgar la garantía
d) Crédito a cable quedaría en pesos a plazo mas largo

2) Si aceptan el precio de 555bp para Cablemas. Creo que es un super precio, viendo donde están tradeando el papel de Cablemas y el precio. Licenciado, podrás ver que luchamos por esos basis points adicionales.

3) Quedaron de regresar (a más tardar mañana) conmigo hoy para que nos digan si nos garantizan que no habrá un conflicto legal entre JP y

Televisa por el tema del crédito de Inbursa. Les dije que dependiendo de eso estaba el tema de España y el tema de comprarles el crédito de Cablemas.

Vamos a ver con que regresan, pero quería rebotar contigo el punto 1), xq quizá podríamos poner una oferta agresiva.

Saludos

Salvi

---

# EXHIBIT I



'RANSPERFECT

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
VASHINGTON, DC

City of New York, State of New York, County of New York

I, Pearl Leo, hereby certify that the document "E-mail from De Angoitia Noriega Alfonso to Guadalupe Phillips Margain and Salvi Folch Viader Rafael on June 18, 2009 at 12:59PM" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Pearl Leo

Sworn to before me this

Wednesday, December 16, 2009

Signature, Notary Public

KRISTIN MILORO
Notary Public - State of New York
No. 01MI6212799
Qualified in New York County
Commission Expires Oct 19, 2013

Stamp, Notary Public

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 T 212.689.5555 F 212.689.1059 WWW.TRANSPERFECT.COM

From: De Angoitia Noriega Alfonso
Sent: Thursday, June 18, 2009 12:59:50 PM
To: Phillips Margain Guadalupe; Folch Viadero Salvi Rafael
Subject: Re: CABLEVISION LOAN

The only risk is the inflation at this term, right?
Sent via BlackBerry by AT&T

----Original Message----
From "Phillips Margain Guadalupe" <gphilips@televisa.com.mx>

Date: Thursday, June 18, 2009 10:53:20
To: Folch Viadero Salvi Rafael<sfolch@televisa.com.mx>; De Angoitia Noriega Alfonso<aangoitia@televisa.com.mx>
Subject: Re: CABLEVISION LOAN

Personally the investment makes a lot of sense to me. It's a very good risk with a 7.39% YTM in USD at a term of 3.5 years.

The C+ at a spread of 555 over L gives a price of 35.15 with an 8.19% ytm
Regards, Lupe

---Original Message---
From: Folch Viadero Salvi Rafael
Sent: Thursday, June 18, 2009 10:42 AM
To: Phillips Margain Guadalupe
Subject: Fw: CABLEVISION LOAN

---Original Message---
From: Folch Viadero Salvi Rafael
To: De Angoitia Noriega Alfonso
Sent: Thursday, June 18, 2009 6:14:08
Subject: Re: CABLEVISION LOAN

It's in dollars, the duration is short (3.5 years) for which in this case the inflation risk is less worrying.

Cable would stay with the loan and the derivative, because the conditions are very good.

It's a good investment, with lower yield than TVI and Cablemas, but with very good yield

TV is investing at very low rates, for which this would give a significant yield pickup

---Original Message---
From: De Angoitia Noriega Alfonso
To: Folch Viadero Salvi Rafael
Sent: Thursday, June 18, 2009 1:38:19
Subject: Re: CABLEVISION LOAN

The yield would be 7%? What is being bought, the original loan or the derivative also? Are we buying an investment in dollars or in pesos?
If in these three and a half years the inflation goes sky high (10-15%), what would happen?
Then how about TV buys it and keeps it as an investment.
What does Lupe think of us buying a small part personally?
Regards
Alfonso

From: Folch Viadero Salvi Rafael
Sent: Wednesday, June 17, 2009 10:52 AM
To: De Angoitia Noriega Alfonso
Cc: Phillips Margain Guadalupe

Subject: CABLEVISION LOAN

We have to make a decision regarding the Cablevision loan. Sorry that this mail is so long, but we're sending you all the information so that you can tell us how you want us to proceed.

