UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EMPRESAS CABLEVISIÓN, S.A.B. DE
C.V.,

                Plaintiff,

      - against -

JPMORGAN CHASE BANK, N.A. and J.P.
MORGAN SECURITIES INC.,

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

    09 Civ. 9972 (JSR)

    **UNDER SEAL**

## CORRECTED MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION AND IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................ 2

    A.    The Credit Agreement ................................................................. 2

    B.    JPMorgan's Efforts to Syndicate the Loan ................................. 5

        1.    JPMorgan is Unable to Syndicate the Loan to the Banks Proposed by Grupo Televisa ............................................. 5

        2.    JPMorgan's Disclosure to Cablevisión of Its Plans to Discuss an Assignment of the Loan to Inbursa ............................ 6

    C.    JPMorgan's Negotiations With Inbursa ...................................... 7

    D.    Televisa Offers to Purchase the Loan for Financial Considerations and Refuses Inbursa's Offer to Modify the Credit Agreement to Televisa's Satisfaction ............................................................................ 8

    E.    The Participation Agreement ...................................................... 10

ARGUMENT .............................................................................................. 11

I.    The Claim For Breach of the Credit Agreement Should Be Dismissed Because the Credit Agreement Expressly Permits the Sale Of Participations Without the Consent of the Borrower ............................................................. 12

    A.    The Participation Agreement Complies Fully With All the Requirements for a Participation Under the Credit Agreement ............... 15

    B.    The Participation Agreement Does Not Violate the Confidentiality Provisions of the Credit Agreement ........................................... 17

        1.    The Credit Agreement Expressly Permits the Disclosure of "Information"—Broadly Defined—to Any Actual or Prospective Participant ..................................................... 17

        2.    The Participation Agreement Expressly Protects from Disclosure "Any Information of a Confidential Nature Relating to the Credit Document or the Borrower" ..................... 18

    C.    There Are No Agreements Between JPMorgan and Inbursa Other Than the Explicit Terms of the Participation Agreement ...................... 20

1.     No Rights Under the Credit Agreement or Improper Access To Information Have Been Transferred to Inbursa ........................... 21

2.     Cablevisión's Remaining Arguments Are Unsupportable ........... 22

3.     New York Law Requires That a Participation Agreement Must Be Construed Solely by Reference to Its Express Terms ............. 23

II.     Cablevisión's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Should Be Dismissed ...................................................................... 26

    A.     The Covenant of Good Faith Does Not Allow the Court to Rewrite the Credit Agreement to Place Additional Restrictions on Participations. ...... 26

    B.     The Claim for Breach of Implied Covenant of Good Faith Is Duplicative of the Breach of Contract Claim ........................................... 28

    C.     JPMorgan Acted in Good Faith Throughout the Negotiation and Sale of the Participation ................................................................................ 29

III.     Cablevisión Has Failed To Demonstrate Its Entitlement To A Preliminary Injunction ................................................................................................................ 30

    A.     Cablevisión is Not Likely to Succeed on the Merits of its Claims ........... 31

    B.     Cablevisión Will Not Suffer Irreparable Injury Absent an Injunction ..... 31

    C.     The Balance of Hardships Does Not Tip In Cablevisión's Favor ............ 34

CONCLUSION ................................................................................................................ 35

## TABLE OF AUTHORITIES

### Cases

*Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (N.Y. 1957) ..................... 2

*Broder v. Cablevisión Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005) ......................... 26

*Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir. 1981) .......... 34

*CDC Group Plc v. Cogentrix Energy, Inc.*, 354 F. Supp. 2d 387 (S.D.N.Y. 2005) ......... 33

*Coleman v. Bd. of Educ. of the City of Mt. Vernon*, 990 F. Supp. 221, 226 (S.D.N.Y. 1997) ................................................................................................................ 31

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, No. 00 Civ. 7677 (JSR), 2009 U.S. Dist LEXIS 81376, at *17 (S.D.N.Y. Sept. 9, 2009) ..................... 26

*Concesionaria DHM, S.A. v. Int'l Fin. Corp.*, 307 F. Supp. 2d 553, 564 (S.D.N.Y. 2004) ................................................................................................................................ 28

*D & L Holdings v. RCG Goldman Co., LLC*, 287 A.D.2d 65, 73 (1st Dep't 2001) ......... 27

*Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291-92 (N.Y. 1995) .............................. 28

*Davis & Assocs. v. Health Mgmt. Servs.*, 168 F. Supp. 2d 109, 112 (S.D.N.Y. 2001) ........................................................................................................................................ 1

*EarthWeb, Inc. v. Schlack*, 2000 U.S. App. LEXIS 11446 (2d Cir. 2000) ...................... 33

*Faively Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 (2d Cir. 2009) . 12, 31, 32

*Holiday Inns of Am., Inc. v. B & B Corp.*, 409 F.2d 614, 618 (3d Cir. 1969) .................. 34

*Hunt, Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) ................ 1

*In re Coronet Capital Co.*, 142 B.R. 78, 82 (Bankr. S.D.N.Y. 1992) ........................ 24, 25

*In re Parmalat Sec. Litig.*, 598 F. Supp. 2d 569, 572 (S.D.N.Y. 2009) ........................... 12

*In re Sackman Mortgage Corp.*, 158 B.R. 926, 932 (Bankr. S.D.N.Y. 1993) ............ 23, 24

*JPMorgan Chase Bank, N.A. v. IDW Group, LLC*, No. 08 Civ. 9116 (PGG) ........... 28, 29

*Mack v. Otis Elevator Co.*, 326 F.3d 116, 119-20 (2d Cir. 2003) ............................... 11, 12

*Meyers v. Selznick Co.*, 373 F.2d 218, 223 (2d Cir. 1966) ................................................. 1

*New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 750 (2d Cir. 1977)........... 31, 34

*TVT Records v. Island Def Jam Music Group*, 244 F. Supp. 2d 263, 277 (S.D.N.Y. 2003) ......................................................................................................... 29

*Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co. Ltd.*, 339 F.3d 101 (2d Cir. 2003) ............................................................................................................... 33

## Other Authorities

A. Zaldivar Mueller, "Corporate Governance Assessment: Mexico." 9 U.S.-Mex. L.J. 137, 143-44 (2001)................................................................................................ 33

Richard Wight, The LSTA's Complete Credit Agreement Guide § 11.3 (2009)............. 23

Defendants JPMorgan Chase Bank, N.A. and J.P. Morgan Securities Inc. (together "JPMorgan") respectfully submit this memorandum of law in opposition to Plaintiff Empresas Cablevisión, S.A.B. de C.V.'s ("Cablevisión") Application for a Preliminary Injunction and in Support of JPMorgan's Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This is a breach of contract case. While styled as a preliminary injunction motion and larded with extraneous facts, at bottom, the question before the Court is whether JPMorgan validly sold a participation in a loan made to Cablevisión to a third party, Banco Inbursa, S.A. ("Inbursa"). The question is one that must be determined by reference to the two contracts which both parties agree govern the dispute. The first is a Credit Agreement that JPMorgan entered into with Cablevisión in December 2007 that provided Cablevisión with a $225 million loan. The second is a Participation Agreement that JPMorgan executed in July 2009, selling a 90% participation in the Cablevisión loan to Inbursa.

