UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EMPRESAS CABLEVISIÓN, S.A.B. DE
C.V.,

                Plaintiff,

   -against-

JPMORGAN CHASE BANK, N.A. and J.P.
MORGAN SECURITIES INC.,

              Defendants.

09 Civ. 9972 (JSR)

**UNDER SEAL**

---

## PLAINTIFF'S DECEMBER 17, 2009 MEMORANDUM IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION

Stephen R. Neuwirth
Daniel P. Cunningham
Judd R. Spray
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff*
*Empresas Cablevisión, S.A.B. de C.V.*

## Table of Contents

Preliminary Statement .......................................................................................................1

Statement of Facts ...........................................................................................................7

      The Telecommunications Market In Mexico ............................................................7

      Cablevisión Acquires Control of Bestel ...................................................................8

      The Credit Agreement ...............................................................................................9

            The Credit Agreement Imposes Various Restrictive Covenants on Cablevisión .........................................................................................9

            The Credit Agreement Grants Cablevisión a Veto Right Over Assignments ........10

            The Credit Agreement Restricts JPMorgan's Right To Sell Participations ...........11

            The Credit Agreement Restricts Disclosure of Cablevisión's Confidential Information .................................................................................12

      Cablevisión and Its Majority Owner Grupo Televisa Acted in Good Faith ......................12

            Grupo Televisa Makes Extraordinary Efforts To Help JPMorgan Syndicate the  Loans ................................................................................12

      JPMorgan Attempts to Assign Its Interest In the Credit Agreement To Banco Inbursa.................................................................................14

Argument ......................................................................................................................24

I.      STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF ...........................................24

II.    CABLEVISIÓN IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM THAT JPMORGAN HAS BREACHED THE CREDIT AGREEMENT ........................24

III.  IN THE ALTERNATIVE, CABLEVISIÓN IS LIKELY TO SUCCEED ON ITS CLAIM THAT JPMORGAN BREACHED ITS DUTY OF GOOD FAITH ..................29

IV.  CABLEVISIÓN WILL SUFFER IMMINENT AND IRREPARABLE HARM..............32

      A.    The Subversion of Bargained-For Veto Rights Results in Irreparable Injury.........................................................................................32

      B.    Competitive Injuries Resulting from this Assignment are Irreparable .................35

V.    THE BALANCE OF HARDSHIPS TIPS SHARPLY IN CABLEVISIÓN'S
      FAVOR ........................................................................................................37

VI.   PARTIAL REFORMATION IS NOT AN ADEQUATE REMEDY HERE ....................38

CONCLUSION ...................................................................................................40

## TABLE OF AUTHORITIES

**Page**

### CASES

*Berliner Foods Corp. v. Pillsbury Co.,*
    633 F. Supp. 557 (D. Md. 1986) ......................................................................... 37

*Brenntag Int'l Chems., Inc. v. Bank of India,*
    175 F.3d 245 (2d Cir. 1999) ............................................................................. 32

*CanWest Global Comm'ns. Corp. v. Mirkaei Tikshoret Ltd.,*
    804 N.Y.S. 2d 549 (N.Y. Sup. N.Y. Co. 2005) ............................................... 33

*Carvel Corporation v. Diversified Mgmt. Group, Inc.,*
    930 F.2d 228 (2d Cir. 1991) ............................................................................. 31

*CDC Group PLC v. Cogentrix Energy, Inc.,*
    354 F. Supp. 2d 387 (S.D.N.Y. 2005) .............................................. 1, 33, 34, 38

*Chase Manhattan Bank, N.A. v. Keystone Distrib., Inc.,*
    873 F. Supp. 808 (S.D.N.Y. 1994) ................................................................... 30

*Clemente Global Growth Fund, Inc. v. Pickens,*
    705 F.Supp. 958 (S.D.N.Y. 1989) ............................................................... 37, 38

*Dalton v. Educ. Testing Service,*
    87 N.Y.2d 384 (1995) ................................................................................. 30, 31

*Ebker v. Tan Jay Intern. Ltd.,*
    741 F.Supp. 448 (S.D.N.Y. 1990) .................................................................... 39

*Estee Lauder Cos. Inc. v. Batra,*
    430 F. Supp. 2d 158 (S.D.N.Y. 2006) .............................................................. 5, 36

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.,*
    375 F.3d 168 (2d Cir. 2004) ............................................................................. 25

*Faiveley Trans. Malmo AB v. Wabtec Corp.,*
    559 F.3d 110 (2d Cir. 2009) ............................................................................. 36

*Gatewood v. U.S. Cellular Corp.,*
    953 F.2d 1393 (D.C. Cir. 1992) ....................................................................... 39

*Gitlitz v. Bellock,*
    171 P.3d 1274 (Colo. Ct. App. 2007) .............................................................. 33

*Grand Union Co. v. Cord Meyer Dev. Co.,*
    761 F.2d 141 (2d Cir. 1985) ............................................................................. 39

*In re Coronet Capital Co.,*
    142 B.R. 78 (Bankr. S.D.N.Y. 1992) .................................................................. 29

*In re Sackman Mortgage Corp.,*
    158 B.R. 926 (Bankr. S.D.N.Y. 1993) ................................................................ 29

*In re Shick,*
    235 B.R. 318 (S.D.N.Y. Bankr. 1999) ................................................................ 31

*Int'l Equity Inv., Inc., v. Opportunity Equity Partners, Ltd.,*
    407 F. Supp. 2d 483 (S.D.N.Y. 2005) ............................................................... 33

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,*
    323 F. Supp. 2d 525 (S.D.N.Y. 2004) ............................................................... 35

*JPMorgan Chase Bank, N.A. v. IDW Group, LLC,*
    No. 08 Civ. 9116 (PGG), 2009 WL 321222 (S.D.N.Y. Feb. 9, 2009) ............... 30

*MasterCard Int'l Inc. v. Visa Int'l Service Ass'n, Inc.,*
    471 F.3d 377 (2d Cir. 2006) ............................................................................... 39

*McFarland v. Gregory,*
    322 F.2d 737 (2d Cir. 1963) ............................................................................... 40

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn,*
    73 F. Supp. 2d 425 (S.D.N.Y. 1999) ................................................................. 36

*Muze, Inc. v. Digital On-Demand, Inc.,*
    123 F. Supp. 2d 118 (S.D.N.Y. 2000) ........................................................ 35, 36

*N. Atl. Instruments, Inc. v. Haber,*
    188 F.3d 38 (2d Cir. 1999) .......................................................................... 24, 37

*Oracle Real Estate Holdings I LLC v. Adrian Holdings Co. I, LLC,*
    582 F. Supp. 2d 616 (S.D.N.Y. 2008) ............................................................... 33

*Paxi, LLC v. Shiseido Americas Corp.,*
    636 F. Supp. 2d 275 (S.D.N.Y. 2009) ............................................................... 24

*Register.com, Inc. v. Verio, Inc.,*
    356 F.3d 393 (2d Cir. 2004) ............................................................................... 35

*Republic of Philippines v. Marcos,*
    806 F.2d 344 (2d Cir. 1986) ............................................................................... 24

*Sally Beauty Co. v. Nexxus Prods. Co.,*
    801 F.2d 1001 (7th Cir. 1986) ........................................................................... 37

*Ticor Title Ins. Co. v. Cohen,*
    173 F.3d 63 (2d Cir. 1999) .......................................................................... 35, 36

*Tradescape.com v. Shivaram,*
    77 F.Supp. 2d 408 (S.D.N.Y. 1999) .................................................................. 37

iv

*Travelers Int'l. A.G. v. Trans World Airlines*, Inc.,
  41 F.3d 1570 (2d Cir. 1994)..................................................................... 29, 31

*Wisdom Import Sales Co., LLC v. Labatt Brewing Co. Ltd.*,
  339 F.3d 101 (2d Cir. 2003)..................................................................... passim

Plaintiff Empresas Cablevisión, S.A.B. de C.V. ("Cablevisión") respectfully submits this memorandum of law in support of its application for a preliminary injunction.

## Preliminary Statement

Pursuant to a Credit Agreement dated December 19, 2007 (the "Credit Agreement"), defendants JPMorgan Chase Bank, N.A. and J.P. Morgan Securities Inc. (together, "JPMorgan") loaned $225 million to plaintiff Cablevisión. The Credit Agreement provides that JPMorgan cannot assign any portion of the loan without first obtaining Cablevisión's consent. In a written agreement dated July 15, 2009, however, JPMorgan – without Cablevisión's consent and over Cablevisión's objection – sold a 90 percent, or more than $200 million, interest in the Cablevisión loan to Banco Inbursa, S.A., a bank under common control with companies that are Cablevisión's principal competitors. While JPMorgan labels Banco Inbursa's acquisition a mere loan "participation," the JPMorgan-Banco Inbursa agreement on its face constitutes a loan "assignment" as defined in the Credit Agreement. The JPMorgan-Banco Inbursa agreement thus has abrogated Cablevisión's bargained-for, contractual right to veto loan assignments.

The Second Circuit held in *Wisdom Import Sales Co., LLC v. Labatt Brewing Co. Ltd.*, 339 F.3d 101 (2d Cir. 2003) that the subversion of a bargained-for veto right by itself can constitute irreparable harm justifying preliminary injunctive relief. Courts have applied these principles where, as here, a bargained-for veto right is essential to preserving the "balance of power" in an important business relationship. *See, e.g.*, *CDC Group PLC v. Cogentrix Energy, Inc.*, 354 F. Supp. 2d 387 (S.D.N.Y. 2005) (preliminary injunction granted to preserve plaintiff's contractual right to prevent the defendant from transferring to a third party the defendant's interests in a subsidiary involved in a joint venture). Cablevisión's veto right here serves as a counterweight to JPMorgan's power as lender to grant or deny waivers of and amendments to the restrictive covenants in the Credit Agreement that affect Cablevisión's core ability to compete –

including the ability to incur debt, expend capital, and invest in expansion and growth. Cablevisión's veto right also serves to protect access to its confidential business information.

The Credit Agreement, included as Exhibit 1 to the accompanying Declaration of Judd Spray (the "Spray Dec."), itself defines the difference between an assignment, in which the assignee assumes rights and obligations of the lender, and a participation, in which the participant does not assume the lender's rights or obligations (except for very specific and limited economic rights intended to protect the participant's percentage ownership stake in the loan). Thus, as expressly set forth in Section 9.04(e) of the Credit Agreement, the lender can sell participations without the borrower's consent "*provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the other Lender Parties shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement."

