UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EMPRESAS CABLEVISIÓN, S.A.B. DE
C.V.,

Plaintiff,

-against-

JPMORGAN CHASE BANK, N.A. and J.P.
MORGAN SECURITIES INC.,

Defendants.

09 Civ. 9972 (MGC) (JSR)

**FILED UNDER SEAL**

## DECLARATION OF GUADALUPE PHILLIPS MARGAIN

Guadalupe Phillips Margain, under penalty of perjury, declares as follows:

1.     I submit this Declaration in support of the application by Plaintiff Empresas
Cablevisión, S.A.B. de C.V. ("Cablevisión") for a preliminary injunction against Defendants
JPMorgan Chase Bank, N.A. and J.P. Morgan Securities Inc.  Unless otherwise indicated, I have
personal knowledge of the facts set forth herein.

2.     I have a law degree from the Instituto Tecnológico Autónomo de México.  I also
have a Masters degree in international affairs, with a concentration on business and finance, from
the Fletcher School at Tufts University, where I am now a Ph.D. candidate.

3.     I have been involved in banking and finance since 1994, when I worked at the
Mexican Ministry of Finance.  From 1994 to 1996, I was involved in the process of liberalizing
the Mexican banking sector.  I later worked as an associate at Enron Corporation.

4.     I am currently the Director of Finance and Risk at Grupo Televisa, S.A.B.
("Grupo Televisa"), a Mexican telecommunications company that owns approximately 51% of

Cablevisión's publicly-traded shares. I work in Grupo Televisa's headquarters in Mexico City,
Mexico. I have been with Grupo Televisa since June 2000, and have held my current position
since February 2004. My primary areas of responsibility at Grupo Televisa include corporate
finance, treasury and risk management for Grupo Televisa and its subsidiaries. As part of my job
responsibilities, we consolidate the corporate finance activities of Grupo Televisa's subsidiaries,
including Cablevisión, and we act as internal advisors to such entities for all their investment
banking activities; likewise, I was Cablevisión's Chief Financial Officer during the period of
April 2002 through February 2004.

5.      Cablevisión, a Mexican company that is publicly-traded on the Mexican Stock
Exchange, sells cable television and telecommunications services to consumers in Mexico. In
2002, Cablevisión started providing cable internet service to residential and business subscribers.
In November 2003, Cablevisión began a process of reengineering its technological infrastructure
to, among other things, increase its bi-directional capacity and replace analog signaling with
digital signaling. Since July 2007, Cablevisión has used this bi-directional capacity to offer
customers a "triple play" package that currently combines access to over 270 digital television
channels, high-speed internet access, and unlimited local telephone calling.

6.      This is a critical juncture in Cablevisión's competitive history, as the company
seeks to capture a share in the pay television, internet and telephone service markets.

7.      Attached hereto as Exhibit 1 is a true and correct copy of a February 2009
"Confidential Information Memorandum" prepared by JPMorgan.

8.      Teléfonos de México, S.A.B. de C.V. ("Telmex"), the telecommunications
conglomerate also based in Mexico City, is among Cablevisión's chief competitors in the

telecommunications market, in connection with internet and telephone land lines, and potentially in the pay television market.

9.      Attached hereto as Exhibit 2 are true and correct excerpts from Telmex's Form 20-F, filed with the Securities and Exchange Commission, for the year ended December 31, 2008.

10.     Attached hereto as Exhibit 3 are true and correct excerpts from the Annual Report of Carso Global Telecom, S.A.B. de C.V. for the year ended December 31, 2008.

11.     Attached hereto as Exhibit 4 is a true and correct copy of an article titled "Mexico Antitrust Agency: Telmex Dominant In Call Completion," dated November 6, 2009, published by Dow Jones & Company, Inc.

12.     Attached hereto as Exhibit 5 is a true and correct copy of an article titled "Mexico Publishes Bidding Rules For Wireless Auction," dated November 23, 2009, published by Dow Jones & Company, Inc.