CABLEVISION LOAN
Cablevision has a VERY good loan with the following characteristics:
Amount 225 million dollars at LIBOR + 52.5bp
Term: December 2012
Exchanged to pesos, which carries it to a principal of 2450 million at a rate of 8.36%
For Cablevision it's impossible (even with the Televisa guarantee) to get a loan in better conditions than this one. The problem it would have if it were to want to refinance is that it would have to pay at par value, which makes the proposal unviable since it would be increasing the principal and the interest rate.

JP MORGAN
JP Morgan planed on syndicating the loan, couldn't and its books are over the limit. They have to sell 90% of the loan in a fire-sale and that's why they've looked for different alternatives, including Inbursa to sell this loan. Given the conditions, the price at which they would sell it would probably be at a rate between 475 and 500 bp. That means that the discount they will give to the buyer will be about 13.5% so that with the rate the loan pays it brings you a yield of 7%. An asset with a risk at 3.5 years with a yield of 7% is very attractive and that's why Inbursa is interested in buying the asset.

INBURSA
Inbursa is willing to buy the loan in the conditions we advised: a) eliminating all the covenants except leverage ratio and interest coverage ratio, b) information only limited to what Cablevision gives to the BMV, c) no events of mandatory prepayment. Here it's worth clarifying that although Pepe told me they agreed, I'm sure that upon discussing the modifications to the contract, it won't be an easy process. Also since JP remains with 10% of the loan, the discussion may become even more complex.

TELEVISA
We've been evaluating the possibility of us buying it. It's a good asset with an attractive yield. Cablevision is a "relevant subsidiary" of GTV (more than 10% of the Group's assets), for which it's a fact that it has a very low credit risk.

REFINANCING
Refinancing is a good option for GT, but it's also viable if Cablevision gets the discount in the purchase of the loan, since otherwise it doesn't make sense for Cablevision to refinance its liabilities at this time.

RECOMMENDATIONS:
After Lupe and I talked it over, our preferences would go in this order:

1) Televisa buys the loan and maintains the investment. Here TV benefits from the discount offered by JP. Considering TV's cash, it becomes an excellent investment opportunity

2) TV extends a bridge loan to Cablevision so that Cable is the one to repurchase the asset and get the discount. TV's loan could be at a rate of approximately 10% in pesos. We refinance TV's bridge loan in the market. Cablevision gets JP's discount. This option would have an effect in the accounting registry for paying the loan at a discount and getting rid of the derivative. We'd have to see how to draw it up, because it's like that Cable can't directly buy the loan with a discount and we'd have to triangulate it.

3) Inbursa buys the loan and eliminates the covenants and other points they mentioned.

4) JP keeps the loan or sells it to someone else with the covenants as they are.

WE AWAIT YOUR INSTRUCTIONS...

From: De Angoitia Noriega Alfonso
Sent: Thursday, June 18, 2009 12:59:50 PM
To: Phillips Margain Guadalupe; Folch Viadero Salvi Rafael
Subject: Re: CREDITO CABLEVISION

El unico riesgo es la inflacion a ese plazo, no?
Sent via BlackBerry by AT&T

-----Original Message-----
From: "Phillips Margain Guadalupe" <gphilips@televisa.com.mx>

Date: Thu, 18 Jun 2009 10:53:20
To: Folch Viadero Salvi Rafael<sfolch@televisa.com.mx>; De Angoitia Noriega Alfonso<aangoitia@televisa.com.mx>
Subject: RE: CREDITO CABLEVISION

En lo personal a mi me hace mucho sentido la inversión. Es un riesgo muy bueno con un YTM de 7.39% en usd a un plazo de 3.5 años.