Cablevisión's complaint and motion for preliminary relief thus present a legal issue of contract interpretation for the Court to decide, and the Court's resolution of that question should dispose of this case. *Davis & Assocs. v. Health Mgmt. Servs.*, 168 F. Supp. 2d 109, 112 (S.D.N.Y. 2001) ("Issues of contract interpretation . . . are pure issues of law capable of resolution on summary judgment.").[1]

---

[1] *See also Meyers v. Selznick Co.*, 373 F.2d 218, 223 (2d Cir. 1966) (Friendly, J.) ("the construction of written contracts . . . is a question of law for the court") (quotations and citation omitted); *Newman v. Comm'r of Internal Revenue*, 894 F.2d 560, 562 (2d Cir. 1990) (same); *see also Hunt, Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) ("Where the language of the contract is unambiguous, and

1

As described in more detail below, JPMorgan is entitled under the Credit Agreement to sell a participation in the Cablevisión loan to anyone, without the Borrower's consent, so long as it complied with certain restrictions. The Participation Agreement executed between JPMorgan and Inbursa is consistent in all respects with the requirements and restrictions of the Credit Agreement. Based on a simple comparison of the two critical documents, it is clear that JPMorgan acted within its contractual rights. Therefore, Cablevisión's complaint for breach of contract and breach of the covenant of good faith and fair dealing must be dismissed. Likewise, Cablevisión's motion for preliminary injunction must be denied because Cablevisión can neither demonstrate a likelihood of success on the merits of its contract claims or irreparable harm.

## STATEMENT OF FACTS

### A.    The Credit Agreement

JPMorgan loaned Cablevisión $225 million (the "Loan") pursuant to a credit agreement dated December 19, 2007 (the "Credit Agreement") and a promissory note dated December 21, 2007.[2] At the time the parties entered into the Credit Agreement, Cablevisión understood that JPMorgan intended to syndicate the Loan—i.e., to sell up to 90% of the Loan—because JPMorgan did not want credit exposure to the Loan beyond a 10% hold amount. (Compl. ¶ 6.) Indeed, as described below, Cablevisión was involved

---

reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court."); *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (N.Y. 1957) ("where the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a question of law").

[2] A copy of the Credit Agreement is attached as Exhibit A to the Declaration of Jaquelina Truzzell, dated December 16, 2009. A copy of the promissory note is attached as Exhibit B to the Complaint.

2

in JPMorgan's efforts to syndicate the Loan. (Compl. ¶ 8.) Section 9.04(e) of the Credit Agreement provides two mechanisms by which JPMorgan could syndicate the Loan—by assigning the Loan or by selling a participation in the Loan.

Assignments and participations have different consequences for the Borrower, and, correspondingly, the Credit Agreement imposes different sets of conditions required to effectuate each of them. In the case of an assignment, the assignee becomes a "party" to the Credit Agreement and "shall . . . have the rights and obligations of a Lender under this Agreement." Credit Agreement § 9.04(b). The assigning lender, on the other hand, is "released from its obligations under this Agreement." *Id.* An assignment thus effectively replaces the lender with the assignee with respect to all rights and obligations under the Credit Agreement.[3]

Because an assignment profoundly impacts the Borrower-Lender relationship—severing the contractual privity between the Borrower and the Lender (with respect to the portion sold) and substituting a new party to the contract—the Credit Agreement provides that, except in two limited circumstances not applicable here, "the Borrower must give prior written consent to any  . . . assignment." *Id.* § 9.04(b)(i).[4]

---

[3] "Assignment" is a defined term under the Credit Agreement. *See* Credit Agreement § 1.01 ("'Assignment' means an assignment and assumption agreement entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent and the Borrower, in the form of Exhibit A or any other form approved by the Administrative Agent.").

[4] The circumstances under which consent of the Borrower to an assignment is unnecessary are where "(1) such assignment or transfer is an assignment or transfer of all or any portion of a Loan to a Person that is a Lender or a Lender Affiliate or (2) an Event of Default has occurred and is continuing." Credit Agreement § 9.04(b)(i). It is undisputed that neither of these exceptions is applicable in this case.

3

In contrast, the sale of a participation in the Loan has a limited effect on the relationship with the Borrower, and the Credit Agreement imposes stringent conditions to ensure that, upon the sale of a participation, the effect on the Borrower's obligations to and rights against the Lender are correspondingly limited. The first three of these conditions ensure that the essence of the Lender's obligations and responsibilities under the Credit Agreement are preserved and that the Borrower will continue to deal directly with the Lender:

> (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the other Lender Parties shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

*Id.* § 9.04(e). The fourth and final condition required of any participation ensures that the Lender retains the sole right to enforce the Credit Agreement and approve amendments, modifications or waivers to any provision, including any restrictive covenants. *Id.*[5]

Given these requirements—which ensure that the sale of a participation affects the rights and obligations of the Borrower and Lender in specified, limited ways—the Credit Agreement expressly permits the sale of participations "without the consent of the Borrower." *Id.*

Because marketing the Loan—whether by assignment or participation—would necessitate the Lender's disclosure of all relevant information received about the

---

[5] The Lender is permitted to agree with the participant that it will not agree to certain limited, specified amendments without the consent of the participant. *Id.* Those limited exceptions are not relevant here, but the provisions of the Participation Agreement reflect the required limits imposed by the Credit Agreement.

4

Borrower to actual or prospective assignees or participants, the Credit Agreement allows

the disclosure of "Information," as defined in the Credit Agreement, about the Borrower

to "any actual or prospective assignee of or Participant in any of its rights or obligations

under this Agreement," subject to that entity's further agreement to keep such

information confidential. *Id.* § 9.16(f)(i). The term "Information" is broadly defined to

include "all information received from the Borrower." *Id.* § 9.16. The Credit Agreement

thus expressly permits JPMorgan to disclose any information received from the Borrower

to any actual or prospective assignee or participant.

**B.      JPMorgan's Initial Efforts to Syndicate the Loan**

        1.      JPMorgan is Unable to Syndicate the Loan to the Banks Proposed
             by Grupo Televisa

Although JPMorgan had intended to immediately sell up to 90% of the Loan, it

found that the state of the financial markets—then profoundly affected by the ongoing

credit crisis—made it all but impossible to do so. (Declaration of Jaquelina Truzzell,

Dec. 16, 2009 (hereinafter "Truzzell Decl.") ¶¶ 7-8.) In early 2009, JPMorgan began a

process to syndicate the Loan in cooperation with Grupo Televisa, Cablevisión's parent

company, to several banks which already had a relationship with Televisa. Despite

JPMorgan's best efforts, however, none of the banks proposed by Televisa made final

offers to purchase more than a small portion of the Loan. (Declaration of Sheldon L.

Pollock, Dec. 17, 2009 (hereinafter "Pollock Decl.") Ex. A: Deposition of Jaquelina

Truzzell, Dec. 16, 2009 (hereinafter "Truzzell Dep."), at 33:18-34:7; 34:7-35:13.)

Having met with little success marketing the Loan to the banks suggested by

Televisa, JPMorgan explored the possibility of selling the Loan to Inbursa, one of

Mexico's largest banks and, unlike most of the other large banks in Mexico which are foreign-owned, under Mexican ownership. (Truzzell Decl. ¶ 10). Inbursa is a 22.08% shareholder in Cablevisión. (Pl. Rule 7.1 Statement.)

> 2.  JPMorgan's Disclosure to Cablevisión of Its Plans to Discuss an Assignment of the Loan to Inbursa

JPMorgan did not hide its effort to market the Loan to Inbursa. Rather, in March or early April of 2009, Giberto Sotelo of JPMorgan spoke on the phone with Guadalupe Phillips Margain ("Ms. Phillips"), Director of Finance and Risk at Televisa, and informed her of JPMorgan's desire to show the Loan to Inbursa. (Truzzell Dep. at 11:17- 12:25.) In that conversation, Ms. Phillips told Mr. Sotelo that she did not object to JPMorgan showing the Loan to Inbursa. (*Id.*) In the same vein, as Televisa acknowledges, a representative of JPMorgan asked Televisa on May 8, 2009, for permission to obtain a credit report regarding Cablevision which could be shared with Inbursa. That request was granted and a written permission was issued. (Pollock Decl. Ex. B: Authorization to Request to Credit Reports dated May 8, 2009.)