The JPMorgan-Banco Inbursa agreement does not satisfy these criteria. <u>First</u>, that agreement gives Banco Inbursa the right to direct JPMorgan's own exercise under the Credit Agreement of the power to demand and receive Cablevisión's most sensitive competitive business information. Section 3.01 of the JPMorgan-Banco Inbursa agreement provides that "[t]he Bank will request from the Borrower (to the extent it is entitled under the Credit Document to do so) and (if and to the extent received by the Bank from the Borrower and subject to Section 4.03 hereof) furnish to the Participant such information concerning the business, affairs or financial condition of the Borrower *as the Participant may reasonably request*". Spray

2

Dec. Ex. 2 (emphasis added).[1]  Section 3.01 also provides that the Participant shall be entitled to request not only copies of any amendments, consents, waivers or notices related to the loan, but also "any other material received by the Bank in its capacity as Lender, relating to any of the foregoing." *Id.*[2]

Second, the JPMorgan-Banco Inbursa agreement provides that Banco Inbursa will become an assignee, and thus assume the Lender's rights (with respect to the 90 percent of the loan it has acquired) in the event Cablevisión defaults on its obligations under the Credit Agreement.  Section 2.04(d) of the JPMorgan-Banco Inbursa agreement states that "[t]he Bank and the Participant hereby agree that if an Event of Default occurs and is continuing, this Agreement shall be terminated and replaced by an assignment agreement (in the form of Exhibit A in the Credit Document) whereupon the Participant shall become a Lender." *Id.*  While the Credit Agreement does permit JPMorgan to make assignments without Cablevisión's consent *following* a default, here JPMorgan has *already* (when no default has occurred) sold to Banco Inbursa all of the Lender's rights if an event of default should occur – including the right, among other things, to require immediate full repayment of the loan.  JPMorgan officer Jacqueline Truzzell admitted that when Banco Inbursa had first requested "a mechanism by which they can start direct proceedings against the borrower in the case of a breach" – which Ms. Truzzell testified included an event of default – she had written to her colleagues that "we can't give them this because its contrary to the participation structure."  Spray Dec., Ex. 3, at 48:4 – 52:6.

---

[1]   Section 4.03 of the JPMorgan-Banco Inbursa agreement, referenced in 3.01, only reinforces Banco Inbursa's right to receive Cablevisión's competitively sensitive business information pursuant to Section 3.01.  Section 4.03 provides, in relevant part: "Anything in this Agreement to the contrary notwithstanding, the Bank shall not be obligated to disclose to the Participant any information of a confidential nature relating to the Credit Document or the Borrower (*except for the documents and information expressly required to be furnished by the Bank under Sections 3.01* and 3.03 hereof)." *Id.* (emphasis added.)

[2]   This provision also references Section 4.03, described in footnote 1, *supra*.

Third, the JPMorgan-Banco Inbursa agreement, at § 2.04(a)(B), gives Banco Inbursa the right to receive 90 percent of "any type of compensation or fees collected by the Bank in its capacity as Lender under the Credit Document." Spray Dec., Ex. 2. This provision covers any fees that JPMorgan would receive as consideration for granting waivers of or amendments to the critical restrictive covenants in the Credit Agreement. Such an arrangement means that almost all of the economic value of the Lender's right to police the restrictive covenants has been passed to Banco Inbursa. In practice, it is difficult to conceive that Banco Inbursa would not be influencing JPMorgan's future review of covenant waiver requests. The JPMorgan-Banco Inbursa agreement expressly provides at § 3.03(b) that "[s]ubject to Section 4.03 hereof, *the Bank will endeavor to inform the Participant prior to agreeing to any other amendment, waiver or consent relating to the Loan Documents* (it being understood however that, except as expressly provided in this Section 3.03, the Bank shall have sole discretion with respect to the action to be taken)." *Id.* (emphasis added).

Fourth, the JPMorgan-Banco Inbursa agreement, at §5.01, gives Banco Inbursa a right of first refusal if JPMorgan determines to sell the final 10 percent interest in the loan it has retained.

As Ms. Truzzell testified, and as discussed in the accompanying declaration of Daniel Toscano, an expert in the loan syndication market, the foregoing provisions also are not typical of participation agreements generally, including JPMorgan's own standard participation agreement for use in Latin America. Ms. Truzzell also admitted that such provisions have not been included in other loan participation agreements she has negotiated during her 14-year career at JPMorgan. In all of the foregoing ways, both individually and in combination, JPMorgan may have purported to stay close to the line of what is permitted by the Credit Agreement, but in fact JPMorgan crossed way over that line.

Cablevisión respectfully submits, however, that Banco Inbursa's acquisition of the foregoing rights should come as no surprise. Banco Inbursa is controlled by Carlos Slim Helú, reported to be Mexico's wealthiest individual, and his family. The Slim family also controls Teléfonos de México, S.A. B. de C.V. ("Telmex"), the telecommunications conglomerate that is among Cablevisión's chief competitors, including in the emerging and important "triple play" market through which Cablevisión sells combined packages of pay television, internet and telephone services.

The rights Banco Inbursa has acquired have tremendous value to a competitor of Cablevisión. They give the competitor access, upon demand, to Cablevisión's most sensitive business plans and financial projections. In the event of default, they give the competitor power to impose debilitating requirements that could threaten constructive resolution of a problem and thus business development and expansion. The disclosure of confidential information to a competitor typically results in irreparable harm, "given the difficulty in ascertaining empirically how much of a competitive advantage such information" provides. *Estee Lauder Cos. Inc. v. Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006).

Without the type of rights that Banco Inbursa has acquired, a 90 percent "participation" in a $225 million loan would be difficult to explain. A true participant assumes financial risk without acquiring corresponding rights of the lender. Mr. Toscano notes in his declaration that participations are normally for relatively small interests. In his years of experience, including as a director of the Loan Trading and Syndication Association, he has never before this litigation seen an agreement purporting to have a single party acquire a 90 percent participation in a loan.

Ms. Truzzell's deposition testimony, and the documents produced by JPMorgan, confirm that JPMorgan's course of conduct was entirely inconsistent with its present argument that the

agreement with Banco Inbursa was nothing more than a standard loan participation agreement.

The record shows that:

- From the outset, JPMorgan recognized that Cablevisión would be concerned about the sale of an interest in the loan to a bank controlled by the Slim family.[3]

- In early May 2009, without first obtaining Cablevisión's consent, JPMorgan made a secret handshake deal to assign 90 percent of the loan to Banco Inbursa. JPMorgan then proceeded on the understanding it would need to honor its commitment to Banco Inbursa.

- When Cablevisión refused to consent to the assignment, JPMorgan responded by threatening to sell Banco Inbursa the 90 percent interest as a "participation."

- During June and early July 2009, JPMorgan negotiated a purported "participation" agreement with Banco Inbursa that sold the 90 percent interest at what Ms. Truzzell testified was a "substantial" discount from par. *See* Spray Dec. Ex. 3 at 41:16 - 42:5.

- JPMorgan chose not to accept the proposal by Grupo Televisa, S.A.B., Cablevisión's majority owner, to acquire the loan at a higher price (or lower discount) than Banco Inbursa was paying, even though Ms. Truzzell had confirmed to her colleagues that the "settlement" of any agreement with Televisa could have been achieved within a few days.

- Ms. Truzzell testified at her deposition that Banco Inbursa was the sole bank in the world to have offered to purchase a 90 percent interest in the loan – suggesting that the bank was achieving unique competitive advantages for the Slim empire.

- JPMorgan also chose not to offer any other bank – including banks that had expressed an interest in participating in the loan – the same discount provided to Banco Inbursa.

- JPMorgan purposefully hid its agreement with Banco Inbursa, entered on July 15, 2009, from Cablevisión and Grupo Televisa, even though Ms. Truzzell testified that she was aware of no legal impediment to disclosing the agreement. Indeed, the JPMorgan-Banco Inbursa agreement expressly permits the agreement to be disclosed to Cablevisión.

- In August, when JPMorgan had still not disclosed its agreement with Banco Inbursa, and after JPMorgan's vice chair suggested to Grupo Televisa that its concerns about a transfer

---

[3]   Ms. Truzzell provided hearsay testimony that one of her colleagues at JPMorgan had spoken in late March or early April 2009 to an officer of Grupo Televisa, Guadalupe Phillips, who had purportedly consented to JPMorgan approaching Banco Inbursa about acquiring an interest in the Cablevisión loan. The accompanying Second Declaration of Ms. Phillips, dated December 17, 2009, refutes this assertion. Moreover, Ms. Truzzell admitted that she had not personally participated in any conversation with Ms. Phillips, and that in any event at the time of any conversation with Ms. Phillips, JPMorgan had not contemplated or expected that Banco Inbursa would acquire a 90 percent interest in the loan. *See* Spray Dec., Ex. 3, at 15:5 – 16:22.

to Banco Inbursa were being addressed, JPMorgan successfully convinced Grupo Televisa to acquire a separate loan JPMorgan had made to another Televisa company.

- As late as November 2009, JPMorgan refused to answer specific requests from Grupo Televisa for confirmation Banco Inbursa had acquired a 90 percent interest in the loan.

The foregoing facts, and others detailed below, also show that even were the JPMorgan-Banco Inbursa here a genuine "participation" agreement as defined in the Credit Agreement, it would nonetheless (and in the alternative) violate JPMorgan's covenant of good faith and fair dealing under New York law.[4]  This breach of the covenant of good faith would also justify injunctive relief.

## Statement of Facts

### The Telecommunications Market In Mexico

Plaintiff Cablevisión is one of Mexico's most important cable operators.  *See* Declaration of Guadalupe Phillips Margain ("Phillips Dec."), dated December 3, 2009, at Ex. 1.  Since July 2007, Cablevisión has offered customers a popular "triple play" package combining access to over 270 digital television channels, high-speed internet access, and unlimited local telephone calling.  *Id.* at Ex. 1 and ¶ 5.  Grupo Televisa is the majority owner of Cablevisión, and also owns a majority stake in Cablemás and a substantial stake in TVI, two other cable television and telecommunications businesses.  *Id.*

Telmex, the Mexican telecommunications conglomerate, is among Cablevisión's chief competitors, at this time in connection with internet and telephone service, and potentially in the pay television market.  *See* Phillips Dec. at ¶ 8.  Carlos Slim Helú and his family own a controlling stake in Telmex.  *Id.* at Ex. 2, p. 12 of 170; Ex. 3.  Public information suggests that Telmex owns or controls over 80 percent of telephone land lines in Mexico, while América

---

[4] The Credit Agreement provides, at § 9.09(a), that "[t]his agreement shall be construed in accordance with and governed by the law of the State of New York."