13.     Attached hereto as Exhibit 6 are true and correct excerpts of the 2008 Annual Report of Grupo Financiero Inbursa, S.A.B. de C.V.

14.     Attached hereto as Exhibit 7 are true and correct excerpts from Carlos Slim Helú's website, www.carlosslim.com, printed on November 29, 2009.

15.     Grupo Televisa and its affiliates for many years had a strong business relationship with JPMorgan and its predecessor companies. In 2000, for example, JPMorgan lent Televisa money and advised Televisa in connection with a transaction concerning the Spanish digital platform Via Digital. Between 2001 and 2008, Grupo Televisa and its affiliates borrowed over $700 million from JPMorgan through loan facilities. Between 2000 and 2008, Grupo Televisa and its affiliates retained JPMorgan as a co-lead or lead manager to issue and purchase over $2.6

3

billion in debt issuances. Between 1999 and 2007, Televisa and its affiliates entered into with
JPMorgan approximately $1 billion notional value of derivative instruments. Televisa and its
affiliates also maintained investments with JPMorgan between 2003 and 2009, that when
measured at year end ranged in value from approximately $140 million to in excess of $1 billion.
Moreover, JPMorgan advised Grupo Televisa in connection with mergers and acquisitions,
including Televisa's acquisition in 2005 of a 40 percent stake in the Spanish over-the-air
television station "La Sexta." And Grupo Televisa maintains over 162 active checking accounts
at JPMorgan.

16.     Cablevisión owns 69.20% of Cablestar and, as of December 2007, Cablemás and
TVI each owned 15.40% of Cablestar. In June 2009, Grupo Televisa acquired TVI's
indebtedness under its credit facility with JPMorgan. In July 2009, Grupo Televisa exchanged
its account receivable in connection with such credit facility for the 15.4% interest TVI held in
Cablestar. In December 2007, Cablestar paid $325 million to acquire shares of companies
owning the majority of the assets of Bestel, which operated the third-largest national fiber-optic
network in Mexico. Cablevisión contributed $225 million, and Cablemás and TVI each
contributed $50 million, for Cablestar's payment.

17.     To finance the acquisition of companies owning the majority of the assets of
Bestel by Cablestar, Plaintiff Cablevisión, Cablemás and TVI each entered into loan facilities
with Defendant JPMorgan. Cablevisión borrowed $225 million from JPMorgan pursuant to a
credit agreement, dated December 19, 2007 (the "Credit Agreement"), and a promissory note
dated December 21, 2007 (the "Promissory Note"). Attached hereto as Exhibit 8 is a true and
correct copy of the Credit Agreement. Attached hereto as Exhibit 9 is a true and correct copy of

the Promissory Note.  Pursuant to separate credit agreements, Cablemás and TVI each borrowed $50 million from JPMorgan.

18.     In exchange for lending $225 million to Cablevisión, JPMorgan received, inter alia, certain assurances with regard to the management of Cablevisión's affairs going forward. These assurances are expressed as negative covenants in the Credit Agreement.  Among the negative covenants are restrictions on Cablevisión's ability to incur debt, make fundamental changes, undertake investments, sell assets, expend capital, and leverage its business.  *See* Ex. 8 hereto at Article 6, "NEGATIVE COVENANTS."  Information about debt, mergers, investments, asset sales, capital expenditures, and debt leveraging are among the categories of highly-sensitive competitive information that are implicated by the restrictive covenants in the Credit Agreement.

19.     Cablevisión and JPMorgan negotiated the terms of the Credit Agreement in late 2007.  At that time, Cablevisión was aware of JPMorgan's intention to syndicate and assign 90% of the $225 million loan, along with 90% of Cablemás and TVI's loans, shortly after the transaction closed.  Cablevisión recognized that syndication would cede control over the loan to third-party institutions, along with the right to enforce the restrictive covenants described above, and therefore bargained for and received the right unilaterally to veto proposed loan assignments. *See* Ex. 8 hereto at § 9.04(b).