El C+ a un spread de 555 sobre L, da un precio de 35.15 con un ytm 8.19%
Saludos, Lupe
-----Mensaje original-----
De: Folch Viadero Salvi Rafael
Enviado el: Jueves, 18 de Junio de 2009 10:42 a.m.
Para: Phillips Margain Guadalupe
Asunto: Fw: CREDITO CABLEVISION

----- Original Message -----
From: Folch Viadero Salvi Rafael
To: De Angoitia Noriega Alfonso
Sent: Thu Jun 18 06:14:08 2009
Subject: Re: CREDITO CABLEVISION

Es en dolares, la duracion es corta (3.5 anos) x lo q en este caso el riesgo de inflacion es menos preocupante

Cable se quedaria con el credito y con el derivado, xq las condiciones son muy buenas.

Es una buena inversion, con menor rendimiento a TVI y Cablemas, pero con muy buen rendimiento

TV esta invirtiendo a tasas muy bajas, x lo q esto le daria un yield pickup importante

----- Original Message -----
From: De Angoitia Noriega Alfonso
To: Folch Viadero Salvi Rafael
Sent: Thu Jun 18 01:38:19 2009
Subject: RE: CREDITO CABLEVISION

El rendimiento sería 7%? Que es lo que se compra, el crédito original o también el derivado? Estamos comprando inversión en dólares o en pesos?
Si en estos tres años y medio la inflación se va a las nubes (10-15%) que pasaría?
Entonces como ven que lo compre TV y lo mantenga como inversión.
Como ve Lupe que compraramos una parte pequeña en lo personal?
Saludos
Alfonso

-----Original Message-----
From: Folch Viadero Salvi Rafael
Sent: Wed 6/17/2009 10:52 AM
To: De Angoitia Noriega Alfonso
Cc: Phillips Margain Guadalupe

Subject: CREDITO CABLEVISION

Tenemos que tomar una decisión respecto al crédito de Cablevisión. Perdón que este mail está muy largo, pero te mandamos toda la información para que nos digas cómo quieres que procedamos:

CRÉDITO CABLEVISIÓN
Cablevision tiene un crédito MUY bueno con las siguientes características:
Monto 225 millones de dólares a Libor + 52.5bp
Plazo: Diciembre de 2012
Swapeado a pesos, que lo lleva a un principal de 2,450 millones con tasa de 8.36%
Para Cablevisión es imposible (inclusive con la garantía de Televisa) el conseguir un crédito en mejores condiciones que este. El problema que tendría si lo quisiera refinanciar es que tendría que pagar a par, lo que hace inviable la propuesta ya que le estaría subiendo el principal y la tasa de interés.

JPMORGAN
JP Morgan planeaba sindicar el crédito, no lo pudo hacer y trae sus libros excedidos. Tienen que vender el 90% del crédito en un "fire-sale" y por eso han buscado distintas alternativas, incluyendo Inbursa para vender este crédito. Dadas las condiciones, el precio al que lo venderían sería probablemente con una tasa de entre 475 y 500 bp. Ello quiere decir que el descuento que le darán al comprador será de aproximadamente el 13.5%, para que junto con la tasa que pague el crédito te lleve a un yield de 7%. Un activo con el riesgo de cable a 3.5 años con un rendimiento del 7% es muy atractivo y por eso Inbursa está interesado en comprar el activo.

INBURSA
Inbursa está dispuesto a comprar el crédito en las condiciones que le dijimos: a) eliminar todos los covenants excepto leverage ratio e interest coverage ratio, b) información solamente limitada a la que Cablevisión entrega a la BMV, c) no hay eventos de mandatory prepayment. Aquí vale la pena aclarar que aunque me dijo Pepe que estaban de acuerdo, estoy seguro que al entrar a la discusión de las modificaciones al contrato no será un proceso fácil. Además como JP se queda con el 10% del crédito la discusión podría ser aún más compleja.