After JPMorgan and Inbursa reached an agreement on the terms of an assignment, on May 21, 2009, Julian Lautersztain of JPMorgan e-mailed Ms. Phillips and others at Televisa formally requesting Cablevisión's consent to assign the Loan to Inbursa. (Pollock Decl. Ex. C: Email from Julian Lautersztain to Pablo Camacho et al. dated May 21, 2009, at 2.) Ms. Phillips responded that Cablevisión would "analyze a[] possible assignment of a portion of the loan to Banco Inbursa," and requested additional information. (Pollock Decl. Ex. D: Email from Guadalupe Phillips Margain to Gilberto

6

Sotelo dated May 22, 2009, at 3.)  Cablevisión did not immediately refuse its consent.
(*Id.*)

### C.    JPMorgan's Negotiations With Inbursa

Cablevisión continued to consider the question of its consent to the assignment
over an extended period.  Due to Cablevisión's delay in responding to JPMorgan's
request for consent to an assignment, JPMorgan and Inbursa began to discuss a
participation agreement in the alternative if the request for consent to the assignment was
forthcoming.  On June 3, 2009, Jacqueline Truzzell of JPMorgan sent Jesus Granillo
Rodriguez of Inbursa the standard form participation agreement used by JPMorgan in
Latin America for this line of business to commence discussions.  (Pollock Decl. Ex. E:
E-mails between Jacqueline Truzzell and Jesus Granillo Rodriguez dated June 3-10,
2009, at 11-12.)

There were active negotiations over the next several days.  On June 8, 2009, Mr.
Granillo of Inbursa sent JPMorgan a markup of the JPMorgan draft.  (Pollock Decl. Ex.
F: Markup of Participation Agreement Under Negotiation, Attached to Email from Jesus
Granillo Rodriguez to Jacqueline Truzzell dated June 8, 2009.)  In his markup, Mr.
Granillo requested several changes to the JPMorgan standard form including, with
respect to several provisions, "side letter[s]" giving Inbursa the right "to make decisions
concerning all matters related to the granting of amendments and waivers." (*Id.* at 3-5.)
JPMorgan unequivocally rejected the requested "side letters" on the ground that they
would not be consistent with the Credit Agreement:

> According to that which is established in Section 9.04(e), we can only ask
> you for your opinion concerning the changes which are stipulated in
> Section 9.02 (b). *To diverge from this in any way would be a failure to*

7

> *respect our contractual obligations within the Credit Agreement, and this*
> *would expose us to legal problems with the Borrower; for this reason, we*
> *cannot accept this point.*

(Truzzell Decl. Ex. B: Email from Jacqueline Truzzell to Jesus Granillo Rodriguez dated

June 10, 2009) (emphasis added); *see also id.* (stating that "the document does not allow

us to consult you regarding the amendments or waivers beyond those which are listed in

Section 9.02 (b)"); *id.* (reaffirming yet again that "it is not possible to establish this

mechanism either directly or via a side letter, as this would go against that which is

established in Section 9.04 (e) of the Credit Agreement . . ."). As a result of JPMorgan's

definite rejection, no side letter was ever pursued. JPMorgan and Inbursa continued to

negotiate the Participation Agreement throughout June and July. It was formally

executed on July 15, 2009.[6]

> **D.     Televisa Offers to Purchase the Loan for Financial Considerations**
> **and Refuses Inbursa's Offer to Modify the Credit Agreement to**
> **Televisa's Satisfaction**

Despite protestations to the contrary, it appears that Televisa's biggest objection

to the assignment of the Loan to Inbursa was its concern that it would lose the

opportunity to buy the Loan itself at a very significant discount. For example, after a

June 16 conversation between Salvi Folch of Televisa and Sjoerd Leenart of JPMorgan

regarding the possibility that Televisa might purchase the Loan instead of Inbursa,

(Pollock Decl. Ex. G: E-mails between Sjoerd Leenart and Salvi Folch dated June 16-17,

2009, at 2-3), Televisa's internal e-mails demonstrate that Televisa's primary motivation

to purchase the Loan was its belief that the Loan would yield a substantial profit to

---

[6] A copy of the Participation Agreement is attached as Exhibit C to the
Declaration of Jaquelina Truzzell, dated December 16, 2009.

Televisa. (*See, e.g.*, Pollock Decl. Ex. H: E-mails between Salvi Folch and Alfonso de Angoitia dated June 16-17, 2009, at 1) ("[C]onsidering the term and the credit and the credit quality of Cablevisión it sounds like a very attractive price."); (*id.*) ("If with those resources, Cable prepays the credit, the big winner would be who buys the Installment."); (Pollock Decl. Ex. I: E-mails between Alfonso de Angoitia and Salvi Folch dated June 17-18, 2009, at CAB000953) ("Considering [Televisa]'s cash, it becomes an excellent investment opportunity[.]").  There is no discussion in any of these internal Televisa e-mails of a fear that Inbursa would use its role as assignee or participant to gain information or some other unfair advantage.  Instead, internal Televisa e-mails confirm that Televisa recognized that Inbursa's interest in the Loan was the same as its own—financial profit, not some unfair competitive advantage or access to Cablevisión's financial information.  (Pollock Decl. Ex. I, at CAB000953) ("An asset with the risk of cable for 3.5 years with a yield of 7% is very attractive and that's why Inbursa is interested in buying the loan.").

Inbursa's conduct demonstrates that it, too, was interested in the Loan because of its potential profitability, and not to obtain information or some other advantage over Cablevisión.  As Televisa's Salvi Folch recounted, on June 16, 2009 in negotiations which *excluded* JPMorgan, Inbursa agreed to Televisa's "conditions for the loan, meaning the covenants are eliminated.  There's no info other than what's public . . . I told [Inbursa] that based on all this, we were evaluating [Televisa] to buy the loan. . ." (Pollock Decl. Ex. J: E-mails between Salvi Folch and Alfonso de Angoitia dated June 16, 2009, at CAB000946) (emphasis added.)  Thus, Cablevision had a deal regarding an assignment to Inbursa which would fully protect its confidential information.  But even

9

with a deal in hand that would meet its supposed concerns about the transfer of confidential information and would eliminate the Loan covenants so there could be no ability by Inbursa to influence decisions, Cablevisión still refused its consent to assignment.  Under the circumstances, the only reason to refuse consent was because Televisa wanted the deal for itself.

**E.     The Participation Agreement**

As a result of Cablevisión's refusal to consent to an assignment, JPMorgan and Inbursa executed a Participation Agreement which did not require borrower consent.  The Participation Agreement contains provisions making clear that JPMorgan's obligations and responsibilities under the Credit Agreement are fully preserved and that JPMorgan retains not only the *right* to approve amendments, modifications or waivers, but also (going well beyond the requirements of the Credit Agreement) that, with the exception of very limited consent rights expressly permitted by the Credit Agreement (*see* footnote 5 above) the Participation Agreement will not even "affect" JPMorgan's *discretion* in this regard.

Under the Participation Agreement, JPMorgan is obligated to share with Inbursa only information that is "*expressly required* to be furnished by the Bank under Sections 3.01 and 3.03," Participation Agreement § 4.03 (emphasis added), namely:

- "[C]opies of the Credit Document and any amendments, consents, waivers or notices, or any other material received by the Bank in its capacity as Lender, relating to any of the foregoing (collectively, the "Loan Documents")." Participation Agreement § 3.01.