Móvil, also controlled by Mr. Slim and his family, owns or controls over 70 percent of the cellular telephone market in Mexico. *Id.* at Ex. 4 and Ex. 5. Telmex offers customers both telephone services and Internet access (through DSL and dial-up). Telmex has pending applications with the Mexican government to provide pay television services through its telephone lines. *Id.* at Ex. 2, p. 9 of 170. A JPMorgan evaluation of Grupo Televisa and its cable companies in February 2009 identified as "Competition" risks the possibility of Telmex obtaining either a concession for "IPTV" or a license for satellite television. *See* Spray Dec. Ex. 4 at JPM0001670.

Telmex is closely related to Banco Inbursa. Public information suggests that Carlos Slim is honorary life chairman of Telmex and Banco Inbursa's parent company, Grupo Financiero Inbursa, S.A.B. de C.V. ("Grupo Financiero"), and Mr. Slim and his family own controlling shares in both entities. Phillips Dec. at Ex. 7. Public documents identify one of Mr. Slim's sons as the chair of Telmex's board of directors and a second son as chair of Grupo Financiero. *Id.* at Ex. 2, p. 52 of 170; Ex. 6, p. 56-57. The two entities have six board members in common. *Id.* at Ex. 2, p. 52-56 of 170; Ex. 6, p. 56-57.

### Cablevisión Acquires Control of Bestel

As of December 2007, Cablevisión owned 69.2% of a subsidiary holding company named Cablestar, S.A. de C.V. ("Cablestar"). Cablevisión's affiliates Cablemás and TVI each owned 15.4%. In December 2007, Cablestar paid $325 million to acquire shares of companies owning the majority of the assets of Bestel, which operated the third-largest national fiber-optic network in Mexico. Cablevisión contributed $225 million to the purchase, and Cablemás and TVI each contributed $50 million. *See* Phillips Dec. at ¶ 16.

To finance the acquisition, Plaintiff Cablevisión, Cablemás and TVI each entered into a loan facility with Defendant JPMorgan. Grupo Televisa and its affiliates for many years had a

strong business relationship with JPMorgan and its predecessor companies. *See* Phillips Dec. at

¶ 15.[5] Cablevisión borrowed $225 million from JPMorgan pursuant to the Credit Agreement and

a promissory note. *Id.* at Ex. 8 (Credit Agreement) and Ex. 9 (Promissory Note). Pursuant to

separate agreements, Cablemás and TVI each borrowed $50 million from JPMorgan. *Id.* at ¶ 17.

**The Credit Agreement**

> The Credit Agreement Imposes Various Restrictive Covenants on Cablevisión

In exchange for lending $225 million to Cablevisión, JPMorgan received, *inter alia*,

certain assurances with regard to the management of Cablevisión's affairs going forward. These

assurances are expressed as negative covenants in the Credit Agreement. Among the negative

covenants are restrictions on Cablevisión's ability to incur debt, make fundamental changes,

undertake investments, sell assets, expend capital, and leverage its business. *See* Phillips Dec. at

Ex. 8, Article 6 ("NEGATIVE COVENANTS"). In particular, the Credit Agreement provides:

- Debt: Cablevisión may incur, create or assume additional debt only in enumerated and narrowly-defined circumstances. *Id.* at Ex. 8, § 6.01.

- Fundamental Changes: With limited exceptions, Cablevisión may not "merge into or consolidate with any other person, or liquidate or dissolve, or permit any other Person to merge into or consolidate with it." *Id.*, § 6.03.

- Investments, Loans, Advances, Guarantees and Acquisitions: Again with limited exceptions, Cablevisión may not "purchase, hold or acquire . . . any Equity Interest in or evidence of indebtedness or other security . . . of, make any loan or advance to, Guarantee any obligation of, or make any investment or other interest in, any other Person, or purchase or otherwise acquire . . . any assets of any other Person constituting a business unit." *Id.*, § 6.04.

---

[5]   In early 2008, for example, when Grupo Televisa announced its intention to pursue a debt offering, JPMorgan sought to be a lead underwriter. JPMorgan was one of many suitors. JPMorgan's Raimundo Langlois wrote to Grupo Televisa on February 15, 2008, stating, *inter alia*, "I reiterate JPM's interest in this transaction and the value we place in a long term and mutually beneficial relationship." Grupo Televisa chose J.P. Morgan Securities Inc. and HSBC Securities (USA) Inc. to act as lead underwriters of the bond offering. In May 2008, Grupo Televisa issued $500 million in ten-year notes. *See id.* ¶¶ 25-26 and Ex. 13.

- Assets:  Cablevisión's cumulative asset sales may not exceed $50 million during any fiscal year, and asset sales must be for 90% cash consideration (a narrow class of sales, including the sale of worn-out and surplus equipment, can be made freely).  *Id.*, § 6.05.

- Capital Expenditures:  Cablevisión may not permit its annual capital expenditures to exceed $100 million per annum between 2008 and 2012.  *Id.*, § 6.12.  (As discussed below, the parties later amended this provision, before the 90 percent interest in the Cablevisión loan was sold to Banco Inbursa.)

- Leverage:  Cablevisión may not permit its leverage ratio (a comparison of total debt and EBITDA) to exceed 4 to 1.  *Id.,* § 6.14.

It is not unusual for a lender, particularly of a large sum, to condition its loan on the acceptance of negative covenants like those described above.  Such restrictions give the borrower a keen interest in limiting the lender's ability to assign the loan and the attendant right to enforce the restrictive covenants.  *Id.* at ¶ 20.  *See also* Declaration of Daniel Toscano ("Toscano Dec.") at ¶ 9.

<u>The Credit Agreement Grants Cablevisión a Veto Right Over Assignments</u>

When Cablevisión and JPMorgan negotiated the terms of the Credit Agreement in late 2007, Cablevisión was aware that JPMorgan intended to syndicate and assign 90 percent of the $225 million loan, along with 90 percent of the Cablemás and TVI loans.  *See* Phillips Dec. at ¶ 19.[6]  Cablevisión recognized that syndication would give access to its most confidential information and cede control over the loan to third-parties, along with the right to enforce the restrictive covenants described above, and Cablevisión accordingly bargained for and received the right to veto unilaterally any proposed loan assignments.  *Id.* at ¶ 19.  Section 9.04(b) of the Credit Agreement provides in pertinent part:

---

[6]  The Credit Agreement states that partial assignments "shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement."  *Id.* at Ex. 8, § 9.04(b)(ii).

> Any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of any Commitment it has at the time and any Loans at the time owing to it); *provided* that: (i)  . . . the Borrower must give prior written consent to any such assignment (which consent shall not be unreasonably withheld). . . .

*Id.* at Ex. 8, § 9.04(b).  As explained in the accompanying declaration of Mr. Toscano, borrowers commonly bargain for such a veto right.

The Credit Agreement provides two exceptions to JPMorgan's obligation to obtain Cablevisión's consent to an assignment:  "a Lender may assign or otherwise transfer its rights and obligations hereunder without the prior written consent of the (a) Borrower if (1) such assignment or transfer is an assignment or transfer of all or any portion of a Loan to a Person that is a Lender or a Lender Affiliate or (2) an Event of Default has occurred and is continuing."  *Id.* at Ex. 8, § 9.04(b)(i)(a).  Neither exception has been triggered.

The veto right over assignments assures that an unsuitable party could not replace JPMorgan in the exercise of the Lender's rights.  *See* Phillips Dec. at ¶ 20.  The veto right also protects Cablevisión's sensitive competitive information.  *See id.* at ¶ 18.

### The Credit Agreement Restricts JPMorgan's Right To Sell Participations

The Credit Agreement permits JPMorgan, as Lender, to sell "participations" in the Cablevisión loan to "one or more banks or other entities."  Phillips Dec. at Ex. 8, § 9.04(e).  The Credit Agreement provides, however, that participations do not transfer JPMorgan's rights and obligations to a participant.  Thus, JPMorgan as Lender may only sell a participation if:

> (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii)  the Borrower, the Administrative Agent and the other Lender Parties shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

*Id.* at Ex. 8, § 9.04(e).  In addition,

> Any agreement or instrument pursuant to which [JPMorgan] sells such a participation shall provide that [JPMorgan] shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; *provided* that such agreement or instrument may provide that [JPMorgan] will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant.

*Id.* at Ex. 8, § 9.04(e).  The reference to Section 9.02(b) means a participant that otherwise qualifies only can have consent rights to the limited extent that a proposed amendment or waiver would alter that participant's economic rights by, for example, reducing the amount of principal or interest payable or postponing a due date for principal or interest.  *Id.* at Ex. 8, §9.02(b).

<u>The Credit Agreement Restricts Disclosure of Cablevisión's Confidential Information</u>

Cablevisión also bargained for restrictions on JPMorgan's ability to disclose confidential information to third parties.  With limited exceptions, JPMorgan agreed to maintain the confidentiality of Cablevisión's "Information," broadly defined.  *See* Phillips Dec. at Ex. 8, § 9.16.  And the Credit Agreement imposes detailed, bold-lettered restrictions on how the Lender can handle Cablevisión's confidential information.

**Cablevisión and Its Majority Owner Grupo Televisa Acted in Good Faith**

<u>Grupo Televisa Makes Extraordinary Efforts To Help JPMorgan Syndicate the Loans</u>

The borrowers' unilateral right to veto assignees made it necessary for JPMorgan to coordinate its syndication efforts with Cablevisión and with Cablemás and TVI.  During 2008 and 2009, the Televisa entities made extraordinary efforts to assist JPMorgan with syndication.  Phillips Dec. ¶¶ 22, 27, 28 and 31, and Ex. 14.

When JPMorgan was unable to syndicate the loan in 2008 in the face of difficult credit markets, Televisa voluntarily agreed to increase the interest rate it paid to JPMorgan.  The floating interest rate on Cablevisión's loan is determined by adding a margin over LIBOR.

Despite no contractual obligation to do so given the timing of JPMorgan's request, Cablevisión agreed to JPMorgan's request for an increase. *Id.* at ¶ 29 and Ex. 15.

On March 9, 2009, at the request of JPMorgan's Jackie Truzzell, representatives of JPMorgan and Televisa met to discuss the status of ongoing negotiations with banks. At the time, at least three banks – HSBC, BNP Paribas and Scotia Bank, all acceptable to the Televisa parties – apparently were prepared to acquire interests in the loans, though JPMorgan asserted that the terms being offered were not sufficiently attractive from its perspective. *Id.* at ¶ 33.