20.     It is not unusual for a lender, particularly of a sum as large as $225 million, to condition its loan on the acceptance of negative covenants like those described above.  One implication of such restrictions is to give the borrower a keen interest in limiting the lender's ability to assign the loan, and the attendant right to enforce the restrictive covenants, to a third party unacceptable to the borrower.  Given the large size of Cablevisión's loan, it was likely that Cablevisión would seek waivers or modifications of the negative covenants or other terms in the

Credit Agreement in light of business exigencies and opportunities. By securing the right to veto proposed assignments unilaterally, Cablevisión obtained assurance that an unsuitable party could not step into JPMorgan's shoes and exercise control over the loan and its restrictive covenants. This veto right is critical to the balance of power between the lender and the borrower.

21.     On May 8, 2009, for example, Cablevisión negotiated an amendment to the Credit Agreement's restrictions on capital expenditure in order to respond to business opportunities for growth. Attached hereto as Exhibit 10 is a true and correct copy of the amendment to the Credit Agreement that Cablevisión and JPMorgan executed on May 8, 2009. Cablevisión would not want to conduct crucial negotiations of this sort with an uncooperative or adverse assignee.

22.     On November 16, 2007, before the loan documents were even finalized, Mr. Raymundo Langlois of JPMorgan emailed a number of Grupo Televisa employees, including me, to ask for Grupo Televisa's preferences with regard to banks that might participate in the syndication. Attached hereto as Exhibit 11 are a true and correct copy of Mr. Langlois's November 16, 2007, email and a certified English translation thereof.

23.     Attached hereto as Exhbit 12 are a true and correct copy of an email from Mr. Langlois to me and others, dated November 20, 2007, and a certified English translation thereof.

24.     JPMorgan and Grupo Televisa worked together throughout 2008 to try to syndicate the Bestel loans, but they were unsuccessful.

25.     During the period when the foregoing syndication efforts were underway, Grupo Televisa continued to treat JPMorgan as a valued business partner, consistent with their long-term relationship. In early 2008, when Grupo Televisa announced its intention to pursue a debt offering, JPMorgan sought to be a lead underwriter of the offering. Attached hereto as Exhibit

6

13 is a true and correct copy of a February 15, 2008, email from Mr. Langlois to various persons at Grupo Televisa. JPMorgan was one of many suitors for this business.

26.     Grupo Televisa chose J.P. Morgan Securities Inc. and HSBC Securities (USA) Inc. to act as lead underwriters of the bond offering. In May 2008, Grupo Televisa issued $500 million in ten-year notes.

27.     In a June 17, 2008, plan titled 'Syndication Strategy,' JPMorgan proposed to Cablevisión and Grupo Televisa a five-step strategy for syndicating the loans to Cablevisión, Cablemás and TVI. Attached hereto as Exhibit 14 are a true and correct copy of an email from Mr. Langlois, dated June 17, 2008, and a certified English translation thereof. The 'Syndication Strategy' attachment to Mr. Lanlois's email, also attached hereto as Exhibit 14, was originally drafted in English.

28.     Tightening credit markets worldwide made syndication of the three Grupo Televisa loans difficult. By the end of 2008, JPMorgan had not been able to syndicate a portion of any of the three credit facilities.

29.     In late 2008, JPMorgan asked Cablevisión to modify the terms of the Credit Agreement by agreeing to a higher interest rate on its $225 million loan. Grupo Televisa and Cablevisión understood that Cablevisión had no contractual obligation to modify the terms of the Credit Agreement, but Cablevisión nevertheless agreed to JPMorgan's request. Attached hereto as Exhibit 15 is a true and correct copy of the December 22, 2008, amendment to the Credit Agreement.