TELEVISA
Hemos estado evaluando la posibilidad de que nosotros lo compremos. Es un buen activo con un rendimiento atractivo. Cablevisión es una "subsidiaria relevante" de GTV (mas del 10% de los activos del Grupo), por lo que es un hecho que tiene muy bajo riesgo crediticio.

REFINANCIAMIENTO
El refinanciamiento es una buena opción para GT, pero solo es viable si Cablevisión es el que captura el descuento en la compra del crédito, ya que de lo contrario no le hace sentido a Cablevisión refinanciar su pasivo en este momento.

RECOMENDACIONES:
Después de discutirlo Lupe y yo, nuestras preferencias irían en este órden:

1) Televisa compra el crédito y mantiene la inversión. Aquí TV se beneficia del descuento que ofrece JP. Considerando la caja que tiene TV, se convierte en una excelente oportunidad de inversión.

2) TV le extiende un crédito puente a Cablevisión para que Cable sea el que recompre el activo y capture el descuento. El crédito de TV podría ser a una tasa de aprox 10% en pesos. Buscamos refinanciar el crédito puente de TV en el mercado. Cablevisión captura el descuento de JP. Está opción tendría un efecto en el registro contable por cancelar el crédito a descuento y por deshacer el derivado. Habría que ver la forma de instrumentarlo, porque es probable que Cable no pueda directamente comprar el crédito con descuento y habría que triangularlo.

3) Inbursa compra el crédito. Elimina los covenants y otros puntos comentados con ellos.

4) El crédito lo conserva JP o se lo vende a alguien más con los covenants tal y como están.

ESPERAMOS TUS INSTRUCCIONES....

# EXHIBIT J



'RANSPERFECT

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
/ASHINGTON, DC

City of New York, State of New York, County of New York

I, Pearl Leo, hereby certify that the document "E-mail from Salvi Folch Viader Rafael to De Angoitia Noriega Alfonso on June 16, 2009 at 4:54PM" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Pearl Leo

Sworn to before me this

Wednesday, December 16, 2009

Signature, Notary Public

KRISTIN MILORO
Notary Public - State of New York
No. 01MI6212799
Qualified in New York County
Commission Expires Oct 19, 2013

Stamp, Notary Public

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 T 212.689.5555 F 212.689.1059 WWW.TRANSPERFECT.COM

From: Folch Viadero Salvi Rafael
Sent: Tuesday, June 16, 2009 4:54:48 PM
To: De Angoitia Noriega Alfonso
Subject: Re: Heredia

You're question is difficult, because you see what happened to Cablecom and JP themselves. They thought they'd find market to sell and couldn't. If we buy it we would have to assume the risk of having to keep it at Televisa

-------------

From: De Angoitia Noriega Alfonso
To: Folch Viadero Salvi Rafael
Sent: Tuesday, June 16, 2009 4:22:11 PM
Subject: Re: Heredia

If we can refinance it in pesos, we make it ours

Sent via BlackBerry by AT&T

-----------

From: Folch Viadero Salvi Rafael
Sent: Tuesday, June 16, 2009 2:27:22 PM
To: De Angoitia Noriega Alfonso<aangoitia@televisa.com.mx>
Subject: Heredia

I just spoke with Heredia, they do accept the conditions for the loan, meaning the covenants are eliminated. There's no more info other than what's public, pre-payable and there are no events of mandatory prepayment.

I told him that based on all this, we were evaluating TV to buy the loan and that we'd let him know.

I think we win in any way, because if we don't want to buy the loan, we remove all the covenants. What do you want to do? Inbursa without covenants or do we buy it ourselves?

From: Folch Viadero Salvi Rafael
Sent: Tuesday, June 16, 2009 4:54:48 PM
To: De Angoitia Noriega Alfonso
Subject: Re: Heredia

Esta dificil tu pregunta, xq ya ves lo que le paso a cablecom y al propio JP, creeian q encontrarian mercado para venderlo y no pudieron. Si lo compraramos tendriamos q asumir el riesgo de q nos lo tuvieramos q quedar en Televisa

---

From: De Angoitia Noriega Alfonso
To: Folch Viadero Salvi Rafael
Sent: Tue Jun 16 16:22:11 2009
Subject: Re: Heredia

Si lo podemos refinanciar en pesos, lo hacemos nosotros.