- "[E]ach executed and delivered amendment, waiver or consent in respect of the Loan Documents, the occurrence of any 'Event of Default' of which the Bank

gives to the Borrower, [and] its exercise of any rights or remedies against the Borrower in respect of the Credit Document." Participation Agreement § 3.03.[7]

However, if JPMorgan receives confidential information from Cablevisión, the Participation Agreement makes clear that, unless that information is expressly required to be delivered under Sections 3.01 or 3.03, JPMorgan is not obligated to disclose any confidential information about the Credit Agreement or Cablevisión to Inbursa:

> "Anything in this Agreement to the contrary notwithstanding, *the Bank shall not be obligated to disclose to the Participant any information of a confidential nature relating to the Credit Document or the Borrower* (except for the documents and information expressly required to be furnished by the Bank under Sections 3.01 and 3.03 hereof)."

Participation Agreement § 4.03 (emphasis added).  Thus, if Cablevisión provides JPMorgan with confidential information outside of that designated by Section 3.01 or 3.03, JPMorgan would share this information with Inbursa only if permitted to do so by Cablevisión.  (Truzzell Decl. ¶ 20.)

## ARGUMENT

This memorandum of law first addresses JPMorgan's motion for summary judgment in Sections I and II.  JPMorgan's opposition to Cablevisión's motion for a preliminary injunction is addressed in Section III.

The Court should grant a motion for summary judgment if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *Mack v. Otis Elevator Co.*, 326 F.3d 116, 119-20 (2d Cir. 2003).  Summary judgment is properly granted "where the record taken as a whole could not lead a rational trier of fact

---

[7] Moreover, to the extent this information or documents are disclosed, the Participation Agreement requires the recipient to maintain the confidentiality of any such materials it receives.  Participation Agreement § 4.03.

11

to find for the nonmoving party." *Id.* at 120 (alteration and internal quotation marks omitted). When the issue is one where the non-movants will bear the burden of proof at trial, it is enough "for the movant to point to a lack of evidence," in which case the non-movants must come forward "with admissible evidence sufficient to raise a genuine issue of fact for trial." *In re Parmalat Sec. Litig.*, 598 F. Supp. 2d 569, 572 (S.D.N.Y. 2009). Because Cablevisión's contract claims can be decided on the basis of the undisputed terms of the contracts, no genuine issue of fact exists with respect to either claim, summary judgment should be granted and the action should be dismissed.

Section III addresses Cablevisión's motion for a preliminary injunction. Cablevisión must show "(1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction[.]" *Faively Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 (2d Cir. 2009) (internal quotations and citations omitted). Because Cablevisión is unable to meet any of those requirements, the Court should deny Cablevisión's motion for a preliminary injunction.

I.     **THE CLAIM FOR BREACH OF THE CREDIT AGREEMENT SHOULD BE DISMISSED BECAUSE THE CREDIT AGREEMENT EXPRESSLY PERMITS THE SALE OF PARTICIPATIONS WITHOUT THE CONSENT OF THE BORROWER**

The Credit Agreement provides two separate and distinct mechanisms by which JPMorgan could transfer interests in the Loan. First, JPMorgan could assign the Loan. An assignment would make the assignee a "party" to the Credit Agreement; give the assignee the "rights and obligations of a Lender under this Agreement, and "release[] [the

assigning lender] from its obligations under this Agreement." § 9.04(b).  Given these consequences, the Credit Agreement provides that, with certain limited exceptions not here relevant, an assignment requires "prior written consent of the Borrower." § 9.04(b)(1); *see also* § 1.01, Exhibit A.

The second mechanism by which JPMorgan could transfer the Loan under the Credit Agreement is by the sale of a participation in "all or a portion" of the Loan, provided that certain conditions are met.  Unlike an assignment under Section 9.04(b), a participation does not affect the contractual relationship between the Borrower and the Lender.  Indeed, the Credit Agreement expressly conditions any participation upon four requirements that expressly preserve the Borrower-Lender relationship under the Credit Agreement:  "(i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the other Lender Parties shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement." § 9.04(e). Moreover, "Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sale right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents . . ." *Id.*

Because a participation does not affect the legal relationship between the Lender and Borrower, the Borrower's consent to a participation is not required.  § 9.04(e) ("Any Lender may, *without the consent of the Borrower or any other Lender Party, sell participations* to one or more banks or other entities . . .") (emphasis added).  As

13

demonstrated below, the Participation Agreement between Cablevisión and Inbursa fully

satisfies each of the four elements listed in the Credit Agreement.

Lacking any basis to find fault with the Participation Agreement itself,

Cablevisión alleges that there must be some side agreement, by which "the parties have

effectively agreed that . . . Banco Inbursa as a practical matter will have a say in

significant decisions relating to the loan." (Compl. ¶ 12.) But there is no basis to support

such speculation. The negotiations between JPMorgan and Inbursa surrounding the

Participation Agreement demonstrate that JPMorgan strictly observed the Credit

Agreement's conditions for participations and refused to consider terms not consistent

with the Credit Agreement. (Pollock Decl. Ex. E; Truzzell Decl. Ex. B.)[8] And

JPMorgan's witness has confirmed under oath that there are no side agreements of any

sort with Inbursa. (Truzzell Dep. at 114:11-114:19; Truzzell Decl. ¶ 19.)

---

[8] For example, during the negotiations over the participation, Inbursa requested "side letter" agreements with JPMorgan, giving Inbursa the right "to make decisions concerning all matters related to the granting of amendments and waivers." JPMorgan unequivocally rejected these requests on the ground that they would not be consistent with the Credit Agreement:

> According to that which is established in Section 9.04 (e), we can only ask you for your opinion concerning the changes which are stipulated in Section 9.02 (b). To diverge from this in any way would be a failure to respect our contractual obligations within the Credit Agreement, and this would expose us to legal problems with the Borrower; for this reason, we cannot accept this point.

(Truzzell Decl. Ex. B.)

**A.     The Participation Agreement Complies Fully With All the Requirements for a Participation Under the Credit Agreement**

The Credit Agreement expressly allows any Lender to "sell participations . . . in all or a portion of such Lender's rights and obligations" provided that four conditions are met.  Credit Agreement § 9.04(e) (*supra*, at 13.)  The Participation Agreement meets these conditions fully.  It is simply an agreement by JPMorgan, in exchange for a lump sum initial payment, to pass along to the participant a fixed share of the principal and interest payments "upon receipt by the Bank."  Participation Agreement § 2.04(a).  There is nothing in the Participation Agreement that purports to alter JPMorgan's obligations under the Credit Agreement, shift JPMorgan's responsibilities under the Credit Agreement to another party, or interpose any other party in any dealings with the Borrower under the Credit Agreement.  To the contrary, the Participation Agreement expressly provides that the participant does not, by reason of the Participation Agreement, gain any rights under the Credit Agreement or the other Loan Documents:

> Except for amounts specified in Section 2.04(a) hereof [the participant's share of principal and interest payments], the Participant shall not be entitled to receive any amounts payable by the Borrower to or received by the Bank under the Credit Document, *nor (except as expressly provided herein) shall the Participant have, by reason of this Agreement, the Participation, any rights with respect to the Credit Document, any other Loan Document or any other extension of credit by the Bank to the Borrower.*

Participation Agreement § 2.04(b) (emphasis added).[9]

---

[9] The only provision in the Participation Agreement that "expressly" gives the Participant any rights with respect to the Credit Document or any other Loan Documents is Section 2.04(d), which provides that, upon an "Event of Default . . . this Agreement shall be terminated and replaced by an assignment agreement . . . whereupon the Participant shall become a Lender."  Participation Agreement § 2.04(d).  This provision is expressly permitted by the Credit Agreement.  *See* Credit Agreement § 9.4(b).