At the same time, JPMorgan approached Banco Inbursa about acquiring an interest in the Cablevisión loan. JPMorgan's Ms. Truzzell testified that at this time, JPMorgan had not yet contemplated Banco Inbursa acquiring a large stake in the loan and "just wanted to give them the information for them to consider the purchase. The amount of the purchase wasn't open for discussion at that point." *See* Spray Dec. Ex. 3 at 16:8 – 22. JPMorgan recognized that Cablevisión and Grupo Televisa might object to any transfer to a bank within the Slim empire. JPMorgan's Gilberto Sotelo wrote to his colleagues, "I think they would object. Before talking to Inbursa, we'd have to ask TV if they have any objection." Spray Dec. Ex. 5 (JPM0000157). Reflecting the attitude that would infuse JPMorgan's subsequent conduct, JPMorgan's Carlos Ruiz de Gamboa responded to Mr. Sotelo by asking, "And what happens if I want to sell, regardless of what the client 'prefers'"?[7]

While initial contact with Inbursa was underway in late March 2009, JPMorgan's Raimundo Langlois insisted that Televisa itself acquire 100 percent of the Cablemás and TVI

---

[7]   Ms. Truzzel testified she recalled Mr. Sotelo, in either late March or early April 2009, spoke to Grupo Televisa's Guadalupe Phillips and obtained her consent to providing Banco Inbursa with information about the loan. Spray Dec. Ex. 3 at As set forth in Ms. Phillips' accompanying Second Declaration, Ms. Phillips does not recall any such conversation, and is certain that she would not have agreed to any 90 percent assignment to Banco Inbursa. *See* Second Declaration of Guadalupe Phillips Margain, dated December 17, 2009, at ¶ 3.

loans.  Televisa was reluctant to agree.  At this same time, Cablevisión requested from JPMorgan

a waiver to the negative covenant in the Cablevisión Credit Agreement that placed a limit on

Cablevisión's capital expenditures.  Cablevisión sought this waiver to permit key expenditures

on growth Cablevisión deemed critical to securing its competitive position in the emerging

Triple Play market.  JPMorgan responded to this waiver request by conditioning the granting of a

waiver on Grupo Televisa agreeing to acquire the Cablemás and TVI loans – precisely the type

of exercise of power by the lender that Cablevisión's veto right in the Credit Agreement was

meant to counterbalance.  *Id.* at ¶¶ 20, 37 and Ex. 21.  JPMorgan's conditions demonstrated

clearly the power the lender has to impede Cablevisión's growth and ability to compete.

      Ultimately, JPMorgan withdrew the condition it had initially placed on approval of the

capital expenditure covenant waiver, and agreed on May 8, 2009, to a Second Amendment of the

Cablevisión Credit Agreement.  *Id.* at ¶ 41 and Ex. 10.

## JPMorgan Attempts to Assign Its Interest In the Credit Agreement To Banco Inbursa

      Unbeknownst to Grupo Televisa and Cablevisión, at the same time JPMorgan was

addressing Cablevisión's waiver request and pushing Televisa to acquire the Cablemás and TVI

loans, JPMorgan was at work negotiating the sale to Banco Inbursa of a 90 percent interest in the

Cablevisión loan.  On May 7, 2009, without any disclosure that Banco Inbursa was involved,

JPMorgan's Raimundo Langlois sent an e-mail to America Castillo, a junior employee of Grupo

Televisa, with a revised Information Memorandum for prospective assignees of and/or

participants in the Cablevisión loan.  *Id.* at Ex. 24.  This version of the Information

Memorandum was intended to include only public information about Cablevisión, and Mr.

Langlois asked Ms. Castillo "to check that it is correct."  *Id.*  Mr. Langlois also sent Ms. Castillo

a proposed letter in which Cablevisión would grant JPMorgan authorization to deliver the

revised Information Memorandum and evaluation material to potential lenders that identify

themselves as "public siders." *Id.* This was the first time JPMorgan had requested that the

Memorandum exclude Cablevisión's confidential information, and the first time that JPMorgan

did not identify by name the potential acquirer(s) of interest in the Cablevisión loan. *Id.* at ¶ 43.

The very next day – May 8, 2009 – Julian Lautersztain of JPMorgan requested that Ms.

Castillo, the junior Televisa employee, execute a letter drafted by JPMorgan in which

Cablevisión would authorize Banco Inbursa to obtain a Credit Bureau report on Cablevisión. *Id.*

at Ex. 25. Ms. Castillo, not recognizing the significance of this request, and perceiving it routine,

provided the requested authorization to JPMorgan on May 15, 2009. *Id.* at ¶ 45 and Ex. 26.

Mr. Lautersztain did not disclose that the very same day, JPMorgan reached an

agreement to assign 90 percent of the Cablevisión loan to Banco Inbursa. Javier Cervantes of

Banco Inbursa wrote to JPMorgan's Mr. de Gamboa on May 8, 2009 "to confirm that the

US$202.50 million for the Cablevisión loan closed at the LIBOR rate + 525 bps" – meaning that

Banco Inbursa would pay a discount off the face value of the loan of 525 basis points above the

LIBOR interest rate curve. Spray Dec. Ex. 6 at JPM00002953. JPMorgan's Mr. de Gamboa, in

an email to others at JPMorgan including Ms. Truzzell, wrote, "confirmation from client. In

principle Banco Inbursa will buy the loan." *Id.* Ms. Truzzell testified that in early May 2009

there was "the agreement of the sale and at what price." She explained that "[t]here was a

handshake. There wasn't – there wasn't any document that was signed, but there was a – there

was a verbal recognition from both parties that they would – that the loan would be sold." Spray

Dec. Ex. 3 at 17:6 – 18:21. JPMorgan made this agreement without Cablevisión's consent. *Id.*

at 18:22 – 19:9, and took no steps in the next twelve days to obtain that consent.

Early in the morning of May 21, 2009, JPMorgan's Mr. Lautersztain sent an email to

several colleagues, including Mr. Sotelo, asking each to "[p]lease indicate your availability for a

call tomorrow at 10:45 AM NYT to discuss the sale of the loan to Inbursa and what to tell Televisa." Spray Dec. Ex. 7 at JPM0002958. But JPMorgan's plans were disrupted at approximately 9 a.m. Mexico City time that same day, when HSBC informed Grupo Televisa's Pablo Camacho by telephone that JPMorgan had advised HSBC – which previously had indicated an interest in purchasing as much as $40 million notional amount of the Cablevisión loan – that the Cablevisión loan was no longer on the market. Within one hour, at approximately 10 a.m. Mexico City time, Grupo Televisa's Ms. Phillips contacted JPMorgan's Mr. Sotelo to advise that Televisa had received this report. Ms. Phillips asked if the Cablevisión loan had been sold to Banco Inbursa. Mr. Sotelo denied any sale had been made. Phillips Dec. at ¶ 47.

Later that same day, however, Julian N. Lautersztain of JPMorgan sent to Ms. Castillo and others at Grupo Televisa a written request for Cablevisión's approval of the assignment to Banco Inbursa of 90 percent of the Cablevisión loan. The email attached an agreement in final form, pursuant to which JPMorgan would assign 90 percent of its interest in the Cablevisión loan, or $202,500,000, to Banco Inbursa. Mr. Lautersztain wrote that "Inbursa would like to execute this transaction early next week, which would require your agreement and signature by tomorrow morning at the latest." *Id.* at ¶ 48 and Ex. 28.

Just hours later, in the early evening, JPMorgan's Mr. de Gamboa responded to Mr. Lautersztain's earlier email, which had suggested a phone conference on what to tell Televisa about the sale to Banco Inbursa. Mr. de Gamboa wrote to his colleagues: "There is nothing to discuss. The sale already took place and it's a done deal." Spray Dec. 7 at JPM0002957.

The next day, May 22, Mr. Sotelo of JPMorgan telephoned Televisa's Ms. Phillips, and requested that Cablevisión immediately consent to the assignment to Banco Inbursa of 90% of JPMorgan's interest in the Cablevisión loan. When Ms. Phillips indicated that this would be

unacceptable, Mr. Sotelo asserted that since Televisa's Ms. Castillo had authorized Inbursa to review Cablevisión's information at the Credit Bureau, JPMorgan had assumed Televisa did not oppose a possible assignment to Banco Inbursa.[8]  In response, Ms. Phillips emphatically told Mr. Sotelo that such assignment was a problem for Televisa and Cablevisión.  *Id.* at ¶ 49.

Later that day, Ms. Phillips sent an email to JPMorgan stating that Televisa had not consented and would evaluate JPMorgan's request.  *Id.* at Ex. 29.  After thorough review, Cablevisión refused to sanction the proposed assignment.  On June 3, 2009, Ms. Phillips called JPMorgan's Mr. de Gamboa to inform him that Cablevisión had not consented to the proposed assignment to Banco Inbursa.  Mr. de Gamboa's reaction was to threaten to give Banco Inbursa the 90 percent interest in the loan in the form of a "participation."  *Id.* at ¶ 51.

Later on June 3, Ms. Phillips sent JPMorgan an email attaching a letter in which Cablevisión, through its counsel, confirmed that it did not consent to the proposed assignment:

> Taking into account that Inbursa is an affiliate of a major competitor of [Cablevisión], . . . and after careful consideration, we are unwilling to consent to any such assignment to Inbursa.  We believe that it would be inappropriate, and could cause serious harm to our business and our competitive position, if one of our major competitors is allowed to gain access to confidential and competitively sensitive information about us, or to exert any control over our business affairs and hinder the development of our business.

*Id.* at Ex. 30.  Likewise, and as a result of Mr. de Gamboa's threat to give Banco Inbursa the 90 percent interest by means of a purported "participation," Cablevisión clearly addressed that issue and expressed the same concerns about selling a participation to Banco Inbursa, warning JPMorgan that, "[i]f JPMorgan were to sell a participation to Inbursa, we believe such a sale would be a violation of JPMorgan's duty of good faith under the Credit Agreement."  *Id.*

---

[8]   Notably, Mr. Sotelo did not suggest that Ms. Phillips herself had previously indicated that Televisa would consent to such an assignment.  Second Phillips Dec. at ¶5.

In early June, JPMorgan conducted secret negotiations, detailed below, to finalize arrangements with Banco Inbursa to transfer the 90 percent interest in the loan under the guise of a "participation." After learning about JPMorgan's desire to sell an interest to Banco Inbursa, Grupo Televisa proposed to JPMorgan that Televisa itself acquire the loan. Cablevisión and Grupo Televisa offered to match any offer by Banco Inbursa, but had difficulty determining exactly what Banco Inbursa had proposed to pay for its assignment, or whether JPMorgan had already entered into some agreement with Banco Inbursa. *Id.* at ¶ 52 and Exs. 31 and 32.