30.     In January 2009, JPMorgan and the Televisa parties exchanged communications on syndication strategy. Attached hereto as Exhibit 16 are a true and correct copy of an email from Mr. Langlois to me and others, dated January 8, 2009, and a certified English translation of

the same. The attachment to Mr. Langlois's email, which is also attached hereto as Exhibit 16, was originally written in English.

31.     JPMorgan stated during this period that it wanted to complete syndication of the Cablevisión prior to the start of the second calendar quarter of 2009, so that by that time the loan would no longer be registered on JPMorgan's accounting books. Among other things, JPMorgan asked Televisa itself to purchase, either in whole or in part, the Cablemás and TVI loans. In response, Televisa proposed a financial strategy, including an investment in the loans by means of JPMorgan structured notes, instead of a direct acquisition of the loans. JPMorgan declined this proposal.

32.     Attached hereto as Exhibit 17 are a true and correct copy of an email from Pablo Camacho, a Grupo Televisa corporate finance director who reports to me, to JPMorgan, dated February 4, 2009, and a certified English translation thereof.

33.     On March 9, 2009, at the request of JPMorgan's Jackie Truzzell, representatives of JPMorgan and Televisa met again to discuss the status of ongoing negotiations with banks. At the time, it appeared that at least three banks – HSBC, BNP Paribas and Scotia Bank, all acceptable to the Televisa parties – were prepared to acquire interests in the loans, though JPMorgan indicated that the terms being offered were not sufficiently attractive from its perspective. Upon information and belief, however, the per dollar acquisition price offered by these banks was higher than what Banco Inbursa was later offering to pay to acquire 90 percent of Cablevisión's $225 million loan.

34.     Attached hereto as Exhibit 18 are a true and correct copy of an email from Gilberto Sotelo of JPMorgan, to me and others, dated March 11, 2009, and a certified English translation thereof.

8

35.     Attached hereto as Exhibit 19 is a true and correct copy of an email string among various persons at JPMorgan and Grupo Televisa, including me, between March 9 and March 13, 2009, and a certified English translation thereof.

36.     Attached hereto as Exhibit 20 is a true and correct copy of an email from Mr. Langlois to me and others, dated March 13, 2009.

37.     In late March 2009, JPMorgan's Raymundo Langlois insisted that Televisa itself acquire the Cablemás and TVI loans. Televisa was reluctant to agree. During this same period, Cablevisión requested a waiver to the negative covenant in the Cablevisión Credit Agreement that placed a limit on Cablevisión's capital expenditures. Cablevisión sought this waiver to permit key expenditures on growth Cablevisión deemed critical to securing its competitive position in the telecommunications space, and more specifically in the emerging Triple Play market. JPMorgan responded to this waiver request by conditioning the granting of a waiver on Grupo Televisa agreeing to acquire the Cablemás and TVI loans – precisely the type of exercise of power by the lender that Cablevisión's veto right in the Credit Agreement was meant to counterbalance.

38.     Attached hereto as Exhibit 21 are a true and correct copy of an email from Mr. Langlois to me and others, dated March 26, 2009, and a certified English translation thereof.

39.     Attached hereto as Exhibit 22 are a true and correct copy of an email exchange between Mr. Sotelo and me, dated March 29-30, 2009, and a certified English translation thereof.

40.     Attached hereto as Exhibit 23 are a true and correct copy of an email exchange between various people at JPMorgan and Grupo Televisa, including me, between April 8 and April 16, 2009, and a certified English translation thereof.

41.     JPMorgan's Gilberto Sotelo requested a discussion between senior officers of both Grupo Televisa and JPMorgan to discuss the proposed waiver and the Cablemás and TVI loans. Ultimately, at a meeting with officers of Grupo Televisa and JPMorgan, JPMorgan withdrew the condition it had initially placed on approval of the capital expenditure covenant waiver, and JPMorgan in May 2009 agreed to a Second Amendment of the Cablevisión Credit Agreement, raising the amount of capital expenditures Cablevisión would be permitted to make.