Sent via BlackBerry by AT&T

---

From: "Folch Viadero Salvi Rafael"
Date: Tue, 16 Jun 2009 14:27:22 -0500
To: De Angoitia Noriega Alfonso<aangoitia@televisa.com.mx>
Subject: Heredia

Me acaba de hablar Heredia, si aceptan las condiciones para el credito. Es decir se eliminan covenants, no hay info mas alla de la publica, prepagable y no hay events of mandatory prepayment.

Yo le dije que a raiz de todo esto, estabamos evaluando q TV comprara el credito. Que le avisaba.

Creo q ya ganamos de cualquier forma, xq si no quieres comprar el credito nos quitamos de todos los covenants. Que quieres hacer? Inbursa sin covenants o buscamos comprarlo nosotros?

# RULE 56.1 STATEMENT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

EMPRESAS CABLEVISIÓN, S.A.B. DE C.V.,

Plaintiff,

- against -

JPMORGAN CHASE BANK, N.A. AND J.P. MORGAN SECURITIES INC.,

Defendants.

---------------------------------------------------------------- x

09 Civ. 9972 (JSR)

**DEFENDANTS' STATEMENT PURSUANT TO LOCAL RULE 56.1 OF UNDISPUTED FACTS IN SUPPORT OF THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.1(a), defendants JPMorgan Chase Bank, N.A., and J.P. Morgan Securities Inc. (collectively, "JPMorgan") submit the following statement of undisputed material facts.

**The Credit Agreement**

1. JPMorgan loaned Empresas Cablevisión, S.A.B. de C.V. $225 million (the "Loan") pursuant to a credit agreement dated December 19, 2007 (the "Credit Agreement") and a promissory note December 21, 2007 (the "Promissory Note") (collectively, the "Loan Documents."). (Declaration of Jaquelina Truzzell ("Truzzell Decl."), dated December 16, 2009, at Ex. A. (hereinafter "Credit Agreement")); (Compl. Ex. B.)

2. At the time that the Credit Agreement was signed, Cablevisión understood that JPMorgan intended to syndicate up to 90% of the loan because JPMorgan did not credit exposure to the Loan beyond a 10% hold amount. (Compl. ¶ 6.)

3. Section 9.04 of the Credit Agreement sets forth at least two methods by JPMorgan could syndicate the loan—by assigning the loan or by selling a participation in the loan.

4. Section 1.01 of the Credit Agreement defines an assignment as

> an assignment and assumption agreement entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent and the Borrower, in the form of Exhibit A or any other form approved by the Administrative Agent.

5. Assignments and participations have different consequences for the Borrower. (*See* Truzzell Decl. ¶ 5); *see generally* Credit Agreement § 9.04.

6. For an assignment, Section 9.04(b) provides that "the assignee . . . shall be a party" to the Credit Agreement and "shall . . . have the rights and obligations of a Lender under this Agreement."

7. The assigning Lender, pursuant to Section 9.04(b), then is "released from its obligations under" the Credit Agreement.

8. The Credit Agreement requires that "the Borrower must give prior written consent to any . . . assignment." Credit Agreement § 9.04(b)(i).

9. The Credit Agreement also provides that the Lender may sell participations in the loan. *Id.* § 9.04(e).

10. The Credit Agreement imposes four conditions to the Lender's sale of a participation. *Id.*

11. The first three of these conditions included in Section 9.04(e) of the Credit Agreement are as follows:

> (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the other Lender Parties shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

12. The fourth and final condition required of any participation under the Credit Agreement states that the "Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents." *Id.*

13. As a result, under Section 9.04(e), a participant has *no* "right to enforce the Loan Documents" or "to approve any amendment, modification or waiver of any provision of the Loan Documents."