JPMorgan's rights and responsibilities as a Lender under the Credit Agreement thus remain fully intact. And, as the Participation Agreement repeatedly makes clear, the Borrower will continue to deal solely and directly with the Lender regarding its rights and obligations under the Credit Agreement. *See* Participation Agreement § 3.04 (setting forth the Bank's standard of care in "handling the Credit Document"); § 2.04(a) (noting that the Bank will continue to receive payments under the Credit Agreement); § 3.01 (confirming the Bank's sole right to request information from the Borrower under the Credit Agreement). Cablevisión thus does and will continue to deal with JPMorgan, which remains solely responsible for its obligations under the Credit Agreement.

The fourth and final condition required of participations under the Credit Agreement is that any participation "shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents . . ." Credit Agreement § 9.04(e). The purpose of this requirement is to eliminate the concern stressed repeatedly by Cablevisión that a participant non-party to the Credit Agreement could exercise (or decline to waive) some right thereunder to its detriment. (*See* Compl. ¶¶ 10-11,13, 43.)

Here, the Participation Agreement goes well beyond this requirement, providing not only that the Bank retains the sole right to approve amendments, modifications, or waivers to the Loan Documents, but that the sale of a participation will not even "affect its discretion" in this regard:

> "The Bank may (without the Participant's consent) give or withhold its agreement to any amendments of the Loan Documents or any waivers or consents in respect thereof or exercise or refrain from exercising any other rights or remedies which the Bank may have under the Loan Documents or otherwise (and the sale or granting of the Participation by the Bank

16

shall not limit or otherwise affect its discretion in respect of any of the foregoing) . . ."

Participation Agreement § 3.01(a); *see also* § 2.04(b) (further providing that the Participant shall not "by reason of this Agreement, [have] any rights with respect to the Credit Document").

The Participation Agreement thus complies with all of the Credit Agreement's conditions for a valid participation. Because the borrower's consent is not required for the sale of participations, and the Participation Agreement is a valid participation under the Credit Agreement, Cablevisión's claim for breach of contract fails.

**B.     The Participation Agreement Does Not Violate the Confidentiality Provisions of the Credit Agreement**

Cablevisión's contention after reviewing the Participation Agreement is that it requires JPMorgan to provide Inbursa with Cablevisión's "most sensitive and confidential competitive business information." (Transcript of Dec. 9, 2009 Hearing ("Tr.") at 4.) [10] According to Cablevisión, this somehow transforms the participation into an assignment. (Tr. at 5.) Cablevisión is wrong on both points. The Participation Agreement does *not* require JPMorgan to give Inbursa any of Cablevisión's confidential information. And, even if it did, such disclosure would in any event not violate the Credit Agreement.

1.     The Credit Agreement Expressly Permits the Disclosure of "Information"—Broadly Defined—to Any Actual or Prospective Participant

---

[10] Cablevisión filed this action without having seen the Participation Agreement. JPMorgan subsequently agreed to provide Cablevisión with it under confidentiality protections.

First, the Credit Agreement expressly permits Lenders to disclose "Information" about the Borrower to "any actual or prospective assignee of or Participant in any of its rights or obligations under this Agreement," subject to the actual or prospective participant's agreement to maintain the confidentiality of any such Information received. Credit Agreement § 9.16. The term "Information" is defined to include "all information received from the Borrower . . ." *Id.*

Here, the Participation Agreement provides that "The Participant agrees to maintain the confidentiality of any 'Loan Document' or any non-public information relating to the Borrower which it may obtain from the Bank in connection herewith." Participation Agreement § 4.03. Therefore, to the extent JPMorgan desires to provide information about the Borrower—confidential or otherwise—to an actual or prospective participant under the Participation Agreement, such disclosure is expressly permitted under the Credit Agreement.

>   2.   The Participation Agreement Expressly Protects from Disclosure "Any Information of a Confidential Nature Relating to the Credit Document or the Borrower"

Despite the broad rights afforded the Lender under the Credit Agreement to disclose information about the Borrower to actual or prospective participants, the Participation Agreement narrowly limits the information that JPMorgan must provide to Inbursa. Section 4.03 of the Participation Agreement provides that, with the exception of a narrowly limited and expressly defined class of information, JPMorgan is not obligated to disclose any confidential information about the Credit Agreement or Cablevisión:

>   Anything in this Agreement to the contrary notwithstanding, *the Bank shall not be obligated to disclose to the Participant any information of a confidential nature relating to the Credit Document or the Borrower*

18

(except for the documents and information expressly required to be furnished by the Bank under Sections 3.01 and 3.03 hereof).

Participation Agreement § 4.03 (emphasis added).

Thus, the only confidential information JPMorgan must disclose under the

Participation Agreement is that "*expressly required* to be furnished by the Bank under

Sections 3.01 and 3.03," Participation Agreement § 4.03 (emphasis added).

Consequently, far from requiring JPMorgan to provide Inbursa with Cablevisión's

"most sensitive and confidential competitive business information," (Tr. at 4)—which is

in any event expressly permitted by the Credit Agreement—the Participation Agreement

at most requires the disclosure of the following: (i) copies of the Credit Agreement; (ii)

amendments, consents, waivers or notices regarding the Credit Agreement and any other

material "relating to any of the foregoing" that is received by the Bank in its capacity as

Lender; (iii) the occurrence of any "Event of Default" under the Credit Agreement; and

(iv) the exercise by JPMorgan of any of its rights or remedies against the Borrower in

respect of the Credit Document. This limited set of information—all of which is directly

related to the Credit Agreement—can hardly be described as the "most sensitive and

confidential competitive business information."

Cablevisión has argued that the Participation Agreement requires the disclosure of

additional information to Inbursa under the second sentence of Section 3.01, which

provides that "The Bank will request from the Borrower . . . and (if and to the extent

received by the Bank from the Borrower and subject to Section 4.03 hereof) furnish to the

Participant such information concerning the business, affairs or financial condition of the

Borrower as the Participant may reasonably request." Participation Agreement § 3.01.

19

This argument is a red herring.  First, Section 4.03 limits the disclosure under

Sections 3.01 and 3.03 to information "*expressly required* to be furnished by the Bank

under Sections 3.01 and 3.03 hereof."  Participation Agreement § 4.03 (emphasis added).

The only items of information "expressly" referenced in Section 3.01 are the narrow list

of Loan Documents set forth in the first sentence of that provision.  In addition, only a

limited and defined class of information may be obtained from the Borrower under the

Credit Agreement; just because JPMorgan asks Cablevisión for information does not

necessarily mean that the Borrower will provide it.  *See* Participation Agreement § 3.01

(information will only be provided "if and to the extent received . . . from the Borrower").

And, perhaps most importantly, JPMorgan has affirmed under oath that it would not

convey confidential information outside that required by the Participation Agreement

regarding the Borrower absent the Borrower's consent.  (Truzzell Dep. at 113:4-114:10;

Truzzell Decl. ¶20.)[11]

**C.    There Are No Agreements Between JPMorgan and Inbursa Other
        Than the Explicit Terms of the Participation Agreement**

Having failed to identify anything in the Participation Agreement to suggest that it

is not a valid participation under the Credit Agreement, and having failed to demonstrate

any basis for its concerns regarding access to confidential information, Cablevisión

resorts to conjecture, hypothesizing "[o]n information and belief," that "the

_____

[11] Cablevisión's purported concern that its confidential information may be
provided to Banco Inbursa also lacks credibility because Banco Inbursa, as a substantial
shareholder of Cablevisión, is likely entitled to much if not all of the information it may
receive under the Participation Agreement.  Banco Inbursa, S.A., F/0008 (Telmex
Pensiones Jubilados) owns 22.08% of Cablevisión's outstanding shares.  (Plaintiff's Rule
7.1 Disclosure Statement.)

[participation] agreement, whether or not styled a 'participation,' is in fact an assignment of JPMorgan's interests in Loan that violates § 9.04(e) of the Credit Agreement." (Compl. ¶ 75.)  This purely speculative allegation is directly contradicted by the indisputable evidence.