JPMorgan remained committed to pursuing a transfer of the Cablevisión loan to Banco Inbursa, and hoped to convince Grupo Televisa to acquire the smaller loans to Cablemás and TVI. JPMorgan withheld information from Televisa about discussions with Banco Inbursa, and tried to create an atmosphere in which Televisa would be willing to purchase the other loans. For example, JPMorgan's Mr. Leenart wrote to his colleagues on June 4, 2009, that he hoped to set up a meeting with Televisa's CFO. He wrote: "Stated purpose of meeting is to try and make a fresh start after the disagreements over the last few months. Real purpose is to assess whether they can be a buyer of any of the two remaining loans." Spray Dec. Ex. 8 at JPM0003010.

Televisa continued to explore the possibility of itself acquiring the Cablevisión loan. Ms. Truzzell testified that Televisa offered a higher price – that is, a lower discount off the face value of the loan – than had been agreed with Banco Inbursa. Spray Dec. Ex. 3 at 45:15 – 46:19. In early June, Televisa – unaware of JPMorgan's internal positions with respect to Banco Inbursa – also agreed to purchase 100% of the TVI loan from JPMorgan. By accepting the assignment, Grupo Televisa eliminated JPMorgan's exposure on a $50 million credit facility that JPMorgan had not yet been able to syndicate. *Id.* at ¶ 53.

On June 17, 2009, JPMorgan's Mr. Leenart wrote to Televisa's Mr. Folch that, "I cannot envisage any scenario in which we would sell to them [Banco Inbursa] at a better price than to you." Spray Dec. Ex. 9 at JPM0002915. On, June 18, JPMorgan's Mr. Sotelo reported to his colleagues that Televisa was proposing to buy 90% of the Cablevisión loan at a discount of LIBOR plus 475 basis points – that is, a lower discount (and, therefore, a higher price) than had been agreed in May with Banco Inbursa. Mr. Sotelo reported that Televisa was "taking the proposal" to Televisa's investment committee the very next day. In response, Ms. Truzzell wrote that "[o]n the settlement side, and assuming Grupo Televisa S.A.B. is the buyer (the same entity that bought TVI), we should be good to go in three Business Days." Spray Dec. Ex. 10 at JPM0003041.[9]

But though a sale of the Cablevisión loan to Televisa could have been quickly accomplished, and at a better price for JPMorgan than had been agreed with Banco Inbursa, JPMorgan pulled the plug that same day. Mr Leenart wrote to Televisa's Mr. Folch that:

> I called you and left you a voicemail. After I hung up with you, we had an internal meeting to review the entire situation around Televisa and Inbursa and I am afraid I have to ask you to put any internal approval process on hold. We clearly find ourselves caught in a situation which we did not foresee and our legal experts want more time to make sure we fully understand the legal implications of any decision we may make.

Phillips Dec. at Ex. 33. Remarkably, without disclosing JPMorgan's ongoing discussions with Banco Inbursa to finalize an agreement, Mr. Leenart told Mr. Folch that "You have my word that we are not agreeing to or entering into any transaction with any other party." *Id.* Mr. Folch

---

[9]   JPMorgan undoubtedly will try to minimize the importance Ms. Truzzell's statement, by arguing that this rapid settlement could have occurred only after an agreement had been executed with Televisa. In fact, the agreement with Televisa could have been finalized very quickly. Televisa had just purchased the TVI loan, so a precedent directly on point was available. In addition, Televisa is the controlling owner of Cablevisión. There would have been no difficult issues about access to information, consents to waivers or all of the other issues that slowed down negotiations between JPMorgan and Banco Inbursa.

responded that he had been unable to "just cancel" Televisa's internal process, and he could now "confirm you that Televisa is prepared to buy the loan within next week at the price that we discussed this afternoon (475 bp). I take your word that JPMorgan is not agreeing to or entering into any transaction with any other party than Televisa." Spray Dec. Ex. 11 at JPM0000017.

On June 19, 2009, however, Mr. Leenart wrote to Mr. Folch, to argue that a participation to Banco Inbursa would not significantly affect Cablevisión's rights, and that Cablevisión could significantly benefit from Banco Inbursa's purchase of the loan. In Mr. Leenart's words, "I respect your arguments for now wanting to purchase the loan but one could reasonably argue the benefits or risks your are highlighting are limited or can be mitigated." He stated that "we and others need to take a view on whether [JPMorgan] has any reason or ground (reputational, legal) not to proceed with the transaction under discussion with Inbursa." Phillips Dec. at Ex. 34.

Mr. Folch responded to Mr. Leenart's June 19, 2009, email the same day, stating:

I do not want any confusion, so I want to be very clear:

a)      I am surprised by the fact that you have not yet fully understood the implications of participating a portion of the loan to a competitor of Cablevisión, therefore I will not discuss any of the specifics related in your e-mail (including stripping covenants and flexibility on repayment). Those are internal considerations which we believe are valid.

b)      JP Morgan created this situation by itself. It is not Cablevisión's nor Grupo Televisa's fault if JP Morgan committed to a third party on something that it cannot do.

c)      As we have repeatedly told JP Morgan in the past (including in Cablevisión's June 3, 2009 letter), Cablevisión and Grupo Televisa (as the majority shareholder of Cablevisión) have a great concern that the Cablevisión loan is assigned to a competitor or an affiliate of Telmex/Telcel (Inbursa), and we will go the distance, including litigation if it is unavoidable, to prevent any assignment/participation of the Cablevisión loan to any competitor.

*Id.* at Ex. 35.

On June 23, 2009, Grupo Televisa wrote to JPMorgan and reiterated that the sale of a participation to Banco Inbursa would violate JPMorgan's duties of good faith and fair dealing. Grupo Televisa noted that it had "offered to purchase the same amount that JP Morgan is intending to participate to Inbursa and even the full amount of the Loan on more favorable terms than those offered by Inbursa." *Id.* at Ex. 36. JPMorgan did not respond, and negotiations between the parties halted. *Id.* at ¶ 60.

But that same day, JPMorgan's Mr. Cepeda wrote to others at JPMorgan stating, ironically in light of the ongoing treatment of Televisa, that "[w]e are committed to Inbursa. Our word is our bond." Spray Dec., Ex. 12 at JPM0003210. And JPMorgan's Mr. Leenart responded that Grupo Televisa's senior officer, Mr. de Angoitia, should be advised that JPMorgan would retaliate for legal action by Cablevisión to enforce its rights: "To the extent appropriate, do remind Alfonso that we will be a long term partner whether he likes it or not. Because we will sub-participate the loan to Inbursa, JPM will be lender of record until the deal matures or is repaid, and as such, any amendments or changes to the loan agreement, however small, will have to be agreed by JPMorgan. As such, suing us would not be conducive to us acting as a friendly and constructive lender." *Id.* If JPMorgan could approach its lender role in this way, one can only imagine the challenges to Cablevisión of having Banco Inbursa involved.

JPMorgan forged ahead with Banco Inbursa to finalize their agreement. Ms. Truzzell admitted that while JPMorgan was not disclosing to other interested parties the discount rate being offered to Banco Inbursa, *see* Spray Dec., Ex. 3 at 99:15 – 100:02, JPMorgan did disclose to Banco Inbursa the rate that had been offered by Grupo Televisa and gave Banco Inbursa the opportunity to meet it. Ms. Truzzell testified that, "I understand – I was not involved in the price negotiations, but I understand that – that Inbursa was willing to match the price that, or the

21

indication that JPMorgan had received regarding the sale, the potential sale of the loan to Televisa." *Id.* at 67:21 – 68:11.

In early July 2009, JPMorgan was aware that other banks were interested in acquiring at least some of the Cablevisión loan. Ms. Truzzell wrote to her colleagues on July 17 that Tokyo Mitsubishi Bank "[h]ad called recently saying they were now interested in participation in Cablevisión. They sent an email yesterday." She also noted that HSBC remained willing to purchase a $40 million interest in the loan. But Ms. Truzzell rebuffed these offers, telling Tokyo Mitsubishi that "they [sic] were other players considering the asset," and telling HSBC "that the Cablevisión loan was not for sale anymore." Spray Dec. Ex. 13 at JPM0000033. Ms. Truzzell added for good measure her concern that HSBC might let Grupo Televisa know the Cablevisión loan was no longer for sale, and that "they'll probably add two and two together." *Id.*

While Ms. Truzzell asserted at her deposition that there were purported uncertainties about the willingness of the Tokyo Mitsubishi Bank and another bank, Bancomer, to acquire a significant portion of the Cablevisión loan, Ms. Truzzell also admitted at her deposition that none of these banks were offered the same "substantial" discount that JPMorgan was offering to Banco Inbursa. Ms. Truzzell similarly admitted the JPMorgan never explored whether HSBC (which was offering a lower discount than Banco Inbursa for a $40 million interest in the loan) would have been willing to purchase a larger share of the loan at a higher discount. Spray Dec. Ex. 3 at 99:10 – 104:6.

In early July 2009, during the annual conference for business leaders sponsored by Allen & Co. in Sun Valley, Idaho, JPMorgan's vice chair James "Jimmy" Lee told Alfonso de Angoitia, executive vice president of Grupo Televisa, that JPMorgan was eager to find a solution satisfactory to Televisa. On July 15, 2009, Mr. Lee sent an email to Mr. de Angoitia stating: "I

spoke to Gucho, who I believe is resolving.  Great to see you in Sun Valley.  Jimmy."  *Id.* at ¶ 60

and Ex. 37.  That same day, JPMorgan secretly consummated its agreement to transfer a 90

percent interest in the Cablevisión loan to Banco Inbursa.  Again, JPMorgan said one thing to

Televisa but did something very different.

Even after the July 15 agreement, JPMorgan kept the deal secret from Cablevisión and

Grupo Televisa.  On August 12, 2009, JPMorgan's Mr. Sotelo wrote to his colleagues, including

Ms. Truzzell, that "At this point, TV has not asked and we have not told them about the

participation to Inbursa."  Spray Dec. Ex. 14 at JPM0003073.  Ms. Truzzell admitted at her

deposition that there was no legal impediment to disclosing the new agreement to Cablevisión

and Televisa.  Spray Dec., Ex. 3 at 31:12 – 31:18.  In fact, Section 4.04 of the JPMorgan-Banco

Inbursa agreement expressly states that "[t]he Participant acknowledges that the Bank may notify

the Borrower of the Participation."  *Id.*., Ex. 2 at §4.04.

It appears that JPMorgan continued to hope that Grupo Televisa would acquire the

remaining Cablemás loan, or at least approve an assignment – approval that might not be

forthcoming if JPMorgan were to disclose its agreement with Banco Inbursa.  In fact, on August

18, 2009, at a time when the agreement with Banco Inbursa still had not been disclosed,

JPMorgan obtained Cablemás's (and, thus, Televisa's) consent to assigning 90% of Cablemás's

$50 million credit facility.  Phillips Dec. at ¶ 63.