42.     By May 2009, JPMorgan was still attempting to syndicate Cablevisión's $225 million loan. On May 7, 2009, JPMorgan's Mr. Langlois sent an e-mail to America Castillo, a junior employee of Grupo Televisa, with a revised Information Memorandum for prospective assignees of and/or participants in Cablevison's loan. This revised version of the Information Memorandum included only public information from Cablevisión, and Mr. Langlois asked Ms. Castillo to check the accuracy of the revised information memorandum. Part of the revised information memorandum was a proposed letter in which Cablevisión would grant JPMorgan authorization to deliver the revised Information Memorandum and evaluation material to representatives of potential lenders that identified themselves as "public-siders." Attached hereto as Exhibit 24 and a true and correct copy of Mr. Langlois's May 7, 2009, email to Ms. Castillo, and a certified English translation thereof. The "Information Memorandum" prepared by JPMorgan and attached to Mr. Langlois's email was originally written in English.

43.     Mr. Langlois's email to Ms. Castillo represents the first time, since the Credit Agreement had been executed in 2007, that JPMorgan had requested that the Information Memorandum exclude Cablevisión's confidential information; this was also the first time that JPMorgan did not identify by name the potential acquirer(s) of interest in the Cablevisión loan.

10

44.     The very next day—May 8, 2009—Julian Lautersztain of JPMorgan requested
that Ms. Castillo execute a letter drafted by JPMorgan pursuant to which Cablevisión would
authorize Banco Inbursa to obtain a Credit Bureau report on Cablevisión. Attached hereto as
Exhibit 25 are a true and correct copy of an email exchange between Mr. Lautersztain and Ms.
Castillo, dated May 8, 2009, and a certified English translation thereof.

45.     I understand from Ms. Castillo that she did not recognize the potential
significance of this request, and, perceiving it to be routine, provided the requested authorization
to JPMorgan by email on May 15, 2009. Attached hereto as Exhibit 26 are true and correct
copies of Ms. Castillo's May 15, 2009, email, its attachment, and certified English translations
thereof.

46.     Attached hereto as Exhibit 27 are a true and correct copy of an email chain among
various persons at JPMorgan and Grupo Televisa, between May 7, 2009, and May 21, 2009, and
a certified English translation thereof.

47.     On May 21, 2009, at approximately 9 a.m. Mexico City time, a representative of
HSBC Bank informed Pablo Camacho, a Grupo Televisa corporate finance director who reports
to me, by telephone that JPMorgan had advised HSBC – which previously had indicated an
interest in purchasing as much as 40 million dollars of notional amount of the Cablevisión loan –
that the Cablevisión loan was no longer on the market. Within one hour, at approximately 10
a.m. Mexico City time, I contacted Gilberto Sotelo at JPMorgan to ask if the Cablevisión loan
had been sold to Banco Inbursa. Mr. Sotelo, presumably recognizing that such a sale would have
been intolerable from Cablevisión's perspective, denied that any such sale had been made.

48.     But then, just before 4:00 p.m. Mexico City time that same day, Mr. Lautersztain
of JPMorgan sent to Ms. Castillo and others at Grupo Televisa (but not me) a written request for

11

Cablevisión's approval of the assignment to Banco Inbursa of 90 percent of the Cablevisión loan. Attached hereto as Exhibit 28 is a true and correct copy of Mr. Lautersztain's May 21, 2009, email and its attachment, a proposed "Assignment and Assumption."

49.     The next day, May 22, 2009, Mr. Sotelo of JPMorgan telephoned me and requested that Cablevisión immediately consent to the assignment to Banco Inbursa of 90% of JPMorgan's interest in the Cablevisión loan.  Mr. Sotelo implied that JPMorgan had in fact already agreed to assign the loan to Banco Inbursa.  When I indicated that such an assignment would be unacceptable to Cablevisión and Grupo Televisa, Mr. Sotelo asserted that since Ms. Castillo had authorized Banco Inbursa to review Cablevisión's information at the Credit Bureau, JPMorgan had assumed Televisa did not oppose a possible assignment to Banco Inbursa.  In response, I emphatically told Mr. Sotelo that such assignment was a problem for Grupo Televisa and Cablevisión.