14. The Credit Agreement expressly permits the sale of participations "without the consent of the Borrower." *Id.*

15. The Credit Agreement permits the disclosure of confidential "[i]nformation" about the Borrower to "any actual or prospective assignee of or Participant in any of its rights or obligations under this Agreement." *Id.* § 9.16(f)(i).

16. The term "[i]nformation" is defined to include "all information received from the Borrower." *Id.* § 9.16.

**JPMorgan's Negotiation with Inbursa**

17. JPMorgan and Banco Inbursa ("Inbursa") negotiated an assignment of 90% of the Loan in May 2009. (Truzzell Decl. ¶¶ 12-14.)

18. Pursuant to the requirement of the Credit Agreement, JPMorgan sought, in late May 2009, the Borrower's consent to the assignment of the Loan to Inbursa. (Declaration of Sheldon L. Pollock, Dec. 17, 2009 (hereinafter "Pollock Decl.") Ex. C: Email from Julian Lautersztain to Pablo Camacho et al. dated May 21, 2009, at 2.); Credit Agreement § 9.04(b)(i).

19. The Borrower declined to give consent to the assignment of the Loan to Inbursa. (Pollock Decl. Ex. D: Email from Guadalupe Phillips Margain to Gilberto Sotelo dated May 22, 2009, at 3.)

20. JPMorgan and Inbursa began to negotiate a Participation Agreement for 90% of the Loan. (Truzzell Decl. ¶ 15.)

21. On June 3, 2009, Jacqueline Truzzell of JPMorgan sent Jesus Granillo Rodriguez of Inbursa the standard form participation agreement used by JPMorgan in Latin America for this line of business. (Pollock Decl. Ex. E: Emails between Jacqueline Truzzell and Jesus Granillo Rodriguez dated June 3-10, 2009, at 11-12.)

22. On June 8, 2009, Mr. Granillo responded with a marked-up electronic copy of the JPMorgan standard participation agreement. (Pollock Decl. Ex. F: Markup of Participation Agreement Under Negotiation, Attached to Email from Jesus Granillo Rodriguez to Jacqueline Truzzell dated June 8, 2009.)

23. In his markup, Mr. Granillo requested on behalf of Inbursa several changes to the standard form including, with respect to several separate provisions, "side letter[s]" giving Inbursa the right "to make decisions concerning all matters related to the granting of amendments and waivers." (*Id.* at 3-5); (Truzzell Decl. ¶ 16.)

24. JPMorgan rejected Inbursa's request for "side letters" on the ground that they would not be consistent with the Credit Agreement. (Truzzell Decl. at Ex. B: Email from Jacqueline Truzzell to Jesus Granillo Rodriguez dated June 10, 2009); (Truzzell Decl. ¶ 16.)

25. In the e-mail to Mr. Granillo, JPMorgan stated:

> According to that which is established in Section 9.04(e), we can only ask you for your opinion concerning the changes which are stipulated in Section 9.02(b). *To diverge from this in any way would be a failure to respect our contractual obligations within the Credit Agreement, and this would expose us to legal problems with the Borrower; for this reason, we cannot accept this point.*" (Truzzell Decl. at Ex. B) (emphasis supplied.)
>
> ***
>
> [T]he document [the Credit Agreement] does not allow us to consult you regarding the amendments or waivers beyond those which are listed in Section 9.02(b)." (*Id.*)
>
> ***
>
> "[I]t is not possible to establish this mechanism [a "side letter" to "exercise our rights without the Bank's approval," (Pollock Decl. Ex. F)] either directly or via a side letter, as this would go against that which is established in Section 9.04(e) of the Credit Agreement. (Truzzell Decl. at Ex. B.)

26. JPMorgan and Inbursa continued to negotiate the terms and conditions of the Participation Agreement during the first part of July. (Truzzell Decl. ¶ 17-18.)