        1.      No Rights Under the Credit Agreement or Improper Access to Information Have Been Transferred to Inbursa

As demonstrated above, the Participation Agreement gives Inbursa no rights under the Credit Agreement and only very limited access to information relating to the Credit Agreement and other Loan Documents expressly permitted under the Credit Agreement.  The Participation Agreement also expressly provides that it supersedes any prior written or oral statements or agreements between the parties and that the agreement may not be altered orally.  *See* Participation Agreement § 5.04.[12]  Thus, to the extent Cablevisión alleges that there was some side agreement with Inbursa, it would have to be some *written* agreement between JPMorgan and Inbursa executed *subsequent* to the execution of the Participation Agreement.  There is not a scintilla of evidence to support that allegation.

Indeed, the evidence demonstrates that no rights under the Credit Agreement or access to information beyond what is permitted under the Credit Agreement have been transferred to Inbursa.  Jacqueline Truzzell, the official at JPMorgan who negotiated the Participation Agreement with Inbursa, testified that there was no oral or written

---

[12] The merger clause in the Participation Agreement provides that "This Agreement sets forth the entire agreement between the Bank and the Participant relating to the Participation and supersedes any prior written or oral statements or agreements with respect to the matters covered hereby and may not be altered orally."  Participation Agreement § 5.04.

agreement between JPMorgan and Inbursa relative to the Credit Agreement other than the

Participation Agreement.  (Truzzell Dep. at 114:11-114:19.)  Ms. Truzzell further

testified that there was no agreement or understanding—formal or informal, written or

oral—that Inbursa would have any rights other than those conveyed by the Participation

Agreement.  (*Id.* at 51:7-51:15.)  And Ms. Truzzell testified that JPMorgan would not

provide any confidential information aside from that required by the Participation

Agreement and Credit Agreement, absent the Borrower's consent.  (*Id.* at 113:4-114-10;

Truzzell Decl. ¶ 20.)  Ms. Truzzell's testimony is entirely consistent with the agreements,

and demonstrates that no rights or improper access to information were given to Inbursa.

> 2.  Cablevisión's Remaining Arguments Are Unsupportable

Cablevisión's remaining arguments for why—despite the express contract

language and other evidence to the contrary—rights or improper access to information

must have been given to Inbursa is baseless and cannot sustain its claims.  "First and

foremost," Cablevisión alleges, "it would not make sense for Banco Inbursa to purchase a

90% participation in Cablevisión's loan if Banco Inbursa were not also acquiring rights

and access to information."  (Compl. ¶ 75.)  But the Credit Agreement permits any lender

to "sell participations . . . in *all* or a portion of such Lender's rights and obligations under

this Agreement (including *all* or a portion of its Commitments and the Loans owing to

it)," Credit Agreement § 9.16 (emphasis added), provided that certain conditions are met,

as they are in this case.  *See supra*, Section I.A.  Cablevisión's argument thus reduces to

the proposition that, even where expressly contemplated by the Credit Agreement, a 90%

participation is somehow inherently suspect, so that it may be held invalid even though it

satisfies all the conditions of a valid participation under the Credit Agreement. Cablevisión cites no legal authority for this untenable proposition.

In any event, contrary to Cablevisión's assertions, it is consistent with general practice to permit and sell participations in a large percentage or even the entirety of a loan. (*See* Truzzell Decl. ¶ 6); *see also* Richard Wight, The LSTA's Complete Credit Agreement Guide § 11.3 (2009) (containing sample participation provision identical to that of the Credit Agreement). Indeed, Ms. Truzzell testified that she has personal experience with transactions where 100% participations were sold. (Truzzell Dep. at 94:23-94:25.)

> ### 3. New York Law Requires That a Participation Agreement Must Be Construed Solely by Reference to Its Express Terms

Recognizing that their claim for breach of the Credit Agreement is flatly contradicted by the two relevant agreements and the direct evidence that no rights or improper access to information under the Credit Agreement were transferred to Inbursa, Cablevisión rests its case on two cases in the bankruptcy context that purportedly show that the Court can "look past" the agreements themselves to determine the parties' "true intentions." Pl. Br. at 38. But what these cases actually say is that it is the *substantive provisions* of a participation agreement—not merely how the parties *name* the transaction—that determines whether it is a true participation. *In re Sackman Mortgage Corp.*, 158 B.R. 926, 932 (Bankr. S.D.N.Y. 1993) ("[M]erely looking to *what the agreement names the transaction* is an insufficient basis to support the finding of a participation agreement . . . *Labels cannot change the true nature of the underlying transactions.*") (emphasis added); *In re Coronet Capital Co.*, 142 B.R. 78, 82 (Bankr.

23

S.D.N.Y. 1992) ("[A]lthough the parties can call a document a 'loan participation agreement,' . . .*[t]he parties true intention here is evidenced by the terms of the document*.") (emphasis added).

For example, in *In re Coronet*, the court found that an agreement styled "Assignment, Participation, and Servicing Agreement" was in fact a loan to the debtor and not a true participation because of a provision in the agreement that the lender would pay the purported participant *even if the borrower defaulted*. 142 B.R. at 80-81. This demonstrated that the purported "participation" was in substance "a no-fault transaction whereby [the purported participant] was guaranteed to be paid its interest and principal . . ." *Id.* at 81; *see also In re Sackman*, 158 B.R. at 933-34 (holding that while the agreement was titled "Construction Loan Participation Agreement," this title "conflict[s] with the guts of the agreement" which showed that "SMC [the lender] effectively was guaranteeing [the purported participant] repayment of the loan"). By comparison, the Participation Agreement in this matter gives the participant no recourse to the Lender. Participation Agreement § 3.02 ("The Participation will be acquired by the Participant without recourse to the Bank and for the Participant's own account and risk.").

The cases cited by Cablevisión thus support JPMorgan's argument that the Court should look to the provisions of the agreements—and not to Cablevisión's extraneous unsupported allegations—to determine whether the Participation Agreement is a true participation. Here, JPMorgan does not merely rely upon the "what the agreement names the transaction" or what "the parties . . . call [the] document" – but rather upon the express provisions of the Participation Agreement, all of which are fully consistent with the elements of a participation set forth in the Credit Agreement.

24

The cases cited by Cablevisión further demonstrate that the Participation Agreement meets not only the requirements of the Credit Agreement, but also all of the elements of a "true participation" as defined by the New York courts in the bankruptcy context. *In re Coronet* sets forth the following four-part test for determining whether an interest in a loan is a "true participation":

> A true participation agreement is one that: a) money is advanced by participant to a lead lender; b) a participant's right to repayment only arises when a lead lender is paid; c) only the lead lender can seek legal recourse against the borrower; and d), the document is evidence of the parties true intentions."

*In re Coronet*, 142 B.R. at 82.

Each of these elements is satisfied by the express provisions of the Participation Agreement, which explicitly provides that:  (a) "Participant hereby agrees to pay to the Bank an amount (the "Purchase Price")," § 2.03; (b) "The Participation will be acquired by the Participant without recourse to the Bank and for the Participant's own account and risk."  § 3.02; (c) the Participant does not have "any rights with respect to the Credit Document, [or] any other Loan Document," § 2.04(b); and (d) the Participation Agreement "sets forth the entire agreement between the Bank and the Participant relating to the Participation . . ."  § 5.04.

Regardless of where Cablevisión looks for a definition of participation—the Credit Agreement or New York Law—the Participation Agreement fully meets the criteria.  And because it is a valid participation, Cablevisión's consent to the Participation Agreement was not required, and Cablevisión's claim for breach of the Credit Agreement should be dismissed.