By late September 2009, no one from JPMorgan had contacted Televisa or Cablevisión to

"resolve" the transfer to Banco Inbursa.  *Id.* at ¶ 64.  Televisa's Mr. de Angoitia then wrote by

email to Mr. Lee:

> You were kind enough to send me the mail below on July the 15th.  I know this is
> not your direct problem so I am sorry I have to bother you with it.  Unfortunately,
> nothing has happened, nothing has been resolved and, to my surprise Gucho never
> called. . .   I am still puzzled about this since before the problems we were

investing around $1.5 billion of our cash with you. We had traditionally used JPM for M&A, including in respect to our acquisition of the over the air network in Spain. As a result of all this mess and not having received a single call from JPM, we just engaged another bank for a new deal in Spain. Is there any interest on the part of JPM to resolve any of this and to go back to the relationship we have had for so many years? Can you give me some advi[c]e?

*Id.* at Ex. 40. Mr. Lee never responded. *Id.* at ¶ 64.

In November 2009, Cablevisión and Grupo Televisa offered JPMorgan several chances to acknowledge its agreement with Banco Inbursa, but JPMorgan declined, citing "compliance policies and procedures." *See* Phillips Dec. at Exs. 41, 42, 43, 44. Only after Cablevisión filed its complaint in this action did JPMorgan provide Cablevisión a copy of the JPMorgan-Banco Inbursa Agreement.

### **Argument**

## I.    **STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF**

A preliminary injunction should be granted where a party can demonstrate "(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly" in the movant's favor. *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 108 (2d Cir. 2003); *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43 (2d Cir. 1999). In a preliminary injunction, it "is always appropriate to grant intermediate relief of the same character as that which may be granted finally." *Republic of Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986).

## II.   **CABLEVISIÓN IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM THAT JPMORGAN HAS BREACHED THE CREDIT AGREEMENT**

In New York, breach of contract is established when the plaintiff can prove (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages. *Paxi, LLC v. Shiseido Americas Corp.*, 636 F.

Supp. 2d 275, 281-82 (S.D.N.Y. 2009) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004)). There is no dispute that the Credit Agreement is a valid and binding contract, and there should be no dispute that Cablevisión has performed adequately its obligations under the Credit Agreement.

The July 15, 2009 JPMorgan-Banco Inbursa agreement by its plain terms does not satisfy the standards in the Credit Agreement for a participation. JPMorgan breached the Credit Agreement by entering into that agreement without obtaining Cablevisión's consent.

As demonstrated above, the Borrower's right to veto assignments, set forth at § 9.04(b) of the Credit Agreement, is straightforward and unambiguous. Phillips Dec. at Ex. 8, § 9.04(b). The two exceptions to the veto right – for a participation by a party that is already a lender, or after an event of default by the borrower – are not present here. *Id.* at Ex. 8, § 9.04(b)(i)(a).

While the Credit Agreement permits JPMorgan, as Lender, to sell "participations" in the Cablevisión loan to "one or more banks or other entities" without Cablevisión's approval, the Credit Agreement limits "participations" to those transfers by the Lender where (i) such Lender's obligations under this Agreement remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent and the other Lender Parties shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement." Spray Dec., Ex. 1 at § 9.04(e).

The JPMorgan-Banco Inbursa agreement does not satisfy these standards, because it transfers to Banco Inbursa rights of the Lender that, under the Credit Agreement, can only be transferred to an assignee. To begin with, Section 3.01 of the JPMorgan-Banco Inbursa agreement provides:

> To the extent requested by the Participant and subject to Section 4.03 hereof, the Bank will furnish to the Participant copies of the Credit Document and any amendments, consents, waivers or notices, or any other material received by the Bank in its capacity as Lender, relating to any of the foregoing (collectively, "Loan Documents"). The Bank will request from the Borrower (to the extent that it is entitled under the Credit Document to do so) and (if and to the extent received by the Bank from the Borrower and subject to Section 4.03 hereof) furnish to the Participant such information concerning the business, affairs or financial condition of the Borrower as the Participant may reasonably request.

Spray Dec., Ex. 2.[10]  On its face, the second sentence of this Section gives Banco Inbursa, the participant, the power to direct JPMorgan in the exercise of JPMorgan's right under the Credit Agreement to request confidential information about Cablevisión's business, affairs and financial condition.  That right appears in Section 5.01 of the Credit Agreement – which contemplates that this information is intended to be shared only with "Lenders," not participants.[11]

Ms. Truzzell confirmed at her deposition that earlier drafts of Section 3.01 had a shorter first sentence, which did not give Banco Inbursa the right to "notices" or to "any other material received by the Bank in its capacity as Lender, relating to any of the foregoing."  Spray Dec. Ex. 3 at 81:11 – 82:19.  She also admitted that the new added language does not appear in JPMorgan's standard form participation agreement for Latin America.  *Id.* at 88:6 -18.  Ms. Truzzell noted in an email to Banco Inbursa on June 10, 2009 that "[y]ou want to include

---

[10]  Section 4.03 of the JPMorgan-Banco Inbursa agreement, referenced in 3.01, only reinforces Banco Inbursa's right to receive Cablevisión's competitively sensitive business information pursuant to Section 3.01.  Section 4.03 provides, in relevant part:  "Anything in this Agreement to the contrary notwithstanding, the Bank shall not be obligated to disclose to the Participant any information of a confidential nature relating to the Credit Document or the Borrower (*except for the documents and information expressly required to be furnished by the Bank under Sections 3.01* and 3.03 hereof)."  (Emphasis added.)

[11]  Section 5.01 provides, in relevant part, that "The Borrower will furnish to the Administrative Agent (which will promptly forward to each Lender): . . . (e) promptly following any request therefor, such other information regarding the operations, business affairs and financial condition . . . of the Cablevisión Group Companies on a consolidated basis, as the Administrative Agent may reasonably request."  Spray Dec, Ex. 1.  In the Credit Agreement, JPMorgan is both the Administrative Agent and the sole Lender.

wording in Section 3.01 to clarify that you would receive all the information sent by the Borrower," and she wrote that "[w]e can adjust the wording to indicate that we'll send you all the information that the loan's Lenders receive." Spray Dec. Ex. 15 at JPM0003252. Ms. Truzzell testified that "one of the benefits that the – that Inbursa was looking for is to get – to get the information that the bank was – was – was receiving as lender." Spray Dec. Ex. 3 at 83:15-19.

Another key provision of the JPMorgan-Banco Inbursa agreement is Section 2.04(d), which provides that "[t]he Bank and the Participant hereby agree that if an Event of Default occurs and is continuing, this Agreement shall be terminated and replaced by an assignment agreement (in the form of Exhibit A in the Credit document) whereupon the Participant shall become a Lender." Spray Dec., Ex. 2. While the Credit Agreement does permit JPMorgan to make assignments without Cablevisión's consent *following* a default, here JPMorgan has *already* (when no default has occurred) sold to Banco Inbursa the Lender's rights in the event of default – including the right, among other things, to require immediate full repayment of the loan.

Ms. Truzzell testified that this provision was not included in JPMorgan's standard form participation agreement for Latin America, and instead was added to the Banco Inbursa agreement in the negotiation process. Spray Dec. Ex. 3 at 80:12-22. The record also shows that by June 10, Banco Inbursa had advised JPMorgan that, as Ms. Truzzell wrote, "[t]hey want a mechanism by which they can start direct proceedings [against] the Borrower in the case of breach." Spray Dec. Ex. 16 at JPM0003522. Ms. Truzzell, who testified that "breach" encompasses "defaults," *id.*, Ex. 3 at 50:16-25, wrote at the time that **"We can't give them this because it's contrary to the participation structure."** (emphasis added). JPMorgan then did exactly what Ms. Truzzell said it could not do. JPMorgan used different words than Banco Inbursa had suggested, but the substance was exactly what Banco Inbursa had sought.

The final version of the JPMorgan-Banco Inbursa agreement also provides, at Section 2.04(a), that Banco Inbursa will receive its proportionate share, 90 percent, of any fees earned by JPMorgan in its capacity as Lender.  Ms. Truzzell acknowledged that this provision was not present in the June 8 draft of the agreement, and that it was also not part of JPMorgan's standard form participation agreement for Latin America.  Spray Dec. Ex. 3 at72:20 – 73:23; 78:24-79:6. On June 10, Ms. Truzzell wrote to Banco Inbursa that "[y]ou mentioned a need to include language in Section 2.04 indicating that you receive all the economic benefits generated by the loan."  Spray Dec. 15 at JPM0003252.  She testified that Banco Inbursa "initially started – came up with the issue that if they were to hold – if they were to hold the economic rights to – to the loan through the participation, they should also receive the economic benefits that the bank – that the bank receives."  Spray Dec. Ex. 3 at 73:24 - 74:16.  In other words, for Banco Inbursa, being a true participant was not sufficient; Banco Inbursa also demanded, and received, the economic rights of the Lender to collect fees.

As a practical matter, given the power of the purse, Banco Inbursa presumably will be able to influence JPMorgan's future consideration of requests for waivers of, or amendments to, the restrictive covenants, since the Lender typically earns a fees for granting waivers or amendments – but 90 percent of any such fee now will go to Banco Inbursa.  This practical reality is reinforced by 3.03(b) of the JPMorgan-Banco Inbursa agreement, which provides that "the Bank will endeavor to inform the Participant *prior to* agreeing to any other amendment, waiver or consent relating to the Loan Documents."  Spray Dec., Ex. 2.

Finally, Section 5.01 of the JPMorgan-Banco Inbursa agreement gives Banco Inbursa a right of first refusal if JPMorgan decides to transfer the 10 percent interest in the Cablevisión loan retained by JPMorgan.  This provision, which puts Banco Inbursa in a position to own 100

28

percent of the loan, was added in the negotiations at Banco Inbursa's request.  Once again, this

provision is not part of JP Morgan's standard form participation for Latin America.  Spray Dec.

Ex. 3 at 90:24 – 91-21.

That JPMorgan self-servingly labeled its agreement with Banco Inbursa as a

"participation" is not probative of whether the agreement in fact is a participation as defined in

the Credit Agreement.  *See, e.g.*, *In re Sackman Mortgage Corp.*, 158 B.R. 926, 932 (Bankr.