50.     Later that day, I sent an email to JPMorgan to make it clear that Cablevisión had not consented in writing or otherwise to any assignment to Banco Inbursa.  Attached hereto as Exhibit 29 is a true and correct copy of my May 22, 2009, email.  I wrote that Grupo Televisa would analyze JPMorgan's request.  After thorough analysis and review, Cablevisión refused to sanction an assignment of the loan and its restrictive covenants to a close affiliate of one of its chief competitors.

51.     On June 3, 2009, as a courtesy and in order to avoid surprising JPMorgan, I called Mr. Ruiz de Gamboa at JPMorgan to reiterate that Cablevisión had not consented, in writing or otherwise, to the proposed assignment to Banco Inbursa.  Significantly, Mr. Ruiz de Gamboa threatened to give Banco Inbursa the 90 percent interest in the loan in the form of a "participation" – suggesting that JPMorgan was willing to bypass Cablevisión's exercise of its

12

contractual veto right and further indicating that any such arrangement would really be an assignment dressed up as something else. Later that same day, I sent JPMorgan an email attaching a letter in which Cablevisión, through its counsel, confirmed that Cablevisión did not consent to the proposed assignment to Banco Inbursa. Likewise, and as a result of Mr. Ruiz de Gamboa's threat to give Banco Inbursa the 90 percent interest by means of a purported "participation," Cablevisión decided specifically and clearly to address that issue and expressed the same concerns about selling a participation to Banco Inbursa, warning JPMorgan that, "[i]f JPMorgan were to sell a participation to Inbursa, we believe such a sale would be a violation of JPMorgan's duty of good faith under the Credit Agreement." Attached hereto as Exhibit 30 are a true and correct copy of my June 3, 2009, email and a certified English translation thereof. The attached letter was originally written in English.

52.     To prevent Banco Inbursa from exercising control over Cablevisión's affairs through the restrictive covenants in the Credit Agreement and to protect Cablevisión's confidential business information, Cablevisión and Grupo Televisa entered into discussions with JPMorgan to purchase the portion of the loan that JPMorgan intended to sell to Banco Inbursa, or even to buy the entire loan outright. Cablevisión and Grupo Televisa stated that they would match any offer made by Banco Inbursa, but had difficulty determining exactly what Banco Inbursa had offered to pay for its proposed assignment, or whether JPMorgan had already entered into some contractual agreement with Banco Inbursa.

53.     Grupo Televisa itself agreed to purchase 100% of the TVI loan from JPMorgan in June 2009. By accepting the assignment, Grupo Televisa significantly reduced JPMorgan's exposure on a $50 million credit facility that JPMorgan had not been able to syndicate to other banks.

54.     Attached hereto as Exhibit 31 is a true and correct copy of an email from Jose Heredia Breton of Banco Inbursa to Grupo Televisa's CFO, Folch Viadero Salvi Rafael, dated June 11, 2009, and a certified English translation thereof.

55.     Attached hereto as Exhibit 32 is a true and correct copy of an email chain between Sjoerd Leenart of JPMorgan and Grupo Televisa's CFO, Folch Viadero Salvi Rafael, between June 16 and June 18, 2009.

56.     Attached hereto as Exhibit 33 is a true and correct copy of an email from Mr. Leenart to Mr. Folch, copying me and others, dated June 18, 2009.

57.     Attached hereto as Exhibit 34 is a true and correct copy of an email from Mr. Leenart to Mr. Folch, dated June 19, 2009.

58.     Attached hereto as Exhibit 35 is a true and correct copy of Mr. Folch's June 19, 2009, email.

59.     Attached hereto as Exhibit 36 is a true and correct copy of a letter from counsel for Grupo Televisa to Stephen Cutler of JPMorgan, dated June 23, 2009.