27. JPMorgan and Inbursa formally executed the Participation Agreement on July 15, 2009. (Truzzell Decl. ¶ 19 and Ex. C (hereinafter "Participation Agreement").)

28. The Participation Agreement is the entire agreement between JPMorgan and Inbursa with respect to the Loan. Participation Agreement § 5.04.

**The Participation Agreement Fully Complies with the Credit Agreement**

29. Under the Participation Agreement, Section 3.03 states that only JPMorgan has the right to approve amendments, modifications or waivers to the Credit Agreement.

30. The Participation Agreement also states that "the sale or granting of the Participation by the Bank shall not limit or otherwise affect its discretion in respect" to JPMorgan's consideration of any amendments, modifications or waivers to the Credit Agreement. *Id.* § 3.03(a).

31. As required under the Credit Agreement, JPMorgan remains responsible for dealing with Cablevisión in connection with all aspects of the Credit Agreement. *Id.* § 3.04; *see also* Credit Agreement § 9.04(e).

32. Section 2.04(b) of the Participation Agreement expressly provides:

> Except for amounts specified in Section 2.04(a) hereof, the Participant shall not be entitled to receive any amounts payable by the Borrower to or received by the Bank under the Credit Document, *nor (except as expressly provided herein) shall the Participant have, by reason of this Agreement, the Participation, any rights with respect to the*

> *Credit Document, any other Loan Document or any other extension of credit by the Bank to the Borrower.*

(emphasis supplied).

33. Under the Participation Agreement, JPMorgan

> may (without the Participant's consent) give or withhold its agreement to any amendments of the Loan Documents or any waivers or consents in respect thereof or exercise or refrain from exercising any other rights or remedies which the Bank may have under the Loan Documents or otherwise (and the sale or granting of the Participation by the Bank shall not limit or otherwise affect its discretion in respect of any of the foregoing) . . . .

Participation Agreement § 3.03(a); *see also* § 2.04(b) (further providing that the Participant shall not "by reason of this Agreement, [have] any rights with respect to the Credit Document"). Except that the Participant does have to give prior consent to any amendments or waivers that would change the economic terms of the Loan, as described in Section 3.03(a).

34. Section 4.03 of the Participation Agreement provides that JPMorgan is not obligated to disclose any confidential information about Cablevisión or Credit Agreement:

> Anything in this Agreement to the contrary notwithstanding, *the Bank shall not be obligated to disclose to the Participant any information of a confidential nature relating to the Credit Document or the Borrower* (except for the documents and information expressly required to be furnished by the Bank under Sections 3.01 and 3.03 hereof).

(emphasis supplied).

35. The only confidential information JPMorgan must disclose under the Participation Agreement is that "*expressly required* to be furnished by the Bank under Sections 3.01 and 3.03." Participation Agreement § 4.03 (emphasis supplied).

36. Sections 3.01 and 3.03 expressly require the following information:

> "[C]opies of the Credit Document and any amendments, consents, waivers or notices, or any other material received by the Bank in its capacity as Lender, relating to any of the . . . Loan Documents." *Id.* § 3.01.

***

> "[E]ach executed and delivered amendment, waiver or consent in respect of the Loan Documents, the occurrence of any 'Event of Default' of which the Bank gives to the Borrower, [and] its exercise of any rights or remedies against the Borrower in respect of the Credit Document." *Id.* § 3.03(c).

37. Additionally, to the extent this information or documents are disclosed, the Participation Agreement requires the recipient to maintain the confidentiality of any such materials it receives. *Id.* § 4.03.

Dated: New York, New York
December 17, 2009

DAVIS POLK & WARDWELL LLP

By: [signature: Amelia TR Starr]

D. Scott Wise
Amelia T.R. Starr
Sheldon L. Pollock

450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Attorneys for Defendants JPMorgan Chase Bank, N.A. and J.P. Morgan Securities Inc.*