II.     **CABLEVISIÓN'S CLAIM FOR BREACH OF THE IMPLIED**
        **COVENANT OF GOOD FAITH AND FAIR DEALING SHOULD BE**
        **DISMISSED**

Cablevisión's claim for breach of the implied covenant of good faith likewise fails

because the Implied Covenant may not be used to add terms to the Credit Agreement,

which expressly provides for participations.  Moreover, the claim is duplicative of

Cablevisión's claim for breach of contract because the allegations underlying both claims

are identical.

A.     **The Covenant of Good Faith Does Not Allow the Court to Rewrite the**
        **Credit Agreement to Place Additional Restrictions on Participations.**

New York law is well established that the covenant of good faith "does not 'add

to the contract a substantive provision not included by the parties.'"  *Broder v.*

*Cablevisión Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005); *Compania Embotelladora*

*Del Pacifico, S.A. v. Pepsi Cola Co.*, No. 00 Civ. 7677 (JSR), 2009 U.S. Dist LEXIS

81376, at *17 (S.D.N.Y. Sept. 9, 2009) (stating that the duty of good faith "cannot be

used to impose obligations that were not explicitly part of the agreement[,] . . . or to

create, in essence, new, affirmative duties . . . that were not expressly set forth in the

contract.") (quotation marks and citations omitted).

Cablevisión does not identify any provision of the Credit Agreement that

JPMorgan frustrated when it sold a participation in the Loan to Inbursa.  The Credit

Agreement makes clear that JPMorgan retains both the right and full discretion to "give

or withhold its agreement to any amendments of the Loan Documents or any waivers or

consents in respect thereof . . ."  Participation Agreement § 3.01.  And even while

JPMorgan has broad rights under the Credit Agreement to disclose information about

Cablevisión to "actual or prospective Participants," Credit Agreement § 9.16, the

Participation Agreement imposes certain limitations on the amount of Cablevisión's

confidential information that JPMorgan is required to share.  Participation Agreement §§

4.03, 3.01, 3.03.  The implied covenant of good faith cannot be used to fill the gaping

hole in Cablevisión's claim for breach of contract.

  This principle applies with even greater strength here, in the context of "a

commercial contract between two sophisticated commercial parties represented by

counsel."  *D & L Holdings v. RCG Goldman Co., LLC*, 287 A.D.2d 65, 73 (1st Dep't

2001).  If Cablevisión desired further restrictions on participations—over and above the

stringent requirements already contained in the Credit Agreement—it could have

bargained for that right, just as it did with respect to assignments.[13]  Cablevisión did not

bargain for a similar right regarding participations, and may not now request that the

Court imply one.  (*See* Truzzell Decl. ¶ 6.)

  The restriction on participations now requested by Cablevisión would also

directly contradict the Credit Agreement, which expressly permits the sale of

participations "*without the consent of the Borrower*."  Credit Agreement § 9.04(e).  The

covenant of good faith cannot extend so far as to create an implied restriction on

participation sales, where such a restriction would undermine the express terms of the

Credit Agreement.  *See Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291-92 (N.Y.

---

[13] For example, nothing precluded Cablevisión from negotiating a provision
restricting the list of potential participants. *See Bear Stearns Funding, Inc. v. Interface
Group – Nevada*, 361 F. Supp. 2d 283, 287 (S.D.N.Y. 2005) (interpreting an express
provision in credit agreement prohibiting participation sale to competitors).  Cablevisión
did not do so.  (Truzzell Decl. ¶ 6.)

1995) ("The duty of good faith and fair dealing . . . is not without limits, and no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.'" (*quoting Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86 (N.Y. 1983).[14]

### B.   The Claim for Breach of Implied Covenant of Good Faith Is Duplicative of the Breach of Contract Claim

Cablevisión's entire claim for breach of the covenant of good faith is rooted in its concern that the participation to Inbursa violates the Credit Agreement—i.e., that Inbursa might be given rights to regarding proposed alterations, amendments or waivers to the Credit Agreement's restrictive covenants or that Inbursa might improperly receive access to Cablevisión's confidential information.  But, since the Participation Agreement expressly complies with the requirements of the Credit Agreement in each of these respects, Cablevisión is merely repeating its allegation that JPMorgan improperly *assigned* the Loan.

As New York law makes clear, such a claim under the implied duty of good faith is duplicative of the breach of contract claim and must be dismissed. *Concesionaria DHM, S.A. v. Int'l Fin. Corp.*, 307 F. Supp. 2d 553, 564 (S.D.N.Y. 2004) ("[C]ourts routinely dismiss a claim for breach of an implied covenant of good faith 'as redundant

---

[14] The existence of a merger clause in the Credit Agreement further underscores the need to remain faithful to the agreement's express terms. *See* Credit Agreement § 9.06.; *JPMorgan Chase Bank, N.A. v. IDW Group, LLC*, No. 08 Civ. 9116 (PGG), 2009 U.S. Dist. LEXIS 9207, at *15-16 (S.D.N.Y. Feb. 9, 2009) ("[W]hile the presence of 'a merger clause does not prevent a court from inferring a covenant of good faith and fair dealing, . . . such an obligation can only be found where the implied term is consistent with other terms in the contract.'") (*quoting SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352, 354-55 (1st Dep't 2004)).

where the conduct allegedly violating the implied covenant is also the predicate for breach . . . of an express provision of the underlying contract.'") (*quoting TVT Records v. Island Def Jam Music Group*, 244 F. Supp. 2d 263, 277 (S.D.N.Y. 2003)); *JPMorgan*, 2009 U.S. Dist. LEXIS 9207, at *13 ("Typically, raising both claims in a single complaint is redundant, and courts confronted with such complaints under New York law regularly dismiss any freestanding claim for breach of the covenant of fair dealing.") (quotations and citation omitted).  Because the facts underlying Cablevisión's claim of breach of the covenant of good faith are precisely the same as those underlying the breach of contract claim, this Court should dismiss the good faith claim as duplicative.

### C.      JPMorgan Acted in Good Faith Throughout the Negotiation and Sale of the Participation

Contrary to Cablevisión's allegations, JPMorgan's conduct throughout the course of its negotiation and sale of the participation to Inbursa was in good faith, and fully consistent with the requirements of the Credit Agreement.

As an initial matter, the Credit Agreement allowed JPMorgan to sell 90%—even all—of its financial interest in the Loan as a participation.  Credit Agreement § 9.04(e).  Cablevisión acknowledges as much in its Complaint.  (Compl. ¶ 6.)

Cablevisión also knew from the very beginning that JPMorgan would try to syndicate all or a very large percentage of the Loan.  (Compl. ¶ 37.)  And, contrary to Cablevisión's assertions, JPMorgan sought and received Cablevisión's consent to show the Loan to Inbursa.  (Truzzell Dep. at 11:6-11:19.)  For weeks thereafter, neither Cablevisión nor its parent company Televisa voiced any objection.  (Truzzell Dep. at 19:18-20:13, 22:5-22:14.)  Finally, in negotiating the participation, JPMorgan

scrupulously adhered to the Credit Agreement, refusing Inbursa's request for additional agreements that may have transferred some of JPMorgan's creditor's rights. (Truzzell Decl. Ex. B.)

By the time Televisa began discussion of its own interest to compete with Inbursa for the Loan, JPMorgan had already gone a long way down the road of reaching an understanding to sell the participation to Inbursa. (Truzzell Decl. ¶¶ 16, 18.) JPMorgan therefore decided to execute the transaction with Inbursa, which it clearly had a right to do.