S.D.N.Y. 1993) ("merely looking to what the agreement names the transaction is an insufficient

basis to support the finding of a participation . . . ."); *see also In re Coronet Capital Co.*, 142

B.R. 78, 82 (Bankr. S.D.N.Y. 1992) ("although the parties can call a document a 'loan

participation agreement,' we are not obliged to make a holding that exalts [form] over

[substance].").[12]  In assessing whether a purported participation agreement is in fact a

participation, courts in this district have considered, among other factors, the "true intentions" of

the parties.  *In re Sackman*, 158 B.R. at 933 (citing *Coronet Capital*, 142 B.R. at 82) (analyzing

whether purported participation was a loan from the participant to the lead lender).

### III.   IN THE ALTERNATIVE, CABLEVISIÓN IS LIKELY TO SUCCEED ON ITS CLAIM THAT JPMORGAN BREACHED ITS DUTY OF GOOD FAITH

Even if the Court were to determine that the JPMorgan-Banco Inbursa Agreement did not

violate the literal terms of the Credit Agreement, Cablevisión has nevertheless established a

likelihood of success on the merits of its claim for breach of the implied covenant of good and

fair dealing.  An implied covenant of good faith and fair dealing inheres in every New York

contract.  *See Travelers Int'l. A.G. v. Trans World Airlines*, Inc., 41 F.3d 1570, 1575 (2d Cir.

1994).  Encompassed within the implied obligation of each promisor to exercise good faith are

---

[12]   The *Coronet Capital* opinion actually states that "we are not obliged to make a holding that exalts substance over form," but the court appears merely to have transposed the two concepts.

"any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Dalton v. Educ. Testing Service*, 87 N.Y.2d 384, 389 (1995). This embraces a pledge that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* "A party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations." *Chase Manhattan Bank, N.A. v. Keystone Distrib., Inc.* 873 F. Supp. 808, 815-16 (S.D.N.Y. 1994) (denying motion to dismiss claim for breach of duty of good faith and fair dealing, even though breach of contract claim had been dismissed, because "a trier of fact could conclude that [defendant] breached its duty to act in good faith even though there was no technical breach of the Contract").[13] A widely cited treatise notes that, "[i]n determining whether a party has breached the obligation or covenant of good faith and fair dealing, a court must determine not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties." 23 Williston on Contracts § 63:22 (4th ed. 2009).

JPMorgan clearly breached its duty of good faith and fair dealing by selling a 90% interest in the Cablevisión loan to Banco Inbursa. JPMorgan's conduct demonstrates that it purposefully deceived Cablevisión and Grupo Televisa, thereby denying them the opportunity to

---

[13] *See also JPMorgan Chase Bank, N.A. v. IDW Group, LLC*, No. 08 Civ. 9116 (PGG), 2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009) ("While independent obligations beyond those stated in the contract will not be inferred, a plaintiff adequately states an implied covenant claim by alleging conduct that subverts the contract's purpose without violating its express terms."). In *IDW Group,* the Court noted, with respect to claims by JPMorgan Chase Bank itself, that "to simultaneously plead breach of contract and implied covenant claims under New York law, a plaintiff must allege an implied duty that is consistent with the express contractual terms, but base its implied covenant theory on allegations that are distinct from the factual predicate for its contract claims." *Id.* at *5. The Court denied, in part, a motion to dismiss JPMorgan's claim for breach of the implied covenant of good faith and fair dealing, finding that the claim was not duplicative of JPMorgan's breach of contract claim and that JPMorgan had adequately alleged that the defendant had deprived JPMorgan of the benefits of the parties' contract. *Id.* at *7.

acquire the Cablevisión loan at a higher price than Banco Inbursa ultimately paid. JPMorgan pursued the sale of 90 percent of the loan to Banco Inbursa knowing full well that Banco Inbursa is closely affiliated with the companies that compete most directly with Cablevisión and Grupo Televisa in the telecommunications market.

It is well-settled in New York law that a party's authority to exercise discretion under a contract does not relieve the party of the duty to exercise its discretion in good faith. New York's highest court has held that, "[w]here the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Dalton*, 87 N.Y.2d at 389; *see also Travelers*, 41 F.3d at 1575 ("Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith."); *In re Shick*, 235 B.R. 318, 327 (S.D.N.Y. Bankr. 1999) ("'Absolute discretion' . . . does not necessarily mean what it suggests, or negate the implied covenant of good faith and fair dealing."). Similarly, in *Carvel Corporation v. Diversified Mgmt. Group, Inc.*, 930 F.2d 228 (2d Cir. 1991), the Second Circuit held that a distributorship agreement that gave the counterclaim defendant "considerable discretion" with regard to the matters at issue "did not relieve [the counterclaim defendant] of its duty to act in good faith." *Id.* at 231. The *Carvel* court further held that, "even if it had acted within the bounds of its discretion, [the counterclaim defendant] would be in breach if it acted unreasonably." *Id.* at 232. The Second Circuit reversed the jury's verdict and remanded for a new trial because "the jury, as instructed, could have mistakenly believed that [the counterclaim defendant] was not in breach because it had *near absolute control* over these matters." *Id.* (emphasis added).

IV.   **CABLEVISIÓN WILL SUFFER IMMINENT AND IRREPARABLE HARM**

A.   **The Subversion of Bargained-For Veto Rights Results in Irreparable Injury**

To establish irreparable harm, a plaintiff must demonstrate that "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). Accordingly, "only harm shown to be non-compensable in terms of money damages" can be properly deemed irreparable and form the basis for injunctive relief. *Wisdom Import Sales,* 339 F.3d at 113-14.

The Second Circuit has held that the subversion of a bargained-for veto right can result in irreparable harm. *See Wisdom Import Sales*, 339 F.3d at 114-15. The right "to block certain transactions is strategic," in that it creates bargaining leverage against the party that would like to see the transaction proceed. *Id.* at 114. The veto, in other words, has "intrinsic value" as a "trump card of sorts." *Id.* A weaker party that may otherwise be at a bargaining disadvantage can strategically invoke a contractually secured veto right to preserve a certain "balance of power" within the relationship. *Id.* Crucially, the "intrinsic value" of such a right cannot be redeemed in a suit for money damages. *See id.* at 114-15. This is because a party could systematically override the veto, and then, if sued at law, argue that the vetoed transaction nevertheless was "a good one and, therefore, no harm, irreparable or otherwise result[ed]." *Id.* at 114. For this reason, "[t]he only way to render [a veto right] truly viable is to enforce it." *Id.*

In *Wisdom Import Sales*, the parties had entered a joint-venture agreement to establish a U.S. distribution infrastructure for their respective beer brands. *See id.* at 104. The plaintiff owned a 30% stake in the venture and the defendant owned a 70% stake. As a minority shareholder, the plaintiff ceded day-to-day control over the distributorship's operations to the defendant, but bargained for and obtained a right to veto transactions involving certain

32

"fundamental matters." *Id.* at 105.  Sometime after the agreement was executed, the plaintiff validly exercised its veto to block the integration of Beck's beers, recently acquired by the defendant, into the distributorship's portfolio. *See id.* at 113.  After the defendant disregarded the veto and began integrating the Beck's brand, the Plaintiff sought and obtained a preliminary injunction enjoining the transaction, valued at over $300 million.  The Court found that the plaintiff had been irreparably harmed, concluding that the veto right could only be realized through specific enforcement. *Id.* at 114.

   *Wisdom Import Sales* concerned the balance of power in corporate governance, but its reasoning has been extended to other contexts. *See Oracle Real Estate Holdings I LLC v. Adrian Holdings Co. I, LLC*, 582 F. Supp. 2d 616, 625-27 (S.D.N.Y. 2008) (denying plaintiff bargained-for contract remedy under which defendants' interests in joint venture transferred to the plaintiff would cause plaintiff irreparable injury); *Int'l Equity Inv., Inc., v. Opportunity Equity Partners, Ltd.*, 407 F. Supp. 2d 483, 496-98 (S.D.N.Y. 2005) (irreparable harm from defendants' efforts to dilute plaintiffs' voting and control rights in telecommunications company); *CanWest Global Comm'ns. Corp. v. Mirkaei Tikshoret Ltd.*, 804 N.Y.S. 2d 549, 571 (N.Y. Sup. N.Y. Co. 2005) (loss of the right to participate in management constitutes irreparable harm); *see also Gitlitz v. Bellock*, 171 P.3d 1274, 1279-80 (Colo. Ct. App. 2007) (collecting cases).

   A recent application of *Wisdom Import Sales* by this Court is instructive. *See CDC Group PLC v. Cogentrix Energy, Inc.*, 354 F. Supp. 2d 387 (S.D.N.Y. 2005).  The parties in *CDC Group* were involved in a joint venture to construct a power plant and sell power. *See id.* at 388.  Each party had a subsidiary (CDC Holdings and Cogentrix International) which, in turn, held an ownership stake in the entity that had obtained a concession for the project from the Dominican Republic. *Id.*  The parties' agreement required them each to maintain their

33

ownership interests in their respective subsidiaries for seven years from the start of commercial operation of the power plant. *See id.* at 389-90. After the defendant took steps to sell its shares in its subsidiary to a third party, the plaintiff sued to enjoin the sale. *See id.* at 388-89. In granting a preliminary injunction, this Court reasoned that the plaintiff had bargained for a binding and stable partnership with the defendant, *see id.* at 390, and thus for protection against the substitution of a different party that might be "operationally unknowledgeable [or] fickle in its commitment to the Project," *id.* at 393. Relying on *Wisdom Import Sales*, this Court recognized that "[t]he only way to render viable the prohibition on either of the corporate parents transferring a majority interest . . . is to enforce it." *Id.* at 394.

The circumstances here are analogous to those in *CDC Group* and fall amply within the broad principles announced in *Wisdom Import Sales*. To begin with, there can be no dispute that Cablevisión bargained for and acquired an unambiguous right to block proposed assignments of JPMorgan's rights and obligations under the Credit Agreement. As in *CDC Group*, this right to block or "veto" proposed assignments gives Cablevisión the ability to control the identity of its contracting partner. Cablevisión specifically bargained for the right to insist that its lending relationship be with JPMorgan or a suitable assignee, not some third-party whose commitment to a fruitful lending relationship could not be trusted. *See CDC Group*, 354 F. Supp. 2d at 393-94.