60.     I understand that JPMorgan did not respond to Grupo Televisa's June 23, 2009, letter. I understand, however, that in July 2009, during the annual conference of media moguls, investment bankers, and other business leaders sponsored by Allen & Co. in Sun Valley, Idaho, JPMorgan's vice chairman James "Jimmy" Lee told Mr. Alfonso de Angoitia, executive vice president of Grupo Televisa, that JPMorgan was eager to find a solution satisfactory to Televisa. Thereafter, on July 15, 2009, Mr. Lee sent an email to Mr. de Angoitia. Attached hereto as Exhibit 37 is a true and correct copy of Mr. Lee's July 15, 2009, email.

14

61.    Attached hereto as Exhibit 38 are a true and correct copy of an email from Juan Pablo Gasca of HSBC to various persons at Grupo Televisa, including me, dated July 27, 2009, and a certified English translation thereof.

62.    Attached hereto as Exhibit 39 are a true and correct copy of an email from Mr. Ruiz de Gamboa to me, dated August 5, 2009, and a certified English translation thereof.

63.    On August 18, 2009, JPMorgan assigned 90% of its interests in Cablemás's $50 million credit facility and Cablemás, which had its own contractual veto right under its own credit agreement with JPMorgan, consented to these assignments.

64.    I understand that, by late September 2009, neither "Gucho," referenced in the July 15 email from JPMorgan's vice chairman, Mr. Lee, nor anyone else from JPMorgan had contacted Televisa or Cablevisión to "resolve" the proposed assignment to Banco Inbursa of 90 percent of the Cablevisión loan. Attached hereto as Exhibit 40 is a true and correct copy of an email from Mr. de Angoitia of Grupo Televisa to Mr. Lee, dated September 29, 2009. I understand that Mr. Lee never responded to this email from Mr. de Angoitia.

65.    On November 6, 2009, I sent JPMorgan a letter to ask JPMorgan to confirm the sale of its interest in Cablevisión's loan to Banco Inbursa. Attached hereto as Exhibit 41 is a true and correct copy of my November 6, 2009, letter.

66.    Maarten Offeringa of JPMorgan responded to my November 6 letter on November 16, 2009, and did not deny that it had sold a 90% interest in Cablevisión's loan to Banco Inbursa. Attached hereto as Exhibit 42 is a true and correct copy of Mr. Offeringa's November 16, 2009, letter.

15

67.    On November 18, 2009, Grupo Televisa wrote to JPMorgan again, offering JPMorgan another chance to clarify the situation. Attached hereto as Exhibit 43 is a true and correct copy of Grupo Televisa's November 18, 2009, letter.

68.    JPMorgan responded by letter on November 19, 2009, again refusing to confirm or deny the existence of any agreement with Banco Inbursa. Attached hereto as Exhibit 44 is a true and correct copy of JPMorgan's November 19, 2009, letter.

69.    Attached hereto as Exhibit 45 is a true and correct copy of JPMorgan's fee letter, dated November 29, 2007.

70.    It is inconsistent with general practice in the credit markets for a party to acquire a very large participation in a loan, such as the 90 percent interest Banco Inbursa is acquiring from JPMorgan, because there is little or no incentive for a party to take on 90 percent of the risk of a loan without acquiring the corresponding rights of the lender to enforce the business terms of the loan (including any restrictive covenants) and seek redress against the borrower. It has been my experience and observation that the acquisition of large percentage interests in commercial loans is normally by means of an assignment or other instrument that gives the acquiring party the key rights of the lender with respect to the acquired portion of the loan.

71.    For this reason, and under all the circumstances described in this declaration, I believe it is implausible that Banco Inbursa would be acquiring a 90 percent interest in the Cablevisión loan by means of a participation as that term is defined in the Credit Agreement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 3, 2009, in Boston, Massachusetts.

_____

Guadalupe Phillips Margain