Finally, Cablevisión fails to allege any manner in which JPMorgan has failed to "deal fairly" with Cablevisión. Cablevisión has not, since prior to the Participation Agreement, requested any modification, waiver, amendment or any other consideration under the Credit Agreement, nor has it expressed an intent to do so in the future. Thus, JPMorgan had not had an opportunity to act on any request. And no confidential information has been sent by JPMorgan to Banco Inbursa pursuant to the Participation Agreement. (Truzzell Decl. ¶ 21.)[15]

Accordingly, Cablevisión's claim that JPMorgan violated the implied covenant of good faith and fair dealing should be dismissed.

## III. CABLEVISIÓN HAS FAILED TO DEMONSTRATE ITS ENTITLEMENT TO A PRELIMINARY INJUNCTION

"A party seeking a preliminary injunction must demonstrate: (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the

---

[15] Nothing in the Credit Agreement requires JPMorgan to disclose to Cablevisión the negotiation or even the existence of the sale of a participation.

merits to make them a fair ground for litigation and a balance of hardships tipping

decidedly in the movant's favor, and (2) irreparable harm in the absence of the

injunction[.]" *Faively*, 559 F.3d at 116 (internal quotations and citations omitted).

      "[P]reliminary injunctive relief can be awarded only upon a clear showing that the

movant is entitled to the relief, and that in making such a showing the movant bears a

heavy burden[.]" *New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 750 (2d Cir.

1977) (citations omitted) (emphasis supplied). "A preliminary injunction is an

extraordinary remedy, and should not be routinely granted." *Coleman v. Bd. of Educ. of

the City of Mt. Vernon*, 990 F. Supp. 221, 226 (S.D.N.Y. 1997).

### A.    Cablevisión is Not Likely to Succeed on the Merits of Its Claims

      Cablevisión cannot show any "serious question," let alone a likelihood of success

on the merits because, as explained in detail in Sections I and II, the Participation

Agreement fully complies with requirements for a participation under the Credit

Agreement and the evidence demonstrates that there were no other agreements between

JPMorgan and Inbursa. These undisputed and indisputable facts are dispositive of this

breach of contract action, and Cablevisión's claims should be dismissed.

### B.    Cablevisión Will Not Suffer Irreparable Injury Absent an Injunction

      Aside from this utter lack of merit, Cablevisión cannot demonstrate that any

"irreparable harm" would result absent an injunction; in fact, Cablevisión has failed to

show that the Participation Agreement would result in any "harm" at all, irreparable or

otherwise.

      Cablevisión asserts that it could be harmed by the participation between

JPMorgan and Inbursa for two reasons. First, because JPMorgan may decline some

request for an amendment or waiver of some provision of the Credit Agreement to the detriment of Cablevisión at the insistence of Inbursa and, second, because Inbursa may obtain access to confidential information about Cablevisión as a result of the participation. As demonstrated above, these concerns have no basis in the agreements and are wrong as a matter of law.

But even putting aside the merits of these claims, the harm Cablevisión claims is purely speculative. *Faiveley*, 559 F.3d 110 at 118 ("[T]o satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent[.]").

With respect to its first concern, Cablevisión has not requested any amendment, modification or waiver of any provision of the Credit Agreement. Nor has Cablevisión indicated that it intends to make any such request in the near future. And even if Cablevisión does, in the future, request an amendment or waiver to the Credit Agreement and that request is not granted, that decision can be legally tested then. But it is entirely speculative now.

Cablevisión's second concern, the release of confidential information to Inbursa, is even more remote. As an initial matter, since the execution of the Participation Agreement, Inbursa has not requested—and JPMorgan has not provided to Inbursa—any confidential information under the Participation Agreement.[16] Nor has Cablevisión identified any specific item of confidential information it has provided to JPMorgan that

---

[16] JPMorgan has given to Banco Inbursa the Loan Documents and related information—and it did so in May 2009, after first asking Cablevisión for, and receiving, permission to so.

it is afraid will now be provided to Inbursa.  The evidence also shows, as Cablevisión's parent Televisa itself recognized, that Inbursa did not purchase the Loan to obtain access to Cablevisión's confidential information.  (Pollock Decl. Ex. I.)  And Inbursa, as a more than 22% shareholder of Cablevisión, already has substantial rights to information about Cablevisión.[17]   Where there is no indication that a plaintiff's confidential information has already been disclosed, or will inevitably be disclosed absent an injunction, the plaintiff fails to meet its heavy burden of showing irreparable harm.  *See, e.g., EarthWeb, Inc. v. Schlack*, 2000 U.S. App. LEXIS 11446 (2d Cir. 2000) (unpublished) (affirming the denial of preliminary injunction where plaintiff failed to show that defendant had already, or would soon, use plaintiff's proprietary information).[18]

In any event, given the undisputed provisions of the Credit Agreement, Cablevisión granted JPMorgan the right to share confidential information with a participant like Inbursa, so it cannot now claim to be harmed by a transfer of information it contractually consented to.  At bottom, then, Cablevisión's request for a preliminary injunction is simply an attempt to shift the focus of this action from the relevant

---

[17] For example, under Mexican law a shareholder holding more than 10% is entitled to representation on a company's board of directors.  *See* A. Zaldivar Mueller, "Corporate Governance Assessment: Mexico."  9 U.S.-Mex. L.J. 137, 143-44 (2001).

[18] Cablevisión's reliance on *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co. Ltd.*, 339 F.3d 101 (2d Cir. 2003), is misplaced.  In *Wisdom*, the court awarded a preliminary injunction only after first concluding that the defendant had, in fact, breached the contract and thereby deprived the plaintiff of bargained-for voting rights.  *Id.* at 113-14.  In contrast, Cablevisión cannot show that it has lost, or even is in danger of losing, any rights under the Credit Agreement.  The other precedent upon which Cablevisión relies, *CDC Group Plc v. Cogentrix Energy, Inc.*, 354 F. Supp. 2d 387 (S.D.N.Y. 2005), is inapposite for the same reason; there, too, the court expressly found that defendants had already executed a sales agreement with a third party that violated their contract with the plaintiff.

agreements, where it belongs, to a litany of extraneous (and unsupported) allegations about the harm it would suffer if the agreements were interpreted contrary to their express terms.

With no likelihood of success on the merits, and no clear basis to claim irreparable harm, this Court should avoid exercising "[t]he dramatic and drastic power of injunctive force . . . [which] may not be used simply to eliminate a possibility of a remote future injury[.]" *New York*, 550 F.2d at 755-56 (*quoting Holiday Inns of Am., Inc. v. B & B Corp.*, 409 F.2d 614, 618 (3d Cir. 1969) (emphasis supplied)).  Cablevisión's motion for preliminary injunction should therefore be denied.

### C.     The Balance of Hardships Does Not Tip in Cablevisión's Favor

A movant for a preliminary injunction "must show that the harm which he would suffer from the denial of his motion is 'decidedly' greater than the harm his opponent would suffer if the motion was granted." *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir. 1981).  As demonstrated above, the "hardships" Cablevisión posits are baseless.  By contrast, an injunction would require JPMorgan to somehow put the entire (now nearly five-month old) transaction on hold and expose JPMorgan to legal claims by Inbursa.  The balance of hardships certainly does not favor Cablevisión.  *See Buffalo Forge*, 638 F.2d at 569.

34

## CONCLUSION

For these reasons, JPMorgan respectfully requests that the Court deny

Cablevisión's motion for preliminary injunction and grant summary judgment in favor of

JPMorgan.

Dated:   New York, New York
         December 21, 2009

DAVIS POLK & WARDWELL LLP

By: _____
        D. Scott Wise
        Amelia T.R. Starr
        Sheldon L. Pollock

450 Lexington Avenue
New York, New York  10017
(212) 450-4000

d.wise@davispolk.com
amelia.starr@davispolk.com
sheldon.pollock@davispolk.com

*Attorneys For JPMorgan Chase Bank,
N.A. and J.P. Morgan Securities Inc.*

35