Moreover, Cablevisión's veto right functions to preserve a delicate "balance of power" struck by the Credit Agreement. *Wisdom Import Sales*, 339 F.3d at 114 (focusing on veto rights that "preserve[] an agreed-upon balance of power"). It does this by diminishing the oppressive force of the Credit Agreement's negative covenants. Cablevisión's veto, if invoked, hinders JPMorgan's ability to reduce its exposure under the Credit Agreement through syndication (JPMorgan's stated intention all along). Thus, the veto gives Cablevisión "a trump card of

34

sorts," *see Wisdom Import Sales*, 339 F.3d at 114 – one that can be employed to generate

leverage to, among other things, more effectively negotiate waivers to the Credit Agreement's

restrictive covenants.  This is what happened earlier this year, when Cablevisión rebuffed

JPMorgan's effort to impose onerous conditions on consent to a request for a waiver of the

Credit Agreement limits on Cablevisión's capital expenditures.  *See* Phillips Dec. at ¶¶ 37, 41.

**B.    <u>Competitive Injuries Resulting from this Assignment are Irreparable</u>**

Cablevisión is also irreparably harmed by the competitive injury that will result from the

assignment of 90% of the Credit Agreement to a financial institution under common control with

a key competitor of Cablevisión.  Generally speaking, "[t]he potential loss of market advantage

has been recognized to constitute irreparable harm," *Muze, Inc. v. Digital On-Demand, Inc.*, 123

F. Supp. 2d 118, 131 (S.D.N.Y. 2000), because "it would be very difficult to calculate monetary

damages that would successfully redress the loss of a relationship with a client that would

produce an indeterminate amount of business in years to come," *Ticor Title Ins. Co. v. Cohen*,

173 F.3d 63, 69 (2d Cir. 1999) (violation of covenant not to compete results in irreparable harm);

*accord Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (solicitation of

customers identified through publically available information on plaintiff's website caused

irreparable harm); *see also Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d

525, 532 (S.D.N.Y. 2004)  ("loss of client relationships and customer good will built up over the

years constitutes irreparable harm").

Here, the threat of competitive injury arises, first, because the JPMorgan-Banco Inbursa

agreement gives Banco Inbursa access to Cablevisión's most confidential information, including

highly sensitive business plans and financial projections.  As discussed above, it was an essential

part of the bargain that Banco Inbursa "would receive all information sent by the Borrower," and

JPMorgan amended the wording of Section 3.01 of the JPMorgan-Banco Inbursa agreement "to

indicate that we'll send you all the information that the loan's Lenders receive." JPM-0003252.

This gives Banco Inbursa's affiliate Telmex a significant competitive advantage in the "triple play" and more general telecommunications markets, and at Cablevisión's expense. As this Court has held, the disclosure of confidential information to a competitor typically results in irreparable injury, "given the difficulty in ascertaining empirically how much of a competitive advantage such information" provides. *Estee Lauder Cos. Inc. v. Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (finding irreparable injury based in part on the likely disclosure to a competitor of "confidential information about the stage of development of products in the pipeline"); *Muze*, 123 F. Supp. 2d at 129-31 (S.D.N.Y. 2000) (ruling that unauthorized use of plaintiff's database granted competitor advantage, causing plaintiff to suffer irreparable harm); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn*, 73 F. Supp. 2d 425, 428 (S.D.N.Y. 1999) (holding that the threat of lost business resulting from the misappropriation of confidential records constituted irreparable harm).[14] The competitive injury that Cablevisión would experience if Telmex were to obtain the information available to Banco Inbursa under its agreement with JPMorgan is impossible to quantify, and thus, by definition, irreparable. Banco Inbursa has every opportunity, and every incentive, to prevent Cablevisión from developing customer relationships that would otherwise generate "an indeterminate amount of business in years to come." That constitutes irreparable harm. *See Ticor Title Ins. Co.*, 173 F.3d at 69.

In addition, JPMorgan has ceded to Banco Inbursa all the Lender's rights under the Credit Agreement if a default should occur – including the right, when Cablevisión's chips are

---

[14]    These decisions were not weakened by the Second Circuit's recent decision in *Faiveley Trans. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009). *Faiveley* rejected the proposition that the misappropriation of a trade secret creates an automatic presumption of irreparable harm, but in doing so, it did not cast doubt on the widely shared view that competitive injuries arising from the release of confidential information are difficult to quantify and thus often irreparable. *See id.* at 118-19.

down, so to speak, to call the loan and require immediate payment. Such loan acceleration would cripple Cablevisión's ability to compete. To be sure, Banco Inbursa might assert that it could exercise disinterested control over the Lender's rights in such circumstances. But common sense counsels that Cablevisión will be irreparably harmed if forced to rely on an entity under common control with Cablevisión's prime competitor. *See Berliner Foods Corp. v. Pillsbury Co.*, 633 F. Supp. 557, 559-60 (D. Md. 1986) (manufacturer irreparably harmed by assignment of distributorship to a competitor, because "defendants need a distributor of whose loyalty they can be assured" and because "it defies common sense to require a manufacturer to leave the distribution of its products to a distributor under the control of a competitor or potential competitor"); *accord Sally Beauty Co. v. Nexxus Prods. Co.*, 801 F.2d 1001, 1007 (7th Cir. 1986) (agreeing with *Berliner's* analysis in damages action).

## V.   THE BALANCE OF HARDSHIPS TIPS SHARPLY IN CABLEVISIÓN'S FAVOR

Based on Cablevisión's showing of irreparable harm and a likelihood of success on the merits, a preliminary injunction should issue. However, even if Cablevisión had not shown a likelihood of success on the merits, a preliminary injunction should nonetheless issue as Cablevisión has, at a minimum, shown a "fair ground for litigation" and that the balance of hardships tips strongly in favor of the party seeking injunctive relief. *N. Atl. Instruments*, 188 F.3d at 43. "To demonstrate that the balance of hardships tips in its favor, a movant must show that the harm it would suffer absent the relief sought is substantially greater than the harm the opposing party would suffer if relief were granted." *Clemente Global Growth Fund, Inc. v. Pickens*, 705 F.Supp. 958, 971 (S.D.N.Y. 1989). Put differently, "the balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Tradescape.com v. Shivaram*, 77 F.Supp. 2d 408, 411 (S.D.N.Y. 1999).

Here, injunctive relief would not impede JPMorgan's ability to collect regular interest payments from Cablevisión under the Credit Agreement pending a trial on the merits. Nor would an injunction threaten JPMorgan's ability to re-enter the same arrangement it has made with Banco Inbursa, or a similar arrangement, should JPMorgan prevail on the merits. *See CDC Group*, 354 F. Supp. 2d at 394 (enjoining defendant's transfer of an ownership interest in a subsidiary would not irreparably harm defendant, absent showing that similar transfer could not be  arranged after trial on the merits).

Any complaint by JPMorgan that a preliminary injunction would force JPMorgan to carry the entire Cablevisión loan on its own books, at least temporarily, cannot outweigh the competitive harm to Cablevisión caused by transferring 90 percent of the loan to Banco Inbursa. Moreover, such an argument by JPMorgan ignores that (a) JPMorgan itself declined to pursue HSBC Bank's offer to acquire a $40 million interest in the loan, or to follow-up in good faith with other banks acceptable to Televisa; and (b) JPMorgan rebuffed the offer by Grupo Televisa to purchase the entire loan on terms more favorable to JPMorgan than those being offered by Banco Inbursa.

It must also be noted that  even if JPMorgan were to suffer some modicum of harm from the issuance of a preliminary injunction, such harm would be entirely attributable to JPMorgan's decision knowingly to enter into an agreement with Banco Inbursa over Cablevisión's express objection. *See Pickens*, 705 F. Supp. at 971 (granting preliminary injunction against defendants that "entered a risky business knowingly").

## VI.   PARTIAL REFORMATION IS NOT AN ADEQUATE REMEDY HERE

Section 9.04(b) of the Credit Agreement specifically states that "[a]ny assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection (b) shall be treated for purposes of this Agreement as a sale by such Lender of a

participation in such rights and obligations in accordance with subsection (e) of this Section."
Phillips Dec., Ex. 8. Cablevisión thus expects JPMorgan to argue that, to the extent the Court
finds the JPMorgan-Banco Inbursa Agreement to be an invalid assignment, the Court should
merely reform that agreement to meet the definition of a participation. Cablevisión respectfully
submits that such partial reformation would not be sufficient to equitably remedy the
circumstances here.

Cablevisión seeks only to enforce its own contractual rights vis-à-vis JPMorgan. *See
generally MasterCard Int'l Inc. v. Visa Int'l Service Ass'n, Inc.*, 471 F.3d 377, 386 (2d Cir.
2006). Cablevisión thus seeks an injunction preventing JPMorgan from honoring the terms of
the JPMorgan-Banco Inbursa agreement pending a trial on the merits. New York law permits a
court in equity to fashion whatever remedy justice may require. *Ebker v. Tan Jay Intern. Ltd.*,
741 F.Supp. 448, 466 (S.D.N.Y. 1990) ("A distinguishing feature of equity is the application of
settled rules to unusual conditions and the molding of its decrees so as to do equity between the
parties. The power of equity is as broad as equity and justice require.") (internal citations
omitted), *aff'd*, 930 F.2d 909 (2d Cir. 1991). At least one court interpreting Second Circuit
precedent has held that a court "may enforce part but not all of an agreement either to fulfill the
parties' actual intention or to remedy harm caused by unconscionable or inequitable conduct by
one of the parties." *Gatewood v. U.S. Cellular Corp.*, 953 F.2d 1393, 1397(D.C. Cir. 1992)
(citing Second Circuit decisions) (internal citations omitted).

New York Courts have shown particular willingness to order injunctive relief that differs
from the language of a contract where, as here, a party has acted in bad faith or has, through
breach of the contract, prejudiced the other party's business interests. In *Grand Union Co. v.
Cord Meyer Dev. Co.*, 761 F.2d 141 (2d Cir. 1985), for example, the Second Circuit upheld a

39

lower court order enjoining a breaching party from entering into negotiations with the other

party's competitor.  The Court held that, "[a]though the injunction is broad, it is consistent with

the court's equitable  power to devise whatever remedy it believes in its discretion is necessary to

make injured parties whole." *Id.* at 147; *see also McFarland v. Gregory*, 322 F.2d 737, 739 (2d

Cir. 1963) (affirming district court's order, even though it went beyond the terms of the contract,

and holding that a court's order of specific performance "need not be identical with that

promised in the contract.").

**CONCLUSION**

For the foregoing reasons, Plaintiff Cablevisión respectfully requests that this Court grant

its application for a preliminary injunction.

Dated:   New York, New York
         December 17, 2009

Respectfully submitted,

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP

By: *Stephen R. Neuwirth*
     Stephen R. Neuwirth
     Daniel P. Cunningham
     Judd R. Spray

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*stephenneuwirth@quinnemanuel.com*
*danielcunningham@quinnemanuel.com*
*juddspray@quinnemanuel.com*

*Attorneys for Plaintiff*
*Empresas Cablevisión, S.A.B. de C.V.*